1  Center for Public Interest Law
   University of San Diego School of Law
2    Robert C. Fellmeth, SBN 49897
     Ed Howard, SBN 151936
3  5998 Alcala Park
   San Diego, CA 92110
4  Telephone:    (619) 260-4806
   Facsimile:    (619) 260-4753
5  cpil@sandiego.edu

6  Sullivan, Hill, Lewin, Rez & Engel           Hulett, Harper, Stewart
   A Professional Law Corporation                 Dennis Stewart, SBN 99152
7    Donald G. Rez, SBN 82615                      Kirk Hulett, SBN 110726
   550 West "C" Street, Suite 1500                 Jennifer Kagan, SBN 234554
8  San Diego, California 92101                   550 West "C" Street, Suite 1600
   Telephone:    (619) 233-4100                  San Diego, CA 92101
9  Facsimile:    (619) 231-4372                  Telephone:    (619) 338-1133
   rez@shlaw.com                                 Facsimile:    (619) 338-1139
10                                               dstewart@hulettharper.com

11  Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 14  MICHAEL SHAMES; GARY GRAMKOW, on behalf of themselves and on behalf of all persons similarly situated,  Plaintiffs,  v.  THE HERTZ CORPORATION, a Delaware corporation; DOLLAR THRIFTY AUTOMOTIVE GROUP, INC., a Delaware corporation; AVIS BUDGET GROUP, INC., a Delaware corporation; VANGUARD CAR RENTAL USA, INC., an Oklahoma corporation; ENTERPRISE RENT-A-CAR COMPANY, a Missouri corporation; FOX RENT A CAR, INC., a California corporation; COAST LEASING CORP., a Texas corporation; THE CALIFORNIA TRAVEL AND TOURISM COMMISSION and CAROLINE BETETA  Defendants. | Case No. 07CV2174 H BLM  **OPPOSITION TO MOTIONS TO DISMISS**  [CLASS ACTION]  Date:        April 1, 2008 Time:        10:30 a.m. Dept.:        13  Judge:        Hon. Marilyn L. Huff |

# **TABLE OF CONTENTS**

I.    INTRODUCTION .......................................................................................................... 1

II.   THE *TWOMBLY* STANDARD IS MET BY THE COMPLAINT HEREIN .......................... 4

    A.    *Twombly* Merely Requires Allegations Rendering A Conspiracy Plausible. .............. 4

    B.    Plaintiffs' Allegations Meet The *Twombly Standard.* .................................................. 6

    C.    Plaintiffs' Complaint Alleges Additional Plus Factors.............................................. 8

III.  DEFENDANTS HAVE NO STATE ACTION IMMUNITY AND PLAINTIFFS
      HAVE ANTITRUST STANDING......................................................................................... 9

    A.    There is No State Action Immunity Here. ................................................................. 9

        1.    The Rental Car Defendants Are Not Immunized........................................... 11

        2.    The CTTC Is Not Immunized. ....................................................................... 14

    B.    Plaintiffs Have Standing. ........................................................................................ 16

IV.   PLAINTIFFS' COMPLAINT STATES A PENDENT CAUSE OF ACTION FOR
      VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ................................ 17

    A.    The Government Code Does Not Bar Plaintiffs' UCL Claim. ................................. 18

    B.    Defendants' Antitrust Violations Establish That They Have Engaged In
        Unlawful Practices Under The UCL........................................................................ 19

    C.    Plaintiffs Have Alleged Facts Sufficient To Show Defendants Engaged In
        Deceptive Or Misleading Advertising Or Acted Fraudulently. ............................... 20

    D.    The Defendants' Acts Constitute "Unfair" Competition. ....................................... 22

    E.    Proposition 64 Does Not Bar the UCL Claim. ....................................................... 23

V.    CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*324 Liquor Corp. v. Duffy,*
    479 U.S. 335, 344-45 (1987) ................................................................... 12

*AFL-CIO v. Schermerhorn,*
    373 U.S. 746, 753 n.6 (1963) ..................................................................... 6

*Appalachian Coals v. U.S.,*
    288 U.S. 344, 359-360, 53 S. Ct. 471 (1933) ............................................. 9

*Arpin v. Santa Clara Valley Transp. Agency,*
    261 F.3d 912 (9th Cir. 2001) ..................................................................... 6

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. ___, ___, 127 S. Ct. 1955 (2007) ............................... 1, 4, 5, 6, 8

*Buller v. Sutter Health, et al., ___*
    Cal. Rptr. 3d ____, 2008 WL 588399 at *5 (March 5, 2008) ............... 22, 24

*California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,*
    445 U.S. 97, 100 S. Ct. 937 (1980) .................................................... 10, 11

*Cantor v. Detroit Edison Co.,*
    428 U.S. 579, 592-93, 96 S. Ct. 3110 (1976) .......................................... 16

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,*
    20 Cal. 4th 163 (1999) ..................................................................... 19, 22

*Citizens for a Better Environment v. Union Oil Co. of California,*
    996 F. Supp. 934 (N.D. Cal. 1997) .......................................................... 20

*Columbia Steel Casting Co., Inc. v. Portland General Elec. Co.*
    111 F.3d 1427 (9th Cir. 1996), *cert. denied,* 118 S. Ct. 1688 (1998) ............ 11

*Copperweld Corp. v. Independence Tube Corp.,*
    467 U.S. 752 (1984) ................................................................................. 19

*Corrections USA v. Dawe,*
    504 F. Supp. 2d 924 (E.D. Cal. 2007) ........................................................ 6

*Costco Wholesale Corporation v. Maleng,*
    514 F.3d 915 (9th Cir. 2008) .................................................................. 13

*C-O-Two Fire Equip. Co.,*
    197 F.2d 489 (9th Cir.), *cert. denied,* 73 S. Ct. 211 (1952) ....................... 8

*Daniel v. American Bd. of Emergency Medicine,*
    988 F. Supp. 127, (W.D. N.Y. 1997) ....................................................... 16

*Day v. AT&T Corp.,*
    63 Cal. App. 4th 325, 74 Cal. Rptr. 2d 55 (1998) .................................... 24

        Case No.: 07CV2174 H BLM

*Eastern Railroad Presidents Conference v. Noerr Motor Freight,*
    365 U.S. 127 (1961) .................................................................................................. 21

*First Nat'l Bank v. Cities Serv. Co.,*
    391 U. S. 253 (1968) .................................................................................................. 9

*Forsyth v. Humana, Inc.,*
    114 F.3d 1467 (9th Cir. 1997) ................................................................................ 3, 16

*FTC v. Ticor Title Ins. Co.,*
    504 U.S. 621, 112 S. Ct. 2169, 119 L.Ed.2d 410 (1992) ........................................ 11

*Glen Holly Entertainment, Inc. v. Tektronix, Inc.,*
    343 F.3d 1000 (9th Cir. 2003) ........................................................................ 3, 10, 16

*Goldfarb v. Virginia State Bar,*
    421 U.S. 773, 95 S. Ct. 2004 (1975) .......................................................... 14, 15, 16

*Harkins Amusement Enterprises, Inc. v. Gen. Cinema Corp.,*
    850 F.2d 477 (9th Cir. 1988) .................................................................................... 5

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.,*
    Nos. MDL-765, CIV 87-987, 1990 U.S. Dist. LEXIS 19207, at *50, 1990 WL
    126500 *17 (D. Ariz. July 25, 1990) ........................................................................ 5

*In re Graphics Processing Units Antitrust Litig.,*
    No. 06-07417, MDL No. 1826, 2007 U.S. Dist. LEXIS 85533, at *38 (N.D. Cal.
    Nov. 7, 2007) ............................................................................................................ 6

*In re Petroleum Prods. Antitrust Litig.,*
    906 F.2d 432 (9th Cir. 1990), *cert. denied,* 111 S. Ct. 2274 (1991) ....................... 8

*In re Tableware Antitrust Litig.,*
    484 F. Supp. 2d 1059 (N.D. Cal. 2007) .................................................................... 9

*In re Universal Service Fund Telephone Billing Practice Litigation,*
    219 F.R.D. 661 (D. Kan. 2004) .......................................................................... 15, 18

*In re Uranium Indus. Antitrust Litig.,*
    466 F. Supp. 958 (1979) ............................................................................................ 9

*Kasky v. Nike, Inc.,*
    27 Cal. 4th 939 (2002) .............................................................................................. 21

*Kendall v. Visa U.S.A. Inc.,*
    ___ F.3d ___, 2008 WL 613924 (C.A. 9 (Cal.)) No. 05-16549, slip op. at 2190-92
    (9th Cir. Mar. 7, 2008) ........................................................................................... 5, 7

*Kochert v. Greater Lafayett Help Services, Inc.,*
    463 F.3d 710 (7th Cir. 2006), *cert. denied,* 127 S. Ct. 1328 (2007) ...................... 10

*Lafayette v. Louisiana Power & Light Co.,*
    435 U.S. 389, 98 S. Ct. 1123, 55 L.Ed.2d 364 (1978) ............................................ 11

*Linear Technology Corp. v. Applied Materials, Inc.,*
    152 Cal. App. 4th 115, 61 Cal. Rptr. 3d 221 (2007) ................................................ 20

*Lorillard Tobacco Company v. Reilly,*
    533 U.S. 525 (2001).................................................................................................... 21

*McClain v. Real Estate Board of New Orleans,*
    444 U.S. 232 (1980).................................................................................................... 20

*McKell v. Washington Mut., Inc.,*
    142 Cal. App. 4th 1457, 49 Cal. Rptr. 3d 227 (2005)................................... 20, 22, 24

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
    473 U.S. 614, 105 S. Ct. 3346 (1985)........................................................................ 9

*National Electrical Contractors Association, Inc. v. National Constructors Association,*
    678 F.2d 492 (4th Cir. 1982) .............................................................................. 13, 14

*Parker v. Brown,*
    317 U.S. 341 (1943)............................................................................................ 11, 16

*Patrick v. Burget,*
    486 U.S. 94, 100, 108 S. Ct. 1658, 100 L.Ed.2d 83 (1988)............................... 11, 12

*People v. National Association of Realtors,*
    155 Cal. App. 3d 578 (1984) .............................................................................. 19, 22

*Podolsky v. First Healthcare Corp.,*
    50 Cal. App. 4th 632 (1996) ...................................................................................... 22

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n., Inc.,*
    814 F.2d 358 (7th Cir. 1987) .............................................................................. 10, 13

*Progressive West Ins. Co. v. Yolo County Superior Court,*
    135 Cal. App. 4th 263, 37 Cal. Rptr. 3d 434 (2005).................................................. 22

*Reiter v. Sonotone,*
    442 U.S. 330, 99 S. Ct. 2326 (1979)......................................................... 3, 16, 17, 24

*Roskind v. Morgan Stanley Dean Witter & Co.,*
    80 Cal. App. 4th 345 (2000) ...................................................................................... 20

*Schnall v. Hertz Corp.,*
    78 Cal. App. 4th 1144, 93 Cal. Rptr. 2d 439 (2000)................................................. 22

*State Farm Fire & Casualty Co. v. Superior Court,*
    45 Cal. App. 4th 1093 (1996) .............................................................................. 20, 22

*TON Servs., Inc. v. Qwest Corp.,*
    493 F.3d 1225 (10th Cir. 2007) .................................................................................. 6

*U.S. v. Socony-Vacuum Oil Co.,*
    310 U.S. 150, 60 S. Ct. 811 (1940)...................................................................... 3, 21

*U.S. v. Topco Associates, Inc.,*
    405 U.S. 596, 610, 92 S. Ct. 1126 (1972).................................................................. 9

*United Mine Workers v. Pennington,*
    381 U.S. 657 (1965)................................................................................... 2, 16, 21, 24

*Yeager's Fuel v. Pennsylvania Power and Light Co.,*
    22 F.3d 1260, 1266 (3rd Cir. 1994) ............................................................... 11

**Statutes**

15 United States Code § 1 ......................................................................... 4, 5, 19

California Government Code § 13995.65(f) .......................................................... 18

Government Code § 11120, *et seq.* ................................................................... 8

Government Code § 13995.40 .......................................................................... 14

Government Code § 13995.65(e).......................................................................... 15

**Other Authorities**

*The Problems of Tacit Collusion Under the Antitrust Laws,*
    24 N.Y.L.S.L. Rev. 881, 899 (1979).............................................................. 8

Case No.: 07CV2174 H BLM

# I. **INTRODUCTION**

Defendants' Motions to Dismiss are largely answered with a single fundamental point.[1] The legislative amendments to the California Tourism Marketing Act ("CTMA") neither compel nor allow the Rental Car Defendants to do what they are alleged to have done in the Complaint: (a) agree to charge consumers a uniform fee in connection with the Defendants' CTTC assessment obligation, nor (b) agree to a mechanism designed to increase their base rental car rates. The Complaint alleges a cartelization that fixed prices in two ways ("CTTC assessment" and "airport concession fee" add-on to the base rate) each of which is independently wrongful.

The relevant law permitted the Rental Car Defendants to **assess themselves**, at an agreed level, an amount to pay the state to help tourism (for the California Travel and Tourism Commission ("CTTC")) pursuant to the CTMA. The law neither compelled nor permitted them, once they arrived at a self-assessment amount, **to agree among themselves to recover this assessment (and likely more) in the form of an agreed charge to renters**. Likewise, the relevant law permitted each of the Rental Car Defendants **to unbundle** the existing airport concession fee from their rental car base rate for purposes of separate disclosures. However, it neither compelled nor permitted them **to agree to a *price increase* on their new base rates of roughly the amount of the previously bundled fee**. Defendants alternatively skirt or ignore these distinctions, and those distinctions are fatal to their motion.

Contrary to Defendants' Motion, Plaintiffs' Complaint meets the "plausibility" standard as articulated in *Twombly* and thus satisfies the minimal pleading requirements of Rule 8. The plausibility standard merely requires that the allegations "suggest that an agreement was made." *Bell Atlantic Corp. v. Twombly*, 550 U.S. ___, ___, 127 S. Ct. 1955, 1965 (2007) ("*Twombly*"). No detailed allegations are necessary. *Id.* at 1964. Where a complaint alleges parallel conduct within "some factual context suggesting agreement," it will be sustained. *See id.* at 1961.

---

[1] The sufficiency of the Complaint pursuant to *Twombly* and state action immunity claims were also raised by the CTTC and Beteta. Because the arguments presented are the same, they will be addressed together in this brief for the Court's convenience. The pendent jurisdiction issue raised by the CTTC alone is addressed in a companion Opposition Brief.

1       Here, Plaintiffs have met the *Twombly* standard. Plaintiffs allege, in relevant part, that the

2 Rental Car Defendants, horizontal competitors, communicated among themselves in late 2006 a plan

3 concerning the alleged schemes: (1) CTTC assessment levels, and (2) the unbundling of the airport

4 concession fee. Following their communications, there was a historically unprecedented change in

5 the price of rental cars (rates declined on average in the United State and rose in California airports),

6 which corresponded in amount with increases which were the subject of their communications. The

7 CTTC was involved in and facilitated price communications among the Rental Car Defendants,

8 which effected the price fixing alleged. (Complaint ¶¶ 1, 32-37, 44-46.) The Complaint makes clear

9 that we have a price increase corresponding to a number discussed among each of the Rental Car

10 Defendants (allegedly for an innocent purpose), imposed at the same moment in time (which is

11 specified), not by two or three of them, but by all seven. The fact of communications, the time and

12 context of the communications, the fact that the communications concerned the very number at

13 issue, the simultaneous imposition of the aberrational price increase, and no apparent cost

14 justification, makes the allegations reach well past *Twombly* standards.

15       Quite apart from the combination add-on of the 9% "airport concession fee" (authorized as a

16 cost that could be itemized on a bill, not a price increase, as noted above), is the 2.5% charge

17 allegedly to go to the CTTC budget. Here, the pleadings allege a naked, direct combination to arrive

18 at a uniform figure so that the amount legitimately authorized for each Defendant to contribute

19 comes entirely from consumers as a 100% pass-through. That agreement to fix a final and charged

20 price is nowhere authorized by the cited statute, nor by any other law. This allegation not only meets

21 *Twombly* standards, but Plaintiffs are unclear how Defendants avoid summary judgment disposition.

22       The extraordinary combination of two simultaneous price fix schemes, neither authorized by

23 any statute for imposition by these Defendants as a coordinated group, is hardly individual conduct.

24 And both are within the purview of *per se* prohibited acts under consistent precedent. The

25 conspiracy is not only "plausible" under *Twombly*, it is rather embarrassingly unsubtle.

26 Accordingly, Defendants' Motion must be denied.

27       Defendants' assertions that the "CTTC assessment" was "authorized by state law" and that a

28 consumer lacks standing to assert injury from the unlawful overcharges are incorrect. First, the

assertions badly misstate the facts pleaded in the Complaint. Second, numerous errors of law are implicit in the positions taken by Defendants. Indeed, at least three fundamental predicates of the federal antitrust laws would be eviscerated under Defendants' legal theory:

- The federal antitrust law is the "*Magna Carta* of free enterprise" and cannot be facilely thwarted by mere state conduct which does not explicitly contemplate and oversee anticompetitive behavior; the state neither mandated nor oversees the two coordinated pricing arrangements complained of herein;

- Second, price fixing is the core concern of the antitrust laws, and any agreement among competitors to raise, depress, fix, peg, or stabilize prices is illegal *per se* under the federal antitrust laws. *See, e.g., U.S. v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S. Ct. 811, 844 (1940). "Courts have held *per se* unlawful agreements among competitors to establish uniform costs and markups, **impose mandatory surcharges**, specify price differentials between grades of a product, adopt common classifications of customers entitled to discounts, and standardize the percentage of functional discounts." ABA Section of Antitrust Law, *Antitrust Law Developments* at 84 (6th ed. 2007) (emphasis added); and

- Of course consumers have standing to complain about unlawfully elevated prices; that is the very essence of what the antitrust laws are designed to protect against. *Reiter v. Sonotone,* 442 U.S. 330, 342, 99 S. Ct. 2326, 2332 (1979); *Glen Holly Entertainment, Inc. v. Tektronix, Inc.,* 343 F.3d 1000, 1014 (9th Cir. 2003); *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1478 (9th Cir. 1997) ("such an increase in consumer prices caused by the asserted conduct would constitute antitrust injury of the type the antitrust laws were designed to prevent").

The Complaint alleges that the Rental Car Defendants utilized the CTTC to enter into a conspiracy to raise prices to consumers and the CTTC facilitated that cartelization. They did so in two particulars: First, they agreed among themselves to a price fix of 2.5% to be a "CTTC assessment" and to pass all of that assessment on to consumers as a surcharge and to not compete with each other on that additional 2.5% surcharge to consumers. Nowhere does California law

1   require Defendants to engage in that conduct. Second, in unbundling, Defendants agreed to raise

2   rates 9% across the board instead of competing at the pre-existing competitive level. There is no

3   statutory authorization for this unlawful cartelization. No allegation in the Complaint and no statute

4   cited in the moving papers is to the contrary. The applicable statutes cited by Defendants do not

5   authorize the private pricing coordination here at issue. The rule mandated by the antitrust laws in

6   the absence of "state action" requires independent pricing by horizontal competitors. There is no

7   compelled "state action" here; and there is no immunity for these Defendants. Moreover,

8   Defendants have deceived and misled consumers about all of this; thus further violating California's

9   unfair competition statute. Defendants' Motions to Dismiss should be denied.

## II. **THE *TWOMBLY* STANDARD IS MET BY THE COMPLAINT HEREIN**

**A.**   ***Twombly* Merely Requires Allegations Rendering A Conspiracy Plausible.**

12        The issue in *Twombly* was "whether a 15 U.S.C. section 1 ["§ 1"] complaint can survive a

13   motion to dismiss when it alleges [the defendants] engaged in certain parallel conduct unfavorable to

14   competition, absent some factual context suggesting agreement." *Twombly, supra,* at 1961. In

15   *Twombly*, the status quo was a monopoly among the defendant telecommunication companies. Prior

16   to 1996, each of the ILECs enjoyed a monopoly on local telephone business in their areas. *Id.* After

17   twelve years of this anticompetitive system, the Telecommunications Act of 1996 ended the ILECs'

18   monopolies and forced them to share their networks with CLECs. *Id.* Each of the ILECs obviously

19   opposed having to share their networks with the CLECs and, individually, had interests in keeping

20   the CLECs out of their respective markets. Therefore, in attempting to keep the CLECs out of their

21   respective markets, the ILECs engaged in parallel, anticompetitive conduct. The entirety of the

22   plaintiffs' allegations was that "the ILECs 'engaged in parallel conduct' in their respective service

23   areas to inhibit the growth of the upstart CLECs." *Id.* at 1962.[2]

24        The Court found these allegations to be insufficient because the plaintiffs merely alleged that,

25   given the parallel conduct, the defendants must have conspired. *Id.* at 1962–63. In the absence of

---

27   [2] The *Twombly* plaintiffs also alleged that the ILECs agreed to refrain from competing with each other by entering each other's markets as CLECs. *Twombly,* 127 S. Ct. at 1955. The Court, however, paid little attention to this argument and was not swayed by the ILECs' decisions to not enter each other's markets because there was no incentive for them to do so. *Id.* at 1972. (ILECs are incumbent local exchange carriers, CLECs are competitive local exchange carriers.)

        Case No.: 07CV2174 H BLM

additional allegations, the § 1 claim was dismissed. *Id.* at 1966. The Court held that a showing of parallel conduct, **without anything more** (*i.e.*, viable allegations regarding meetings or other plus factors), is insufficient to overcome a motion to dismiss. *Id.* at 1961.

The Supreme Court went on to describe in greater detail the standard for use on a motion to dismiss a § 1 claim. The *Twombly* Court reaffirmed that "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Id.* at 1964. It then stated that allegations rendering a conspiracy "plausible" are sufficient to overcome a motion to dismiss, even if "recovery is very remote and unlikely." *Twombly*, 127 S. Ct. at 1964–65 (citation omitted). The Court repeated several times that for such a complaint, the relevant standard is whether the claim for relief is "plausible." *Id.* at 1965 ("plausible grounds to infer an agreement"); *id.* at 1965 ("facts that are **suggestive enough** to render a § 1 conspiracy plausible") (emphasis added); *id.* at 1966 ("allegations **plausibly suggesting** (not merely consistent with agreement)") (emphasis added); *id.* at 1966 n.5 ("plausible liability"); *id.* at 1968 ("the requirement of plausibility"). *See also Kendall v. Visa U.S.A. Inc.*, No. 05-16549, slip op. at 2190-92 (9th Cir. Mar. 7, 2008) (*"Kendall"*) (restating *Twombly* standard).

Under *Twombly's* "plausibility" standard, plaintiffs' complaint, as a whole, need only "suggest that an agreement was made . . . [or] raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 1965. *Kendall* at 2190-91 (quoting *Twombly*). "It is not necessary for a plaintiff to show an explicit agreement among defendants in support of a Sherman Act conspiracy, 'concerted action may be inferred from circumstantial evidence of the defendant's conduct and course of dealings.'" *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, Nos. MDL-765, CIV 87-987, 1990 U.S. Dist. LEXIS 19207, at *50 (D. Ariz. July 25, 1990) (quoting *Harkins Amusement Enterprises, Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 484 (9th Cir. 1988)). The standard does not "impose a probability requirement at the pleading stage." *Twombly*, 127 S. Ct. at 1965. Indeed, due to the secret nature of conspiracies, direct allegations of conspiracy

are neither possible nor necessary. *See In re Graphics Processing Units Antitrust Litig.*, No. 06-07417, MDL No. 1826, 2007 U.S. Dist. LEXIS 85533, at *38 (N.D. Cal. Nov. 7, 2007).[3]

*Twombly* does not affect the rule that on a motion to dismiss, "all well-pleaded factual allegations are accepted as true and construed in the light most favorable to the plaintiff." *TON Servs., Inc. v. Qwest Corp.*, 493 F.3d 1225, 1236 (10th Cir. 2007); *see Erickson*, 127 S. Ct. at 2200 (quoting *Twombly*, 127 S. Ct. at 1964). Additionally, the Court "is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the 'well-pleaded' allegations of the complaint. Thus, the plaintiff need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly alleged." *Corrections USA v. Dawe*, 504 F. Supp. 2d 924, 929 (E.D. Cal. 2007) (citing *Retail Clerks Int'l Ass'n Local 1625, AFL-CIO v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963)).[4]

**B.      Plaintiffs' Allegations Meet The *Twombly* Standard.**

The differences between *Twombly* and the present case begin with their factual backgrounds. In the present case, prior to 2006, the rental car market was highly competitive and each of the Rental Car Defendants had varying rates and pricing structures. Complaint ¶ 1, 36. Then, in the second half of 2006, Defendants began to communicate in connection with the CTTC and AB 2592, and, in January 2007, coincident with AB 2592's enactment, the Rental Car Defendants all simultaneously increased their prices by 9% and imposed a 2.5% fee on consumers. *Id.* ¶ 1, 35–37, 44, 46. These pricing changes were not required by AB 2592. In other words, coinciding with the

---

[3] The *Twombly* Court also cited Professor Areeda's antitrust treatise, where he explains that "parallel behavior that would **probably** not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by advance understanding among the parties" supports an inference of conspiracy. 6 Areeda & Hovenkamp ¶ 1425, at 167–85 (cited in *Twombly*, 127 S. Ct. at 1965 n.4) (emphasis added). In a competitive environment, a natural response to AB 2592 would have been to take advantage of the 9% fee breakout and lower base rates or to absorb some or all of the 2.5% assessment. Here, however, each of the Rental Car Defendants chose to maximize their prices. This illogical parallel behavior, at the very least, makes a conspiracy plausible.

[4] Defendants improperly attempt to insert evidence into the record at this stage of the pleadings through their repeated references to Robert Fellmeth's letter (the "Fellmeth letter") to Mark Leno prior to AB 2592's passage. In reviewing a motion to dismiss, courts may only consider the contents of the complaint, and "extraneous evidence" should not be considered. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001). Further, as detailed in Plaintiffs' Response to Defendants' Request for Judicial Notice, the Fellmeth letter may not be judicially noticed. In any event, the Fellmeth letter only accurately predicted that Defendants would engage in cartel behavior upon the occasion of AB 2592's passage.

1  Defendants' communications about prices and pricing mechanisms, the rental car market

2  experienced an atypical price increase. This is in contrast to the telecommunications industry in

3  *Twombly*, which began as an anticompetitive market and one which the ILECs naturally wished to

4  maintain. In the present case, in the absence of collusion beyond the scope of AB 2592, the sudden

5  switch to an anticompetitive market is inexplicable. The change in pricing patterns becomes even

6  more suspect when coupled with the uncontested fact that the Rental Car Defendants, in conjunction

7  with the CTTC, were communicating about these precise prices.

8         Furthermore, Plaintiffs' allegations are not centered around mere parallel conduct totally

9  bereft of a factual context making coordinated conduct plausible. Rather, the thrust of Plaintiffs'

10  allegations is that Defendants communicated about pricing beyond the parameters of AB 2592. *See*

11  Complaint ¶ 35. As a result of their collusion regarding pricing, beyond the scope of AB 2592, in

12  January of 2007, the Rental Car Defendants all simultaneously (and contrary to precedent) increased

13  their prices by 9% and imposed a uniform 2.5% fee on consumers. Plaintiffs have gone far beyond

14  the basic allegation that the Defendants engaged in parallel conduct. Plaintiffs allege parallel

15  conduct, within a factual context, which makes a conspiracy, at least, plausible. Plaintiffs allege the

16  time of the conspiracy (late 2006 and prior to January 2007) and the time and the circumstances of

17  the conspiracy (in the context of communications among the companies, as facilitated by the CTTC

18  in connection with the CTTC assessment and unbundling of the Airport Concession Fee). These

19  allegations are more than specific enough "to give [the] defendant[s] seeking to respond to [the]

20  allegations of ...conspiracy an idea where to begin," *Kendall, supra*, at 2191."[5]

21

22

---

23  [5] The allegations of this case bear no resemblance to *Kendall* and thus *Kendall* offers no support for Defendants. In *Kendall*, plaintiff merchants alleged that member banks of the Visa and Mastercard credit card associations conspired with each other and/or the associations with respect to a fee paid by merchants to association member banks which

24  acquire their credit card transactions (the merchant discount) and an intra-association fee which passes from the member bank which acquired the transaction from the merchant to the member bank which issued the card on which the charge

25  was made (interchange fee). *Kendall* at 2187-89. The Court found "no facts [alleged] to support [the plaintiffs'] theory that the Banks conspired or agreed with each other or the Consortiums" beyond the allegation that the banks adopted

26  charged or followed the member bank-to-member bank interchange fees set by the credit card association. *Id.* at 2193. Unlike *Kendall*, this case involves allegations that independent competitors, not joined together by any common

27  network, conspired on fees and rental car prices to third parties which were not dictated or set in any way by a legitimate member association (*i.e.*, Visa and Mastercard), but rather which should have been a mater of competition among them.

28  (*E.g.*, Complaint ¶¶ 1, 32-37.)

1    While Defendants may contend that their pricing changes came solely as a result of unilateral

2  action in response to AB 2592, Defendants are jumping the gun on this highly factual issue.  The

3  only issue before the Court is whether Plaintiffs' allegations support a plausible inference that the

4  Defendants expressly or implicitly agreed.  Indeed, in a competitive environment, the likelihood is

5  slim that, in the absence of an agreement, each Rental Car Defendant would choose to raise its base

6  rate by the entire 9% and pass the entire 2.5% along to consumers.  These circumstances alone meet

7  the *Twombly* plausibility standard.  Because Plaintiffs have alleged a factual context, which renders a

8  conspiracy plausible, the Complaint must be sustained.

9  **C.**   **Plaintiffs' Complaint Alleges Additional Plus Factors.**

10    Furthermore, the Court recognized that pleading parallel conduct, animated by "plus factors,"

11  can raise an inference of conspiracy to the level of plausibility.  *Twombly, supra,* at 1966 n.4.  An

12  example of a plus factor, cited by the Court, is "when [a company] rigidly refuses to make any sales

13  by lower prices by even *de minimis* amounts."  Blechman, *Conscious Parallelism, Signaling and*

14  *Facilitating Devices: The Problems of Tacit Collusion Under the Antitrust Laws,* 24 N.Y.L.S.L. Rev.

15  881, 899 (1979) (cited in *Twombly,* 127 S. Ct. at 1965 n.4).  Here, that not a single Rental Car

16  Defendant attempted to lower its rates by even a *de minimis* amount makes a conspiracy plausible.

17    Furthermore, Defendants clearly had the opportunity to conspire.[6]  *See In re Petroleum*

18  *Prods. Antitrust Litig.,* 906 F.2d 432, 447 (9th Cir. 1990), *cert. denied,* 111 S. Ct. 2274 (1991) ; *C-*

19  *O-Two Fire Equip. Co.,* 197 F.2d 489, 493 (9th Cir.), *cert. denied* 73 S. Ct. 211 (1952) .  The CTTC

20  offered them a forum, facilitated the conspiracy, and maintained its confidentiality via violations of

21  the Bagley-Keene Act, Cal. Gov't Code § 11120, *et seq.*  That Defendants actually met and actually

22  communicated about these fees and when is clearly alleged.  Defendants communicated and agreed

23  on the assessment amount in an unsupervised referendum.  Defendants then easily took the

---

24

25  [6] In the cases cited by Defendants for the proposition that participation in trade associations is insufficient under *Twombly,* Defendants overlooked a major distinction between those cases and the case at bar.  In each of the other cases, the plaintiffs merely alleged that, because the defendants were members of a trade organization, they had an opportunity

26  to conspire.  Here, Plaintiffs have specifically alleged, and it is undisputed, that Defendants met to discuss the very topics which formed the basis of their conspiracy.  Furthermore, while allegations of participation in trade associations alone

27  are not determinative of conspiracy, when coupled with other allegations, they can bring claims to the plausibility level. *See In re Static Random Access Memory (SRAM) Antitrust Litigation,* No. M:07-cv-01819, MDL No. 1819, 2008 U.S.

28  Dist. LEXIS 15826, at *48 (N.D. Cal. Feb. 14, 2008).

        Case No.: 07CV2174 H BLM

1   communications one step further and formed an illegal conspiracy to recover the assessment from

2   renters. These circumstances make a conspiracy plausible, at least.

3       Numerous additional plus factors are present in this case, each making a conspiracy

4   plausible. For example, the Defendants all acted within a short time frame. *See In re Tableware*

5   *Antitrust Litig.*, 484 F. Supp. 2d 1059, 1076 (N.D. Cal. 2007). Defendants charged supracompetitive

6   prices. *In re Uranium Indus. Antitrust Litig.*, 466 F. Supp. 958, 962 (1979). Also, with the new law

7   going into effect, Defendants were motivated to conspire. *See First Nat'l Bank v. Cities Serv. Co.*,

8   391 U. S. 253, 287 (1968). And finally, although the Rental Car Defendants "vary among

9   themselves" in base rates (Complaint ¶ 36) and price differently between customer groups, by

10  season, and in advertising - this charge as alleged is imposed with uniformity over time and between

11  Defendants and customer groups.

12              **III. DEFENDANTS HAVE NO STATE ACTION IMMUNITY**

13                  **AND PLAINTIFFS HAVE ANTITRUST STANDING**

14  **A.       There is No State Action Immunity Here.**

15      "Antitrust laws in general, and the Sherman Act in particular…are as important to the

16  preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the

17  protection of our fundamental personal freedoms." *U.S. v. Topco Associates, Inc.*, 405 U.S. 596,

18  610, 92 S. Ct. 1126, 1135 (1972). The Supreme Court has repeatedly emphasized the paramount

19  importance of the Sherman Antitrust Act and its enforcement. "As a charter of freedom, the act has

20  a generality and adaptability comparable to that found to be desirable in constitutional provisions."

21  *Appalachian Coals v. U.S.*, 288 U.S. 344, 53 S. Ct. 471, 474 (1933). "The Sherman and Clayton

22  Acts reflect Congress' appraisal of the value of economic freedom; they guarantee the vitality of the

23  entrepreneurial spirit. Questions arising under these Acts are among the most important in public

24  law." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 652, 105 S. Ct.

25  3346, 3367 (1985). The federal interest in enforcing the national policy in favor of competition,

26  while expressed through statute rather than a constitutional provision, is paramount in that Congress

27  exercised all the power it possessed under the Commerce Clause when it approved the Sherman Act.

28  As the Supreme Court has repeatedly noted, it "must acknowledge the importance of the Act's

1  procompetition policy." *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S.

2  97, 110-111, 100 S. Ct. 937, 946 (1980).

3      The "principal purpose of the antitrust laws is to prevent overcharges to consumers."

4  *Kochert v. Greater Lafayett Help Services, Inc.,* 463 F.3d 710, 715 (7th Cir. 2006), *cert. denied,* 127

5  S. Ct. 1328 (2007) , quoting *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n., Inc.,* 814

6  F.2d 358, 368 (7th Cir. 1987). As the Ninth Circuit has said, "the antitrust laws are designed to

7  protect customers from the harm of unlawfully elevated prices." *Glen Holly Entertainment, Inc. v.*

8  *Tektronix, Inc.,* 343 F.3d 1000, 1014 (9th Cir. 2003). Here Defendants, under the auspices of the

9  CTTC, have conspired and voted to increase charges to consumers by 2.5% and further agreed to

10  pass the entirety of that 2.5% charge on to consumers. That is directly antithetical to very heart and

11  soul of the Sherman Antitrust Act. It constitutes a *per se* price fixing violation that is irredeemable

12  and cannot be permitted by this Court.

13      Not satisfied with preserving (and increasing) their profits in that way, the Rental Car

14  Defendants further agreed that when the State Legislature authorized them to individually unbundle

15  their rates, they would not compete over this 9% that was now unbundled but would, rather, add that

16  to the charge on consumers. Thus, consumers were faced with a double price increase: 2.5% for the

17  amount the Defendants agreed to assess themselves and pass on to consumers; and the 9% which is

18  added due to the unbundling which - again - Defendants agreed among themselves to use as a way to

19  raise prices to consumers. Nothing in the statute required them to raise their rates by 2.5% or 9%;

20  indeed, nothing authorized them to raise their rate by the 9%, even individually. As a matter of the

21  natural law of competition, seven competitors would not likely raise their rates simultaneously; at

22  least one would have taken advantage of the situation to gain a competitive edge.[7] Instead of

23  competition breaking out, however, it was artificially suppressed by an unlawful cartel.

24

25

26

27  ───────────────

[7] *See In re Universal Service Fund Telephone Billing Practices Litigation,* 219 F.R.D. 661, 681 (D. Kan. 2004) (noting
28  that "[i]n a truly competitive market" surcharge rates would not be at the highest possible level).

1.    <u>**The Rental Car Defendants Are Not Immunized.**</u>

The facile assertion by Defendants that "action authorized by state law is immune from antitrust liability" is inaccurate. As set forth above, Congress broadly preempted the field on behalf of free and open competition in or affecting interstate commerce. However, the Supreme Court has permitted state governments and certain regulated private actors to establish that a state regulatory scheme precludes antitrust liability. But the Ninth Circuit has been explicit that such immunity is strictly limited and quite rigorous:

> The state-action doctrine cloaks anticompetitive conduct with antitrust immunity only if the state's intent to displace competition with regulation is "clearly articulated and affirmatively expressed as state policy." *Midcal*, 445 U.S. at 105, 100 S. Ct. at 943 (upholding state wine pricing system because "[t]he legislative policy is forthrightly stated and clear in its purpose to permit resale price maintenance"). The *Midcal* test is a "rigorous" one that "ensure[s] that private parties [can] claim state-action immunity from Sherman Act liability only when their anticompetitive acts [are] truly the product of state regulation." *Patrick v. Burget*, 486 U.S. 94, 100, 108 S. Ct. 1658, 1662, 100 L.Ed.2d 83 (1988). It guarantees that the "private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests, *id.* at 101, 108 S. Ct. at 1663, and limits the spread of an immunity that is "disfavored, much as are repeals [of the antitrust laws] by implication," *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636, 112 S. Ct. 2169, 2176, 119 L.Ed.2d 410 (1992), because of Congress's "overarching and fundamental policies" protecting competition, *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 398-99, 98 S. Ct. 1123, 1129, 55 L.Ed.2d 364 (1978)."

*Columbia Steel Casting Co., Inc. v. Portland General Elec. Co.* 111 F.3d 1427, 1436 (9th Cir. 1996), *cert. denied*, 118 S. Ct. 1688 (1998). The "state action doctrine" (sometimes referred to as "*Parker v. Brown* immunity" because of the seminal Supreme Court decision on the matter, *Parker v. Brown*, 317 U.S. 341 (1943)) thus offers an antitrust defendant an affirmative defense, with the party asserting it bearing the burden of proof. *Yeager's Fuel v. Pennsylvania Power and Light Co.*, 22 F.3d 1260, 1266 (3rd Cir. 1994) ("state action immunity is an affirmative defense" as to which defendant "bears the burden of proof"). Here, the Rental Car Defendants have not even explained what their theory is as to state action immunity, much less proven it by a preponderance of evidence.

As the Supreme Court explained in *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980), a two-prong test supplies the analytical framework within which the assertion of state action immunity must be evaluated; both standards must be fulfilled: (1) The challenged restraint must be "one clearly articulated and affirmatively expressed as state

11    Case No.: 07CV2174 H BLM

1  policy," and (2) "the policy must be 'actively supervised' by the state itself." 445 U.S. at 105. The

2  clear articulation requirement serves to ensure that the state has authorized departures from free

3  market competition. When not explicit in a statute, the state's articulation of an intent to displace

4  competition can be inferred if anticompetitive conduct foreseeably results from the regulation.

5  Here, nothing indicates the state clearly intended to displace competition; rather the state only

6  allowed the Rental Car Defendants to assist the CTTC in determining how much of an assessment

7  each would pay. Nothing in the statute says that the Rental Car Defendants could go further and

8  agree to pass that assessment on to consumers, to mislead consumers about where the assessment

9  came from, and or to raise rates by an additional 9%.[8] Where in the legislation is such an

10  articulation of a state desire to displace competition and permit cartelization?

11       Secondly, the "active supervision" requirement is to ensure that the state action defense "will

12  shelter only the particular anticompetitive acts of private parties that, in the judgment of the State,

13  actually further state regulatory policies." *Patrick v. Burget,* 486 U.S. 94, 100-01 (1988). Numerous

14  state programs have failed to afford protection due to a lack of supervision. Thus, despite a clearly

15  articulated and affirmatively expressed state policy of resale price maintenance in the liquor

16  industry, the Supreme Court found there to be no active state supervision of the prices set by certain

17  industry participants pursuant to this policy, and that the state action doctrine therefore did not apply.

18  *324 Liquor Corp. v. Duffy,* 479 U.S. 335, 344-45 (1987). Similarly, in *Patrick v. Burget,* 486 U.S.

19  94, 101 (1988), the Supreme Court ruled that the state action defense did not apply to the action of

20  Oregon physicians who served on a hospital peer review committee because the state limited its role

21  to regulating the peer review process; the state did not "have and exercise power to review particular

22  anticompetitive acts of private parties... ." Similarly, here, the CTTC both as structured and as

23  applied does not permit state officials to have or exercise power to review the anticompetitive acts of

24

---

25  [8] Indeed the Legislature established that it anticipated continued competition when it said assessed companies could ("may") pass on "some or all" of the surcharge to consumers. (Gov't Code § 13995.65(e).) If competition was to be

26  displaced, the Legislature would have mandated that all the surcharges be passed through - instead competition was anticipated so that only some (or none) of the surcharge would be passed through. Rather than displacing competition,

27  the Legislature anticipated and provided for continued competition. The Legislature knew that "[i]n a truly competitive market" surcharge rates would not be at the highest possible level. *In re Universal Service Fund Telephone Billing*

28  *Practices Litigation,* 219 F.R.D. 661, 681 (D. Kan. 2004).

1 the private parties. The state statute itself is not regulation at all; it simply instructs the CTTC and its

2 constituent members to raise monies from its own profits to promote tourism. It does not tell them

3 to displace competition, to fix prices, to mislead consumers. Indeed, the Ninth Circuit has recently

4 articulated what the law is in a case with similarities (absent the 21st Amendment) to this situation:

5 "If the restraint is not unilaterally imposed, but rather involves 'a state's decision to let producers

6 dictate market conditions to others,' it is deemed a hybrid restraint which is 'illegal *per se* under the

7 Sherman Act.'" *Costco Wholesale Corporation v. Maleng,* 514 F.3d 915, 928 (9th Cir. 2008).

8     Here there is no unilateral action by the government imposing the restraint. Rather,

9 Defendants met together, entered into an agreement to assess themselves not an individual dollar

10 figure but a percentage of their revenues, further agreed to what that percentage of revenues would

11 be, and further agreed together and uniformly to pass that percentage on to consumers.[9] None of that

12 involved the state's decision to dictate market conditions but is the illicit activity of competitors to

13 fix a portion of the prices by imposing a mandatory surcharge and passing that mandatory surcharge

14 on to consumers, and then misleading consumers about the source and nature of that surcharge. *See*

15 *Premier Elec. Contr. Co. v. Nat'l Elec. Contractors Ass'n.,* 814 F.2d 358, 369-70 (7th Cir. 1987)

16 ("no one involved in establishing and collecting the 1% fee had consumer's interest at heart").

17 Here, too, Defendants were advancing their own profit margins. They entered into an agreement to

18 enhance those profits and had consumers pay for it. To justify this conduct "would abolish the *per*

19 *se* rule against horizontal price fixing." *Id.* at 370.[10]

20     The court in *National Electrical Contractors Association, Inc. v. National Constructors*

21 *Association,* 678 F.2d 492, 501 (4th Cir. 1982), is further instructive:

22         There can be no doubt that the agreement in question here, which adds
        a 1% charge to all IBEW construction contracts falls within the

23

---

24 [9] Adding insult to injury, Defendants deceive consumers that the 2.5% surcharge on their statements is, *e.g.,* "CA Tourism Commission Assessment @ 2.5%" and this misleading description is placed directly above "sales tax 7.75%."

25

26 [10] *Charlie's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.,* 810 F.2d 869, 876 (9th Cir. 1987), relied upon by Defendants is irrelevant because there the state explicitly authorized an exclusive dealing contract. No hybrid restraint was involved there; no independent action by market participants was contemplated. Having the state set an assessment

27 level for individual car rental companies is a long way from allowing the market participants to agree to a 2.5% surcharge on consumers and agree that consumers would pay the entire amount of the assessment. Defendants can find

28 no solace in the state action immunity for their violation of the antitrust laws.

        Case No.: 07CV2174 H BLM

definition of price fixing. By taking the additional 1% of labor costs from non-NECA contractors, it robs them of a competitive advantage beneficial to the public. It clearly interferes with the market forces that set the price of such contracts.

Here, too, the agreement to charge consumers the 2.5% assessment tends to stabilize the price of car rental contracts, "a practice illegal *per se* under the Sherman Act." *Id.*

As set forth in the Complaint, the CTTC is a California nonprofit corporation; a separate entity not a specific part of the executive branch of the government of California. Complaint ¶ 18; Government Code section 13995.40. "The CTTC is a separate, independent California non-profit mutual benefit corporation. ...[I]t operates independently from determinative control by the state. The Commission consists of 37 members who serve coextensively both as Commissioners and as Board of Directors of the corporation." Complaint ¶ 26. Twenty-four of the 37 Commissioners are selected by the industry, without nomination or selection by any elected or appointed public official. Complaint ¶ 27; *see* Government Code section 13995.43. As set forth in the Complaint, the "assessment levels are delegated to industry decision." Complaint ¶ 28. "The 24 industry selected members have final, controlling decision making power within the CTTC." Complaint ¶ 29; *see* Government Code section 13995.45(d). There is, as a matter of law, no active state supervision as required for state action immunity to apply.

As set forth in the Complaint, "The Rental Car Defendants combined in restraint of trade to satisfy their own obligation to provide CTTC funding by adding a price-fixed consumer assessment to all of their bills to consumers with no contribution from the Rental Car Defendants whatever, and to use the disagregation of the airport concession fee not as a clarification of the source of charges, but as a mechanism to add 9% to 2006 base charges - by and for each of the Rental Car Defendants - accomplishing artificial and unlawful profits." Complaint ¶ 35. State action immunity is not even implicated; Defendants certainly have not proven it applies by a preponderance of the evidence.

### 2.    The CTTC Is Not Immunized.

"The threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the State acting as sovereign." *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 790, 95 S. Ct. 2004, 2015 (1975) (striking

1  down Virginia's mandatory fee schedules). As the Supreme Court concluded: "Here we need not

2  inquire further into the state-action question because it cannot be fairly said that the State of Virginia

3  through its Supreme Court Rules required the anticompetitive activities of either respondent

4  [including the State Bar of Virginia]"[11]  *Id.*  Similarly, here, as fully discussed, *supra*, there is no

5  state policy articulating a displacement of price competition among Defendants. Nothing **required**

6  the agreement among the rental car companies to surcharge consumers 100% of the assessment, and

7  no state policy **required** that the unbundled portion of the rental car fee is added back into

8  consumers' bills by all of the car companies. Defendants quote from statutes that the CTTC is to

9  promote tourism in California, but no statute orders competition among car rental companies to be

10  displaced and no statute mandates the creation of a price-fixing cartel. Indeed to the contrary, the

11  Legislature provided for competition when it said companies "may" (but were not required to) "pass

12  on" "some or all" of the assessment. (Gov't Code § 13995.65(e).) Clearly the Legislature

13  anticipated competition, not cartelization since "[i]n a truly competitive market" surcharge rates

14  would not be at the highest possible level, *In re Universal Service Fund Telephone Billing Practice*

15  *Litigation*, 219 F.R.D. 661, 681 (D. Kan. 2004), and here the legislation provided **for** that

16  competition; not displacement of it. "It is not enough that...anticompetitive conduct is 'prompted'

17  by state action; rather it must be compelled by direction of the state acting as a sovereign."

18  *Goldfarb, supra,* at 791, 95 S. Ct. at 2015. Again, the Supreme Court language applies dispositively:

19  "The fact that the State Bar is a state agency for some limited purposes does not create an antitrust

20  shield that allows it to foster anticompetitive practices for the benefit of its members." *Id:* at 791, 95

21  S. CT. at 2015.  Similarly, that the CTTC may be a state agency for some limited purposes does not

22  create an antitrust shield that allows it to foster antitrust practices for the benefit of its members.

23  *Goldfarb* is mainstream law. The Supreme Court has noted (in citing several of its holdings) that (as

24  here) "cases of this kind involve a blend of private and public decision making.  The Court has

25  already decided that state authorization, approval, encouragement, or participation in restrictive

26

27

28

---

[11] Thus the bulk of CTTC's discussion of the issue is irrelevant. However the CTTC is characterized (whether as a political subdivision or not), the price fixing here cannot be immunized.

private conduct confers no antitrust immunity." *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.

Ct. 3110, 3118-19 (1976) (footnotes to four Supreme Court decisions omitted). Despite the CTTC's

efforts to suggest otherwise "The *Parker* doctrine is not so broad as to constitute an automatic

'status' exemption for state agencies... ." *Daniel v. American Bd. of Emergency Medicine*, 988 F.

Supp. 127, 182 n.52 (W.D. N.Y. 1997). Here the CTTC has participated in and facilitated an illegal

price fixing cartel; just as the State Bar did in *Goldfarb*. And, just as in *Goldfarb*, the CTTC is not

immunized.

**B.    Plaintiffs Have Standing.**

Defendants' half-hearted (and eleven-line) argument that the unlawful agreement to charge

consumers an additional 2.5% and an additional 9% "did not cause direct injury to" such consumers

is silly. Plaintiffs were directly injured by the agreement to assess consumers the 2.5%, and to place

a phony and misleading label on their statements that the 2.5% was a governmental required

assessment. Plaintiffs, and all consumers, have been charged 2.5% more as a result of that unlawful

agreement and an additional 9% because of the unlawful agreement by which the cartel uniformly

implemented the unbundling. The United States Supreme Court could not have been more clear:  A

consumer acquiring goods or services for personal use, is injured in their "property" when the price

of those goods or services is artificially inflated by reason of anticompetitive conduct and thus has

standing to sue. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 342, 99 S. Ct. 2326, 2331, 2332

(1979); *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1014 (9th Cir. 2003)

("antitrust laws are designed to protect customers form the harm of unlawfully elevated prices").

*See* 15 U.S.C. section 15(a). The Supreme Court has been adamant that "[t]he essence of the

antitrust laws is to ensure fair price competition in an open market" and further that the

congressional history of the Sherman Act suggests that "Congress designed the Sherman Act as a

'consumer welfare prescription.'" *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342-43, 99 S. Ct. 2326,

232-233 (1979). As the Ninth Circuit reaffirmed, "such an increase in consumer prices caused by

the asserted conduct would constitute antitrust injury of the type the antitrust laws were designed to

prevent." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997), *aff'd on other grounds*,

525 U.S. 299 (1999). A consumer overcharged as a result of an agreement to raise prices to those

1    consumers rather than engage in fair price competition in an open market has been wrongfully

2    deprived of money (property) and has standing to sue for redress under the federal antitrust statutes.

3    *Reiter v. Sonotone Corp.,* 442 U.S. 330, 342, 99 S. Ct. 2326, 2332 (1979). There is no doubt, here,

4    that these Plaintiffs have standing to assert the unlawful overcharges.

5        IV.  **PLAINTIFFS' COMPLAINT STATES A PENDENT CAUSE OF ACTION FOR**

6            **VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**

7            Plaintiffs' pendent cause of action for violation of California's unfair competition law

8    ("UCL") (B&P Code section 17200, *et seq.*) is correctly summarized by Defendants as applying to

9    practices that are "unlawful" or "fraudulent" or "deceptive or misleading advertising" or "unfair."

10   Here, Plaintiffs have alleged activities by Defendants that are unlawful, fraudulent or deceptive or

11   misleading advertising, and/or unfair. In particular, Plaintiffs have alleged:

12       • Defendants entered into an agreement whereby each of them agreed to charge

13           consumers a uniform 2.5% surcharge, which surcharge each of them agreed to pass

14           on in its entirety to consumers (Complaint, *e.g.,* ¶¶ 1, 34, 35, 44, and 46);

15       • Defendants agreed to use the "unbundling" permission they were given to increase

16           their base rental car rates by that amount, and each of them did so (Complaint, *e.g.,*

17           ¶¶ 1, 35, 36, 37, 44 and 46);

18       • Defendants misrepresented to consumers and deceived consumers that the 2.5%

19           surcharge on car rentals is owed by consumers and levied on them by the CTTC. In

20           fact, the assessment is owed by Defendants, not consumers, and Defendants were

21           nowhere given authority to cartelize and uniformly agree to pass all of this

22           assessment on to consumers (Complaint ¶ 49(B));

23       • Defendants are wrongfully collecting more money from the 2.5% surcharge and

24           uniform pass through than they pay in CTTC assessments (Complaint ¶ 49(B)).

25

26

27

28

                                    17                    Case No.: 07CV2174 H BLM

1    **A.      The Government Code Does Not Bar Plaintiffs' UCL Claim.**

2    Defendants'[12] assertion that they are immunized from *any* liability based upon application of

3    the antitrust laws (including the UCL) is legally incorrect. Section 13995.90 of the Government

4    Code provides only that if a defendant establishes "proof that the act that is complained of was done

5    in compliance with the provisions of [the CTMA]" it has a "defense" to an antitrust / UCL action.

6    The Rental Car Defendants then make the *non-sequitur* reach that "Plaintiffs do not and cannot

7    allege that the Rental Car Defendants violated the CTMA" (Brief, page 16, lines 1-2), and they are

8    therefore immunized. Of course, that is not the test and Plaintiffs do not allege violations of the

9    CTMA. Defendants have the burden to prove that all acts complained of were "done in compliance

10   with the provisions of" the CTMA. Defendants have not even made an effort. Instead, they assert

11   that the CTMA expressly provides that "an assessed business **may** pass on **some** or **all** of the

12   assessment to customers." Cal. Gov. Code §13995.65(f). Yet the wrongdoing is that Defendants,

13   and each of them, have agreed among themselves to create a car rental cartel and to pass on all the

14   assessments to all customers; and each of them agreed to do it in unison with each other. The

15   CTMA neither provides for nor countenances such an affront to the free enterprise system. Indeed,

16   the federal antitrust laws explicitly preclude such an agreement. *See, e.g., In re Universal Service*

17   *Fund Telephone Billing Practices Litigation,* 219 F.R.D. 661, 666, 681 (D. Kan. 2004) (upholding

18   class action for agreement to maintain surcharge at supra competitive levels). The distinction

19   between individual decisions on how much (if any) of the CTTC assessment should be passed

20   through to consumers and a cartel agreeing to charge consumers 2.5% surcharges goes to the very

21   heart of the antitrust laws. There is no authority for the collusive arrival of a surcharge to be passed

22   on to consumers by a cartel in the CTMA.

23   Similarly, nothing in the statute allows Defendants to enter into a cartel and agree to pass

24   through and/or increase rates by 9% simply because they now have legislative permission to itemize

25   on a bill. Nothing in the legislation purports to immunize such conduct from the unfair competition

26

27

---

[12] Plaintiffs concede that neither the CTTC nor Beteta are liable under the UCL. Plaintiffs' argument herein is as to the

28   Rental Car Defendants only.

1  statute (or any other antitrust statute). Similarly, Defendants have failed to prove that the Legislature

2  granted them immunity for the deceptive nature of their statements to consumers about the CTTC

3  fee or that the Legislature authorized them to deceive consumers into paying more to Defendants

4  than Defendants pay to the CTTC under the guise of collecting a CTTC assessment.

5       Nor have Defendants established a "safe harbor." California law recognizes that when the

6  Legislature permits certain conduct or considered a situation and concluded no action should lie,

7  courts enforcing the "unfair" prohibition of the UCL should not override that determination. "When

8  specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition

9  law to assault that harbor." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,

10  20 Cal. 4th 163, 182 (1999). But,

11       [t]o forestall an action under the unfair competition law, another provision must
         actually "bar" the action or clearly permit the conduct. There is a difference between
12       (1) not making an activity unlawful, and (2) making that activity lawful. For example,
         Penal Code section 211, which defines robbery, does not make murder unlawful.
13       Most assuredly, however, that section does not also make murder lawful. Acts that the
         Legislature has determined to be lawful may not form the basis for an action under
14       the unfair competition law, but acts may, if otherwise unfair, be challenged under the
         unfair competition law even if the Legislature failed to proscribe them in some other
15       provision.

16  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 183 (1999).

17  Here the Legislature has not purported to grant defendants the right to cartelize interstate commerce;

18  the Legislature has not granted defendants the right to deceive consumers, and the Legislature has

19  not granted Defendants the right to overbill consumers. That individual defendants could determine

20  on their own to engage in some of the conduct is tautological; it is the illicit cartelization that turns

21  otherwise permitted behavior into violations of federal and state law.[13]

22  **B.**  **Defendants' Antitrust Violations Establish That They Have Engaged In Unlawful**

23      **Practices Under The UCL.**

24       Violations of the antitrust laws are unlawful within the meaning of the UCL. *See People v.*

25  *National Association of Realtors*, 155 Cal. App. 3d 578 (1984); *Cel-Tech Communications, Inc. v.*

26  _____

27  [13] The whole point of § 1 of the Sherman Act is that it reaches restraints of trade effected by a contract, combination or
     conspiracy between separate entities. It does not reach conduct that is wholly unilateral. *See, e.g., Copperweld Corp. v.*
28  *Independence Tube Corp.*, 467 U.S. 752, 767-68 (1984).

1  *Los Angeles Cellular Telephone Company,* 20 Cal. 4th 163 (1999). Moreover, the federal Sherman

2  Act reaches antitrust violations that "affect" interstate commerce; here, Defendants cannot dispute

3  that the airport car rental industry affects interstate commerce. *McClain v. Real Estate Board of New*

4  *Orleans,* 444 U.S. 232 (1980).  Furthermore, it is clear that violations of federal law are "unlawful"

5  for purposes of the UCL.  "Case authority clearly provides that violation of a federal law may serve

6  as a predicate for a section 17200 action." *Roskind v. Morgan Stanley Dean Witter & Co.,* 80 Cal.

7  App. 4th 345, 352 (2000), citing, *State Farm Fire & Casualty Co. v. Superior Court,* 45 Cal. App.

8  4th 1093, 1103 (1996).  *See Citizens for a Better Environment v. Union Oil Co. of California,* 996 F.

9  Supp. 934 (N.D. Cal. 1997).  Plaintiffs' UCL claim states a cause of action for violation of the

10 federal antitrust laws as discussed above.

11 **C.    Plaintiffs Have Alleged Facts Sufficient To Show Defendants Engaged In Deceptive Or**

12 **Misleading Advertising Or Acted Fraudulently.**

13     Ordinarily, whether a practice is deceptive or fraudulent cannot be mechanistically

14 determined on the pleadings; "[r]ather the determination is one question of fact, requiring

15 consideration and weighing of evidence from both sides before it can be resolved." *McKell v.*

16 *Washington Mut., Inc.,* 142 Cal. App. 4th 1457, 1472, 49 Cal. Rptr. 3d 227, 240 (2005); *Linear*

17 *Technology Corp. v. Applied Materials, Inc.,* 152 Cal. App. 4th 115, 134-35, 61 Cal. Rptr. 3d 221,

18 236 (2007) ("Whether a practice is deceptive, fraudulent, or unfair is generally a question of fact

19 which requires 'consideration and weighing of evidence from both sides' and which usually cannot

20 be made on demurrer").  "In drafting the [UCL], the Legislature deliberately traded the attributes of

21 tort law for speed and administrative simplicity.  As a result, to state a claim under the UCL, one

22 need not plead and prove the elements of a tort.  Instead, one need only show that members of the

23 public are likely to be deceived." *Linear Technology Corp. v. Applied Materials, Inc.,* 152 Cal. App.

24 4th 115, 133-34, 61 Cal. Rptr. 3d, 221, 235-36 (2007.  The statute applies explicitly and separately to

25

26

27

28

misleading statements made to consumers.[14]  A statement with nothing more than a "tendency to mislead" violates the UCL. *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002).

Plaintiffs acknowledge that the statements made to the Legislature by the industry are protected by the *Noerr-Pennington* doctrine – including even statements that intentionally misled the Legislature.[15]  But statements to consumers are quite different.  There is no First Amendment protection for misleading advertising or commercial communication to consumers. *See Lorillard Tobacco Company v. Reilly*, 533 U.S. 525 (2001).  Here, the Complaint establishes that each bill from each of the Defendants includes an alleged "CTTC charge."  The implication is that the CTTC or the state is imposing that charge, and that it is a lawful charge as displayed.  But it is not a lawful "CTTC charge" emanating from statutory authority; it is an unlawfully arranged price fix pass-through.  Although state law allows an individual company to pass-through a charge for the industry obligation to fund the CTTC, it does not permit collusion to impose such a charge.  To not be misleading, the charge should read:  "industry arranged pass-through charge to fully fund its Tourism promotion obligation to the CTTC."  The Defendants might formulate a more concise descriptor, but the one each consumer now receives has a "tendency to mislead" as to the actual nature of the charge.  Further, the amount of the charge collected is substantially beyond the amount due from the industry under the statute.  Although the precise parameters of such an overcharge have not been pled because they require discovery for precise measurement, it is clear that the amount that is collected as a "CTTC charge" is substantially more than the amount paid to the state for CTTC specified contribution.

---

[14] *See also Business & Professions Code* section 17500, substantially subsumed by the UCL, also prohibiting deceptive and misleading statements.

[15] None of the causes of action pled by Plaintiffs are predicated on protected lobbying conduct:  any references to such conduct in the Complaint is quite clearly for background purposes only.  Defendants' invocation of *Noerr-Pennington* is therefore misplaced.  In *Eastern Railroad Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961) the Supreme Court immunized efforts to solicit competition - restricting legislation.  *See United Mine Workers v. Pennington*, 381 U.S. 657 (1965).  However, that government officials know or induce challenged private conduct does not create or even implicate immunity.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 225-26 (1940) (rejecting argument that antitrust immunity was conferred by federal officials' knowledge of and acquiescence in defendants' collaborative efforts).

Case No.: 07CV2174 H BLM

1        It is clear that the "practice of deceptively overcharging consumers" is a viable UCL cause of

2   action. *Buller v. Sutter Health, et al.*, ___ Cal. Rptr. 3d ___, 2008 WL 588399 at *5 (March 5,

3   2008). This is true on several levels as set forth above. Thus, listing charges on statements may

4   indeed allow for a finding that the charge listed could be deceptive. *McKell v. Washington Mut.,*

5   *Inc.*, 142 Cal. App. 4th 1457, 1472, 49 Cal. Rptr. 3d 227, 240 (2006) ("That the statement merely

6   lists the charge imposed does not preclude a finding it is deceptive"). Thus, in *Schnall v. Hertz*

7   *Corp.*, 78 Cal. App. 4th 1144, 1163, 93 Cal. Rptr. 2d 439, 453 (2000) it was held that "the allegedly

8   deceptive manner in which Hertz induces its customers to incur the charge" could constitute a

9   deceptive practice. *See People v. Dollar Rent-A-Car Systems, Inc.*, 211 Cal. App. 3d 119, 128-129,

10  259 Cal. Rptr. 191, 197(1989); *Progressive West Ins. Co. v. Yolo County Superior Court,* 135 Cal.

11  App. 4th 263, 285, 37 Cal. Rptr. 3d 434, 452 (2005) (finding cause of action had been stated because

12  "[t]his conduct is likely to deceive the public"). Here the public is deceived concerning both the

13  description of the 2.5% surcharge and its origin and genesis.

14  **D.    The Defendants' Acts Constitute "Unfair" Competition.**

15      Apart from the unlawful or misleading basis for UCL violation is the generic "unfair" act of

16  competition. Section 17200 lies in equity, and the precedents allow the Court to weigh all

17  circumstances, including corrupt motives, deceit, and cumulative impact. The test of whether a

18  business practice is unfair involves an examination of its impact on its alleged victim, balanced

19  against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must

20  weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victims...

21  *Podolsky v. First Healthcare Corp.*, 50 Cal. App. 4th 632, 647 (1996), citing *State Farm v. Superior*

22  *Court*, 45 Cal. App. 4th 1093, 1102.4 (1996).[16]

23      Hence, the Court, sitting in equity must ask: Is it generically "unfair" to consumers for these

24  defendants to publicly lie about two sources of price increase? A statute allows these Defendants to

25  pass through a CTTC charge to consumers as *individually determined* (allowing market forces to

26

27  [16] The California Supreme Court's more restrictive reading of "unfairness" in *Cel-Tech Communications, Inc., supra*, is confined to anticompetitive allegations of competitors, not by consumers. "As the [Supreme Court] itself acknowledged, we are not to read *Cel-Tech* as suggesting that such a restrictive definition of 'unfair' should be applied in the case of an

28  alleged consumer injury," *Smith v. State Farm Mutual Automobile Ins. Co.*, 93 Cal. App. 4th 700, 721-22 (2001).

1  limit the extent each company passes through or, alternatively, does not pass through and instead

2  contributes from its profits). Is it "unfair" – quite apart from an antitrust violation – to instead

3  collude and arrive at a 2.5% price hike so none of them will pay any of the CTTC charge from their

4  profit share? Is it "unfair" to advertise to the world (beyond the legislature) that they wish only for

5  consumers to know that some of their payment is going to "airports" as concession fees and not to

6  them, and that is why the charge is separately stated, when it is really not at all a "clarification" for

7  consumer benefit, but a collusively arranged and privately imposed price increase? Is it unfair to

8  mislabel items on bills to deceive consumers?

9  **E.     Proposition 64 Does Not Bar the UCL Claim.**

10          Finally, Defendants claim that California's Proposition 64 bars the case because the class

11  representatives must have suffered "financial harm" but have not. (Def't. Memo at 20-21). The class

12  representatives, and each member of the class as to each bill of each of the Defendants, have

13  suffered such financial harm as alleged. They have paid a 2.5% CTTC charge that is collusively,

14  unlawfully, and unfairly imposed and a higher airport concession fee collusively arranged.

15  Defendants improperly cite the *Pfizer*[17] case for the proposition that "plaintiff must have acted in

16  reliance on the allegedly false and misleading representations or advertisements" to have suffered

17  such financial harm. However, review has been granted in *Pfizer* (as Defendants properly note)

18  effectively mooting that holding. Moreover, that case involves the fraudulent practice end of the

19  UCL. Financial harm in an antitrust case does not involve "reliance" by the victim on anything.[18]

20  And here consumers do rely on the billing statement provided by Defendants. The statements

21  clearly assert a 2.5% surcharge by the CTTC and consumers pay the bill!

22

23  [17] The Supreme Court granted review in *Pfizer* (45 Cal. Rptr. 3d 840 (2006)) at which point the Appellate decision "is no longer considered published" Cal. Rules of Court 8.1105(e)(1) and such an opinion "must not be cited or relied on... ." Cal. Rules of Court 8.1115(a).

24

25  [18] The purpose of Proposition 64 was to prevent lawsuits ginned up by attorneys who had no clients suffering financial impact (and in the *Trevor* and other discipline cases giving rise to Proposition 64 had clients who were "in house" and

26  actually had no dealing whatever with the defendants). See ballot arguments for and against Proposition 64, and other documents informing the electorate's intent at http://igs.berkeley.edu/library/htProp64UnfairBusiness.html. Its purpose was not to eviscerate the substantive terms and coverage of competition law. Indeed, the Defendants' theory of a

27  required predicate of "actual reliance on misrepresentations" appears to mandate the elimination of all UCL coverage from not only anticompetitive offenses (where misrepresentations and reliance are rarely involved), but any other

28  unlawful or unfair act in competition that does not qualify as common law fraud.

1    As Defendants note, Proposition 64 requires only "that standing requirements of the United

2  States Constitution" apply. Defendants' Brief, page 20, lines 22-23. But, the United States Supreme

3  Court clearly established that consumers who suffer injury by being overcharged have constitutional

4  standing to assert those claims. *Reiter v. Sonotone,* 442 U.S. 330, 342-343, 99 S. Ct. 2326, 2332-

5  2333 (1979). Moreover, as set forth above, it is clear that consumers who have been "deceptively

6  overcharged" may assert a claim. *See, e.g., McKell v. Washington Mut., Inc.,* 142 Cal. App. 4th

7  1457, 1472, 49 Cal. Rptr. 3d 227, 240 (2006); *Day v. AT&T Corp.,* 63 Cal. App. 4th 325, 334, 74

8  Cal. Rptr. 2d 55, 61 (1998) ("We emphasize that it is immaterial under the statutes pursuant to which

9  appellants have sued whether a consumer has been *actually misled* by an advertiser's

10  representations. It is enough that the language used is likely to deceive, mislead or confuse"). *See,*

11  *e.g., Buller v. Sutter Health,* ___ Cal. Rptr. 3d ___, 2008 WL 588399 (March 5, 2008)

12  (distinguishing cases that "involved the practice of deceptively overcharging consumers" from other

13  cases requiring additional pleading). Here, the billing statements assert a 2.5% surcharge, and

14  consumers, and each of them, pay the bill! The Supreme Court, in upholding standing for

15  consumers, noted that the Sherman Act was designed as a "consumer welfare prescription" and thus

16  consumers had standing to assert claims of overcharge. *Reiter v. Sonotone Corp.,* 442 U.S. 330,

17  342-43, 99 S. Ct. 2326, 2332-2333 (1979). A *fortiori,* this state consumer welfare prescription

18  known as the UCL would not deprive consumers, the only possible category of plaintiffs able to

19  complain, of standing to challenge this unfair competition.

20

21

22

23

24

25

26

27

28

Case No.: 07CV2174 H BLM

1

## V.  CONCLUSION

2

For the reasons described above, Defendants' Motions to Dismiss should be denied.

3

4  Dated: March 11, 2008

**SULLIVAN HILL LEWIN REZ & ENGEL**
**A Professional Law Corporation**

5

6

7  By: /s/ Donald G. Rez

Donald G. Rez
Attorneys for Plaintiff Class
rez@shlaw.com
550 West "C" Street, Suite 1500
San Diego, California 92101
Telephone:      (619) 233-4100
Facsimile:(619) 231-4372

8

9

10

11

**CENTER FOR PUBLIC INTEREST LAW**
**University of San Diego School of Law**
ROBERT C. FELLMETH
cpil@sandiego.edu
Ed HOWARD
5998 Alcala Park
San Diego, CA 92110
Telephone:    (619) 260-4806
Facsimile:    (619) 260-4753

12

13

14

15

16

**HULETT, HARPER, STEWART**
Dennis Stewart
Kirk Hulett
550 West "C" Street, Suite 1600
San Diego, CA 92101
Telephone:      (619) 338-1133
Facsimile:      (619) 338-1139
dstewart@hulettharper.com

17

18

19

20

Attorneys for Plaintiff

21

22

23

24

25

26

27

28

25                        Case No.: 07CV2174 H BLM

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MICHAEL SHAMES; GARY GRAMKOW, on behalf of themselves and on behalf of all persons similarly situated, | ) ) ) ) | Case No. 07 CV 2174 H BLM **CERTIFICATE OF SERVICE** |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| THE HERTZ CORPORATION, a Delaware corporation; DOLLAR THRIFTY AUTOMOTIVE GROUP, INC., a Delaware corporation; AVIS BUDGET GROUP, INC., a Delaware corporation; VANGUARD CAR RENTAL USA, INC., an Oklahoma corporation; ENTERPRISE RENT-A-CAR COMPANY, a Missouri corporation; FOX RENT A CAR, INC., a California corporation; COAST LEASING CORP., a Texas corporation; THE CALIFORNIA TRAVEL AND TOURISM COMMISSION and CAROLINE BETETA | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

IT IS HEREBY CERTIFIED THAT:

I, CYNTHIA FREDERICK, am a citizen of the United States and am at least eighteen years of age. My business address is 550 West "C" Street, Suite 1500, San Diego, California 92101.

I am not a party to the above-entitled action. I have caused service of the following documents:

1.    **OPPOSITION TO MOTIONS TO DISMISS**

on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notified them. I also hereby certify that on March 11, 2008, I mailed the foregoing document or paper via the United States Postal Service, First-Class mail, postage prepaid on the following parties:

1      1.      **SEE ATTACHED SERVICE LIST**

2      I declare under penalty of perjury that the foregoing is true and correct.

3      Executed on March 11, 2008.

4

5                                              CYNTHIA FREDERICK

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## SERVICE LIST

2

*Michael Shames, et al. v. The Hertz Corporation*
**USDC Case No. 07 CV 2174 H BLM**

3

4

Service by Electronic Case Filing System and First- Class Mail, Postage Pre-Paid:

5

| ADDRESSEE | PARTY |
|---|---|

6

Richard G. Parker
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006
Tele:   (202) 383-5380
Fax:    (202) 383-5410
rparker@omm.com

**Attorneys for Defendant The Hertz Corporation**

7

8

9

10

11

Michael F. Tubach
Thomas P. Brown
**O'MELVENY & MYERS LLP**
Embarcadero Center West
275 Battery Street, Suite 2600
San Francisco, CA 94111-3305
Tele:   (415) 984-8700
Fax:    (415) 984-8701
mtubach@omm.com
tbrown@omm.com

**Attorneys for Defendant The Hertz Corporation**

12

13

14

15

16

17

Gerald A. Stein
**O'MELVENY & MYERS LLP**
Times Square Tower
Seven Times Square
New York, NY 10036
Tele:   (212) 326-2000
Fax:    (212) 326-2061
gstein@omm.com

**Attorneys for Defendant The Hertz Corporation**

18

19

20

21

22

Jeffrey A. LeVee
**JONES DAY**
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2300
Tele:   (213) 489-3939
Fax:    (213) 243-2539
jlevee@jonesday.com

**Attorneys for Dollar Thrifty Automotive Group, Inc.**

23

24

25

26

27

28

| ADDRESSEE | PARTY |
|---|---|
| Michael L. Weiner (*Pro Hac Vice*)<br>**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**<br>Four Times Square<br>New York, NY 10036-6522<br>Tele:   (212) 735-2666<br>Fax:    (212) 735-2000<br>mweiner@skadden.com | **Attorneys for Avis Budget Group, Inc.** |
| Douglas B. Adler<br>**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**<br>300 South Grand Avenue, Suite 3400<br>Los Angeles, CA 90071-3144<br>Tele:   (213) 687-5000<br>Fax:    (213) 621-5120<br>Douglas.adler@skadden.com | **Attorneys for Avis Budget Group, Inc.** |
| Sara L. Bensley (*Pro Hac Vice*)<br>**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**<br>1440 New York Ave., NW<br>Washington, DC 20005-2111<br>Tele:   (202) 371-7000<br>Fax:    (202) 393-5760<br>sbensley@skadden.com | **Attorneys for Avis Budget Group, Inc.** |
| Gregory D. Call<br>Beatrice B. Nguyen<br>**FOLGER LEVIN & KAHN LLP**<br>Embarcadero Center West<br>275 Battery Street, 23rd Floor<br>San Francisco, CA 94111<br>Tele:   (415) 986-2800<br>Fax:    (415) 986-2827<br>gcall@flk.com<br>bnguyen@flk.com | **Attorneys for Defendants Enterprise Rent-A-Car Company and Vanguard Car Rental USA, Inc.** |
| Jennifer S. Romano<br>**FOLGER LEVIN & KAHN**<br>1900 Avenue of the Stars, 28th Floor<br>Los Angeles, CA 90067<br>Tele:   (310) 556-3700<br>Fax:    (310) 556-3770<br>jromano@flk.com | **Attorneys for Defendants Enterprise Rent-A-Car Company and Vanguard Car Rental USA, Inc.** |

| ADDRESSEE | PARTY |
|---|---|
| John H. Stephens<br>**WERTZ MCDADE WALLACE MOOT & BROWER**<br>945 Fourth Avenue<br>San Diego, CA 92101<br>Tele:  (619) 233-1888<br>Fax:  (619) 696-9476<br>jstephens@wertzmcdade.com | **Attorneys for Defendant Fox Renta A Car dba Payless Rent-A-Car** |
| T. Patrick Long<br>**LONG, WILLIAMSON AND DELIS**<br>400 N. Tustin Avenue, Suite 370<br>Santa Ana, CA 92705<br>Tele:  (714) 668-1400<br>Fax:  (714) 668-1411<br>palong@lw-d.com | **Attorneys for Defendants Coast Leasing Corp. dba Advantage Rent A Car** |
| Thadd A. Blizzard<br>Michael Kvarme<br>W. Scott Cameron<br>**WEINTRAUB GENSHLEA CHEDIAK**<br>400 Capitol Mall, Eleventh Floor<br>Sacramento, CA 95814<br>Tele:  (916) 558-6000<br>Fax:  (916) 446-1611<br>cpost@weintraub.com | **Attorneys for Defendant California Travel and Tourism Commission** |
| Edmund G. Brown, Jr.<br>**ATTORNEY GENERAL OF THE STATE OF CALIFORNIA**<br>W. Dean Freeman<br>Felix E. Leatherwood<br>Supervising Deputy Attorneys General<br>Ronald N. Ito<br>Diane Spencer Shaw<br>Lisa W. Chao<br>Deputy Attorney General<br>300 S. Spring Street, Suite 1702<br>Los Angeles, CA 90013<br>Tele:  (213) 897-2477<br>Fax:  (213) 897-5775 | **Attorneys for Defendants Caroline Beteta and The California Travel and Tourism Commission** |