1  | Center for Public Interest Law
University of San Diego School of Law
2  | Robert C. Fellmeth, SBN 49897
Ed Howard, SBN 151936
3  | 5998 Alcala Park
San Diego, CA 92110
4  | Telephone:    (619) 260-4806
Facsimile:     (619) 260-4753
5  | cpil@sandiego.edu

6  | Sullivan, Hill, Lewin, Rez & Engel
A Professional Law Corporation
7  | Donald G. Rez, SBN 82615
550 West "C" Street, Suite 1500
8  | San Diego, California 92101
Telephone:    (619) 233-4100
9  | Facsimile:     (619) 231-4372
rez@shlaw.com
10 |

Hulett Harper Stewart LLP
Dennis Stewart, SBN 99152
Kirk Hulett, SBN 110726
Jennifer Kagan, SBN 234554
550 West "C" Street, Suite 1600
San Diego, CA 92101
Telephone:    (619) 338-1133
Facsimile:     (619) 338-1139
dstewart@hulettharper.com

11 | Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

MICHAEL SHAMES; GARY
GRAMKOW, on behalf of themselves and
on behalf of all persons similarly situated,

        Plaintiffs,

v.

THE HERTZ CORPORATION, a
Delaware corporation; DOLLAR
THRIFTY AUTOMOTIVE GROUP, INC.,
a Delaware corporation; AVIS BUDGET
GROUP, INC., a Delaware corporation;
VANGUARD CAR RENTAL USA, INC.,
an Oklahoma corporation; ENTERPRISE
RENT-A-CAR COMPANY, a Missouri
corporation; FOX RENT A CAR, INC., a
California corporation; COAST LEASING
CORP., a Texas corporation; THE
CALIFORNIA TRAVEL AND TOURISM
COMMISSION and CAROLINE BETETA

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 07CV2174 H BLM

**OPPOSITION TO MOTION BY
CTTC TO DISMISS FIRST
AMENDED COMPLAINT**

**[CLASS ACTION]**

Date:          July 14, 2008
Time:          10:30 a.m.
Ctrm:          13

Judge:         Hon. Marilyn L. Huff
Trial Date:    Not Set
Complaint Filed: November 14, 2007

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**Page**

I.    Introduction ................................................................................................................. 1

    A.    The CTTC As Nucleus of All Wrongdoing ..................................................... 2

    B.    There Is No "State Action" Immunity Here ................................................... 3

II.    No Statutory Authority for Agreement to Uniformly Pass Through The Tourism
Commission Assessment .............................................................................................. 6

III.    No Statutory Authority for Transforming Itemization into a 9% Unfair Price Increase ......... 10

IV.    CTTC Status for "*Independent* State Action" Supervision ........................................... 11

    A.    The CTTC is not a "Political Subdivision" of the State of California .................... 13

    B.    CTTC is Industry-Appointed and Industry-Controlled ....................................... 17

V.    CTTC Involvement and Bagley-Keene Open Meeting Act Violations ................................ 19

VI.    Miscellaneous CTTC Contentions Lacking Merit ......................................................... 22

    A.    Inapplicability of the State Cartwright Act ...................................................... 22

    B.    Standing of Shames ................................................................................... 22

VII.    Conclusion ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*324 Liquor Corp. v. Duffy,*
    479 U.S. 335, 344-45, 107 S. Ct. 720, 725-726 (1987) .................................................... 18

*Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.,*
    155 F.3d 59 (2d Cir., 1998) ............................................................................................... 15

*Bankers Insurance Co. v. Fla. Residential Property & Casualty Underwriting Ass'n,*
    137 F.3d 1293, 1297 (11th Cir. 1998) ........................................................................ 15, 17

*Blumenthal v. U.S.,*
    332 U.S. 539, 557, 68 S. Ct. 248, 256 (1947) ................................................................. 20

*California Retail Liquor Dealers Assn., v. Midcal Aluminum,*
    445 U.S. 97, 105, 100 S. Ct. 937, 943 (1980) ................................... 3, 6, 12, 14, 16

*Cantor v. Detroit Edison Co.,*
    428 U.S. 579, 592-593, 96 S. Ct. 3110, 3118-19 (1976) ................................................ 13

*Carnegie-Mellon Univ. v. Cohill,*
    484 U.S. 343, 350, 108 S. Ct. 614, 619 (1988) ............................................................... 19

*Catalano, Inc. v. Target Sales, Inc.,*
    446 U.S. 643, 100 S. Ct. 1925 (1980) ............................................................................. 14

*Chicago v. International College of Surgeons,*
    522 U.S. 156, 165-66 (1997) ........................................................................................... 23

*City of Lafayette v. Louisiana Power & Light Co.,*
    435 U.S. 389, 398-99, 98 S. Ct. 1123, 1129, 55 L.Ed.2d 364 (1978) ............................... 7

*Columbia Steel Casting Co., Inc. v. Portland General Elec. Co.,*
    111 F.3d 1427, 1436 (9th Cir. 1996), *cert. denied,* 118 S. Ct. 1688 (1998) .................. 7, 16

*Costco Wholesale Corp. v. Maleng,*
    522 F.3d 874, 887 (9th Cir. 2008) .............................................................................. 12, 14

*Daniel v. American Bd. of Emergency Medicine,*
    988 F. Supp. 127, 182 n.52 (W.D. N.Y. 1997) ................................................................ 13

*Finlan v. City of Dallas,*
    888 F. Supp. 779, 784 (N.D. Tex. 1995) ......................................................................... 23

*FTC v. Ticor Title Ins. Co.,*
    504 U.S. 621, 636, 112 S. Ct. 2169, 2176, 119 L.Ed.2d 410 (1992) ................................ 7

*Glen Holly Entertainment, Inc. v. Tektronix, Inc.,*
    343 F.3d 1000, 1014 (9th Cir. 2003) ................................................................................. 5

*Goldfarb v. Virginia State Bar,*
    421 U.S. 773, 790, 95 S. Ct. 2004, 2015 (1975)............................................. 3, 11, 13, 14, 22

*Hass v. Oregon State Bar,*
    883 F.2d 1453, 1457 (9th Cir. 1989), *cert. denied,* 110 S. Ct. 1812 (1990)........................ 13

*In re Universal Service Fund Telephone Billing Practices Litigation,*
    219 F.R.D. 661, 681 (D. Kan. 2004)................................................................ 8

*International Fed'n of Pro'l & Tech. Eng'rs, Local 21, AFL-CIO v. Superior Court,*
    42 Cal. 4th 319, 328-29 (2007)..................................................................... 23

*Knudsen Corp. v. Nevada State Dairy Comm'n,*
    676 F.2d 374, 378 (9th Cir. 1982) ................................................................. 22

*Kochert v. Greater Lafayett Help Services, Inc.,*
    463 F.3d 710, 715 (7th Cir. 2006), *cert. denied,* 127 S. Ct. 1328 (2007)............................. 5

*Linda R.S. v. Richard D.,*
    410 U.S. 614, 617 n.3, 93 S. Ct. 1146, 1149 (1973)................................................. 24

*Massachusetts v. EPA,*
    127 S. Ct. 1438, 1453 (2007)....................................................................... 24

*McClain v. Real Estate Board of New Orleans,*
    444 U.S. 232, 100 S. Ct. 502 (1980)................................................................ 4

*MedImmune, Inc. v. Genentech, Inc.,*
    127 S. Ct. 764, 771 (2007)......................................................................... 24

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
    473 U.S. 614, 652, 105 S. Ct. 3346, 3367 (1985)................................................... 6

*National Electrical Contractors Association, Inc. v. National Constructors Association,*
    678 F.2d 492, 501 (4th Cir. 1982) ................................................................. 14

*Patrick v. Burget,*
    486 U.S. 94, 100-01, 108 S. Ct. 1658, 1663 (1988) ..................................... 2, 6, 12, 18

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n., Inc.,*
    814 F.2d 358, 368 (7th Cir. 1987) ................................................................. 5

*Sanders v. Brown,*
    504 F.3d 903 (9th Cir. 2007), *cert. denied,* 2008 WL 292872 (Mem) (2008)...................... 16

*U.S. v. Consolidated Packaging Corp.,*
    575 F.2d 117, 127 (7th Cir. 1978) ................................................................. 20

*U.S. v. Socony-Vacuum Oil Co.,*
    310 U.S. 150, 223, 60 S. Ct. 811, 844 (1940)...................................................... 4

*U.S. v. Topco Associates, Inc.,*
    405 U.S. 596, 610, 92 S. Ct. 1126, 1135 (1972).................................................... 6

*Walker v. County of Santa Clara,*
    2005 WL 2437037, at *7 (N.D. Cal. Sept. 30, 2005) ........................................................... 24

*Yeager's Fuel v. Pennsylvania Power and Light Co.,*
    22 F.3d 1260, 1266 (3d Cir. 1994)........................................................................................ 6

*Zenith Radio Corp. v. Hazeltine Research,*
    395 U.S. 100, 130, 89 S. Ct. 1562, 1580 (1969)................................................................. 22

**Statutes**

15 U.S.C. § 1 ............................................................................................................................ 4

15 U.S.C. § 26.......................................................................................................................... 22

28 U.S.C. §1367(a) .................................................................................................................. 19

Government Code § 11130 ................................................................................................. 23, 25

Government Code § 11130(a)................................................................................................... 23

Government Code § 11130.3 .................................................................................................... 25

Government Code § 13995.40.5(a)............................................................................................. 2

Government Code
    § 13995.65(f).................................................................................................... 1, 4, 7, 8

**Other Authorities**

ABA Section of Antitrust Law, *Antitrust Law Developments* at 84 (6th ed. 2007) ..................... 5, 22

AREEDA & HOVENKAMP IA *Antitrust Law* ¶ 224d at 97 (3d ed. 2006) ..................................... 13

California Constitution Art. 1, § 3(b)(1) ..................................................................................... 23

## I.    Introduction

Plaintiffs file this brief in opposition to Defendant California Travel and Tourism Commission's ("CTTC") Motion to Dismiss the First Amended Complaint ("FAC").  A number of the arguments presented by the CTTC are addressed in Plaintiffs' opposition to the motion to dismiss filed by the Rental Car Defendants, filed in conjunction herewith.  This response focuses on the particular arguments of the CTTC and is better considered after review of Plaintiffs' Opposition to the Rental Car Defendants' Motion to Dismiss.

CTTC's assertions are flawed both factually and legally.  The one thing Plaintiffs and all seven of the Rental Car Defendants agree on is that the CTTC is at the "nucleus" of the instant allegations.  Plaintiffs have clearly alleged (and indeed have provided rather extraordinary evidentiary support for the allegations) that the CTTC facilitated, participated in, and financially benefited from a conspiracy to fix and raise prices for rental cars at California airports.  And the relationship between the CTTC, its violations of the Bagley-Keene Act and the illegal cartel by the Rental Car Defendants of passing-through the entire 2.5% tourism commission assessment and uniformly hiking base car rental rates 9% is inextricable and intertwined as the pre-discovery FAC Exs. A-I support.  Legally, the CTTC assertion that the "state action" affirmative defense exempts its conduct from antitrust liability is wrong.  There simply is no state policy articulating an intent that price competition among Defendants (for either the tourism commission assessment or the base rate hike) be displaced.  Indeed, the Legislature provided directly to the contrary (and in favor of continued competition) when it statutorily provide that each individual company "may" (but are not required to) "pass on" "some or all" of the CTTC assessment "notwithstanding any other provision of law." (Gov't Code § 13995.65(f).)[1]  Nor can the CTTC be said to qualify under the "active supervision" requirement for state action immunity.  That requirement assures that the state action defense "will shelter only the particular anticompetitive acts of private parties that, in the judgment of the state, actually further state regulatory policies." *Patrick v. Burget*, 486 U.S. 94, 100-01, 108

---

[1] Statutory references herein are to the California Government Code unless otherwise indicated.

S. Ct. 1658, 1663 (1988). Here, nothing about the state statute permits displacement of competition and nothing about the CTTC permits it to protect against anticompetitive acts of private parties; indeed the CTTC has facilitated a private cartel.

### A.    The CTTC As Nucleus of All Wrongdoing

The one thing the Plaintiffs and all seven of the Rental Car Defendants agree on is that the CTTC is at the "nucleus" of the instant allegations. And the relationship between the CTTC, the Bagley-Keene Act, and the illegal price-fixing cartel by all competing Rental Car Defendants is inextricably intertwined:

(a)    The CTTC receives 79% of its budget from the Rental Car Defendants.[2] All of these monies come from the CTTC 2.5% assessment here at issue.

(b)    The 2.5% pass-through price fix allegation involves CTTC facilitation operationally, and beyond its role as sole beneficiary. In the minutes of October 3, 2006 of the CTTC Executive Committee, **the first item of business is "Rental Car Pass Through Fees."** (FAC Ex. G.) Not "assessment of industry" as the statute provides, but "pass through fees" – an *ultra vires* jump. At the bottom of the first page of the minutes of this meeting, there is a Government Affairs Update paragraph describing the passage of AB 2592, and reporting that "**the CTTC has acquired a partnership with the rental car industry to secure a long-term funding solution for the CTTC...** . (*See* FAC ¶¶ 39-41, and Exs. F and G.)

(c)    After passage, the CTTC administered the referendum of Defendants authorizing the assessment and served as the vehicle for illicit communications for private coordination. That election, although authorized by statute, was distorted into the approval of a uniform final consumer charge (FAC ¶ 39, Ex. D "**everyone agreed to continue the funding as long as the pass-through was in place,**").[3] Secrecy of the CTTC in so functioning is part of the "nucleus" of the alleged violation.

---

[2] http://renew.visitcalifornia.com/library/PDF/CTTC_PalmCard_STATEWIDE.pdf. The Rental Car Defendants currently occupy four seats on the CTTC and are statutorily authorized (and are expected) to increase to six. The CTTC Bylaws provide that Commission industry membership is to be proportional to financial contribution (Article IV, Section 5). AB 2592 added Government Code Section 13995.40.5(a) to provide for a maximum of six rental car members. The current four include appointees of Defendants Dollar/Thrifty (Brian Carpenter), Avis/Budget (Bob Muhs), Hertz (Brian Kennedy), and Enterprise (Kathy Turner).

[3] *See also*, FAC Ex. G, transforming the issue on CTTC meeting agendas from industry assessment to "rental car pass through fees."

(d)    FAC Ex. I is an e-mail **communication from Defendant National Rental Car complaining to the CTTC staff that another (competing) Rental Car Defendant is failing to pass through the 2.5% CTTC** charge in its billing. Such an affront makes National "look bad" and the matter is to be resolved through the offices of the CTTC. The CTTC response? Dated January 16, 2007, CTTC staffer Terri Toohey writes: "**I will discuss the issue with our executive director. We also have a meeting planned with industry next week and I will put it on the agenda.**" On January 31, 2007, CTTC issued a notice of a Feb. 14, 2007 Executive Committee meeting. There is only one thing on the agenda of that meeting – and it is a **CLOSED SESSION entitled "Analysis of Legal Issues on Various Funding Requests and Proposals." This is an unlawful closed session under the Bagley-Keene Act.** It failed to cite the Government Code section authorizing the closed session, and its agenda specification was impermissibly vague (as its agenda item listing have been consistently over the agency's history).[4] Shortly thereafter, Avis fell into line and began to include the 2.5% CTTC fee on all of its customer invoices.[5]

(e)    In order to further facilitate the combination, the CTTC included on its web site the following line baldly stating:  **"This assessment rate [the CTTC charge] shall be passed through to the customer."** Not "may be" (the language of the statute) or could be. Shall be. (FAC Ex. H.)

## B.    There Is No "State Action" Immunity Here

The CTTC assertion that its conduct is exempted from antitrust scrutiny by the "state action" exemption to antitrust liability is wrong. The Supreme Court adopted a two-part standard for "state action" immunity: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy,' second, the policy must be 'actively supervised by the state itself.'" *California Retail Liquor Dealers Assn., v. Midcal Aluminum*, 445 U.S. 97, 105, 100 S. Ct. 937, 943 (1980). As the Supreme Court concluded in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 790, 95 S. Ct. 2004, 2015 (1975) (striking down Virginia's mandatory attorney fee schedules): "Here we need not inquire further into the state-action question because it cannot be fairly said that the State of

---

[4] The email and obtuse CTTC closed session suggests the catch-22 in foreclosing antitrust cases short of discovery. The CTTC has not made full disclosure pursuant to the Public Records Act request by Plaintiffs. And it has secreted minutes of the discussion of National Rental Car's grievance over the failure of all six of its competitors to follow the pattern of 100% fee pass-through to consumers.

[5] "State enforcement of adherence to privately set, supra-competitive prices is precisely the danger which the Supreme Court envisioned in crafting the hybrid and active supervision tests." *Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 896 (9th Cir. 2008).

1  Virginia through its Supreme Court Rules required the anticompetitive activities of either respondent

2  [including the State Bar of Virginia]"[6]  Similarly, here, there is no state policy articulating the

3  Legislature's intent to displace price competition among Defendants; that is the fundamental fallacy

4  of the CTTC's argument.  To the contrary, the Legislature provided for competition when it said

5  individual assessed businesses "may" (but are not required to) "pass on" "some or all" of the CTTC

6  assessment "notwithstanding any other provision of law." (Gov't Code § 13995.65(f).)  Clearly the

7  Legislature anticipated competition, not cartelization; the legislation provided **for** that competition,

8  not displacement of it. "It is not enough that anticompetitive conduct is 'prompted' by state action;

9  rather it must be compelled by direction of the state acting as a sovereign." *Goldfarb, supra,* at 791,

10  95 S. Ct. at 2015.  Again, the Supreme Court language applies dispositively:  "The fact that the State

11  Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to

12  foster anticompetitive practices for the benefit of its members." *Id.* at 791, 95 S. Ct. at 2015.

13  Similarly, that the CTTC may be a state agency for "some limited purposes" does not create an

14  antitrust shield that allows it to foster antitrust practices for the benefit of its members. *Goldfarb* is

15  mainstream law.

16        Federal antitrust law prohibits "every contract, combination in the form of trust or otherwise,

17  or conspiracy, in restraint of trade or commerce..." 15 U.S.C. § 1.  Where they affect interstate

18  commerce, such restraints are prohibited as a matter of federal supremacy.[7]  Price fixing is the core

19  concern of the antitrust laws, and any agreement among competitors to raise, depress, fix, peg, or

20  stabilize prices is illegal *per se* under the federal antitrust laws. *See, e.g., U.S. v. Socony-Vacuum Oil*

21  *Co.*, 310 U.S. 150, 223, 60 S. Ct. 811, 844 (1940). "Courts have held *per se* unlawful agreements

22  among competitors to establish uniform costs and markups, **impose mandatory surcharges**, specify

23  price differentials between grades of a product, adopt common classifications of customers entitled

24  ――――――――――――――――――

25  [6] Thus, the bulk of CTTC's discussion of the "state action" issue is irrelevant.  However the CTTC is characterized (whether as a political subdivision or not), the price fixing here cannot be immunized.

26  [7] The airport car rental market "affects interstate commerce." *McClain v. Real Estate Board of New Orleans*, 444 U.S. 232, 100 S. Ct. 502 (1980).

27

28

1  to discounts, and standardize the percentage of functional discounts." ABA Section of Antitrust

2  Law, *Antitrust Law Developments* at 84 (6th ed. 2007) (emphasis added). The "principal purpose of

3  the antitrust laws is to prevent overcharges to consumers." *Kochert v. Greater Lafayett Help*

4  *Services, Inc.*, 463 F.3d 710, 715 (7th Cir. 2006), *cert. denied*, 127 S. Ct. 1328 (2007) , quoting

5  *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n., Inc.*, 814 F.2d 358, 368 (7th Cir. 1987).

6  "[T]he antitrust laws are designed to protect customers from the harm of unlawfully elevated prices."

7  *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1014 (9th Cir. 2003)

8    The instant FAC alleges two intertwined horizontal price-fixing wrongs: (a) the agreement to

9  uniformly pass through to consumers the 2.5% tourism commission assessment; and (b) the

10  agreement to transform a statute authorizing the separate itemization of a 9% "airport concession

11  fee" (to enhance consumer information) into a uniform 9% add-on charge. The CTTC served as the

12  vehicle for the unlawful cartel pricing. Its involvement is invoked by all Defendants, each claiming

13  "state action" qualified immunity. The CTTC served as the forum for agreements, published

14  instructions to execute the restraint, and enforced it. The Bagley-Keene Open Meeting Act

15  allegations are highly relevant – both because this statute is cited as a basis for special "political

16  subdivision" status by the CTTC itself (notwithstanding its noncompliance) and because its violation

17  facilitated the sometimes secretive forum for the acts here alleged.

18    Defendant CTTC contends that these acts do not violate antitrust law chiefly because:

19    (a)  they were authorized by state law, or are the natural consequences of such

20       authorization (CTTC Brief at 7-9), and that

21    (b)  following such authorization, administration by the CTTC was proper "state action"

22       because

23      (1)  the CTTC is a "political subdivision of the state" analogous to the state bar or

24         to towns and cities, or

25      (2)  the CTTC actually qualifies to exercise independent state supervision. (CTTC

26         Brief at 4-13.)

27

28

::ODMA\PCDOCS\PCDOCS\285303\2             Case No.: 07CV2174 H BLM

5

1   Defendants must establish state authorization to displace competition. Federal law requires

2   competition – especially independent pricing by direct competitors.[8] The state's ability to fashion

3   exceptions to federal law (under the "state action" exception to federal antitrust liability) is limited.

4   The conduct must be *"clearly articulated and affirmatively expressed* as state policy" and "the policy

5   must be 'actively supervised' by the state itself." *California Retail Liquor Dealers Association v.*

6   *Midcal Aluminum, Inc.* 445 U.S. 97, 105, 100 S. Ct. 937, 943 (1980). Both here fully apply.

7   **II.    No Statutory Authority for Agreement to Uniformly Pass Through The Tourism
        Commission Assessment**

8

9       "State action" immunity is an affirmative defense as to which the defendant asserting it

10  "bears the burden of proof." *Yeager's Fuel v. Pennsylvania Power and Light Co.*, 22 F.3d 1260,

11  1266 (3d Cir. 1994). The burden falls on the Defendants to show that the Legislature is specifying

12  more than a contribution to the CTTC budget from industry (which it does authorize) and also

13  *allowing* ("may" is the operative term in the statute) a pass through as individually decided by

14  competitors. State action immunity is strictly and rigorously limited:

15          The state-action doctrine cloaks anticompetitive conduct with antitrust immunity only
            if the state's intent to displace competition with regulation is "clearly articulated and
16          affirmatively expressed as state policy." *Midcal*, 445 U.S. at 105, 100 S. Ct. at 943
            (upholding state wine pricing system because "[t]he legislative policy is forthrightly
17          stated and clear in its purpose to permit resale price maintenance"). The *Midcal* test
            is a "rigorous" one that "ensure[s] that private parties [can] claim state-action
18          immunity from Sherman Act liability only when their anticompetitive acts [are] truly
            the product of state regulation." *Patrick v. Burget*, 486 U.S. 94, 100, 108 S. Ct. 1658,
19          1662, 100 L.Ed.2d 83 (1988). It guarantees that the "private party's anticompetitive
            conduct promotes state policy, rather than merely the party's individual interests, id.
20          at 101, 108 S. Ct. at 1663, and limits the spread of an immunity that is "disfavored,

21

22  [8] "Antitrust laws in general, and the Sherman Act in particular...are as important to the preservation of
    economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental
23  personal freedoms." *U.S. v. Topco Associates, Inc.*, 405 U.S. 596, 610, 92 S. Ct. 1126, 1135 (1972). "The
    Sherman and Clayton Acts reflect Congress' appraisal of the value of economic freedom; they guarantee the
24  vitality of the entrepreneurial spirit. Questions arising under these Acts are among the most important in
    public law." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 652, 105 S. Ct. 3346,
25  3367 (1985). The federal interest in enforcing the national policy in favor of competition, while expressed
    through statute rather than a constitutional provision, is paramount in that Congress exercised all the power it
26  possessed under the Commerce Clause when it approved the Sherman Act. As the Supreme Court has
    repeatedly noted, it "must acknowledge the importance of the Act's procompetition policy." *California Retail
27  Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110-111, 100 S. Ct. 937, 946 (1980).

28

1  much as are repeals [of the antitrust laws] by implication," *FTC v. Ticor Title Ins.*
   *Co.*, 504 U.S. 621, 636, 112 S. Ct. 2169, 2176, 119 L.Ed.2d 410 (1992), because of
2  Congress's "overarching and fundamental policies" protecting competition, *City of*
   *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 398-99, 98 S. Ct. 1123,
3  1129, 55 L.Ed.2d 364 (1978)."

4  *Columbia Steel Casting Co., Inc. v. Portland General Elec. Co.*, 111 F.3d 1427, 1436 (9th Cir.

5  1996), *cert. denied*, 118 S. Ct. 1688 (1998). The CTTC here argues that the Court should imply,

6  contrary to the rather specific "notwithstanding any other provision of law" instruction of

7  Section 13995.65(f), that the Legislature has nevertheless authorized an entity controlled by industry

8  to: (a) determine how much each rental car competitor will uniformly charge consumers, (b) collect

9  that money, and (c) apparently allow each to keep any sums that exceed the statutory amount they

10  owe as fees. Nothing "clearly articulated and affirmatively expressed as state policy'" supports such

11  a proposition.

12  Plaintiffs agree that AB 2592, enacted in 2006, allows for the collection of monies to relieve

13  the general fund of much of its contribution to the CTTC. That money is to be collected from each

14  of the seven competitors (then nine as the industry was formatted in 2006). The CTTC has properly

15  implemented that portion of the statute by requiring revenue data from each Rental Car Defendant so

16  that each can pay its proportionate sum. (*See* FAC ¶¶ 35-36). Since the funds are not assessed from

17  consumers, but privately from industry, the statute provides for the pre-approval of the assessment

18  by the car rental competitors in a "referendum." The CTTC Memorandum of Agreement then

19  provides that the industry's obligation to make the specified contribution for CTTC financing is

20  *conditioned* on the continuation of the right to separately state (itemize) the "airport concession fee."

21  (FAC Ex. A.) The CTTC argues that the "assessment was set at 2.5%" (CTTC Brief at 9:27) – using

22  the passive voice to obscure the fact that it was not so set by legislation (nor does the statute

23  authorize the CTTC to set a final consumer charge). Why would anyone think that this is intended

24  by the Legislature as a statutorily - or CTTC - set add-on fee to be directly charged to consumers?

25  The statute provides for a detailed calculation by CTTC not of a consumer charge, but of the

26  assessed amount that each of the Rental Car Defendants is to pay. (*See* Section 13995.65(h).) If

27  competition was to be displaced, the Legislature would have mandated that all the surcharges be

28  passed through, instead, competition was anticipated so that only some (or none) of the surcharge

1  would be passed through. (Section 13995.65(f).) The Legislature knew that "[i]n a truly

2  competitive market" surcharge rates would not be at the highest possible level, *In re Universal*

3  *Service Fund Telephone Billing Practices Litigation*, 219 F.R.D. 661, 681 (D. Kan. 2004), and that

4  is what the Legislature here anticipated.

5      Defendants' "legislative intent" argument fails on many levels. First, it does **not** meet the

6  requisite "clearly articulated and affirmatively expressed as state policy" standard. Rather, the

7  history is rather common. Many state agencies collect fees to fund their own activities; the CTTC is

8  but one. The Legislature commonly specifies either a fee on licensees under agency jurisdiction, or

9  a ceiling for fee assessment (of licensees or businesses – *not* the final consumer). Applicable

10  statutes throughout the California codes explicitly outline the agency's power to set and charge the

11  license fees paid by industry. In no instance, and as to any state agency, does that assessment imply

12  the right of assessed businesses to pass through those charges by collusive agreement.[9]

13      Defendants advance the remarkable proposition that approval for a price-fixing agreement

14  may be implied from a system that (a) specifically reserves the amount of pass-through to individual

15  discretion, (b) provides for detailed ministerial calculation of amounts *due from the rental firms*,

16

17  [9] By way of demonstration, one of the firms representing Plaintiffs, the Center for Public Interest Law has
monitored regulatory agencies since 1980. Applicable law governing the special fund financing of agencies is
similar to the provisions applicable to CTTC. It never specifies the amount to go onto consumer invoices
18  down the line. For example, applicable law for California special fund agencies and set forth in the state's
Business & Professions Code includes the following (all references are to that Code): licensed clinical labs
19  (§§ 1300-01), dentists (§ 1716.1), physicians (§ 2435), psychoanalysts (§ 2529.5), speech pathology
(§ 2534.2), nursing (§ 2811), psychologists (§§ 2983-84), optometry (§ 3145-3147.6), hearing aid dispensers
20  (§ 3451,4), physician assistants (§§ 3521-21.5), pharmacy (§ 4400), psychological technicians (§ 4548),
veterinarians (§§ 4904-05), acupuncture (§ 4970), marriage, family and child counselors (§ 4984.7), social
21  workers (§ 4994.1), accountants (§§ 5130, 5131, 5134), advertisers (§§ 5480-01, architects (§§ 5600-01),
landscape architects (§ 5680.1), engineers (§ 6796), locksmiths (§ 6980.79), contractors (§§ 7135-37), barbers
22  (§§ 7415-19), repossessors (§ 7511), private security services (§ 7588), funeral directors (§ 7729), geologists
(§ 7887), shorthand reporters (§ 8031), structural pest control operators (§§ 8673-75), land surveyors
23  (§ 8805), cemeteries (§ 9753), electronic and appliance repair dealers (§ 9873), auto repair shops (§ 9886.3).
Although each agency is governed by persons appointed entirely by elected public officials, none presume
24  and the Legislature has never enacted or intended any instruction as to how the fees assessed are to be paid.
As with the CTTC, they may or may not be included as a charge element in consumer invoices. Rarely does
25  any competitor include them as an itemized cost item. But as with the CTTC none are precluded from
allocating the pro-rata share of such fees onto consumer billing. The amount that is so billed, if any, is never,
26  ever specified in any statute (as it is not with the CTTC statute) nor is it specified by any such regulatory
agency.

27

28

::ODMA\PCDOCS\PCDOCS\285303\2

Case No.: 07CV2174 H BLM

(c) was represented by the Rental Car Defendants themselves as a "private" contribution from *them*, and (d) is administered and controlled by a body with an industry appointed super-majority.

The actual intent of the Legislature is most informed by the representations made by industry to the Legislature.[10] The concluding paragraph of the Rental Car Defendants' lobbyist's support letter reads: "By guaranteeing a higher level of tourism funding through an increase in *private* assessments, AB 2592 would not only save the general fund money but would also stimulate the economy by generating new spending, jobs and tax revenue. It would also ensure that consumers *know what they are being charged* by rental car companies..." (emphasis added, Rental Car Defendants' AB 2592 support letter, Ex. A).[11]

Consistent with the industry's characterization of the bill as a "win-win", the final legislative analysis (Ex. B) describes increases in assessments for additional CTTC funding of specific amounts to be assessed the industry, an obligation sensibly divided among the competitors in proportion to their respective share of total airport rental car annual revenue. There is authority for separate itemization of various charges (including that portion of the tourism commission assessment that a company may decide to pass through). The airport concession fee would be unbundled so it could

---

[10] CTTC parses a letter from Robert Fellmeth – an attorney from one of the three law firms representing Plaintiffs – from the 400-page legislative history of AB 2592. The letter warns of the possible industry conversion of a separate itemization of the airport concession fee into an unlawful price-fix addendum. The CTTC seriously argues that this informs legislative intent – such that the statute thusly intended the transformation of that separate itemization on an invoice – into an intended price increase. (Note that the cited letter says nothing about the fixing of the CTTC 2.5% pass-through agreement – even the letter's author did not think the Defendants would do that). Nor – contrary to its description – did the letter suggest that the legislation would lawfully authorize the 9% "add-on" price fix – quite the opposite – that it might facilitate an unlawful price fix. That prescience hardly establishes either legislative intent or the notion that separately itemizing a charge implies the predictable result that it will be added on to the invoice. Rather more significant are the oft-stated representations of the Rental Car Defendants who *sponsored* the measure that (a) the CTTC contribution would be *privately* funded, and (b) the "disaggregation" of the 9% airport concession fee was purely and solely to enhance consumer information about where the funds would go (*see* Defendants' letter, Ex. A, typically reflecting representations made in the legislative record).

[11] A Request for Judicial Notice of Exhibits A and B, additional parts of the Bill's legislative history, has been filed concurrently herewith.

be separately stated instead of mandatorily hidden in the "base rate."[12]  There is no indication in the

analysis, rental car industry advocacy, or the rest of the legislative history, that there would

necessarily be any base rate hike or price increase to consumers.  Nothing establishes an intent that

competition be displaced or that Defendants were allowed through the CTTC to agree that the entire

fee must be passed on to consumers (as the CTTC posted on its Web site, FAC Ex. H).

### III.    No Statutory Authority for Transforming Itemization into a 9% Unfair Price Increase

In addition to the 2.5% CTTC fee is the 9% price fix – the private transformation of the

"airport concession fee" ("ACF") from its benign separate itemization in consumer bills to promote

accurate information, into an industry-wide price-fixed increase.  The Legislature was promised and

thought it was enacting a "win-win" in AB 2592, as reflected above.  But end-of-session

amendments raised concerns.  Newspapers editorialized caution and attorney Fellmeth wrote a

warning letter.  Industry calmed the waters, promising to take over some of the general fund burden

of the CTTC, and at the same time to increase its budget markedly to increase beneficial tourism and

boost the state economy.  All the industry asked in return was a change in the restrictive airport car

rental billing law.

Prior to 2007, virtually all charges had to be included in the "base rate" on the invoice.[13]

Consumer advocates won that reform a decade ago to combat last minute rental car bill "add-ons"

that were unadvertised and presented in hurried circumstances.  Industry wanted to be able to let the

public know it was not getting the ACF (Ex. A), thus it should be separately itemized.  And as the

final legislative floor analysis reflects (Ex. B), the industry compromised on the bill to include a

---

[12] Importantly, unlike the CTTC fee charged to industry, the airport concession fee is a direct "percentage of revenue" assessment set by law.  Accordingly, Plaintiffs agree that this charge may be separately stated as a percentage charge consistent with its established percentage assessment figure.  But there is no instruction to (a) calculate a percentage for invoice augmentation to yield the raw number fee owed by industry for CTTC special fund financing, nor (b) change the separate itemization of the 9% airport concession fee into an additional charge above and beyond the previous base charge that had **already included it**.

[13] *See* Civil Code Section 1936.01(a)-(b).

1   provision that all of its advertising would include notice of that separate charge so there would be no

2   surprises when the car is turned in and invoice received (often in hurried circumstances).

3        But nowhere is there authority for a price-fixing agreement. There is no "clearly articulated

4   and affirmatively expressed as state policy" program to increase the price to consumers. Defendants,

5   instead of simply unbundling, used the opportunity to fix prices. As set forth in the FAC, and

6   discussed in Plaintiffs' Opposition to Rental Car Defendants' Motion to Dismiss, evidence of

7   conspiracy included: (a) an industry with normally varying prices and costs between competitors, (b)

8   the adoption of a comparable price change (9% increase) not by two or three, but all seven, (c) no

9   cost or other market justification for the identical price change, (d) an historical pattern of seasonal

10  price decreases from December to January that is here defied in the face of lower demand, (e) a

11  pattern of price decreases in other states from December to January that is here defied, (f) a change

12  manifest at the same moment in time, and (g) a change that corresponds exactly to a billing alteration

13  all seven of the Defendants are precisely discussing among themselves. (FAC ¶¶ 43-44.)

14       There is no statutory or state action defense for any of the above. Defendants simply argue

15  that the addition of the 9% to every consumer's airport rental car bill in the state on January 1 is the

16  inevitable, predictable, and intended result of legislation – legislation that was represented by its

17  sponsors and apparently enacted to do nothing more than allow the separate itemization of a charge

18  to enhance consumer information about where their payments were going. But no state policy to

19  displace competition is articulated, so no state action defense is really implicated.

20  **IV.    CTTC Status for *"Independent* State Action" Supervision**

21       Without statutory authority, the price arrangements here at issue become, *ipso facto*, price-

22  fixing offenses under federal law. The CTTC is itself a creature of statutory construction. Its

23  authority is derivative.[14] All of the argument about whether or not the CTTC can exercise required

24  

---

25  [14] As to the novel "CTTC is a political subdivision with inherent powers analogous to a state bar" argument of
    Defendants, the Supreme Court ruled as to mandatory fee price fixing by the Virginia bar: "Here we need not
26  inquire further into the state-action question because it cannot be fairly said that the State of Virginia through
    its Supreme Court Rules required the anticompetitive activities of either respondent (including the State Bar
27  of Virginia)." *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 790, 95 S. Ct. 2004, 2015 (1975).

28

1  "independent state supervision" is admittedly superfluous if there is no authority for it or the Rental

2  Car Defendants to act to (a) arrange a pass-through of the entire CTTC charge and/or (b) transform

3  the separate statement of the 9% airport concession fee into a 9% price hike (enriching Defendants

4  and costing consumers over $100 million on an annual basis).  But in terms of the separate, second

5  *Midcal* prong requiring "*independent* state supervision" to immunize a restraint of trade otherwise

6  violative of the Sherman Act, no cogent argument is made.  While a clever lawyer may attempt to

7  spin individual facts differently, the CTTC has always recognized and promoted itself as "an

8  industry-led public/private partnership" [FAC Ex. C] whereby private industry entered into a joint

9  venture Memorandum of Agreement with the CTTC [FAC Exs. A and F ("the CTTC has acquired a

10 partnership with the rental car industry to secure a long-term funding solution for the CTTC")].  This

11 resulted in an agreement among the industry members - a cartel to pass on a surcharge to each of

12 their customers - a *per se* price fixing violation of the federal antitrust laws.  [*See* FAC Ex. G agenda

13 item IV A; Ex. D ("everyone agreed to continue the funding as long as the pass-through was in

14 place"); Ex. H - CTTC website ("This assessment rate shall be passed through to the consumer.")]

15 The CTTC can do many things as a public-private partnership effectively controlled by the private

16 sector, but a continuing  supervision of restraints of trade – particularly those involving the

17 calculation of enforceable consumer charges – is not one of them.  Indeed the Ninth Circuit has just

18 reiterated "[i]f the restraint is not unilaterally imposed, but rather involves a 'state's decision to let

19 producers dictate market conditions to others', it is deemed a hybrid restraint which is illegal *per se*

20 under the Sherman Act." *Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 887 (9th Cir. 2008).

21        In *Patrick v. Burget*, 486 U.S. 94, 101, 108 S. Ct. 1658, 1663 (1988), the Supreme Court

22 ruled that the state action defense did not apply to the action of Oregon physicians who served on a

23 hospital peer review committee because the state limited its role to regulating the peer review

24 process; the state did not "have and exercise power to review particular anticompetitive acts of

25 private parties…"  Similarly, here, the CTTC both as structured and as applied does not permit state

26 officials to have or exercise power to review the anticompetitive acts of the private parties.  The state

27 statute itself is not regulation at all; it simply instructs the CTTC and its constituent members to raise

28 monies from its own profits to promote tourism.  It does not tell them to displace competition, fix

prices, or mislead consumers. "The Court has already decided that state authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity." *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 592-593, 96 S. Ct. 3110, 3118-19 (1976) (footnotes to four Supreme Court decisions omitted). Despite the CTTC's efforts to suggest otherwise, "the *Parker* doctrine is not so broad as to constitute an automatic 'status' exemption for state agencies…" *Daniel v. American Bd. of Emergency Medicine*, 988 F. Supp. 127, 182 n.52 (W.D. N.Y. 1997). Here the CTTC has participated in and facilitated an illegal price-fixing cartel; just as the State Bar did in *Goldfarb*. And, just as in *Goldfarb*, the CTTC is not immunized.

### A.    The CTTC is not a "Political Subdivision" of the State of California

In a creative argument, CTTC argues that it is a "political subdivision" and is hence immune from state action standards. That is, "political subdivisions ... are immune for actions taken 'pursuant to *clearly articulated and affirmatively expressed* as state policy,' regardless of whether the state actively supervises the activity." (*See* CTTC Brief at 4.) But it also admits that the CTTC is a "state agency" – nothing more. (CTTC Brief at 2, note 3.) The CTTC is not made up of elected officials, nor are its members appointed by them. Even the defense friendly AREEDA & HOVENKAMP IA *Antitrust Law* ¶ 224d at 97 (3d ed. 2006) rejects the CTTC concept: "We would reserve the 'state itself' designation only for government agencies that are *both* statewide in their jurisdiction and that have no particular susceptibility to capture by a particular business group…. It would *never* include agencies that are dominated by members of the regulated industry and are not directly answerable through the electoral process" (emphasis in original).

CTTC relies on *Hass v. Oregon State Bar*, 883 F.2d 1453, 1457 (9th Cir. 1989), *cert. denied*, 110 S. Ct. 1812 (1990) and four additional inapplicable precedents to provide what it argues is its own special status. In *Hass*, the Oregon Bar established its own system of malpractice insurance that members were required to purchase. The Court specifically found that the requirement was *"clearly articulated and affirmatively expressed* as state policy." State bars are subject to the oversight and review of the state supreme court. Here, no body of state officials of any type oversees the CTTC, or is capable of reversing its decisions. The CTTC's reliance on *Hass* is ironic. For the critical issue raised as to the 2.5% fee pass-through to consumers is that (unlike *Hass*) it does not involve

1  regulating licensees ("you must purchase malpractice coverage") but here arranges a collusive

2  charge **to consumers**. In *Goldfarb* where the Virginia Bar specified minimum hourly billing rates to

3  clients, the Supreme Court held: "The fact that the State Bar is a state agency for some limited

4  purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the

5  benefit of its members." *Goldfarb, supra,* 421 U.S. at 791, 95 S. Ct. at 2015.

6         The CTTC might argue that *Goldfarb* concerned an overall billing rate, whereas the CTTC –

7  in cartelizing the 2.5% charge – is simply specifying one part of a bill.  But fixing any part of a

8  pricing element is *per se* unlawful price fixing.  *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643,

9  100 S. Ct. 1925 (1980) (competitors agreement fixing credit terms is illegal).  *National Electrical*

10  *Contractors Association, Inc. v. National Constructors Association,* 678 F.2d 492, 501 (4th Cir.

11  1982), is directly on point:

12         There can be no doubt that the agreement in question here, which adds a 1% charge to
       all IBEW construction contracts falls within the definition of price fixing. ... It
13         clearly interferes with the market forces that set the price of such contracts.

14  Here, too, the agreement to charge consumers the 2.5% assessment tends to stabilize the price of car

15  rental contracts, "a practice illegal *per se* under the Sherman Act." *Id.*  Even if the CTTC were on

16  some basis a "political subdivision" as a state bar (under state supreme court supervision), it does not

17  help the Defendants.  Even such a political subdivision cannot specify the competitive final

18  consumer charge.[15]  The Supreme Court in *Midcal, supra,* foresaw and rejected arguments similar to

19  those made by the CTTC: "The national policy in favor of competition cannot be thwarted by

20  casting such a gauzy cloak of state involvement over what is essentially a private price-fixing

21  agreement."  445 U.S. at 106.  Such hybrid restraints are "illegal *per se* under the Sherman Act."

22  *Costco Wholesale Corp. v. Maleng,* 522 F.3d 874, 887 (9th Cir. 2008).  Here the "industry-led

23  public/private partnership" facilitated industry members to agree among themselves to pass on costs

24  ───────────────────

25  [15] The exceptions to this principle involve the few agencies where monopoly power or other market factors
   lead to directly authorized rate regulation – such as the Public Utilities Commission.  But this pricing
26  regulation operates under an extensively specified system of rate setting due to market failure to produce
   competitive pricing otherwise.  They are not centered around the fees for special fund financing of the agency.
27  And, they are controlled by public officials.

28

1    to consumers; there was no unilateral imposition by the state Legislature. Thus, under CTTC's

2    argument, there is a hybrid restraint - a *per se* violation of federal antitrust laws. *Costco, supra,* 522

3    F.3d at 895 (Washington's "post and hold" restraint on pricing is a *per se* violation of the Sherman

4    Act).

5          The four cases cited by CTTC only underline (a) the difference between the CTTC and those

6    entities that are granted "political subdivision status" and (b) the stark difference between regulating

7    licensees or billboards or trash-to-energy plants (in cited precedents) – and the collusive setting of

8    final consumer charges. These other cases cited to support CTTC's affirmative defense include

9    *Bankers Insurance Co. v. Fla. Residential Property & Casualty Underwriting Ass'n,* 137 F.3d 1293,

10   1297 (11th Cir. 1998) and *Automated Salvage Transport, Inc. v. Wheelabrator Environmental*

11   *Systems, Inc.* 155 F.3d 59 (2d Cir., 1998). As conceded, *Bankers* concerned an underwriting

12   association that simply acted ministerially under "a detailed plan that must be approved by the

13   Department of Insurance; and ... supervision is by a board of governors that includes representatives

14   appointed by the insurance commissioner." (CTTC Brief at 6.) The CTTC brief regrettably omits

15   the composition of the association's supervising board: a "13-member board [that] includes five

16   consumer representatives, the insurance consumer advocate, and two representatives of the insurance

17   industry appointed by the state insurance commissioner. Only five of the members are appointed by

18   the insurance industry, and even those serve at the insurance commissioner's pleasure" (137 F.3d at

19   1297). This body was controlled by the appointees of public officials; whereas the CTTC is

20   overwhelmingly composed of industry representatives.

21         Similarly, *Automated Salvage* concerns a settlement agreement between a waste facility

22   owner and the Connecticut Resources Recovery Authority (CRRA) under a "Plan, which was

23   promulgated by Connecticut's Department of Environmental Protection (DEP) pursuant to express

24   legislative directive..." (155 F.3d at 62). The CRRA, a statutory creation, includes no private parties

25   at all, but is an authority combining "the towns of East Lyme, Griswold, Groton, Ledyard,

26   Montville, New London, North Stonington, Norwich, Sprague, Stonington and Waterford" (155 F.3d

27   at 66, n.5).

28         To quote the law from CTTC's own cited *Bankers Insurance,* 137 F.3d at 1296-97:

::ODMA\PCDOCS\PCDOCS\285303\2

Case No.: 07CV2174 H BLM

> Factors favoring political-subdivision treatment include ... lack of possibility of private profit, and the composition of the entity's decisionmaking structure. .... The presence or absence of attributes such as these tells us whether the nexus between the State and the entity is sufficiently strong that there is little real danger that the entity is involved in a *private* anticompetitive arrangement. (cite omitted). The more public the entity looks, the less we worry that it represents purely private competitive interests, and the less need there is for active state supervision to ensure that the entity's anticompetitive actions are indeed state actions and not those of an alliance of interests that properly should be competing. *See Town of Hallie...* (at 1296-97).

Even a city must have from the state a "clearly articulated and affirmatively expressed as state policy" basis for its anticompetitive acts (the first *Midcal* prong). As to the second prong, CTTC is correct that political subdivisions are given some "independent" status for purposes of "independent state supervision" – but only where there is such authority. And the CTTC does not qualify for such special "political subdivision" status.

Defendants cite two other cases for the proposition that the CTTC is a "political subdivision" with generic powers to restrain trade: *Sanders v. Brown*, 504 F.3d 903 (9th Cir. 2007), *cert. denied*, 2008 WL 292872 (Mem) (2008), and *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S. Ct. 1344 (1990). In *Sanders*, the court approved a settlement between the state attorney general and tobacco, consistent with the state Legislature's **clearly articulated** direction in enacting the "Qualifying Act and Contraband Amendment." The settlement involved a determined amount and allowed for adjustments by settlors to the amount owed where their revenue declined to a specified point. The difference between this case and the case at bar is stark. The settlement terms were authorized by statute with a state attorney general acting on behalf of the sovereign state. The adjustments were self-executing and left no discretionary conduct that required supervision. In contrast, the Attorney General does not control or even have a vote on the CTTC. *Sanders* might apply if the tobacco industry had negotiated a settlement with a "public-private partnership" agency appointed by tobacco and related industries. And it would be parallel if the relevant statute and settlement provided for a warning on tobacco products – and the industry responded by calculating the cost of printing and advertising, and agreed privately to uniformly add that amount onto the price of every pack. To be parallel, the industry would argue that its post-settlement agreement to add 30 cents to every pack was "state action" because it was the consequential outcome of the package informational change.

1    In *Omni*, the plaintiff argued that city land use restrictions restrained trade and were to the

2  advantage of one company that had lobbied the City for their enactment. The court unsurprisingly

3  held that a City Council vote (a political subdivision) pursuant to clear state authority to regulate

4  land use was subject to state action immunity where restraints resulted from those use limitations.

5  For the case to be analogous here, after the land use restrictions were enacted, the billboard company

6  would agree with its competitors in nearby towns for each of them to raise prices for advertising

7  space by 9%. Then it would argue, as the CTTC does here, that the price-fixed addition of 9% was

8  nothing more than the expected result of the zoning restrictions duly and properly adopted.

9    The CTTC is a public/private partnership duly empowered to stimulate tourism in

10  enumerated ways – a beneficial task. But the CTTC argument that a body of 37, governed by a

11  supermajority of 24 persons selected directly and entirely by industry, is a "political subdivision" of

12  the state to be granted generic state action immunity from federal antitrust law – is a radical notion.

13  **B.     CTTC is Industry-Appointed and Industry-Controlled**

14    CTTC claims the fact that the decisions of its Chair, the Governor-appointed Secretary of the

15  Business, Transportation and Housing Agency, cannot be overridden with respect to the budget and

16  annual marketing plan, except by a 3/5 vote of the Commissioners (CTTC Brief at 3). And the

17  CTTC recites that the Secretary may replace a commissioner for "abuse of office." But the brief

18  fails to clarify that private tourism industry appointees make up more than 3/5 of the CTTC (24 of 37

19  members (section 13995.40(d)); hence, they have final, determinative authority. Nor does the

20  limited-basis removal power help. The statute allows such removal only for "moral turpitude," not

21  for self-interested voting. Aside from never having been exercised, the replacement of anyone from

22  industry removed by the Secretary would come from the same appointing authority -- industry.

23    The CTTC is controlled by persons *appointed by and accountable to* self-interested industry.

24  The public power of such persons cannot be characterized as "independent" for state action

25  purposes, as the quote from the CTTC-cited *Bankers Insurance* case requires. True, if the CTTC

26  were doing nothing more than ministerially processing a "*clearly articulated and affirmatively*

27  *expressed* state policy" set forth by statute – particularly one where the details were specified such

28  that "supervision" need not be independent from self-interested parties – there would be no problem.

::ODMA\PCDOCS\PCDOCS\285303\2                                    Case No.: 07CV2174 H BLM

1   Or, to the extent the CTTC promotes tourism or engages in any act that does not involve restraints of

2   trade, there is no problem.  However, it faces two difficulties here: the state has not "*clearly*

3   *articulated and affirmatively expressed*" as state policy these restraints – restraints in the sacrosanct

4   *per se* price-fixing category.  CTTC cites to nothing that provides that (a) each rental car company at

5   an airport shall pass through 100% of the CTTC charge to consumers,[16] (b) the industry – through

6   the CTTC – may handle the collection, pay the state what each firm owes, and keep whatever

7   remains, and (c) companies may add 9% to every consumer invoice.[17]  Without state articulation of

8   any of these three policies anywhere, the CTTC is in no position to provide "independent

9   supervision" of the *ultra vires* continuous billing and collection that began simultaneously by all

10  Rental Car Defendants in January 2007.  The "active supervision" requirement is to ensure that the

11  state action defense "will shelter only the particular anticompetitive acts of private parties that, in the

12  judgment of the State, actually further state regulatory policies." *Patrick v. Burget*, 486 U.S. 94,

13  100-01, 108 S. Ct. 1658, 1663 (1988).  Numerous state programs have failed to afford protection due

14  to a lack of supervision.  Thus, despite a clearly articulated and affirmatively expressed state policy

15  of resale price maintenance in the liquor industry, the Supreme Court found there to be no active

16  state supervision of the prices set by certain industry participants pursuant to this policy, and that the

17  state action doctrine therefore did not apply.  *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 344-45, 107

18  S. Ct. 720, 725-726 (1987).  Thus, even were the state to delegate the power CTTC claims it has –

19  one involving determination of billing amounts to consumers – it is not constituted in a way to

20  permit such a delegation.  It is intrinsically not "independent."

21

22

23

---

24  [16] As discussed above, the Legislature assigns the CTTC the role of calculating amounts due from each
    company to meet the total due from industry as the statute specifies.

25  [17] If such a power is here implied, what is to prevent it from making the sum not 2.5%, but 3.5%, or 5.5%?
    As discussed above, this CTTC entity is controlled, in making these decisions, by the tourism industry.

26  Under the CTTC theory of statutory authority, what is to prevent them from pocketing for themselves 10% of
    the industry-determined charge?  30%?  50%?

27

28

::ODMA\PCDOCS\PCDOCS\285303\2

Case No.: 07CV2174 H BLM

## V.    CTTC Involvement and Bagley-Keene Open Meeting Act Violations

The Court's initial decision to dismiss the Bagley-Keene Act pendent claims rested upon the stated premise that the CTTC had not been tied into the violations sufficiently. The extensive amendments and detail added cure any such "nexus" shortcoming. (*See* FAC ¶¶ 36-44, Exs. A-I.)

Pendent or supplemental jurisdiction is guided by 28 U.S.C. §1367(a): "...in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III ... Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." Such joinder lies with the sound discretion of the court and is guided by the "values of judicial economy, convenience, fairness, and comity ..." *Carnegie-Mellon Univ. v. Cohill* 484 U.S. 343, 350, 108 S. Ct. 614, 619 (1988).

Plaintiffs are not merely concerned about the anomaly of the CTTC argument that (a) the Bagley-Keene Act is a major indicator of its "political subdivision status" affording it immunity, and (b) whether it violates that same Act as a routine matter is irrelevant to the antitrust allegations (although compliance apparently affords immunity from those same allegations). Of critical concern is the relationship between the nucleus of the violations and the CTTC, as detailed above.

The CTTC is well aware of the hot water it has entered.[18] It is reduced to arguing that the e-mail evidence recounted above is irrelevant because the "CTTC has no power over the Rental Car Defendants... ." (CTTC Brief at 18.) But the allegation is combination and collusion. Whether possible rental car free pricers were coerced by CTTC misses the point – the problem is collusion. That is what the most extreme form of antitrust *per se* liability – horizontal price fixing – is all about.

---

[18] Regrettably, the CTTC brief mischaracterizes the Ex. I e-mail as simply a remonstration by National Car Rental that all rental car companies should contribute their specified CTTC fee obligations. The Court is asked to read FAC Ex. I directly to ascertain its message and may draw its own conclusions. Similarly, the CTTC itself removed its Web site announcement concerning the pass-through charge quoted above (and memorialized in FAC Ex. H) shortly after it was cited by Plaintiffs.

As presented in Plaintiffs' original moving papers, Bagley-Keene Act violations are longstanding and multifaceted.[19]  Regrettably, violations have not entirely ceased even during the pendency of the stipulated interim order.  Bagley-Keene Act violations tie into both aspects of the antitrust case.  CTTC points out that there is no example of specific CTTC arrangement or facilitation of the 9% "airport concession fee" price increase.  This contention that may be summarized as follows:  "Yes, we are involved in the pass-through arrangement of 2.5% that goes to us, as the (pre-discovery) documents Plaintiffs have produced attest, but Plaintiffs have to give examples of our direct arrangement/enforcement of the 9% price fix as well.  And, as to that, yes the industry is meeting through our offices, and yes we have violated the Bagley-Keene Open Meeting Act and conducted proceedings without proper notice, in improper executive session and otherwise.  But Plaintiffs have not pierced our secrecy to expose the discussions and meetings where the 9% may have been discussed, so they should be foreclosed at the outset  from inquiring into and objecting to our unlawful meeting practices.  It is just not related to their case here."  That semi-humorous characterization does not vary much from the CTTC contention here.

"Secrecy and concealment are essential features of successful conspiracy." *Blumenthal v. U.S.,* 332 U.S. 539, 557, 68 S. Ct. 248, 256 (1947).  This is explicitly true of horizontal price-fixing cases.  *U.S. v. Consolidated Packaging Corp.*, 575 F.2d 117, 127 (7th Cir. 1978).  Where a public agency is used as the situs of much of the communication (as here), transparency compliance is a legitimate subject of inclusion.  The Complaint details numerous violations of the Bagley-Keene Open Meetings Act (FAC ¶¶ 65-84).  The allegations are necessarily confined to the 90-day period prior to initial complaint filing because of this statute's unusual three-month statute of limitations.  Thus, violations relevant to some of the critical time period are not in the Complaint itself (*e.g.,* August of 2006 to August of 2007), but they are highly relevant and will necessarily be part of the antitrust case.  Concealment is part and parcel of this offense.

---

[19] Motion for Preliminary Injunction, Docket Document No. 10-2 (November 29, 2007).

1    CTTC complains that the matter should be dismissed because it is unrelated without a

2    showing that a specific, charged violation was the subject of an antitrust offense. That criterion

3    misses the point. First, we would know a lot more about whether the Bagley-Keene Act violations

4    corresponded to the Sherman Act claims – if we did not have the Bagley-Keene Act violations. We

5    do not know what was discussed at an executive session that is not properly noticed, or that was not

6    justified under the Act. CTTC has hidden it actions, and now points to the success of its

7    concealment as a basis for dismissal of those violations.

8        The FAC sets forth numerous meetings prior to August of 2007 and applicable to Bagley-

9    Keene Act compliance - even if not alleged as violations of that Act *per se*. Those earlier violations

10   will be relevant to the antitrust case even if not prosecuted strictly on a Bagley-Keene Act basis.

11   They may include the meeting to bring Avis into line on the 2.5% pass-through that Plaintiffs

12   learned about only fortuitously – and not from any public record. And it may be fairly inferred that

13   transforming the separate itemization of the 9% airport concession fee into an add-on did not occur

14   from mass clairvoyance. The seven Rental Car Defendants were discussing these very subjects

15   through the offices of the CTTC that most of them directly participate in. If the CTTC is a forum

16   and mechanism for all or some of these violations, and if over the 90-day statute of limitations

17   period prior to the initially filed Complaint, Plaintiffs demonstrate numerous violations of the

18   Bagley-Keene Act, should not the subject of that noncompliance – both during the period of the

19   antitrust violative acts and for purposes of preventive, injunctive relief -- be a part of this case?

20   There will be discovery as to these issues, since deliberate concealment is highly relevant in any

21   antitrust combination prosecution. Must Plaintiffs file a separate case in state court to adjudicate the

22   transparency of the CTTC? Inclusion will allow this Court to resolve this case as to the proper

23   remedy to prevent its repetition. And that benefit is of particular import when it concerns the

24   functioning of a "state agency" allegedly assisting and even arranging price-fixing offenses through

25   its public offices.

26

27

28

## VI.    Miscellaneous CTTC Contentions Lacking Merit

### A.    Inapplicability of the State Cartwright Act

CTTC argues that the CTMA includes a general statement of immunity for the CTTC from state antitrust law (Cartwright Act) liability (CTTC Brief at 8). But Plaintiffs have not included Cartwright Act claims in their Complaint. The state cannot grant itself immunity from the application of federal antitrust law – that is the whole point of "state action" requirements. Nor is a boilerplate provision evidence of the kind of specific "clearly and affirmatively articulated" restraint of trade required. In any event, such immunity is limited to "compliance" with the CTMA. The CTMA does not authorize the conduct complained of here.

### B.    Standing of Shames

CTTC further contends that Plaintiff Shames lacks standing because he has not been "personally injured." But Shames has overpaid for his rental car as a result of the conspiracy. That antitrust violation is connected to CTTC secrecy. It is connected to all of the Defendants since each was part of the "combination in restraint of trade" that made the violation possible. By secretly conducting meetings and by failing to provide Internet notice of the actual topics discussed at the meeting (etc.), the CTTC has facilitated the orchestration of the price fixing of the CTTC assessment. Plaintiff has standing to procure injunctive relief to put an end to this facilitating mechanism. Standing under section 16 of the Clayton Act (15 U.S.C. § 26) requires only that plaintiff allege there is a threatened loss or injury cognizable in equity proximately resulting from alleged antitrust violations which constitute antitrust injury. *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 130, 89 S. Ct. 1562, 1580 (1969). "Injunctive remedies under section 16 of the Clayton Act may be as broad as necessary to terminate the illegal conduct, prevent or eliminate its consequences, *and ensure that violations do not recur.*" ABA Section of Antitrust Law, *Antitrust Law Developments* (6th ed. 2007) at 851 (emphasis added). Nor does the CTTC's claim that it is a state agency alter the analysis; the Court can enjoin state agencies to even suspend enforcement of certain provisions of challenged statutes and regulatory schemes. *Knudsen Corp. v. Nevada State Dairy Comm'n,* 676 F.2d 374, 378 (9th Cir. 1982). *See generally Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S. Ct. 2004 (1975) (approving injunction action against state bar). A *fortiori* this

1    Court can require the CTTC to fully comply with state sunshine statutes to help end an illegal price

2    fix. Here, ordering compliance with the state law will go far toward preventing a recurrence of

3    antitrust wrongdoing, and an order requiring CTTC to obey state law is hardly invasive.

4         CTTC's contention that the Bagley-Keene Act violations are only before the Court by means

5    of supplemental jurisdiction and that, as a "state agency," it should not be subject to federal court

6    review, was disposed of by the Supreme Court in *Chicago v. International College of Surgeons*, 522

7    U.S. 156, 165-66 (1997) ("The claims for review of the Commission's decisions are legal 'claims,'

8    in the sense that that term is generally used in this context to denote a judicially cognizable cause of

9    action. And the state and federal claims 'derive from a common nucleus of operative fact,' namely,

10   ICS's unsuccessful efforts to obtain demolition permits from the Chicago Landmarks Commission.

11   That is all the statute requires to establish supplemental jurisdiction…") (citation omitted). Thus, the

12   supplemental jurisdiction of this Court extends to the Bagley-Keene Act claim because the Bagley-

13   Keene Act violation is an integral part of the illegal price-fixing conspiracy. Injunction of state-

14   related entities to thwart cartelization is appropriate.

15        Just as dispositively, California law states that "any interested person may commence an

16   action by mandamus, injunction, or declaratory relief for the purpose of stopping or preventing

17   violations or threatened violations of" the Bagley-Keene Act. Government Code § 11130(a). This

18   furthers Plaintiff's constitutional right: "The people have the right of access to information

19   concerning the conduct of the people's business, and, therefore, the meetings of public bodies and

20   the writings of public officials and agencies shall be open to public scrutiny." California

21   Constitution Art. 1, § 3(b)(1).

22        Openness in government is essential to the functioning of a democracy. "Implicit in
     the democratic process is the notion that government should be accountable for its
23   actions. In order to verify accountability, individuals must have access to government
     files. Such access permits checks against the arbitrary exercise of official power and
24   secrecy in the political process."

25   *International Fed'n of Pro'l & Tech. Eng'rs, Local 21, AFL-CIO v. Superior Court*, 42 Cal. 4th 319,

26   328-29 (2007). Thus, a sufficient interest to invoke standing has been vested in Plaintiff by the

27   Legislature. *Finlan v. City of Dallas*, 888 F. Supp. 779, 784 (N.D. Tex. 1995) ("[a]n interested

28   person may bring an action by injunction to stop, prevent, or reverse a violation or threatened

::ODMA\PCDOCS\PCDOCS\285303\2                                        Case No.: 07CV2174 H BLM

1    violation of the TOMA [Texas Open Meetings Act] by members of a governmental body"). Where

2    a statutory right to challenge agency action exists, standing requirements have been fulfilled.

3    *Massachusetts v. EPA,* 127 S. Ct. 1438, 1453 (2007). The Legislature may create legal rights, the

4    invasion of which creates standing, even though no injury would exist without the statute creating

5    the legal right. *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n.3, 93 S. Ct. 1146, 1149 (1973).

6    Hence, a litigant that the Legislature has accorded a procedural right to protect  his interests can

7    assert that right without meeting any other standing requirements. *See Walker v. County of Santa*

8    *Clara,* 2005 WL 2437037, at *7 (N.D. Cal. Sept. 30, 2005) (self-executing provisions of California

9    Constitution such as free speech clause may be enforced by a private plaintiff in declaratory relief or

10    injunction action).

11        Here, there is both a self-executing constitutional provision and the Legislature has accorded

12    Plaintiff the right to protect his interests both (a) in open government and (b) more specifically in not

13    having a government agency engage in secret price-fixing activities. This cartelization has been

14    foisted precisely by the "arbitrary exercise of official power and secrecy in the political process" that

15    the legislation was designed to prevent. And the relief requested will redress the unlawful conduct.

16        Moreover, Plaintiff Shames, by profession, is a consumer advocate; he heads the largest

17    consumer ratepayer organization in the state, the second largest in the nation. *See* www.ucan.org.

18    The CTTC's suggestion that Plaintiff did not explicitly ask for anything before being denied misses

19    the entire point. The violation is that the CTTC kept its activities secret, and did not publish

20    adequate notice of meetings or agendas so that "interested persons" would know of the commission

21    of its illegal and unlawful activities. This is precisely why the Legislature broadly allowed for those

22    "interested" such as Plaintiff here to pursue injunctive and declaratory relief to put an end to

23    violations because they cause those such as Plaintiff injury.

24        Similarly, as the Supreme Court has recently reiterated, broad relief is available under the

25    declaratory relief statute. *MedImmune, Inc. v. Genentech, Inc.,* 127 S. Ct. 764, 771 (2007). Here the

26    California statute provides for declaratory relief, and Plaintiff clearly meets the *MedImmune*

27    standards as a legal right has been violated, the dispute is definite and concrete, a real and substantial

28

1   right (a constitutional right!) has been violated, and this Court can admit the specific relief by

2   ordering the CTTC to comply with the law. No more is needed.

3        Further, the Bagley-Keene Open Meeting Act is not triggered by damage -- any person has

4   the right to attend and to know in advance about the meeting business of agencies. This is not a

5   damage or restitution case as the precedents cited by Defendants involve.[20] The Bagley-Keene Act

6   gives "any interested person" (Gov't. Code sections 11130, 11130.3) standing to challenge its

7   violation, as befits a public access statute.

8   **VII.    Conclusion**

9        The CTTC motion to dismiss should be denied.

10  Dated:      June 23, 2008                **CENTER FOR PUBLIC INTEREST LAW**
                                             **University of San Diego School of Law**
                                             Robert C. Fellmeth
11                                           Ed Howard

12                                           **HULETT HARPER STEWART LLP**
13                                           Dennis Stewart
                                             Kirk Hulett
14                                           Jennifer Kagan

15                                           **SULLIVAN, HILL, LEWIN, REZ & ENGEL**
                                             **A Professional Law Corporation**
16

17                                           By: /s/ Donald G. Rez
                                                 Donald G. Rez
18                                               550 West "C" Street, Suite 1500
                                                 San Diego, California 92101
19                                               Telephone:      (619) 233-4100
                                                 Facsimile:      (619) 231-4372
20
                                             Attorneys for Plaintiffs
21

22

23

24

25  _____

    [20] The one Bagley-Keene case cited by Defendants does not involve a failure of standing but the court's
26  finding of no connection between that cause of action and the federal matter before that court. That is not the
    case here, as discussed above.
27

28

::ODMA\PCDOCS\PCDOCS\285303\2                                          Case No.: 07CV2174 H BLM