CENTER FOR PUBLIC INTEREST LAW
UNIVERSITY OF SAN DIEGO SCHOOL OF LAW
ROBERT C. FELLMETH, SBN 49897
cpil@sandiego.edu
ED HOWARD, SBN 151936
JULIANNE D'ANGELO FELLMETH, SBN: 109288
5998 Alcala Park
San Diego, CA  92110
Telephone:       (619) 260-4806
Facsimile:       (619) 260-4753

SULLIVAN HILL LEWIN REZ & ENGEL
A Professional Law Corporation
DONALD G. REZ, SBN 82615
rez@shlaw.com
550 West "C" Street, Suite 1500
San Diego, CA  92101
Telephone:       (619) 233-4100
Facsimile:       (619) 231-4372

HULETT HARPER STEWART LLP
DENNIS STEWART, SBN: 99152
dstewart@hulettharper.com
JENNIFER A. KAGAN, SBN: 234554
jenni@hulettharper.com
550 West C Street, Suite 1600
San Diego, CA  92101
Telephone:       (619) 338-1133
Facsimile:       (619) 338-1139

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SHAMES; GARY GRAMKOW, on behalf of themselves and on behalf of all persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE HERTZ CORPORATION, et al.,<br><br>Defendants. | Case No. 07CV2174H(BLM)<br><br>**CLASS ACTION**<br><br>**OPPOSITION TO THE RENTAL CAR DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>DATE:       July 14, 2008<br>TIME:       10:30 a.m.<br>JUDGE:     Honorable Marilyn L. Huff<br>CTRM:      13 |

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND .................................................................................6

    A.    The Tourism Assessment and the Agreement to Pass the Entirety of that Assessment to Renters..........................................................................................6

    B.    The Agreement to Raise Base Rates in Conjunction with the Unbundling of the Airport Concession Fee.................................................................................11

III.  ARGUMENT .......................................................................................................11

    A.    The Allegations in Plaintiffs' First Amended Complaint Are More Than Sufficient to Meet the *Twombly* Pleading Standard..........................................11

        1.    Plaintiffs Have Alleged Substantial Direct Evidence of a Conspiracy with Respect to the Tourism Assessment .............................13

        2.    Clear Evidence of Conspiratorial Behavior Among Defendants, Combined with Specific Allegations Relating to the 9% Charge, Renders a Conspiracy Plausible .................................................................14

    B.    The FAC States Claims Under the UCL and CLRA .............................................18

        1.    The Government Code Provides No Defense for the Price-Fixing Conspiracy Alleged in the FAC .................................................................18

        2.    Defendants Violated UCL's Unlawful Prong .............................................19

        3.    Plaintiffs Have Standing ............................................................................19

        4.    Defendants Violated the UCL by Engaging in a Fraudulent Business Practice........................................................................................20

            a.    Plaintiffs Allege Practices Which Have a Tendency or Likelihood to Mislead ...................................................................20

            b.    Plaintiffs Have Alleged Injury and Causation .............................21

        5.    Plaintiffs Have Stated a Claim Under the Unfair Prong of the UCL .........23

        6.    Plaintiffs Have Alleged a Claim for Violation of the CLRA...................24

IV.   CONCLUSION ....................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aron v. U-Haul Co.*,
   143 Cal. App. 4th 796 (2006)........................................................................22, 24, 25

*Bell Atlantic Corp. v. Twombly*,
   ___U.S. ___, 127 S. Ct. 1955 (2007)...........................................................*passim*

*Belton v. Comcast Cable Holdings, LLC*,
   151 Cal. App. 4th 1224 (2007).................................................................................24

*Bristow v. Lycoming Engines*,
   No. Civ. 5-06-1947, 2007 U.S. Dist. LEXIS 31350 (E.D. Cal. Apr. 10, 2007) ....................25

*Buckland v. Threshold Enters., Ltd.*,
   155 Cal. App. 4th 798 (2007)...................................................................................20

*C-O-Two Fire Equip. Co. v. United States*,
   197 F.2d 489 (9th Cir. 1952)....................................................................................16

*Californians for Disability Rights v. Mervyn's, LLC*,
   39 Cal. 4th 223 (2006) ...........................................................................................21

*Cel-Tech Commc'n, Inc. v. L.A. Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999)...............................................................................19, 23, 24

*Chavez v. Whirlpool Corp.*,
   93 Cal. App. 4th 363 (2001) ....................................................................................19

*City of Moundridge v. Exxon Mobil Corp.*,
   Civil Action No. 04-940 (RWR), 2008 U.S. Dist. LEXIS 31236
   (D.D.C. Apr. 16, 2008)......................................................................................13, 16

*Colgan v. Leatherman Tool Group, Inc.*,
   135 Cal. App. 4th 663 (2006)...................................................................................25

*Corrections USA v. Dawe*,
   504 F. Supp. 2d 924 (E.D. Cal. 2007).......................................................................11

*Cortez v. Purolator Air Filtration Prods. Co.*,
   23 Cal. 4th 163 (2000) ...........................................................................................21

*EEOC v. Concentra Health Servs.*,
   496 F.3d 773 (7th Cir. 2007)....................................................................................13

*First Nat'l Bank v. Cities Serv. Co.*,
   391 U.S. 253 (1968).................................................................................................17

ii

*FTC v. Ticor Title Ins. Co.*,
 504 U.S. 621 (1992) .................................................................................................... 4

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
 896 F.2d 1542 (9th Cir. 1989) .................................................................................. 15

*Hall v. Time Inc.*,
 158 Cal. App. 4th 847 (2008) ............................................................................. 21, 22

*In re Dual-Dec Video Cassette Recorder Antitrust Litig.*,
 Nos. MDL-765, CIV 87-987, 1990 U.S. Dist. LEXIS 19207 (D. Ariz. July 26, 1990) ............. 12

*In re Firearm Cases*,
 126 Cal. App. 4th 959 (2005) ................................................................................... 22

*In re Graphics Processing Units Antitrust Litig.*,
 540 F. Supp. 2d 1085 (N.D. Cal. 2007) ............................................................... 13, 15

*In re Late Fee & Over-Limit Fee Litig.*,
 528 F. Supp. 2d 953 (N.D. Cal. 2007) ...................................................................... 17

*In re Petroleum Prods. Antitrust Litig.*,
 906 F.2d 432 (9th Cir. 1990) .................................................................................... 16

*In re Southeastern Milk Antitrust Litig.*,
 MDL No. 1899 (E.D. Tenn. May 20, 2008) ............................................................... 12

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
 MDL No. 1819, 2008 U.S. Dist. LEXIS 15826 (N.D. Cal. Feb. 14, 2008) .......................... 16

*In re Tableware Antitrust Litig.*,
 484 F. Supp. 2d 1059 (N.D. Cal. 1007) .................................................................... 17

*In re Uranium Indus. Antitrust Litig.*,
 466 F. Supp. 958 (J.P.M.L. 1979) ............................................................................ 17

*Interstate Circuit, Inc. v. United States*,
 306 U.S. 208 (1939) ................................................................................................. 16

*Kasky v. Nike, Inc.*,
 27 Cal. 4th 939 (2002) ............................................................................................. 20

*Kendall v. Visa U.S.A., Inc.*,
 518 F.3d 1042 (9th Cir. 2008) .......................................................................... 2, 5, 17

*King v. St. Vincent's Hosp.*,
 502 U.S. 215 (1991) ................................................................................................... 7

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
 232 F.3d 979 (9th Cir. 2000) .................................................................................... 23

iii

*Lazar v. Hertz Corp.,*
    143 Cal. App. 3d 128 (1983).......................................................................... 24

*Lee v. Am. Nat'l Ins. Co.,*
    260 F.3d 997 (9th Cir. 2001).......................................................................... 20

*Linear Tech. Corp. v. Applied Materials, Inc.,*
    152 Cal. App. 4th 115 (2007) ........................................................................ 20

*Mass. Mut. Life Ins. Co. v. Superior Court,*
    97 Cal. App. 4th 1282 (2002)....................................................................22, 25

*McKell v. Wash. Mut., Inc.,*
    142 Cal. App. 4th 1457 (2006) ...................................................................... 20

*NCAA v. Board of Regents,*
    468 U.S. 85 (1984)......................................................................................... 24

*People v. Dollar Rent-A-Car Sys., Inc.,*
    211 Cal. App. 3d 119 (1989).......................................................................... 21

*Prata v. Superior Court,*
    91 Cal. App. 4th 1128 (2001) ........................................................................ 21

*Progressive W. Ins. Co. v. Superior Court,*
    135 Cal. App. 4th 263 (2005) ........................................................................ 23

*Roskind v. Morgan Stanley Dean Witter & Co.,*
    80 Cal. App. 4th 345 (2000) .......................................................................... 19

*Roth v. Rhodes,*
    25 Cal. App. 4th 530 (1994) .......................................................................... 20

*Scott v. Kuhlmann,*
    746 F.2d 1377 (9th Cir. 1984)........................................................................ 18

*Scripps Clinic v. Superior Court,*
    108 Cal. App. 4th 917 (2003) ........................................................................ 23

*Smith v. State Farm Mut. Auto. Ins. Co.,*
    93 Cal. App. 4th 700 (2001) .......................................................................... 23

*Ting v. AT&T,*
    319 F.3d 1126 (9th Cir. 2003)........................................................................ 24

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001)......................................................................................7, 24

*Vinci v. Waste Mgmt.,*
    80 F.3d 1372 (9th Cir. 1996)......................................................................12, 13

iv

*Weber v. Dep't of Veterans Affairs*,
   512 F.3d 1178 (9th Cir. 2008)......................................................................... 12

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
   668 F.2d 1014 (9th Cir. 1982)................................................................... 14, 20

*Williams v. Gerber Prods. Co.*,
   523 F.3d 934 (9th Cir. 2008)..............................................................*passim*

## STATUTES, RULES & REGULATIONS

Federal Rule of Civil Procedure
   Rule 8 ...................................................................................................... 13
   Rule 9 ...................................................................................................... 12
   Rule 12(b)(6) ...................................................................................... 11, 12

California Business & Professions Code
   § 17200 .................................................................................................... 19
   § 17500 .............................................................................................. 20, 23

California Civil Code
   § 1770(a) ................................................................................................. 24
   § 1770(a)(14) .......................................................................................... 24
   § 1936.01 .................................................................................................. 7
   § 1936.01(a)(3) ..................................................................................... 6, 7
   § 1936.01(b)(2) ......................................................................................... 7
   § 1936.01(b)(3) ......................................................................................... 7

California Government Code
   § 11120 .................................................................................................... 16
   § 13995.20 ................................................................................................. 6
   § 13995.20(b) ............................................................................................ 6
   § 13995.60(d) ............................................................................................ 6
   § 13995.65 .............................................................................................. 6, 7
   § 13995.65(f) ....................................................................................*passim*
   § 13995.90 ............................................................................................ 1, 18

## SECONDARY AUTHORITIES

Blechman, *Conscious Parallelism, Signaling and Facilitating Devices: The Problems of
   Tacit Collusion Under the Antitrust Laws*, 24 N.Y.L. Sch. L. Rev. 881 (1979).................... 16

1    **I.        INTRODUCTION**

2           This case involves an agreement among the Rental Car Defendants, who operate at California

3    airports, and a facilitating organization, the California Travel and Tourism Commission ("CTTC"),

4    which participated in, and was financially benefited by, the agreement to fix and raise prices for rental

5    cars.  ¶¶ 1, 2, 6.[1]  The conspiracy alleged has two contemporaneous elements: 1) an agreement to

6    unlawfully pass-on to renters the entirety of a tourism commission assessment which the Rental Car

7    Defendants had agreed to pay to fund the CTTC ("tourism assessment") and 2) an agreement to take

8    perverse advantage of legislation unbundling an airport concession fee ("ACF") to impose an

9    unprecedented and uncharacteristic uniform increase in rental car base rates in roughly the amount of

10   the previously bundled fee.  ¶¶ 2-5.  The First Amended Complaint ("FAC") alleges, and there can be

11   no dispute from the statutes at issue, that the Defendants were neither required to pass-on all or any of

12   the tourism assessment or the ACF, nor were they authorized to agree to do so.  ¶¶ 2, 4, 5, 37, 38, 43,

13   44.  Defendants do not contest, nor could they reasonably do so, that agreeing to pass-on the tourism

14   assessment and/or agreeing to raise base rates by the amount of the ACF is price-fixing.[2]  Because the

15   legislation at issue, AB 2592, neither condoned nor directed price-fixing, the safe harbor provision of

16   that statute (Cal. Gov't Code § 13995.90) is not in the least implicated.[3]

17          Responding to the Court's April 8, 2008 dismissal of the antitrust claim pursuant to *Bell*

18   *Atlantic Corp. v. Twombly*, ___U.S. ___, 127 S. Ct. 1955 (2007) ("*Twombly*"), Plaintiffs have now

19   filed a factually detailed FAC with ten exhibits.  The FAC pleads, with accompanying explicit

20   documentary evidence, the "who," "what," "where," and "when" of meetings and communications

21   in furtherance of, and evidencing, the alleged conspiracy.  ¶¶ 1-7, 12-28, 35-55; Exs. A-J.[4]  While

22   the CTTC in particular attempts to distance itself from the case, the "who" includes personnel

23   _____

24   [1]  All references to "Complaint" and to "¶ __" are, unless indicated otherwise, to the "First
     Amended Complaint for Injunction, Money Damages and Declaratory Relief" filed May 1, 2008.

25   [2]  As discussed in Plaintiffs' accompanying Memorandum in Opposition to the CTTC's related
     Motion, price-fixing is a core concern of the antitrust laws.

26   [3]  In addition, the purported "safe harbor" provision pertains only to the general *state*, Cartwright
     Act and unfair competition law.  Such general immunity declarations within any state law do not

27   provide "state action" protection from federal antitrust liability.  *See* detailed discussion in
     accompanying "Opposition to Motion by CTTC to Dismiss First Amended Complaint."

28   [4]  All references to "Ex. __" are to the Exhibits filed with the FAC, unless otherwise stated.

1

1  from both the Rental Car Defendants and the CTTC, and the "where" and "when" are largely

2  CTTC-related communications and meetings, including admissions of price-fixing emanating from

3  the CTTC itself.  ¶¶ 1-6, 23, 29-34, 36-55; Exs. A-J.

4      Defendants do not argue, again because they could not reasonably do so, that the FAC fails

5  to put them on ample notice of precisely the conduct which is the subject of the Complaint.  *See*

6  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (complaint must be specific

7  enough "to give defendant seeking to respond to allegations of . . . conspiracy an idea of where to

8  begin").  Instead, Defendants[5] attempt to assert that the FAC still fails to plead facts sufficient to

9  raise a "plausible" suggestion of agreement.  *Twombly*, 127 S. Ct. at 1965.  They are wrong.

10     In light of the detailed (indeed evidentiary) allegations of the FAC, Defendants' continued

11  reliance on *Twombly*'s minimal "plausibility" pleading standard is surprising to say the least.  The

12  Court correctly summarized the *Twombly* standard in its prior Order as requiring the pleading of

13  enough factual matter to "plausibly suggest" an agreement was made, one that goes beyond mere

14  labels and conclusions and a mere allegation of parallel pricing conduct.[6]  It also stated the basic

15  standards which continue to govern this pleading motion (and which are pointedly ignored by the

16  Defendants in their motions), i.e., that the Court must construe the FAC in the light most favorable

17  to the Plaintiffs, accept all well-pleaded factual allegations as true, and must give the Plaintiffs the

18  benefit of every reasonable inference to be drawn from the well-pleaded allegations of the

19  complaint.[7]  On a motion to dismiss, a moving defendant can not carry its burden by disputing the

20  reasonable inferences raised by the Complaint, read and interpreted in the light most favorable to

21  the pleader, nor by inviting the Court to weigh or find alternative inferences.  That, however, is

22  precisely what the Defendants improperly attempt to do using terms such as "this suggests at

23

24

25  _____

    [5]  The CTTC's and the Rental Car Defendants' largely repetitive *Twombly* arguments are

26  addressed together.

    [6]  *See* Order Granting Defendants' Motions to Dismiss and Denying without Prejudice Motion for

27  Preliminary Injunction entered April 8, 2008 ("4/8/08 Order") at 6-8.

    [7]  *Id.* at 5 (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990), and *Cahill*

28  *v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996)).

2

1    most," "the logical inference to be drawn," "this is consistent with," etc.[8]

2         Perhaps the clearest example of Defendants' procedurally erroneous approach is their

3    discussion of Exhibits I and B and the related allegations.  RCD Mem. at 12-13; CTTC Mem. at

4    18.  Exhibit I is the McNulty/Toohey email exchange in mid-January 2007 in which Defendant

5    National is complaining to the CTTC that "our competitor Avis is not charging the tourism fee."

6    In response, the CTTC promised to "discuss the issue with the Executive Director [of the CTTC]"

7    and to put it on an agenda of a meeting planned with the industry the following week.  ¶ 41; Ex. I.

8    National's complaint then appears as an agenda item on the January 25, 2007 CTTC committee

9    meeting as "Airport locations not charging the fee – unfair pricing advantage."  ¶ 41; Ex. B.

10    Inventing a fact that appears nowhere in the FAC nor the attached Exhibits, the Rental Car

11    Defendants assert: "[T]his email reflects Ms. McNulty's individual concern that each rental car

12    company . . . should charge and pay the tourism assessment to the CTTC."  RCD Mem. at 12.  The

13    CTTC's equally weak pass at these documents is to focus on a different part of the email, ignore

14    the following agenda entry referring to "unfair pricing advantage," and suggest that the upshot of

15    the document is the CTTC's concern that the other rental car companies may not have been

16    informed of the assessment.  CTTC Mem. at 18.  Even if these extra-Complaint assertions were

17    exculpatory (which they are not)[9] or rose to the level of a fair reading of the documents (which

18    they do not),[10] Defendants here are doing nothing less than a) inventing facts which are not pled in

19    the FAC, and/or b) proffering alternative inferences that are contrary to those pled in the FAC,

20    inferences that are (or so they argue) more favorable to them than to the pleader.  Compare ¶¶ 39-

21    41 with CTTC Mem. at 18.  This is plainly both improper and unavailing on a motion to dismiss.

22    *See Williams v. Gerber Prods. Co.*, 523 F.3d 934, 937 (9th Cir. 2008) ("All allegations of material

23

---

24    [8]  *See* Memorandum of Points and Authorities in Support of the Rental Car Defendants' Motion to Dismiss the First Amended Complaint ("RCD Mem.") at 11, 12; Memorandum of Points and

25    Authorities of Defendant California Travel and Tourism Commission in Support of Motion to Dismiss Plaintiffs' First Amended Complaint ("CTTC Mem.") at 18.

26    [9]  Even the Rental Car Defendants' reading of the document admits Ms. McNulty (who was obviously acting within the scope of her duties) was concerned "that each rental company . . .

27    should *charge*" the tourism assessment.  RCD Mem. at 12.

28    [10]  The documents refer to "pricing" and "pricing advantage" and not a concern over someone not paying the tourism assessment to the CTTC as Defendants would read them.

1  fact in the complaint are taken as true and construed in the light most favorable to the plaintiff.")

2  (quoting *Stoner v. Santa Clara County Office of Educ.*, 502 F.3d 1116, 1120 (9th Cir. 2007)).

3      In light of the extensive factual matter now pled and the obvious compliance with the *Twombly*

4  standard, Defendants − even though paying lip-service to (and occasionally misstating) the *Twombly*

5  standard − can no longer reasonably couch their arguments within the bounds of the controlling

6  principles, i.e., that the allegations of the FAC, taken as a whole and construed in the Plaintiffs' favor,

7  need only support a "plausible" inference of conspiracy.  *Twombly*, 127 S. Ct. at 1965.  Instead,

8  Defendants are reduced to mischaracterizing the FAC and making jury arguments, proffering their

9  own explanations to the collusive inferences fairly drawn from a series of inculpatory facts and

10  documents.  At the end of the day, the Defendants cannot bring themselves to even attempt to explain

11  away all of the facts pled in the FAC which indicate a "plausible case" of collusion.  Exhibit D, an

12  October 17, 2006 email from the CTTC's counsel to a Hertz representative memorializing the fact that

13  "everyone *agreed* to continue the funding *as long as the pass-through was in place*," goes completely

14  ignored.[11]  "Agreeing" with horizontal competitors as to pricing is, after all, the most basic and

15  pernicious practice proscribed by the antitrust laws.  *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 639

16  (1992) ("No antitrust offense is more pernicious than price fixing.")

17      At the end of the day, these would be difficult facts and documents to explain away at a

18  trial; suggesting that these facts do not suffice to raise a reasonable inference of conspiracy at the

19  pleading stage for *Twombly* purposes is beyond the pale.

20      With respect to the ACF, Plaintiffs have pled that the price increase wasn't just

21  contemporaneous (i.e., parallel), it was "aberrant."  ¶ 5.  The increase defied prior pricing patterns

22  among the Defendants, defied the usual seasonal pricing movement, was counter to the trend in

23  pricing in other non-conspiratorial geographical markets and defied a rational response to reduced

24  demand.  ¶¶ 5, 43-44.  Nor can Defendants dissect the two fees as if they were discussed and

25  imposed in isolation.  They were not.  They arise in the context of the same activity (airport car

26  rentals), the same statute (AB 2592), at the same time, and among the same players.  ¶¶ 2-6, 35-44.

27

28  ---
[11]  All emphasis is added unless otherwise indicated.

4

The uniform price increase in base rates related to the ACF also took place in a demonstrated atmosphere of collusive conversations and industry meetings about passing on the contemporaneously imposed tourism assessment.  ¶¶ 2-6, 35-44.  Defendants' assertion that no additional facts have been pled with respect to the ACF, no matter how many times it is repeated in their briefs, is simply inaccurate.  In addition to the additional allegations relating to their contemporaneous communications about the tourism assessment (¶¶ 3, 39-41), Paragraph 43 of the FAC adds factual detail concerning the aberrant and historically unprecedented character of their pricing in January 2007.  Whether Defendants can rationally argue that all seven companies' simultaneous base rate price increase may have been non-conspiratorial just is not the issue under *Twombly*.[12]  The issue under *Twombly* is whether, giving the pleader the benefit of every reasonable inference, sufficient factual context has been alleged to render a conspiratorial inference "plausible." *Twombly*, 127 S. Ct. at 1965-66.

Plaintiffs have, even without the benefit of discovery,[13] gone beyond "alleg[ing] sufficient facts to make the existence of a conspiracy plausible."  4/8/08 Order at 9.  They have pled evidentiary detail from which it can be inferred that collusion likely occurred.  ¶¶ 2-6, 35-44. Defendants would have this Court become the first to dismiss under *Twombly* a horizontal price-fixing complaint which details (and in many cases attaches evidence of) the who, what, where and when of meetings and collusive communications, including admissions, which attended the imposition of identical price increases that ran counter to historical pricing baselines.  This Court should decline that invitation and deny the motions to dismiss the Sherman Act claim.

Defendants' agreement to charge uniform prices and their misleading characterization of those charges also state claims under the UCL and the Consumer Legal Remedies Act.  Because neither price-fixing nor deception is either contemplated or required by the CTMA, there is no

---

[12]  Defendants simply misapprehend the law when they argue that the law requires the Plaintiff at the pleading stage "to account for" a possible non-conspiratorial explanation in the Complaint. RCD Mem. at 1.  This is a motion to dismiss.  Plaintiffs need not counter non-conspiratorial possibilities, they need only raise the conspiratorial possibility to the level of plausibility.

[13]  Compare *Kendall v. Visa U.S.A., Inc*., 518 F.3d 1042 (9th Cir. 2008) (dismissing complaint with prejudice under *Twombly* after five attempts to plead and only after Plaintiffs had been given the opportunity to conduct discovery).

5

1   immunity for the conduct alleged in the FAC.  The Court should deny the motion to dismiss those

2   claims as well.

3   **II.    FACTUAL BACKGROUND**

        **A.    The Tourism Assessment and the Agreement to Pass the Entirety of that**
4             **Assessment to Renters**

5         It is beyond dispute that the Legislature, in passing AB 2592, neither required that the tourism

6   assessment of the rental car industry be passed in whole to consumers nor sanctioned an industry-wide

7   agreement to do so.  ¶¶ 2, 4, 5, 37, 38, 43, 44.  To the contrary, AB 2592 makes clear that it is in the

8   discretion of each individual Rental Car Defendant as to whether it passes on all or any portion of the

9   tourism assessment to consumers and whether, if it does pass it on, it will separately list the fee on a

10  customer's bill.  First, section 13995.20 of the Government Code defines "assessed business" as "a

11  person required to pay an assessment pursuant to this chapter, and until the first assessment is levied,

12  any person authorized to vote for the initial referendum."  Cal. Gov't Code § 13995.20(b); *see also id.*

13  § 13995.20(h) (defining "person" as "an individual, public entity, firm, corporation, association, or any

14  other business unit, whether operating on a for-profit or nonprofit basis").  This and the rest of the

15  chapter go on to make clear that "assessed business" refers to each of the Rental Car Defendants.[14]

16        Civil Code § 1936.01(a)(3) defines "tourism commission assessment" as "the charge

17  collected by a rental company from a renter that has been established by the California Travel and

18  Tourism Commission *pursuant to Section 13995.65 of the Government Code*."  Cal. Civ. Code

19  § 1936.01(a)(3).  The provision is purely definitional and speaks not at all to whether an assessed

20  business must, or even should, pass-on all or any part of the assessment it must pay to consumers.

21  Other provisions make clear that any decision to pass-on "some or all" of the tourism assessment lies

22  within the unilateral discretion of each company.  The statute neither compels, counsels, nor

23  encourages pass-on; it merely permits it.  Most directly, section 13995.65(f) of the Government

24  Code states: "Notwithstanding any other provision of law, an assessed business *may pass-on some or*

25  *all* of the assessment to customers.  An assessed business *that is* passing on the assessment *may, but*

26

_____

27  [14]  For example, section 13995.60(d) states, "When the secretary calls a referendum, all assessed
     businesses shall be sent a ballot for the referendum."  Cal. Gov't Code § 13995.60(d).  Clearly the
28  Rental Car Defendants are sent ballots, not individual consumers.

1   *shall not be required to*, separately identify or itemize the assessment on any document provided to a

2   customer."   Cal. Gov't Code § 13995.65(f).   This provision makes clear that each Rental Car

3   Defendant individually has the discretion ("may") to pass-on "some or all" of the assessment, and, if

4   it chooses to pass it on, it also has the discretion to separately itemize it.[15]   In addition, Civil Code

5   § 1936.01(b)(2)-(3), the section in which the definition of "tourism commission assessment" is

6   found, goes on to refer, in multiple provisions, to the "tourism commission assessment, *if any*."  Cal.

7   Civ. Code § 1936.01(b)(2)-(3).   While Defendants would like to have the Court look only at the

8   definitional section, § 1936.01, and argue that AB 2592 conclusively assumed a pass-on of the

9   assessment for which they assertedly lobbied,[16] the statutory scheme must be read as a whole.  *See,*

10  *e.g., King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (noting "the cardinal rule that a statute is

11  to be read as a whole"); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (stating that a statute

12  should be read so that "no clause, sentence, or word shall be superfluous, void, or insignificant").

13  Section 1936.01(a)(3) can only be understood, consistent with the other provisions of AB 2592, as

14  defining the charge so it could be referred to in the rest of the statute, which at several places makes

15  clear that passing on "some or all" of the tourism commission assessment to consumers was

16  supposed to be a matter of each Rental Car Defendant's *individual discretion*.  Beyond all dispute is

17  the fact that nowhere does the statute permit what the FAC alleges occurred here: *an agreement by*

18  *the industry to pass-on the assessment to renters.*

19          Defendants, as pled in the FAC, for obvious anticompetitive reasons, determined to avoid

20  competitive disadvantage[17] by making an industry-wide agreement, explicitly evidenced in the

21  documents referred to in the FAC, to agree with each other to pass the entirety of the assessment to

22

23

24

25  _____

    [15]  It bears noting that this provision is part of the very section (§ 13995.65) cross-referenced in the
26  definition which the Defendants selective parse relies upon.

    [16]  Defendants at several points argue that they had lobbied for pass-on.  This is not pled in the
27  FAC.  In any event, if they lobbied for a statutory mandatory pass-on, they didn't get it.

    [17]   *See*, for example, ¶ 41 and Ex. B (agenda item for CTTC meeting "Airport locations not
28  charging the fee – unfair pricing advantage").

7

renters.  ¶¶ 2-6, 35-44.[18]  After AB 2592 passed in 2006, the CTTC hosted meetings and provided a forum for communication among the Rental Car Defendants to discuss what they described as the "partnership" with the Rental Car Defendants and the CTTC in securing the CTTC's funding. ¶¶ 39, 51-53.  It is with respect to these meetings and related communications that the agreement to pass-on the fees is evidenced.  ¶¶ 39-44.  The minutes of the October 3, 2006 CTTC Executive Committee Meeting give the first indication of an explicit and agreed premise of the industry that by agreement among them any assessment would, rather than be the subject of competition, be passed in its entirety to renters.  ¶ 40.  Thus, already at this meeting, it was "reported the CTTC has acquired a partnership with the rental car industry to secure a long-term funding solution for the CTTC" (Ex. F), and, as the agenda to that meeting reflects, there would be further discussion of the "rental car *pass through fees*."  ¶ 40; Ex. G.

The dates and participants of other conspiratorial meetings are pled in the Complaint. Meetings with and among the Rental Car Defendants commenced in the fall of 2006.  ¶¶ 39, 40, 50.  Specifically, they occurred, *inter alia*, on or before October 17, 2006 and on October 23 and/or 25, 2006.  ¶ 39.  Participants included the representatives of the CTTC and the Rental Car Defendants who are specifically identified in the FAC.  ¶ 39.  During these meetings, and accompanying phone conversations and email exchanges, the Rental Car Defendants not only agreed to assess themselves 2.5% of their income from airport rentals to fund the CTTC, but they agreed that they would do so only if each of them agreed to surcharge each consumer the 2.5% assessment.  ¶ 39.  An email dated October 17, 2006 from the CTTC's counsel to Defendant Hertz, with others copied, states rather plainly, "My recollection from the meeting is that everyone agreed to continue the funding *as long as the pass-through was in place*."  ¶ 39; Ex. D.  In other words, the CTTC would be funded as long as the industry, contrary to the clear legislative direction that each firm act unilaterally in deciding on whether to pass-on "all or some" of the assessment (§ 13995.65(f)), instead, specifically agreed to do so.

---

[18]  Assessment of fees for the support of special fund agencies upon those subject to agency jurisdiction is common.  Specifying the amount those professions, trades or businesses are to add to client or consumer bills is not.  It never occurs unless specifically so authorized and specified. *See* Opposition to Motion by CTTC to Dismiss First Amended Complaint for further discussion of this point.

8

1    Counsel for the CTTC drafted a Memorandum of Agreement ("MOA"), which described

2  the assessment, and circulated it among all Defendants.  ¶ 39; Ex. A.  The MOA was fully

3  executed.  ¶ 40.  In accordance with the MOA, the CTTC then sent around a ballot (*see* Ex. E) in

4  November 2006 which reflected the understanding that the "pass-through [be] in place."  ¶ 40.

5  While the MOA had stated that the Rental Car Defendants would pay the assessment to the CTTC

6  as contemplated by AB 2592, the ballot called for a referendum to confirm the Rental Car

7  Defendants' previously reached agreement that "a percentage of revenue [would] be collected BY

8  each passenger car rental company."  ¶ 40; Ex. E.  The Rental Car Defendants were, of course,

9  authorized to vote on the assessment level which they would pay the CTTC.  *They were not*

10  *authorized to reach agreement on their collection of it from renters*.  The use of the preposition

11  "by" instead of "from" is consistent with prior and later documents which take as a matter of

12  primary agreement − even expressly so state − that the industry will pass the entire assessment

13  onto renters.  ¶ 40.  The vote among the Rental Car Defendants, a clear manifestation of their

14  agreement to collect an assessment from renters, i.e., to pass-on the assessment, was unanimous.

15  ¶ 40.  There can be no clearer manifestation of agreement than a unanimous vote.

16    As further evidence of the agreement and the CTTC's central role in facilitating and

17  enforcing the agreement, the CTTC posted on its Web site under the caption "Passenger Car

18  Rental Industry Tourism Assessment Program" a statement (contrary to every provision of the law

19  making the pass-through of the assessment a matter of each firm's individual discretion) that

20  "[t]his assessment rate *shall be passed through* to the customer."  ¶ 41; Ex. H.  No statute requires

21  a mandatory pass-through; to the contrary, Government Code § 13995.65(f) makes charging

22  consumers entirely discretionary.  This use of mandatory language "shall be passed through" is

23  further evidence of the industry's and the CTTC's prior mutual understanding that the assessment

24  on the industry would not be borne in any part by them, but would be passed in a price-fixed

25  charge onto renters.  ¶¶ 3, 41.  In a concession that its agreed mandatory pass-on activity was

26  wrongful, following the filing of this lawsuit, the CTTC sought to cover up this now-damaging

27  price-fixing admission and the CTTC's role in it by removing the language, "This assessment rate

28  shall be passed through to the consumer," from its Web page. ¶ 41; Ex. H.

9

As discussed briefly above, in an email string in January 2007 between a representative of Defendant National Car Rental and Terri Toohey of the CTTC, National complained that its "competitor Avis is not charging the tourism fee" (in effect a complaint that Avis may have been "cheating" on the conspiracy) and asked the CTTC "what can be done about that?" (i.e., to facilitate enforcement of the price-fixing agreement by getting Avis to charge the fee). ¶ 41; Ex. I. In response, the CTTC promised to "discuss the issue with our Executive Director" and that at "a meeting planned with the industry next week . . . I will put it on the agenda." ¶ 41; Ex. I. Then, on the agenda of the Passenger Car Rental Industry Tourism Assessment Meeting scheduled for Thursday, January 25, 2007, sent by email by Terri Toohey of the CTTC to the industry participants, agenda item 5(a) reads "airport location not charging the fee − unfair price advantage." ¶ 41; Ex. B. According to documents produced by the CTTC in response to a Public Records Act request, no further complaints or instances of noncompliance with the price-fixing agreement are recorded. ¶ 41. In a non-collusive market, competitors do not address with other competitors how they should price or whether a pricing differential is giving the competitor "an unfair pricing advantage." A competitive market competes on price; this one did not.

The Rental Car Defendants also facilitated the conspiracy by separately itemizing the CTTC surcharge (although not required to do so) so that each company would be able to observe the others' compliance with the agreement. ¶ 41.

Indeed, the only apparent element of entrepreneurism the Defendants showed with respect to the tourism assessment was in the ways they mischaracterized it to consumers. The descriptions misleadingly referred to it as a "tour tax," "tourist tax," a "mandatory airport related charge," a "governmentally mandated charge," and a "percentage charge established by the California Travel and Tourism Commission." ¶ 62. None of those characterizations are accurate. It is not a "tax" at all; charging it to renters, as the statute makes clear, is not "mandatory"; nor is the charge to the consumer for recovery of "all or some" of the assessment "established by the California Travel and Tourism Commission." ¶¶ 61-62. In fact the pass-on was established by the Rental Car Defendants with the help of the CTTC, acting as a group, in violation of the antitrust laws. ¶¶ 2-4, 6, 38-42.

10

**B.**     **The Agreement to Raise Base Rates in Conjunction with the Unbundling of the Airport Concession Fee**

Nothing in the statute permitting the unbundling of the ACF authorized any pricing level change or price coordination by the Rental Car Defendants.  ¶¶ 2, 5, 37, 43, 44.  Starting in January 2007, coincident with the effective date of the statute, the Rental Car Defendants effected an approximate 9% price increase, not by separating out the ACF from the base billing rate, but by increasing the base rate.  ¶¶ 5, 42-44.  As a result, rental rates at California airports rose in January 2007 from December 2006 while they declined on average in the United States.  ¶ 43.  A survey of average nationwide prices for eight companies at ten non-California airports, between December 2006 and January 2007 showed a marked reduction in prices consistent with decreasing demand; at California airports prices increased.  ¶ 43.  In addition to running contrary to the downward movement of prices in other markets, the price increases at California airports were uncharacteristic for the industry.  Because the airport rental car market is generally competitive, price increases are difficult to achieve and industry pricing historically is not one of industry-wide identical increases.  ¶ 43.  Nonetheless, such an aberrant price increase was achieved at California airports coincident with the occurrence of multiple meetings and communications among the industry participants, the documents pertaining to which, evidence the making of an explicit contemporaneous agreement to pass to consumers the other airport rental fee which was the subject of the same legislation, the tourism assessment.  ¶¶ 38-41; Exs. A-H.

**III.     ARGUMENT**

**A.**     **The Allegations in Plaintiffs' First Amended Complaint Are More Than Sufficient to Meet the *Twombly* Pleading Standard**

As the Court stated in its Order: "[I]n resolving a Rule 12(b)(6) motion, the court construes the complaint in the light most favorable to the Plaintiff and accepts all well-pleaded factual allegations as true."  Order at 5 (citing *Cahill*, 80 F.3d at 337-38); *see also Williams*, 523 F.3d at 937.  Additionally, the Court "is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the 'well-pleaded' allegations of the complaint.  Thus, the plaintiff need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly alleged."  *Corrections USA v. Dawe*, 504

11

1  F. Supp. 2d 924, 929 (E.D. Cal. 2007) (citing *Retail Clerks Int'l Ass'n v. Shermerhorn*, 373 U.S. 746,

2  753 n.6 (1963)).  Courts are not permitted to weigh evidence on a motion to dismiss.  *Williams*, 523

3  F.3d at 939.

4      Contrary to the Defendants' approach of considering the facts pled in the FAC in isolation,

5  "substantive allegations of conspiratorial antitrust behavior should be considered as a whole."  *Vinci*

6  *v. Waste Mgmt.*, 80 F.3d 1372, 1374 (9th Cir. 1996).  Any "attempt to parse and dismember the

7  complaints [is] contrary to the Supreme Court's admonition that '[t]he character and effect of a

8  [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts.'"

9  *In re Southeastern Milk Antitrust Litig.*, MDL No. 1899, slip op. at 14 (E.D. Tenn. May 20, 2008)

10  (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).  In *In re*

11  *Southeastern Milk*, a Sherman Act case addressing the *Twombly* standard, the court made clear that it

12  must view the complaint as a whole and accept all factual allegations as true in order to determine

13  plausibility. *Id*. at 13.  It is not proper to view factual allegations in isolation. *Id*.

14      Even though the FAC pleads many detailed facts, under *Twombly* and its progeny, "a

15  complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

16  allegations."  *Twombly*, 127 S. Ct. at 1964; *Weber v. Dep't of Veterans Affairs*, 512 F.3d 1178,

17  1181 (9th Cir. 2008).  As this Court stated in its Order, *Twombly* merely requires that a complaint

18  allege facts making a conspiracy "plausible."  4/8/08 Order at 7 (quoting *Twombly*, 127 S. Ct. at

19  1965).  Allegations rendering a conspiracy plausible are sufficient to overcome a motion to

20  dismiss, even if "recovery is very remote and unlikely."  *Twombly*, 127 S. Ct. at 1964-65 (citation

21  omitted).  *Twombly* did "not apply any 'heightened' pleading standard, nor . . . seek to broaden the

22  scope of the Federal Rule of Civil Procedure 9."  *Id*. at 1973 n.14.

23      Under *Twombly*, a complaint, read as a whole, need only "suggest that an agreement was

24  made . . . [or] raise a reasonable expectation that discovery will reveal evidence of illegal

25  agreement." *Id*. at 1965.  "It is not necessary for a Plaintiff to show an explicit agreement among

26  defendants in support of a Sherman Act conspiracy, 'concerted action may be inferred from

27  circumstantial evidence of the defendant's conduct and course of dealings.'" *In re Dual-Dec Video*

28  *Cassette Recorder Antitrust Litig.*, Nos. MDL-765, CIV 87-987, 1990 U.S. Dist. LEXIS 19207, at

12

1  *50 (D. Ariz. July 26, 1990) (quoting *Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*, 850

2  F.2d 477, 484 (9th Cir. 1988)).  The *Twombly* plausibility standard does not "impose a probability

3  requirement at the pleading stage." *Twombly*, 127 S. Ct. at 1965.  Indeed, due to the secret nature of

4  conspiracies, direct allegations of conspiracy are neither possible nor necessary.  *See In re Graphics*

5  *Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1096 (N.D. Cal. 2007).  "[A] complaint

6  need not be dismissed where it does not 'exclude the possibility of independent business action.'"

7  *City of Moundridge v. Exxon Mobil Corp.*, Civil Action No. 04-940 (RWR), 2008 U.S. Dist. LEXIS

8  31236, at *12 (D.D.C. Apr. 16, 2008).[19]

9      In sum, as the Seventh Circuit recently held, *Twombly* recognizes "two easy-to-clear hurdles"

10  under Rule 8: 1) Plaintiffs must provide fair notice to Defendants of their claims; and 2) Plaintiffs must

11  plausibly suggest that they have a right to relief, which rises above a "speculative level." *EEOC v.*

12  *Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007).  The FAC easily clears both hurdles.

> **1.    Plaintiffs Have Alleged Substantial Direct Evidence of a Conspiracy with Respect to the Tourism Assessment**

15      Defendants' only defense against the detailed collection of evidence against them

16  pertaining to the tourism assessment is to parse each item of evidence and then argue that each

17  item, construed in isolation and most favorably to Defendants, does not support a conspiracy.  As

18  described above, however, this approach runs contrary to the law, which requires that 1) the

19  evidence be construed in the light most favorable to Plaintiffs; 2) allegations of antitrust behavior

20  be read as a whole; and 3) a court not weigh inferences.  *Williams*, 523 F.3d at 937, 939; *Vinci*, 80

21  F.3d at 1374.

22      Without the benefit of discovery, Plaintiffs have pled detailed and explicit evidence

---

[19]  The CTTC takes excessive liberty when it stitches together the following proposition in its brief: "If the allegations of the complaint are 'consistent with conspiracy but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market' the Section 1 claim must be dismissed.  [*Twombly*, 127 S. Ct.] at 1964." CTTC Mem. at 14 (emphasis omitted).  This partial quote is not from the section of *Twombly* in which the Court articulates its pleading standard, but rather is a preliminary comment citing to a scholarly article reflecting on the potential ambiguity of mere parallel conduct.  *Twombly*, 127 S. Ct. at 1964.  Under *Twombly*, the pleading of parallel conduct that is as consistent with conspiracy as independent action is sufficient to state a claim so long as the allegations are "placed in a context that raises a [plausible] suggestion of preceding agreement." *Id.* at 1966.  This Court, in its prior Order, recognizes this distinction.  4/8/08 Order at 8.

supporting the allegations of agreement among the Rental Car Defendants and demonstrating the CTTC's central facilitating role in the conspiracy.  Read as a whole and in the light most favorable to Plaintiffs, this evidence paints a clear picture of a conspiracy among the Rental Car Defendants and the CTTC which, as a co-conspirator, is jointly and severally liable to the Plaintiffs and the Class.  *See William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1052-53 (9th Cir. 1982) ("[A]ntitrust coconspirators are jointly and severably liable for all damages caused by the conspiracy.").  The detailed evidence submitted by Plaintiffs, in conjunction with their FAC, clearly suffices to present a plausible price-fixing agreement among Defendants.  ¶¶ 2-6, 35-44; Discussion, *infra*, Part II.

> **2.    Clear Evidence of Conspiratorial Behavior Among Defendants, Combined with Specific Allegations Relating to the 9% Charge, Renders a Conspiracy Plausible**

Plaintiffs have also met the *Twombly* standard with respect to the January increase in base rates.  Plaintiffs have alleged that in 2006 and prior, the Defendants had variable pricing patterns, but in January of 2007 the Rental Car Defendants each simultaneously increased their base rates in a manner which was contrary to non-conspiracy baseline indicators (i.e., prior industry pricing patterns, seasonal pricing movement, pricing in other geographical markets in which the defendants compete, and demand).  ¶¶ 5, 43.  Plaintiffs further allege that the "aberrant price movement" occurred following "the meeting among competitors to discuss pricing and the agreement to uniformly charge consumers the CTTC surcharge."  ¶ 5; Discussion, *infra* Part II.

The facts here are similar to those found sufficient in *In re Graphic Cards Processing Units Antitrust Litigation*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007).  There, plaintiffs pled that the defendants' market behavior before the alleged conspiracy differed from that during the conspiracy with respect to the timing of product releases.  Noting the "historically unprecedented change in behavior" pled against a baseline of pre-conspiracy behavior, the court sustained the complaint against a *Twombly* motion.  *Id*. at 1091-95.  A similar situation, indeed a more fulsome set of facts, has been pled here with respect to the January 2007 spike in base rates.  The FAC pleads that the Defendants' identical pricing behavior was inconsistent not only with historical price patterns, but also with seasonal pricing, demand, and their contemporaneous pricing in other geographic markets

14

in which the Defendants compete.  ¶¶ 5, 43.  In addition, as with *Graphic Cards*, Plaintiffs pled that this aberrant and unprecedented price movement took place in the context of industry communications.  Like *Graphic Cards*, the aberrance of the conspiracy conduct against competitive baselines is sufficient to render the alleged conspiracy "plausible" for *Twombly* purposes.[20]

Defendants argue that this pricing is explained by a common response to the legislation allowing the unbundling of the fee.  That, however, might explain the allocation of price as between the base rate and the ACF, but does not (innocently) explain a uniform and historically unprecedented and geographically peculiar *increase in the total price*.[21]  Their only (and oft-repeated response) is to cite to their interpretation of Professor Fellmeth's pre-filing letter to the Legislature.  RCD Mem., Ex. A.  Apart from the highly questionable procedural propriety of finding a "fact" on a motion to dismiss by interpreting a letter in a way which contradicts what is pled in the Complaint,[22] the letter does not even state what the Defendants suggest it says.  What the Fellmeth letter states is that "[t]he end result is going to be an industry-wide price hike of 10% − all of it new profit for the industry."  *Id.*  It merely predicted that as a result of the legislation there would be a 10% price increase; it does not say that this will result from the unilateral and independent decision making of the defendants, or as a natural and non-collusive consequence of the bill as opposed to either their express or tacit collusion.  Professor Fellmeth was predicting a possible unlawful price-fix, not at all suggesting that such a result was legislatively authorized or intended.

The Supreme Court has long recognized that Section 1 of the Sherman Act reaches both explicit and tacit collusion.  It has long been the law:

> that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators . . . [and that] [a]cceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is a restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act.

---

[20]  CTTC cites to an earlier opinion in the *Graphics Card* case dismissing the original complaint ignoring this subsequent decision sustaining the amended complaint.  CTTC Mem. at 17.

[21]  Thus if the pre-January bundled price had been $100 including a $10 ACF, a predictable post-law price change (putting other factors aside) may have been a total $100 price allocated as a $90 base price and a $10 ACF; not a price *increase* to a total price of $110.

[22]  "All allegations of material fact in the complaint are taken as true and construed in the light most favorable to the plaintiff."  *Williams*, 523 F.3d at 937.  Courts may not consider matters outside the pleadings on a motion to dismiss.  *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989).

15

1   *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939).  Professor Fellmeth, a former

2   antitrust professor, is well familiar with this bedrock principle of Sherman Act conspiracy law.

3         Less detail than that found in the current FAC also sufficed to pass *Twombly* muster in

4   *Moundridge*, 2008 U.S. Dist. LEXIS 31236.  There plaintiffs pled only that natural gas prices

5   increased in the face of constant supply, did not fall below the alleged agreed price, that the

6   defendants reported high profits and the years, locations and the defendants who allegedly

7   participated in the agreement.  *Id.* at *3.

8         Finally, a circumstance additional to those pled in *Graphic Cards* and *Moundridge* is pled

9   in the FAC.  Here, at the time of the price hike, and in the months leading up to it, the Rental Car

10  Defendants and the CTTC were meeting, discussing and agreeing with respect to AB 2592 and

11  pass-on of the tourism assessment, the very law that allowed the Rental Car Defendants to break

12  out the 9% fee.  The similarity of the events and people involved also supports an inference of a

13  conspiracy.  *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, MDL No. 1819,

14  2008 U.S. Dist. LEXIS 15826, at *47 (N.D. Cal. Feb. 14, 2008) (citing, among other things, the

15  fact that "the same actors associated with certain Defendants were responsible for marketing both

16  SRAM and DRAM" and that allegations regarding the DRAM wrongdoing supported an inference

17  of a conspiracy in the SRAM industry).

18        Plaintiffs have also alleged recognized "plus factors" which are supportive, along with the

19  explicit detailed evidence referred to previously, of an inference of conspiracy.  Evidence of a

20  conspiracy exists "when [a company] rigidly refuses to make any sales by lowering prices by even

21  *de minimis* amounts."  Blechman, *Conscious Parallelism, Signaling and Facilitating Devices: The*

22  *Problems of Tacit Collusion Under the Antitrust Laws*, 24 N.Y.L. Sch. L. Rev. 881, 899 (1979)

23  (cited in *Twombly*, 127 S. Ct. at 1965 n.4).

24        Furthermore, Defendants clearly had the opportunity to conspire.  *See In re Petroleum*

25  *Prods. Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir. 1990); *C-O-Two Fire Equip. Co. v. United*

26  *States*, 197 F.2d 489, 493 (9th Cir. 1952).  The CTTC offered the Rental Car Defendants a forum,

27  facilitated the conspiracy, and maintained its confidentiality via violations of the Bagley-Keene

28  Act, Cal. Gov't Code §§ 11120, *et seq.*  Not only is it clear here that Defendants met and

16

1    communicated during the period just before the price increase was effectuated, but it is also clear

2    based on evidence gathered to date, that they were having discussions and communications

3    regarding the very matters at issue.

4         Further, the Defendants all acted within a short time frame.  *See In re Tableware Antitrust*

5    *Litig.*, 484 F. Supp. 2d 1059, 1076 (N.D. Cal. 1007).  Defendants charged supracompetitive prices.

6    *In re Uranium Indus. Antitrust Litig.*, 466 F. Supp. 958, 962 (J.P.M.L. 1979).  Also, with the new

7    law going into effect, Defendants were motivated to conspire.  *See First Nat'l Bank v. Cities Serv.*

8    *Co.*, 391 U.S. 253, 287 (1968).  And finally, although the Rental Car Defendants "vary among

9    themselves" in base rates (¶ 36) and price differently between customer groups, by season, and in

10   advertising − the price hike as alleged is imposed with uniformity over time and between Defendants

11   and customer groups.

12        Defendants' reliance on *Kendall* is misplaced.  In *Kendall*, despite the opportunity to

13   conduct discovery (including depositions) and five attempts to state a claim, the Plaintiffs did "not

14   allege any facts to support their theory that the Banks conspired or agreed with each other or with

15   the Consortiums to restrain trade."  *Kendall*, 518 F.3d at 1048.  Notwithstanding discovery,

16   *Kendall's* allegations failed to go beyond conclusory allegations that the banks had adopted

17   merchant discount fees or followed network set interchange rates.  *Id*.  It was clear that there could

18   be no "reasonable expectation" that additional discovery would reveal evidence of illegal

19   agreement because the appellants had already had the opportunity to conduct discovery.  *Id*. at

20   1046.  Here, Plaintiffs have not yet had the opportunity to conduct discovery and have pled

21   substantial and explicit evidence of a conspiracy.

22        Finally, Defendants' reliance on *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d

23   953 (N.D. Cal. 2007), is unavailing.  There the Court cited to the fact that it found the "heart" of

24   the complaint's allegations centered on a chart which in fact showed varying prices and that the

25   Defendants' prices "have all followed different pricing paths at different times, not even roughly

26   in parallel."  *Id*. at 962.  Also, the complaint provided "no details as to when, where, or by whom

27   this alleged agreement was reached."  *Id*.  In other words, the complaint as described by the *In re*

28   *Late Fee* Court bears no relation to the FAC, which details the who, what, where, and when from

17

1   which identical and contemporaneous price increases resulted.  ¶¶ 1-7, 12-28, 35-55.

2       **B.    The FAC States Claims Under the UCL and CLRA**

3       Plaintiffs have asserted valid claims under both California's Unfair Competition Law

4   ("UCL") and the Consumer Legal Remedies Act ("CLRA") based on the following facts.  The

5   Rental Car Defendants entered into an unlawful conspiracy to fix prices with respect to their rental

6   car rates.  The conspiracy consisted of two components: 1) a 9% price hike in their base rates, and

7   2) an agreement to pass-on the 2.5% tourism assessment to consumers.   The Rental Car

8   Defendants misrepresented the nature of the 2.5% assessment, implying that it was owed by

9   consumers to a taxing authority or was governmentally mandated, and omitting the fact that the

10  uniform charge to renters resulted from their own agreement.  By agreeing to uniformly pass the

11  charge along to consumers, the Rental Car Defendants left consumers with no choice or any ability

12  to shop around for a company with lower or no tourism fee and effectively forced them to pay a

13  price-fixed charge.  These facts violate both the UCL and the CLRA and they are certainly not

14  authorized by the CTMA.

15      **1.    The Government Code Provides No Defense for the Price-Fixing
               Conspiracy Alleged in the FAC**

16

17      The Rental Car Defendants' assertion that they are immunized from any liability based upon

18  application of the antitrust laws (including the UCL) is baseless.   Section 13995.90 of the

19  Government Code provides only that if a defendant establishes "proof that the act that is complained

20  of was done in compliance with the provisions of [the CTMA]" it has a "defense" to a *state*

21  antitrust/UCL action.  As an affirmative defense, Defendants generally may not raise this issue at the

22  motion to dismiss stage.  *See, e.g., Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (stating

23  that "[o]rdinarily affirmative defenses may not be raised by motion to dismiss").  Second, even if the

24  argument were proper at this stage, Defendants have the burden of showing that the act complained

25  of − i.e., the price-fixing conspiracy − was done in compliance with the CTMA and that − because

26  this is a motion to dismiss − the defense conclusively appears on the face of the FAC read in the

27  light most favorable to Plaintiffs.  Defendants have not shown this, nor could they.

28      Agreeing to artificially inflate the base rate of rental car charges and to pass along a fee

18

owed by the individual companies to the CTTC, in contravention of a statute which merely permits pass-on in the unilateral discretion of each rental car company, is certainly not within the purview of the CTMA.  Defendants cite to Government Code § 13995.65(f), which provides that "an assessed business may pass-on some or all of the assessment to customers."  Cal. Gov't Code § 13995.65(f).  Yet the wrongdoing is not that the Rental Car Defendants passed on the assessment; it is that they agreed among themselves to do so.  Similarly, Defendants have failed to prove that the Legislature granted them immunity for deceptively describing these charges to consumers as a "tax" or "governmentally mandated charge" or deceiving consumers into paying more to Defendants than Defendants pay to the CTTC.

While it is true that "[w]hen specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor" (*Cel-Tech Commc'n, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999)), price collusion and deception are well outside the harbor.

### 2.    Defendants Violated UCL's Unlawful Prong

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Because Plaintiffs have pled viable claims for violations of the Sherman Act and the CLRA, they have also properly pled a claim under the "unlawful" prong of the UCL. *See Cel-Tech*, 20 Cal. 4th at 180 ("By proscribing 'any unlawful' business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.") (internal quotations omitted); *see also Roskind v. Morgan Stanley Dean Witter & Co.*, 80 Cal. App. 4th 345, 352 (2000) ("[C]ase authority clearly provides that violation of a federal law may serve as a predicate for a section 17200 action.").[23]

### 3.    Plaintiffs Have Standing

Defendants assert a standing objection, solely with respect to Plaintiffs' claim under the unlawful prong of the UCL.  This argument has no merit.  The class representatives, and the members of the alleged class, paid the charges at issue and had no choice in the matter because all

---

[23]  To the extent Defendants suggest via their cite to *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 373-75 (2001), that the legislature or the courts have somehow permitted the conduct at issue, this assertion is clearly erroneous.  *See infra* Part III.B.1.  Nowhere does the law permit a price-fixing conspiracy as alleged in Plaintiffs' FAC.

1    competitors priced identically.  They suffered financial harm as a result.  Defendants' reliance on

2    *Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798 (2007), is misplaced.  In *Buckland*, the

3    plaintiff lacked standing following the passage of Proposition 64 because she had submitted a

4    declaration which established "that she did not buy [the defendant's] product due to 'mistake,

5    coercion or request,' but to establish standing for an action in the public interest."  *Id*. at 818

6    (internal citation omitted).  The court limited its conclusion "to the special facts presented here,

7    which involve an individual who voluntarily buys defendant's product to pursue a UCL action in the

8    public interest against defendant."  *Id*. at 818 n.11.  These facts are not present in the instant case.

9        *Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997 (9th Cir. 2001), also does not avail Defendants.  In

10   *Lee*, the plaintiff brought suit against two insurance companies, but he had only purchased a policy

11   from one of them.  Unlike the present case, in *Lee*, there were no allegations of conspiracy or any

12   other joint action by the two insurance companies.  Here, Plaintiffs have standing as all

13   Defendants are alleged to have conspired and are jointly and severally liable regardless of the

14   specific company with which the plaintiff or the class member dealt.  *See William Inglis & Sons*

15   *Baking Co.*, 668 F.2d at 1052-53 (antitrust conspiracy liability is joint and several); *Roth v.*

16   *Rhodes*, 25 Cal. App. 4th 530, 544 (1994) (same).

17        **4.**    **Defendants Violated the UCL by Engaging in a Fraudulent Business**
             **Practice**

18
19        **a.**    **Plaintiffs Allege Practices Which Have a Tendency or**
                   **Likelihood to Mislead**

20        Ordinarily, whether a practice is deceptive or fraudulent is a question of fact, which cannot

21   be determined on the pleadings.  *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th

22   115, 134-35 (2007); *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1472 (2006).  The statute

23   applies explicitly and separately to misleading statements made to consumers.[24]  A statement with

24   nothing more than a "tendency to mislead" violates the UCL.  *Kasky v. Nike, Inc.*, 27 Cal. 4th 939,

25   951 (2002).  Indeed, billing practices and related representations are often the subject of claims

26   under the fraudulent prong of the UCL.  *See, e.g., McKell*, 142 Cal. App. 4th at 1471-72 (finding

27

28   [24]  *See also* Business & Professions Code § 17500, substantially subsumed by the UCL, also
     prohibiting deceptive and misleading statements.

                                    20

1   that a charge for fees that exceed the defendant's costs was deceptive); *People v. Dollar Rent-A-*

2   *Car Sys., Inc.*, 211 Cal. App. 3d 119, 129 (1989) ("Defendants' practice of charging its customers

3   a higher 'retail repair rate' without explanation or substantiation is a deceptive business practice

4   which falls within the protection of the [UCL]."). If a defendant is found to have engaged in

5   conduct that is "likely to deceive," the statute imposes strict liability. *See Cortez v. Purolator Air*

6   *Filtration Prods. Co.*, 23 Cal. 4th 163, 181 (2000) ("The UCL imposes strict liability when

7   property or monetary losses are occasioned by conduct that constitutes an unfair business

8   practice."); *Prata v. Superior Court*, 91 Cal. App. 4th 1128, 1137 (2001) (stating that the UCL

9   "imposes strict liability"). This remains true following Proposition 64, which "left entirely

10   unchanged the substantive rules governing business and competitive conduct. Nothing a business

11   might lawfully do before Proposition 64 is unlawful now, and nothing earlier forbidden is now

12   permitted. Nor does the measure eliminate any right to recover." *Californians for Disability*

13   *Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 232 (2006).

14        Here, the FAC alleges that the Defendants failed to disclose that the tourism assessment

15   was a charge emanating from an industry cartel decision and instead depicted the charge *to the*

16   *consumer* as, *inter alia*, "TOUR TAX," "Tourism Assessment Fee," and "Tourist Tax" or a

17   "governmentally mandated charge." The implication of these representations and omissions is that

18   some taxing or government authority is imposing the charge on the consumer, and not, as is the

19   case, an industry arranged price-fix. ¶ 62.

20              **b.**    **Plaintiffs Have Alleged Injury and Causation**

21        Defendants state that Plaintiffs must "allege facts sufficient to show that they 'ha[ve]

22   suffered injury in fact and ha[ve] lost money or property as a result of [such] unfair competition.'"

23   RCD Mem. at 16 (quoting Cal. Bus. & Prof. Code § 17204). Plaintiffs have done so: They were

24   charged the fee and had no choice because all competitors had agreed to and were charging a

25   supra-competitive fee in the same amount. ¶¶ 14, 15, 43, 45-48, 57.

26        As Defendants concede, the UCL merely requires "a showing of a causal connection

27   [between the conduct and damages] *or* reliance on the alleged misrepresentation." *Hall v. Time Inc.*,

28

158 Cal. App. 4th 847, 855 (2008);[25] *see also Aron v. U-Haul Co.*, 143 Cal. App. 4th 796, 803 (2006) (finding that allegations which "set forth a basis for a claim of actual economic injury as a result of unfair and illegal business practice" are sufficient to confer standing); *In re Firearm Cases*, 126 Cal. App. 4th 959, 974 (2005) (discussing the need for a "factual nexus" or "link between defendants' conduct and the alleged harm").  Plaintiffs have clearly alleged causation: As a result of the Defendants' market-wide price-fixing conspiracy and misrepresentations and omissions regarding the nature of the assessment and the agreement to an industry-wide fix, Plaintiffs paid more for their car rentals than they otherwise would have.  Further, they could not avoid these charges because each of the Rental Car Defendants agreed to impose them.

If Defendants are purporting to suggest that Plaintiffs need to allege that, had they known the true nature of the assessment, they would have rented a car elsewhere, this is obviously impossible given the facts of the present case.  Specifically, all of the Rental Car Defendants conspired to fix the price and concealed both their conspiracy and the true nature of the uniform charge.  This conspiracy, therefore, left Plaintiffs with no choice but to pay the assessment − all of the Rental Car Defendants were charging it.[26]  Given the facts of this case, the allegations throughout the FAC regarding causation are sufficient to satisfy the "as a result of" language of the UCL.  *See, e.g., Aron*, 143 Cal. App. 4th at 796 ("Because the allegations set forth a basis for a claim for actual economic injury as a result of an unfair or illegal business practice, Aron has standing.").[27]

---

[25]  The facts of *Hall* are inapposite.  In *Hall*, the plaintiff alleged that the defendant "engaged in unfair competition by sending a customer an invoice before the end of the free trial period in order to induce the customer immediately to send payment for the book," but the plaintiff did not pay the invoice until well after the trial period.  *Id.* at 857.  Here, the Plaintiffs could only rent a car at the airport by paying one of the Defendants the collusively set and mischaracterized fee, and in fact did.

[26]  The issue of reliance under the UCL following Proposition 64 is currently on appeal before the California Supreme Court.  *In re Tobacco II Cases*, 142 Cal. App. 4th 891 (2006), *review granted by* 146 P.3d 1250 (Cal. 2006)).  This issue, however, is of no consequence to the present case given the facts at hand − i.e., Defendants conspired to omit the true nature of the assessment and all concealed their conspiracy, leaving Plaintiffs with no choice.

[27]  Furthermore, this case can be likened to *Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282 (2002).  In *Mass. Mutual*, the defendant concealed from plaintiff policyholders that it did not intend to continue paying them a discretionary dividend.  *Id.* at 1286.  The court held that the "as a result of" language of the CLRA was satisfied where material misrepresentations were made.  *Id.* at 1292.  Thus, "'if the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class.'"  *Id.* at 1292-93 (quoting *Vasquez v. Superior Court*, 4 Cal. 3d 800, 814 (1971)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 5.    Plaintiffs Have Stated a Claim Under the Unfair Prong of the UCL

In the consumer context, a business practice is unfair "when that practice 'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 719 (2001).  While Defendants purport to hold Plaintiffs to the *Cel-Tech* test, *Cel-Tech* itself made clear that its standard only applies to actions between competitors:

> This case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context.  Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law such as "fraudulent" or "unlawful" business practices or "unfair, deceptive, untrue or misleading advertising."

*Cel-Tech*, 20 Cal. 4th at 187 n.12; *see Smith*, 93 Cal. App. 4th at 720 n.23 (noting that *Cel-Tech* specifically stated that its test should not be applied in actions involving consumer injuries); *see also Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 994 (9th Cir. 2000) (stating that *Cel-Tech* is limited to claims involving unfairness to competitors); *Progressive W. Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263, 286 (2005) (applying the pre-*Cel-Tech* test and noting that, "[i]n *Cel-Tech*, the Supreme Court declined to extend its more narrow test to consumer cases[, and] it has yet to do so in the six years since that decision was announced").  Some cases state that, to meet the unfair prong even in non-*Cel-Tech* business to business cases, the alleged violation must relate to a public policy tethered to constitutional, statutory, or regulatory provisions.  *E.g., Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003).

In the end, any debate over the standard is academic.  Even under a "tethering" or *Cel-Tech* standard, Plaintiffs have stated a claim under the unfair prong of the UCL.  Plaintiffs' claims are specifically tethered to violations of antitrust laws and public policies favoring competition and consumer protection, which *Cel-Tech* specifically cited as sufficient for a unfair business practice claim.  *Id*. at 186-87.  Plaintiffs' claims are also specifically tethered to statutory policies and provisions prohibiting fraudulent business practices, as evidenced in the False Advertising Law (Cal.

23

1    Bus. & Prof. Code § 17500), CLRA, and Civil Code and common law prohibitions against fraud.[28]

2    **6.    Plaintiffs Have Alleged a Claim for Violation of the CLRA**

3    Under the CLRA, it is unlawful to represent "that a transaction confers or involves rights,

4    remedies, or obligations which it does not have or involve, or which are prohibited by law." Cal.

5    Civ. Code § 1770(a)(14).[29]    Each of the Rental Car Defendants has described the CTTC

6    assessment charge in various misleading ways on its website and on receipts designed to lead

7    consumers to believe the charge is imposed by a governmental (or taxing) entity and that the rental

8    car company has no discretion with respect to the charge.

9    As described in the FAC, Defendants described the assessment on customer receipts and

10   confirmations as "TOUR TAX," "Tourism Tax," and "California Tourism Commission

11   Assessment." Defendants also commonly list the charge under a heading titled "Total Estimated

12   Mandatory Charge" or the like.

13   The above descriptions are deceptive and falsely imply obligations because the Rental Car

14   Defendants are presenting them to consumers as "mandated" charges (or worse, "taxes") over which

15   they have no discretion. These are not "mandatory" charges or "taxes," as the Rental Car

16   Defendants represent. Rather, they represent a collusively imposed pass-on of assessments owed by

17   the Rental Car Defendants to the CTTC, over which they have discretion to charge consumers or

18   _____

19   [28] Furthermore, Defendants' statement that "Plaintiffs' inability to plead a Sherman Act claim precludes any finding that the conduct alleged to violate the Sherman Act is somehow 'unfair' under the UCL" is legally unsupportable. *See* RCD Mem. at 17. If Plaintiffs were required to prove a violation of law to state a UCL claim for unfair practices, the unfair prong would be rendered superfluous. *See TRW Inc.*, 534 U.S. at 31; *see also Cel-Tech*, 20 Cal. 4th at 180 ("[A] practice may be deemed unfair even if not specifically proscribed by some other law."). *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1240 (2007), is inapposite because no anticompetitive effect resulted from the conduct at issue. *Id.* Here, Plaintiffs have alleged a core Sherman Act price-fixing claim and the textbook anticompetitive effect of supracompetitive prices. ¶¶ 49-55; *NCAA v. Board of Regents*, 468 U.S. 85, 107-08 (1984) ("Restrictions on price and output are the paradigmatic examples of the restraints of trade that the Sherman Act was intended to prohibit.").

24   [29] In a footnote, Defendants assert that the CLRA does not apply to rental agreements, citing *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003). The statement in *Ting* is dicta, and the case to which it cites actually held the opposite. In *Lazar v. Hertz Corp.*, 143 Cal. App. 3d 128 (1983), in granting the motion for class certification, the California Court of Appeal directed the trial court to permit motions for intervention by plaintiff-consumers as to the CLRA claim. *Id.* at 144. *See also Aron*, 143 Cal. App. 4th at 807 (upholding a CLRA claim involving a rental agreement). *Ting* is contrary to the plain language of the statute, which states that wrongful conduct "undertaken by any person in a transaction intended to result or which results in the sale *or lease* of goods or services to any consumer are unlawful." Cal. Civ. Code § 1770(a).

24

1    not.   As such, the manner in which they are described represents the transaction involves an

2    obligation (to pay a tax or governmentally imposed charge) that it does not in violation of the CLRA.

3    *See, e.g., Aron*, 143 Cal. App. 4th at 806 ("'[T]he reasonable consumer standard' applies to actions

4    involving claims under the CLRA and UCL for unfair or deceptive business practices.") (quoting

5    *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1360 (2003)); *Colgan v.*

6    *Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 682 (2006) ("To prevail on a false advertising

7    claim, a plaintiff need only show that members of the public are likely to be deceived.").

8        Furthermore, under the CLRA, "the legally relevant question is framed not in terms of

9    'reliance,' which is required in common law fraud, but of materiality."  *Bristow v. Lycoming*

10   *Engines*, No. Civ. 5-06-1947, 2007 U.S. Dist. LEXIS 31350, at *21 (E.D. Cal. Apr. 10, 2007).

11   Reliance under the CLRA can also be inferred.  *See Mass. Mutual*, 97 Cal. App. 4th at 1292-93.

12   ("[I]f the trial court finds material misrepresentations were made to the class members, at least an

13   inference of reliance would arise as to the entire class.").   Because the Rental Car Defendants

14   unanimously and unlawfully agreed to pass the charges along to consumers and passed them on

15   through misrepresentations and omissions implying they were obliged by the transaction as a "tax"

16   or "mandated charge" and Plaintiffs had no choice but to pay them, an inference of reliance arises.

17   **IV.    CONCLUSION**

18        For the foregoing reasons, the Rental Car Defendants' and the CTTC's motions should be

19   denied.

20   DATED: June 23, 2008                    HULETT HARPER STEWART LLP
                                             DENNIS STEWART
21                                           JENNIFER A. KAGAN

22

23                                            */s/ Dennis Stewart*
                                             DENNIS STEWART
24

25                                           550 West C Street, Suite 1600
                                             San Diego, CA  92101
26                                           Telephone:    (619) 338-1133
                                             Facsimile:    (619) 338-1139
27

28

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CENTER FOR PUBLIC INTEREST LAW
UNIVERSITY OF SAN DIEGO
 SCHOOL OF LAW
ROBERT C. FELLMETH
ED HOWARD
JULIANNE D'ANGELO FELLMETH
5998 Alcala Park
San Diego, CA  92110
Telephone:    (619) 260-4806
Facsimile:    (619) 260-4753

SULLIVAN, HILL, LEWIN, REZ & ENGEL
A Professional Law Corporation
DONALD G. REZ
550 West "C" Street, Suite 1500
San Diego, CA  92101
Telephone:    (619) 233-4100
Facsimile:    (619) 231-4372

Attorneys for Plaintiffs