**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**GREENEVILLE DIVISION**

| | | |
|---|---|---|
| **IN RE: SOUTHEASTERN MILK** | ) | **MDL No. 1899** |
| **ANTITRUST LITIGATION** | ) | |
| | ) | **Master File No. 2:08-MD-1000** |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | **Judge J. Ronnie Greer** |
| | ) | **Magistrate Judge Dennis H.** |
| | ) | **Inman** |
| *ALL CASES* | ) | |
| *(EXCEPT BRETO v. DEAN FOODS,* | ) | |
| *NO. 2:07-CV-188)* | ) | |
| | ) | |

**MEMORANDUM OPINION**

The instant matter consists of two actions transferred to this Court by the Judicial

Panel on Multidistrict Litigation for coordinated pretrial proceedings with five other actions filed

in this district. Pending before the Court is defendants' Motion to Dismiss Pursuant to Rule 12(b)(6)

in the *Baisley, Sweetwater* and *Scott* cases. Defendants now rely on the motions to dismiss in all

cases except *Breto* and the plaintiffs in all cases except *Breto* have agreed to be bound by the

motion to dismiss briefing previously filed by the plaintiffs in *Baisley, Sweetwater* and *Scott*. The

motions have been fully briefed and are now ripe for disposition. Pursuant to the Court's local rules,

the motion will be decided without oral argument.

**I.     Background**

All plaintiffs are present or former dairy farmers in the Southeastern United States who raise

cows and produce milk. Defendants are entities and/or individuals involved in either the marketing

and sale of milk on behalf of dairy farmers or the purchase and processing of that milk. Plaintiffs

have filed this action both on behalf of themselves and as a class action on behalf of various classes

of current or former dairy farmers, alleging violations of §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).  They seek treble damages and injunctive relief for an alleged "combination and conspiracy among Defendants to refuse to compete for the purchase of raw Grade A milk ("Grade A milk") produced, marketed and processed in the Southeast United States with the purpose and effect of fixing, stabilizing, and maintaining prices paid to dairy farmers for Grade A milk, foreclosing independent dairy farmers' and independent cooperative members' access to fluid Grade A milk bottling plants, eliminating and stifling competition from independent dairy cooperatives and independent fluid Grade A milk bottlers, and other unlawful activities designed to artificially and anti-competitively reduce the price paid by Defendants for Grade A milk . . ."  *See Sweetwater* complaint, ¶ 1.   The complaints contain five antitrust counts: (1) conspiracy to monopolize and monopsonize in violation of § 2 of the Sherman Act; (2) attempt to monopolize and monopsonize in violation of § 2 of the Sherman Act; (3) unlawful monopolization in violation of  § 2 of the Sherman Act; (4) unlawful monopsony in violation of  § 2 of the Sherman Act; and (5) unlawful conspiracy among defendants to foreclose competition and fix prices in violation of  § 1 of the Sherman Act.

For the purpose of its ruling on these Rule 12(b)(6) motions, the Court accepts as true the facts alleged in the complaint.  Defendants have "conspir[ed] to operate an unlawful cartel that refuses to compete for the purchase of Grade A milk, forecloses access to fluid Grade A milk bottling plants and processors, and fixes prices for Grade A milk paid to Southeast dairy farmers." Together with certain co-conspirators who are not sued in these actions, defendants have carried out their conspiracy through a series of "unlawful" acts, including implementing long-term full-supply agreements between defendant Dean Foods Company ("Dean"), National Dairy Holdings, L.P.

2

("NDH") and Dairy Farmers of America, Inc., ("DFA") in order to control access of Southeast dairy farmers to fluid Grade A milk bottling plants; requiring independent dairy farmers, individuals and entities that were previously free of DFA's control to market their milk through DFA-controlled marketing entities such as Dairy Marketing Services, Inc. ("DMS") in order to gain access to fluid Grade A milk bottling plants; requiring dairy farmer members of the Maryland and Virginia Producers Cooperative Association, Inc. ("Maryland and Virgina Co-op"), a cooperative that was previously independent of DFA, to market their Grade A milk through DFA-controlled Southern Marketing Agency, Inc. ("SMA") to gain access to fluid Grade A milk bottling plants; threatening to cut off and cutting off independent cooperatives' and independent dairy farmers' access to fluid Grade A milk bottling plants; boycotting independent dairy farmers, cooperatives, and fluid Grade A milk bottlers; fixing, depressing and/or stabilizing prices for Grade A milk paid to Southeast dairy farmers; "flooding" the Southeast milk market to further depress prices for Grade A milk paid to Southeast dairy farmers; utilizing DMS and SMA to monitor prices for Grade A milk paid to independent dairy farmers and independent cooperative members; "punishing" independent cooperatives and fluid Grade A milk bottlers that do not comply with defendants' conspiracy in an effort to eliminate or control these entities as competitive outlets for Southeast dairy farmers' Grade A milk; and purchasing fluid Grade A milk bottling plants with the purpose and intent of further stifling competition from independent dairy farmers, cooperatives, and fluid Grade A milk bottlers.

Defendant Dean owns at least 17 fluid Grade A bottling plants in the Southeast and is the largest fluid Grade A milk bottler in the Southeast.[1]  Defendant DFA is the third largest fluid Grade

---

[1]  In 2001, Dean and Suiza, the first and second largest fluid Grade A milk bottlers in the United States, merged into the company now operated under the name Dean Foods Company.

3

A milk bottler in the Southeast and fully or partially owns at least eight Grade A milk bottling plants. NDH owns at least nine fluid Grade A milk bottling plants in the Southeast and is the second largest fluid Grade A milk bottler in the Southeast. DFA owns one-half of NDH. The various individual defendants are managers and officers of SMA or DFA.

DFA is a cooperative that controls ninety percent of the Grade A milk produced in the Southeast. DFA owns and operates its own hauling companies, processing plants and distribution centers that are necessary to deliver Grade A milk from farmer producers to grocery stores. Defendant DMS is a marketing agency which performs milk marketing services for milk processors. With a few exceptions, independent dairy farmers are not permitted to sell Grade A milk directly to Dean and Dean forces farmers to market their Grade A milk through DMS. Defendant SMA is a marketing agency which markets milk on behalf of its member dairy cooperatives, including DFA. Dairy cooperatives that have previously acted independently of each other have been required to join SMA to market their Grade A milk. DFA is the controlling member of SMA.

Dean controls 60 percent of the fluid Grade A milk bottling capacity in the Southeast. The defendants collectively own at least 33 of the approximately 51 Grade A milk bottling plants currently operating in the Southeast, representing 77 percent of the fluid Grade A milk bottling capacity in the Southeast. DFA, through full supply agreements discussed below, controls access to these 33 plants and, because of full supply agreements with other milk bottlers and supermarkets, controls access to at least 41 of the 51 Grade A milk bottling plants in the Southeast. Through its full supply agreements and its control of SMA or DMS, DFA controls 90 percent of the Grade A milk produced in the Southeast and more than 80 percent of the Grade A milk processed by fluid Grade A milk bottlers in the Southeast. Dean, DFA and NDH also control most of the balancing

4

plants in the Southeast, plants which hold Grade A milk produced during weekends and holidays when fluid Grade A milk bottling plants are generally closed.

Central to the alleged conspiracy of defendants are certain full supply agreements between certain bottlers, including Dean and NDH, and DFA in which DFA agreed to supply all of the fluid Grade A milk needed by those bottlers' plants, despite the fact that DFA did not have the production of milk necessary to satisfy the agreements. These agreements were structured to avoid the prohibition of a Department of Justice consent decree[2] against full supply agreements in excess of one year. DFA's full supply agreements consist of a series of 20 successive one year agreements. As an incentive to guarantee the extension of these agreements beyond one year, DFA agreed to forgive $40 million in notes executed by Dean, provided Dean renews each of the 20 one- year agreements. Dean further agreed to pay DFA $47 million in liquidated damages if Dean fails to renew any of the 20 one year agreements.

Defendants have used these full supply agreements to force independent dairy cooperatives needed to fulfill the agreements to join DFA, or to market their Grade A milk through SMA, and to force independent dairy farmers to market their Grade A milk through DMS in order to have access to fluid Grade A bottling plants in the Southeast. As part of the alleged conspiracy, Dean and DFA informed Maryland and Virginia Co-op that Dean would no longer accept Grade A milk from Co-op members unless the Maryland and Virginia Co-op agreed to join SMA. Maryland and Virginia

---

[2]   At the time of the 2001 Dean and Suiza merger, Dean, Suiza and other defendants in this case entered into a consent decree to address DOJ's antitrust concerns by, among other things, divesting 11 of Dean's and Suiza's fluid Grade A milk bottling plants to NDH and the purchase by Dean of DFA's 33.8 percent stake in Suiza. DFA and its subsidiaries then provided more than $40 million in financing to NDH to enable it to acquire the 11 fluid Grade A milk bottling plants divested by Dean and Suiza, as well as other bottling plants. As noted above, DFA has owned at least 50 percent of NDH's equity in voting shares at all times relevant to this complaint.

5

Co-op joined SMA because it had no other choice. DFA, of course, controls SMA. Similar demands were made of other small dairy cooperatives operating in the Southeast. Access to bottling plants is essential to dairy cooperatives and diary farmers because it is their only means to qualify to participate in the United States Department of Agriculture's ("USDA") Federal Milk Market Orders ("FMMO"), receive FMMO minimum blend prices and to be eligible for over order premiums for Class 1 sales of Grade A milk.[3]

Because of "threats" made to other small dairy farmer cooperatives operating in the Southeast, all joined SMA to gain access to fluid Grade A milk bottling plants in the Southeast. Because DFA controls access to the market, DFA members have no choice but to pay inappropriate fees and charges for the services performed by SMA. DFA has utilized its control of SMA to flood the Southeast market with Grade A milk from the Southwest, which has the effect of reducing the minimum price paid to dairy farmers under USDA regulations. Dean refuses to deal directly with independent dairy farmers and forces all independents to market their Grade A milk through DMS. A few independent farmers have gained access to Dean directly, though these independent dairy farmers have accepted prices jointly fixed by the Defendants. Dean, NDH and DFA have agreed that all Grade A milk supplied to Dean, NDH and DFA's fluid Grade A milk bottling plants must be marketed by DFA or through either SMA or DMS, both of which were formed by, and are controlled by, DFA. DMS and SMA thus market nearly all the Grade A milk produced and

---

[3]   USDA classifies Grade A milk into four classes. Class 1 milk is used in beverage milk products for human consumption. USDA calculates minimum prices for each of the four classes of Grade A milk marketed in each of the geographic regions through FMMOs. FMMOs 5 and 7 are at issue in this case and apply in the Southeast. USDA regulations mandate that Grade A milk bottlers pay at least the minimum price set by Orders 5 and 7. Cooperatives and producers are free to negotiate for prices in excess of FMMO minimum prices. The amount by which prices for Grade A milk exceed FMMO minimum blend prices are know generically as "over-order premiums."

processed in the Southeast, permitting them to monitor the prices paid to all dairy farmers by each of the processing defendants – Dean, NDH and DFA. The defendants use this information to fix and stabilize over-order premiums at levels lower than what would have prevailed in a competitive market, thus depressing over-order premium prices paid to Southeast dairy farmers and cooperative members. Southeast dairy farmers have also been subjected to anti-competitive and unlawful fees and dues charged by SMA for the sole benefit of the Defendants' cartel.

Defendants have also jointly sought to exclude, discipline and punish the few remaining independent fluid Grade A milk bottlers and independent cooperatives that have not agreed to participate in the defendants' conspiracy or have attempted to compete with the defendants in the Southeast. For example, Dean, citing its full supply agreement with DFA, refused to discuss a Grade A milk supply agreement with U.S. Milk, a newly formed Southeast organization consisting of a variety of independent dairy farmers and cooperative members, in August, 2006. Since 2002, DFA and Dean have demanded of another small Southeast cooperative that DFA process Dean's monthly payments to the cooperative thereby enabling DFA to monitor prices paid to the cooperative and to deduct substantial fees and penalties from those payments. In early 2005, after Dean purchased Dairy Fresh Corporation, a fluid Grade A milk bottler in the Southeast, DFA gave independent dairy farmers serving Dairy Fresh plants an ultimatum of either joining DFA or finding new markets for their Grade A milk. In 2001 and 2003, independent dairy farmers, including Sweetwater, attempted to negotiate an agreement to supply Grade A milk to a small fluid Grade A milk bottling plant located in the Southeast. DFA, upon learning of these negotiations, threatened that it would never again balance the small bottling plant's Grade A milk if it agreed to be supplied by independent dairy farmers, thereby restricting access to this small bottling plant by independent

7

dairy farmers.  In July 2002, after learning that SMA was paying dairy farmers over-order premiums in excess of what DFA was paying its member dairy farmers in the Southeast, DFA demanded that SMA decrease its payments and threatened, if SMA refused to do so, to flood Order 6 with Grade A milk and terminate DFA's agreement to assist SMA in balancing its Grade A milk supply.  As a result these threats, SMA was forced to pay DFA "tributes" totaling nearly $10,000,000.00.

Defendants have, therefore, obtained control over and foreclosed access to the bottling market and have used that control to fix prices, eliminate competition and make sure farmers have no alternative other than to deal with them.  By requiring Grade A milk to flow through either SMA or DMS to gain access to bottling plants, the defendants have created a mechanism by which they exchange and monitor price information.  The defendants further require that DFA receive, process and account for DFA controlled marketing agencies' member cooperatives' monies from Grade A milk sales.  This allows DFA to monitor Grade A milk sales by other Southeast cooperatives and independent farmers.  The defendants have also used common employees to enforce compliance with the terms of their conspiracy and have agreed to use trucking companies owned by Baird, an individual defendant, to haul Grade A milk produced by SMA's member co-ops.  Defendants are thus aware of the amounts, origins and destinations of nearly all Grade A milk shipped in the Southeast.  All of this allows the defendants to monitor and enforce compliance with their conspiracy.

## II.    Analysis and Discussion

Defendants have moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, that the Court dismiss the claims against them and they advance four general grounds as bases for their motion.  First of all, the defendants allege that plaintiffs have failed to state a claim for which

relief can be granted under the recent Supreme Court decision in *Bell Atlantic Corporation v. Twombly*, 127 S. Ct. 1955 (2007). They also allege that plaintiffs lack antitrust standing, have failed to define the relevant market, and that plaintiffs' claims are barred by the applicable statute of limitations. The Court will address each of these issues in turn.

**Failure to State a Claim Under Twombly**

Federal Rules of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Fed. R. Civ. P.* 8(a)(2). The issue raised by the defendants here turns on whether or not the plaintiffs have pled sufficient facts to state a claim to relief that is plausible following the Supreme Court's recent pronouncement in *Bell Atlantic v. Twombly* (hereinafter referred to as "*Twombly*").

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations." 15 U.S.C. § 1. In the *Twombly* decision, the Supreme Court specifically addressed the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act. In answer to that question the Supreme Court stated:

> [A] plaintiffs' obligation to provide the "grounds" of his "entitle[ment] for relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, *see Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed. 2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level,. . . In applying these general standards to a section 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply

9

calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. . . [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.

*Twombly*, 127 S. Ct. at 1964-66.  This standard was set by the Supreme Court in antitrust cases because such cases frequently cause substantial expenditures and give the plaintiff the opportunity to extort large settlements even where the plaintiff does not have much of a case.  *Id.* at 1966-67.[4]

"[T]erms like 'conspiracy,' or even 'agreement,' are borderline: they might well be sufficient in conjunction with a more specific allegation- for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court is not required to accept such terms as a sufficient basis for a complaint."  *Id.* at 1966 (quoting *DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999)).  To allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a "specific time, place, or person involved in the alleged conspiracies" to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin.  *Id.* at 1970, FN.10.

"'[T]he crucial question' is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement. . ."  *Id.* at 1964(quoting *Theatre Enterprises, Inc. v.*

---

[4]  Few cases have caused as much discussion and confusion as the Supreme Court's decision in *Twombly*.  The decision is not specifically limited to antitrust cases but abrogated *Conley v. Gibson*, 355 U.S. 41 (1957), which held, relying on several prior Supreme Court decisions, that the accepted rule for appraising the sufficiency of a complaint is "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  355 U.S. at 45-46.  The abrogation of *Conley* certainly suggests that the *Twombly* rule reaches beyond antitrust cases; however, a case decided by the Supreme Court later in the 2007 term, *Erickson v. Pardus*, 127 S. Ct. 2197 (2007), adds further to the confusion.  In *Erickson*, a *pro se* § 1983 prisoner suit, the Supreme Court, in a *per curiam* decision, held, citing *Twombly*, that Fed. R. Civ. P. 8(a)(2) requires only a short and plain statement of the claim.  "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" 127 S. Ct. at 2200.  For the purposes of this case, the Court need not decide the full reach of the *Twombly* holding.

10

*Paramount Film Distributing Corp.*, 346 U.S. 537, 540 (1954)). "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, . . ." *Id.* at 1966. Allegations "of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement. . ." *Id.* Without some factual development, bare allegations of parallel conduct stop "short of the line between possibility and plausibility of 'entitle[ment] to relief'". *Id.* (citing *DM Research)*. In other words, "[s]ome threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase." *Id.* (quoting *Asahi Glass Co. v. Pentech Pharmaceuticals, Inc.*, 289 F.Supp.2d 986, 995 (N.D. Ill.. 2003) (Posner, J., sitting by designation)). Based on these standards, it therefore appears that this Court must examine the complaints in this case to determine whether or not it answers the basic questions: Who, what, when, and where? Defendants, quite understandably, argue that the plaintiffs' lengthy complaints are nothing more than allegations of parallel conduct with no factual development to suggest plausibly that a conspiracy or agreement exists. Defendants argue that the key to the plaintiffs' complaints are the full supply agreements entered into between certain milk bottlers, including Dean and NDH, and DFA and Dean's outsourcing agreement with DMS. And, they further argue that the list of factual allegations made by the plaintiffs as underlying the conspiracy are simply "flip sides" of these full supply agreements.[5]

While acknowledging that the complaints do contain other substantive allegations that are not related to the full supply or outsourcing agreements, they describe these

---

[5] Defendants, while acknowledging that plaintiffs make factual allegations that they have denied access to Grade A milk bottling plants, made threats to cut off access, and boycotted independents, argue that these are all things which were accomplished by the terms of these vertical agreements.

11

allegations as mere coincidental parallel conduct undertaken by each of these defendants on its own. They argue that "the mere fact that more than one bottler has chosen to engage in certain similar business conduct, such as entering into a full supply agreement with DFA, is *not sufficient* to render plausible the allegation that they have done so pursuant to an unlawful, horizontal agreement." See *Baisley* Memo., pg. 12. They then address each fact alleged individually and suggest a valid business justification for the action taken. For instance, while appearing to concede that the defendants have closed down bottling plants and/or have refused to operate bottling plants with the effect of decreasing capacity by eliminating sources of access, they argue that no facts are alleged which would allow one to conclude that any acquisitions or closures were anything other than normal transactions or operating decisions by individual processors. Similarly, they argue a business justification for "flooding" the Southeast with raw milk from other areas of the country.

Plaintiffs, on the other hand, point to allegations contained in their complaints of "a series of unlawful activities" which include the implementation of full supply agreements between defendants Dean, NDH and other bottlers, forcing independent dairy farmers, individuals and entities to market their milk through DFA controlled marketing entities, forcing dairy farmer members of the Maryland and Virginia Producers Co-op to market their milk through DFA controlled SMA in order to gain access to fluid Grade A milk bottling plants, using various DFA controlled entities to monitor prices, threatening to cut off and cutting off access to bottling plants, boycotting independent farmers, cooperatives and bottlers, fixing, depressing and/or stabilizing prices, "flooding" the Southeast milk market with milk from other regions, "punishing" independent cooperatives and bottlers in an effort to eliminate or control those entities as competitive outlets for milk and purchasing bottling plants with the purpose and intent to further suppress competition.

12

Plaintiffs argue that all of these acts were committed with the intent to monopolize, monopsonize or restrain trade and had adverse effects on competition. They further argue that all these facts, taken together, support a plausible inference of horizontal conspiracy and accuse the defendants of "dismember(ing) the complaints and re-characterizing their allegations of an illegal conspiracy."

This Court is constrained to agree with the plaintiffs. These complaints, while not answering all specific questions about "who, what, when and where," do put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist. While viewing each of these factual allegations in isolation may lead one to the conclusion drawn by the defendants, i.e., that there is a legitimate business justification for each of the acts, a view of the complaint as a whole, which this Court must take, and accepting all of the factual allegations as true, does support a plausible inference of a conspiracy or agreement made illegal under § 1 of the Sherman Act. As an initial matter, it is interesting to note that defendants acknowledge that the vertical full supply and outsourcing agreements referenced in plaintiffs' complaints could be challenged under the antitrust laws as agreements that unreasonably restrain trade. Defendants assert, however, that this is not the focus of plaintiffs' attack here. Plaintiffs, on the other hand, do not concede defendants' point. They argue, and it appears rightfully so to this Court, that rather than simply alleging facts from which an inference of an agreement can be drawn, they allege, and defendants concede, that actual agreements exist. Beyond that, plaintiffs allege that defendants agreed to commit, and actually did commit numerous other acts, many through the use of these full supply agreements, which are illegal under the Sherman Act. While defendants' assert the conclusion that these full supply agreements are "legitimate", that issue appears to remain open and this Court cannot conclude, accepting all allegations of the complaints as true, that these

13

agreements do not foreclose competition and violate § 1 of the Sherman Act.

Moreover, defendants attempt to parse and dismember the complaints, contrary to the Supreme Court's admonition that "[t]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts." *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 US 690, 699 (1962). While, as acknowledged above, defendants appear to be able to suggest business justifications for many, if not all, of the acts alleged by plaintiffs in their complaints, the fact that multiple instances of parallel conduct are alleged makes it far less likely that a business justification exists for all of the acts taken in total. It seems to this Court to be only logical that the more individual instances of parallel conduct alleged by the plaintiffs, the stronger the inference that can be drawn from those acts of parallel conduct to support an illegal conspiracy and the less likely it is that these parallel acts occurred unilaterally without any conspiracy or agreement. Whether the acts committed by the defendants are simple, benign business decisions made by these individual defendants or whether they represent concerted effort in violation of the Sherman Act are issues of fact which this Court cannot decide on the pleadings and which require discovery prior to resolution. For all these reasons, this Court FINDS that the complaints of the plaintiffs plead sufficient facts to comply with Fed. R. Civ. P. 8(a)(2) and the United States Supreme Court's recent pronouncement in *Twombly*. The complaints adequately state facts which address the questions of who, what, when, and where and give the Defendants seeking to respond to the allegations an idea where to begin. Although somewhat weak on allegations related to "when", the complaints plead sufficient facts to allow defendants to respond, especially in view of the nature and volume of pleadings filed by Defendants in this case. Defendants' motions will be DENIED on this ground.

**Antitrust Standing**

Next, defendants argue that plaintiffs are not the proper parties to bring this private antitrust action and therefore lack "antitrust standing".  Section 4 of the Clayton Act affords a private right of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."  15 U.S.C. § 15.  The Sixth Circuit has established a two part test to determine whether a plaintiff has adequately alleged antitrust standing: (1) has the plaintiff asserted a cognizable "antitrust injury," and (2) is the plaintiff a proper plaintiff to assert a violation of the antitrust laws.  *Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000).  Plaintiffs must establish both parts of this test; otherwise, they lack antitrust standing.

It is the first requirement, antitrust injury, upon which the defendants focus here.  Antitrust standing is a threshold, pleading stage inquiry and a complaint must be dismissed if it fails to establish this requirement.  *NicSand, Inc. v. 3M Company*, 507 F.3d 442, 450 (6th Cir. 2007).  "An antitrust claimant must show more than merely an 'injury causally linked' to a competitive practice; it 'must prove an antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *Id.*, (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 US 477 (1977)).

The Sixth Circuit has also applied the *Twombly* standard to the requirement for pleading antitrust injury and has held that a naked assertion of antitrust injury, without factual allegations plausibly suggesting (not merely consistent with) the same, are insufficient to meet the threshold requirement of Rule 8(a)(2).  *Id.* at 451.  This is not to say, however. as the Sixth Circuit has observed, that one competitor may never sue another under the antitrust laws.  However, "courts typically have permitted such claims to proceed only when one of the rivals has engaged in some

15

form of predatory pricing or illegal tying – when the rival has engaged in something more than vigorous price, product or service competition." *Id.* (citations omitted). The antitrust laws were, after all, enacted for "the protection of *competition* not *competitors*, . . ." *Id.* (quoting *Brunswick,* 429 U.S.at 488, quoting *Brown Shoe Co. v. United States*, 370 U.S. 294 (1964)). *(emphasis in original).*

The defendants argue that their actions depress, rather than raise, the prices paid to plaintiffs and cannot be said to cause antitrust injury. Citing the general rule that the purpose of the antitrust laws is to protect consumers and competition– not competitors, defendants argue that plaintiffs allege no ultimate harm to consumers. Citing *Indeck*, defendants argue that "[a]lthough antitrust actions may, of course, be initiated by marketplace competitors, those actors in the economic forum must at least allege that the exclusion of the competitor from the marketplace results in the elimination of a superior product or a lower cost alternative." *Indeck*, 250 F.3d at 977. Defendants argue that "Plaintiffs' hoped–for gains" are diametrically opposed to consumers interests' in lower prices. Defendants further argue, and plaintiffs do not disagree, that plaintiffs have alleged harm to consumers in only one paragraph of their lengthy complaints.

Plaintiffs, on the other hand, argue that they are sellers who are victimized by the actions of a monopsonist or buyers' conspiracy who always have standing to sue. Plaintiffs further argue that the defendants mischaracterize their relative positions in the market as that of competitors, rather than as a buyer seller relationship. Plaintiffs characterize themselves as "underpaid sellers" and argue that they suffer antitrust injury because they are the victims of an agreement by the defendants to illegally pay them less than the prices that would otherwise prevail in a competitive market.

While the claim made by the defendants, i.e., that consumers ultimately benefit from lower

16

prices paid to sellers has some logical appeal, this Court is not convinced, at this stage of these proceedings, that the plaintiffs have not adequately alleged antitrust injury and recognizes that "[i]njury to competition can occur by monopsony just as it may result from monopoly." *In re NCAA I-A Walk-On Football Players Litigation,* 398 F.Supp.2d 1144 (W.D. Wash. 2005) (citing *National Macaroni Mfrs. Ass'n v. FTC*, 345 F.2d 421, 426 (7th Cir. 1965)).  It may well be that plaintiffs' case will fail on the issue of standing upon scrutiny after further discovery in this case; however, a fair inference may be drawn from the complaint that plaintiffs are "seeking to destroy an anti-competitive arrangement" and have sufficiently alleged the antitrust injury element necessary for antitrust standing.  *See Kentucky Speedway v. National Association of Stock Car Auto Racing, Inc.*, 410 F.Supp.2d 592 (E.D. Ky. 2006).

Although the Court finds that plaintiffs have sufficiently pleaded antitrust injury, the specific allegations that members of the Maryland and Virginia Co-op and of DFA have no standing is more troublesome.  Defendants argue that members of the Maryland and Virginia Co-op have suffered injuries "too indirect" for them to have standing to sue and they liken the situation to that of stockholders who cannot sue on behalf of their corporation.  They further argue that DFA members would, by recovering damages, benefit from the alleged wrongdoing of their own cooperative.  It appears, however, that these claims cannot properly be resolved on the pleadings and this Court will permit these claims to proceed at this time.  Defendants may, however, renew their argument by appropriate  motion with respect to members of both the Maryland and Virginia Co-op and DFA after appropriate discovery.

17

**Relevant Market**

"To establish a claim under § 1, the plaintiff must establish that [a] . . . combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets . . . ." *Davis-Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1195-96 (6th Cir. 1982). Generally, a relevant market is one which includes "products or services that are reasonably interchangeable with, as well as identical to, defendant's product" affected by the rule or regulation being challenged. *National Hockey League Players Association v. Plymouth Whalers Hockey Club*, 419 F.3d 462 (6th Cir. 2005). Market definition is a highly fact-based analysis that generally requires discovery. *Foundation For Interior Design Education Research v. Savannah College Of Art & Design*, 244 F.3d 521, (6th Cir. 2001) (citing *Eastman Kodac Co. v. Image Technical Servs., Inc.* 504 U.S. 451 (1992)). The plaintiffs must also provide a sufficient factual predicate to support its allegations that the defendants enjoy market power in the relevant market. *Id.* at 531.

While acknowledging that plaintiffs define their proposed relevant geographic market as USDA Federal Milk Marketing Orders 5 and 7 (referred to by as plaintiffs as "the Southeast"), defendants argue that this legal conclusion as to the relevant geographic market fails as a matter of law because of factual allegations contained in plaintiffs' complaints that defendants purchase milk from dairy farmers outside the Southeast to supply processing plants in the Southeast, *i.e.*, the "flooding" allegation, thus making the geographic market broader than the Southeast. Secondly, they argue that while the plaintiffs generally describe the relevant product market as either "fluid Grade A milk," or "the market for the purchase of fluid Grade A milk", they offer no factual allegations to show that any defendant possesses monopsony or monopoly power in such a market. For these reasons, defendants argue that plaintiffs' complaints and claims should be dismissed.

18

Plaintiffs, on the other hand, respond that they define two relevant product markets: (1) the market for the purchase of fluid Grade A milk for bottling in the Southeast and (2) the market for the sale and marketing of fluid Grade A milk for bottling in the Southeast. They also allege, as defendants concede, that the relevant geographic market is the Southeast, *i.e.*, the area covered by FMMO's 5 and 7. Because definition of the relevant market is a highly fact based inquiry and because plaintiffs clearly allege relevant product and geographic markets, this Court will spend very little time on this issue. The fact that defendants suggest, at this stage of the litigation, that other relevant markets may likewise exist is of no consequence. Likewise, plaintiffs allege DFA and Dean control over significant portions of both the buy-side and the sale-side of the relevant product markets, allegations which are sufficient to establish a *prima facie* case of monopoly power. These issues simply are not appropriate for disposition on a motion to dismiss given the factual allegations contained in plaintiffs' complaints.

**Statute of Limitations**

The statute of limitations for private federal antitrust actions is four years from the date of the accrual of the action. See 15 U.S.C. § 15b. An antitrust cause of action accrues and the limitation period commences each time a defendant commits an act that injures the plaintiff's business. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 US 321 (1971). "For statute of limitations purposes, . . . the focus is on the timing of the causes of injury, i.e. the defendant's overt acts, as opposed to the effects of the overt acts. *BXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F.3d 462 (6ᵗʰ Cir. 1996), citing *Peck v. General Motors Corp.*, 894 F.2d 844, 849 (6ᵗʰ Cir. 1990) (per curiam). A continuing antitrust violation is one in which the plaintiff's interests are repeatedly invaded. *Id.* at 849 (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9ᵗʰ Cir.

19

1987)).

"When a continuing antitrust violation is alleged, the cause of action accrues each time a plaintiff is injured by an act of the defendants." *Barnosky Oils, Inc. v. Union Oil Co. of California*, 665 F.2d 74, 81 (6th Cir. 1981). "[E]ven when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act." *Peck*, 894 F.2d at 849 (quoting *Pace Industries*, 813 F.2d at 237). An overt act that restarts the statute of limitations is characterized by two elements: (1) it must "be a new and independent act that is not merely a reaffirmation of a previous act"; and (2) it must "inflict new and accumulating injury on the plaintiff." *Pace Industries*, 813 F.2d at 238.

Plaintiffs in this case have alleged a continuing conspiracy. Defendants argue that plaintiffs' alleged injuries were caused by conduct prior to July 5, 2003 and are therefore time barred, that plaintiffs have not identified any overt acts within the limitations period that restart the running of the statute, and that plaintiffs' fraudulent concealment allegations are inadequate to avoid dismissal of their claims as untimely. Because the Court finds that the plaintiffs have adequately pled a continuing antitrust violation and have alleged overt acts which, if proven, would restart the statute of limitations, the motion of the defendant, at this stage of the proceedings, lacks merit. Plaintiffs in this case allege an agreement to eliminate competition. A conspiracy is presumed continuing where there is an agreement to eliminate competition with no "affirmative showing of the termination of that agreement." *Midwestern Machine Co. v. Northwest Airlines, Inc.*, 392 F.3d 265, 275 (8th Cir. 2004), *Morton's Mkt.. Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999).

Plaintiffs in this case have alleged that the continuing conspiracy was implemented by the

20

annual renewal of full supply agreements and have alleged numerous other overt acts occurring within the limitations.  These facts are clearly articulated in plaintiffs' complaint and the Court will not set them out individually in this memorandum opinion.  These allegations are generally set out, however, in paragraphs 49–58 and 61–76 of the *Sweetwater* complaint and 50–61  and 63–78 of the *Baisle*y Complaint.  Accepting these allegations as true, as the Court is required to do for the purposes of these motions, the plaintiffs clearly plead a continuing conspiracy with overt acts committed well within the limitations period applicable to this case.  Because the Court finds that plaintiffs have adequately pled a continuing conspiracy, the Court will not address the defendants' argument that the fraudulent concealment allegations of the complaint are deficient.

**<u>Claims Against Individual Defendants</u>**

Two of the individual defendants who have joined in the motion to dismiss, Gary Hanman ("Hanman") and Gerald Bos("Bos"), have filed a supplemental memorandum to assert arguments that relate only to them as individuals and which they believe entitle them to dismissal,  regardless of whether any of the organizational defendants is dismissed. [Doc. 96, No. 2:07-CV-208].  SMA and James Baird("Baird"), another individual defendant, have filed a supplemental motion to dismiss, also asserting grounds, in part, unique to them. [Doc. 98, No. 2:07-CV-208][6] Hanmen and Bos are identified as former DFA executives who are alleged to have "participated in, authorized, directed and/or knowingly approved or ratified" the antitrust violations alleged in plaintiffs' complaints.  The complaints also allege that DFA was generally under the direction and control of Hanman and Bos.  Similiar allegations are made concerning Baird, who is the manager of SMA and

---

[6]  SMA raises two grounds for dismissal in addition to its argument based on *Twombly*.  SMA claims immunity under the Capper-Volstead Act and protection by the filed rate doctrine.  All issues raised in SMA and Bairds' supplemental motion not addressed in this opinion and order will be addressed in a separate order.

owner, officer and manager of other Texas based entities that transport Grade A milk for DFA and SMA.

The individual defendants argue that the complaints do not comply with Rule 8(a)(2) and *Twombly* as to them.[7]  They argue that plaintiffs fail to allege that they conspired with others to restrain trade and that the conduct described in the complaints fails to state a claim for individual antitrust liability under Sixth Circuit precedent  Characterizing plaintiffs' allegations as "literary gloss" and "clever word-play", defendants argue that the complaints "focus on corporate activity in which [they] participated, if at all, only in a representative capacity on behalf of DFA" or, in Baird's case, SMA.   While seeming to acknowledge that the alleged corporate activity is adequately detailed, they demand that the complaints detail their participation in these underlying events.

These parties spend many pages of their briefs debating the proper standard for pleading a claim of individual liability for antitrust violations, the precedential value of a California district court case., *Murphy Tugboat v. Shipowners & Merchants Tugboat Co.,* 467 F.Supp. 841 (N.D. Cal. 1979)[8], whether there is a per se antitrust pleading requirement, whether plaintiffs must allege that

---

[7]  Defendants cannot be faulted for attacking plaintiffs' complaints on the basis of *Twombly*. The level of factual pleading they seek, however, could rarely, if ever, be met by a plaintiff in an antitrust case before discovery.  While *Twombly* certainly requires of plaintiffs a degree of pleading that may not be required in other types of cases, it was not intended as a shield to be used by antitrust defendants to defeat even a meritorious claim.  Arguing that plaintiffs have not pleaded sufficient facts appears to have become the mantra of defendants in antitrust cases.

[8]  Defendants Bos and Hanman disingenuously create the impression in their briefs, by combining quotes from two different cases and by carefully wording their argument, that the Sixth Circuit, in the *Brown* decision, adopted the holding of *Murphy Tugboat* and requires a showing that corporate officers sought to be held individually liable for antitrust violations "actually participated in 'inherently wrongful conduct.'" Such an impression is false.  Rather than adopting the holding of *Murphy Tugboat*, the Sixth Circuit merely observed that "one court has concluded that personal liability under the antitrust  laws should only attach where the defendant has actively participated in inherently wrongful conduct." *Brown*, 783 F.2d 646.(emphasis added).  Nothing in the *Brown* opinion, nor in any subsequent opinion, suggests that the Sixth Circuit intended to create such a standard.  Even if such an evidentiary standard does apply to cases of alleged personal liability, it cannot be concluded that all of the facts which

22

Hanman and Bos engaged in "inherently wrongful conduct" and whether the claims are "dependent on the context in which they were brought." None of this debate between plaintiffs and defendants is particularly useful to the Court in resolving the motions and is, in fact, largely irrelevant to the their resolution. This Court is bound by Sixth Circuit precedent and the relevant standards have been rather clearly enunciated by the Sixth Circuit in *Brown v. Donco Enterprises, Inc.,* 783 F.2d 644 (6th Cir. 1986).

In *Brown,* antitrust plaintiffs sued both organizational defendants and their attorneys, alleging that the attorney defendants engaged in a conspiracy in violation of 15 U.S.C. 1 *et. seq* and 14. Plaintiffs alleged that defendants engaged in a conspiracy to file and threaten lawsuits so as to coerce, intimidate and compel plaintiffs to purchase from the corporate defendant. The complaint did not allege that the attorney defendants served as active participants in formulating policy for the corporate defendants or acted beyond their role as legal counsel. The Sixth Circuit unequivocally held that corporate "officers and agents may be held individually liable for corporate actions that violate the antitrust laws if they authorize or participate in the unlawful acts." *Brown,* 783 F.2d at 646. Individual liability may be imposed "only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends" and that an individual defendant "exerted his influence so as to shape corporate intentions." *Id.* The Court, in granting defendants' motion for summary judgment, noted that "plaintiffs failed to allege that the attorney defendants made policy decisions on behalf of their client or in any other way motivated [the corporation] to engage in litigation for an anticompetitive purpose." *Id.* at 647.

Plaintiffs allege that Hanman, Bos and Baird actively "participated in, authorized, directed

---

support such a factual conclusion must be pled in detail in the complaint.

and/or knowingly approved or ratified" the illegal conduct complained of. Plaintiffs plead, in straightforward fashion, what *Brown* requires. That they require only a few paragraphs or sentences to do so is of no consequence. Whether plaintiffs can ultimately survive a motion for summary judgment after discovery is also of no consequence to the decision of the instant motion. The additional arguments raised by these individual defendants establish no basis for dismissal of plaintiffs' complaint against them pursuant to Rule 12(b)(6).

### III.    Conclusion

For all the foregoing reasons, defendants' motions to dismiss [ Doc. 47 in 2:07-CV-208; Docs. 30 & 36 in 2:07-CV-248; Doc. 95 in 2:08-CV-12; and Doc. 92 in 2:08-CV-14] are **DENIED**, Defendant Baird's and SMA's supplemental motion[Doc. 98 in No. 2:07-CV-208] is **DENIED IN PART** and discovery should proceed as provided for in the Court's case management and scheduling order. This order is also binding on the parties in Case Nos. 2:07-CV-272 and 2:08-CV-53.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE

24