# NEW YORK LAW SCHOOL LAW REVIEW

© Copyright 1979 by New York Law School

FORMERLY
NEW YORK LAW FORUM

VOLUME XXIV          NUMBER 4          1979

## CONTENTS

ARTICLES

RECENT DEVELOPMENTS IN PRIVATE ANTITRUST CLASS ACTIONS
*Roger Bernstein*
*Daniel Berger* 819

CONTESTS FOR CORPORATE CONTROL UNDER THE NEW LAW OF PREACQUISITION NOTIFICATION
*Stephen M. Axinn*
*Blaine V. Fogg*
*Neal R. Stoll* 857

CONSCIOUS PARALLELISM, SIGNALLING AND FACILITATING DEVICES: THE PROBLEM OF TACIT COLLUSION UNDER THE ANTITRUST LAWS
*Michael D. Blechman* 881

ANTITRUST RESTRICTIONS ON TRADE ASSOCIATION MEMBERSHIP AND PARTICIPATION: RECENT DEVELOPMENTS
*John Bodner, Jr.* 907

NOTE

THE FIRST AMENDMENT: POLITICAL SPEECH AND THE DEMOCRATIC PROCESS ............................. 921

chance there is that some-
ius, even though the sub-
:tantial premium, the arbi-
extra income for the safety
:d first. Thus, a late bidder
; the preacquisition waiting
idder.

cies are well aware of this
to the ordinary entreaties
s a genuine issue as to the
however, the government
the waiting period relating
iy be receptive to the sub-
econd offer is successful it
) prepare and prosecute a
itial bidder's proposed ac-

)N

cation and waiting period
the Williams Act's regula-
:n. There are, of course,
sed here that will surface
eover contest where com-
)n will require fine tuning
imilarly, how the antitrust
1at they are actively in-
ntrol struggles must await

:hat the Act will give the
age over the late-arriving
rget company to locate a
the initial bid has been
knight" probably will have
or the target company's
ecessary in part to induce
1y's stock until the "white
)ires.

# CONSCIOUS PARALLELISM, SIGNALLING AND FACILITATING DEVICES: THE PROBLEM OF TACIT COLLUSION UNDER THE ANTITRUST LAWS

*MICHAEL D. BLECHMAN\**

This Article addresses the persistent antitrust problem of how to deal with anticompetitive behavior by oligopolists which does not involve express agreements to restrain trade. While this subject has been a topic of recurrent controversy for some forty years,[1] the debate has generally been conducted without the benefit of a great deal of empirical evidence as to exactly how competition has (or has not) been suppressed in particular oligopoly industries. This kind of data is now becoming increasingly available as a result of a growing number of cases[2] and government investigations[3] involving tacit collusion. Consequently, the time would seem to be a propitious one to review the relevant jurisprudence and reconsider some fundamental issues in light of the possible insights recent experience may have to offer.

---

\* B.A. 1962, Harvard College; LL.B. 1966, Harvard Law School. The author is grateful to Kenneth A. Hicks, an associate at Kaye, Scholer, Fierman, Hays & Handler, for his assistance in preparing this Article.

1. See notes 4-54 and accompanying text *infra*.

2. See notes 11-34 and accompanying text *infra*. A good deal of interesting information concerning oligopoly markets may be derived not only from American decisions, but also from recent Canadian cases, some of which recite in considerable detail the relevant evidence as to anticompetitive behavior by oligopolists in various industries. See, e.g., Regina v. Canadian Gen. Elec. Co., 29 Can. Pat. Rptr. 2d 1, 34 Can. Crim. Cas. 2d 489 (1976); Regina v. Armco Canada, Ltd., 17 Can. Pat. Rptr. 2d 211, 21 Can. Crim. Cas. 2d 129 (1974). The Canadian cases also confirm that the problem of parallel business behavior is not peculiar to the American economy and legal system. See also UNITED KINGDOM MONOPOLIES COMMISSION, PARALLEL PRICING: A REPORT ON THE GENERAL EFFECT ON THE PUBLIC INTEREST OF THE PRACTICE OF PARALLEL PRICING, Cmnd. 5330 (1973); Stanbury & Reschenthaler, *Oligopoly and Conscious Parallelism: Theory, Policy and the Canadian Cases*, 15 OSGOODE HALL L.J. 617 (1977).

3. The only government investigation which has thus far yielded significant results is that involving the large steam-turbine generator industry, discussed at notes 43-51 and accompanying text *infra*. However, the Justice Department has now also commenced economic studies of selected industries (notably steel and iron ore) as well as an examination of various concentrated markets aimed at finding targets for prosecution. See Remarks of Ky P. Ewing, Jr., Deputy Assistant Attorney General, Antitrust Division, before the Eighteenth Annual Advanced Antitrust Seminar, Practising Law Institute (Dec. 1, 1978), at 6 [hereinafter cited as Ewing Address].

would take some given action only if its competitors acted in the same way, that does (by definition) mean that their behavior is interdependent. But interdependence and agreement are not the same thing. Consider, for example, a case in which each of several oligopolists is willing to maintain a higher price level only if its competitors all charge the same prices. Such behavior is clearly interdependent; but it is also just as clear that it does not constitute an "agreement" under section 1 of the Sherman Act. The problem, then, with a "plus factor" test which depends upon whether particular conduct is or is not contrary to companies' "independent self-interest" is that it does not, by itself, distinguish between conscious parallelism and conspiracy.[82]

The same is also true to some extent of other "plus factors." For example, the fact that parallel behavior is pervasive (that it covers many aspects of the defendants' marketing practices) may show that the uniformity in conduct is no coincidence; but it does not, by itself, prove that the identity is due to an agreement rather than to one defendant consciously paralleling the others' actions.[83] Similarly, the fact that prices have moved upward despite falling demand, or that profits are exorbitantly high, may demonstrate that a given market is chronically non-competitive; but it does not explain the reason for that condition, which could conceivably be due to conscious parallelism rather than to conspiracy.[84]

In order to make the "plus factor" approach a more precise instrument for identifying unlawful agreements under section 1 of the Sherman Act, it may be helpful to begin with that which has to be proven, i.e., the elements of agreement. We have already

---

82. It is thus not surprising that this "plus factor" was found to be present in cases which *equated* conscious parallelism and conspiracy. *See, e.g.,* Milgram v. Loew's, Inc., 192 F.2d 579 (3d Cir. 1951); Ball v. Paramount Pictures, Inc., 169 F.2d 317 (3d Cir. 1948); William Goldman Theatres, Inc. v. Loew's, Inc., 150 F.2d 738 (3d Cir. 1945).

83. There are, of course, circumstances in some cases which point to secret communication of some kind, *e.g.*, where uniformity of conduct extends to matters that have never been publicly announced. Wall Prods. Co. v. National Gypsum Co., 326 F. Supp. at 319-20. However, the problem with which this Article is primarily concerned is distinguishing between agreement and conscious parallelism where there is no such overt conspiracy.

84. Based upon past experience, it may appear very likely that the lack of competition is due to some sort of express or tacit agreement. *See* Posner, *supra* note 38, at 1575; Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 HARV. L. REV. 655 (1962). But to assume that this is so, and to accordingly accept indicia of non-competitiveness as "plus factors" probative of the existence of conspiracy (rather than conscious parallelism), would create a self-fulfilling hypothesis.

[Vol. 24

in the
 is in-
ot the
several
 if its
clearly
it con-
t. The
 upon
es' "in-
nguish

ctors."
that it
s) may
it does
rather
ions.[83]

falling
te that
not ex-
be due

precise
n 1 of
has to
already

esent in
lgram v.
169 F.2d
F.2d 738

ret com-
ters that
Co., 326
rily con-
re there

of com-
note 38,
onscious
ume that
factors"
), would

suggested that the first of these is a consciousness of commitment. This state of mind must generally be proven by inference, from things which the defendants have said or done. For example, when a company declines to go after profitable business in arbitrary categories,[85] when it rigidly refuses to make any sales by lowering prices by even *de minimis* amounts,[86] when it furnishes competitors with detailed information about its own operations,[87] when it imposes penalties upon itself for price cutting[88] or when it feels the need to report and explain its pricing errors to competitors,[89] such conduct indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement. It is true that in each of these examples, the conduct may be characterized as contrary to the defendants' independent economic interests; but that, by itself, is not what makes the acts probatively significant. Rather, it is that each shows, to a greater or lesser de-

---

85. *See, e.g.*, Morton Salt Co. v. United States, 235 F.2d 573, 578-79 (10th Cir. 1956).

86. In Morton Salt Co. v. United States, 235 F.2d 573 (10th Cir. 1956), an employee of one defendant was given a copy of a bid being submitted by two other defendants which had been calculated to a four decimal point figure. The employee omitted the last two decimals in making his own bid (it being his practice to bid to two decimals), and as a result, his company won the bid by $2.32 in a contract of over $38,000. The employee was reprimanded for undercutting the competitor and thereafter his authority was strictly limited. *Id.* at 578. Similarly, in *Regina v. Canadian Gen. Elec. Co.*, the court found it noteworthy that one of the defendants termed a one cent deviation in price "a serious breach of the Lamp Sales programme." 29 Can. Pat. Rptr. 2d at 27, 34 Can. Crim. Cas. 2d at 514.

87. *See* Morton Salt Co. v. United States, 235 F.2d 573 (10th Cir. 1956); Justice Dep't Memorandum, *supra* note 43, at 17006. *See also* United States v. American Linseed Oil Co., 262 U.S. 371, 390 (1923) (companies divulging intimate knowledge of their internal affairs were not "*bona fide* competitors"); American Column & Lumber Co. v. United States, 257 U.S. 377, 410 (1921) ("Genuine competitors do not make daily, weekly and monthly reports of the minutest details of their business to their rivals . . . they do not contract . . . to submit their books to the discretionary audit . . . of their rivals for the purpose of successfully competing with them . . . ."); Regina v. Canadian Gen. Elec. Co., 29 Can. Pat. Rptr. 2d at 32, 34 Can. Crim. Cas. 2d at 518 ("Genuine competitors do not make reports of their business transactions to their rivals . . . .").

88. *See, e.g.*, the discussion of the General Electric and Westinghouse price protection clauses at notes 43 & 44 *supra*. *See also* Regina v. Canadian Gen. Elec. Co., 29 Can. Pat. Rptr. 2d 1, 34 Can. Crim. Cas. 2d 489 (1976), where, when one of Canadian General Electric's agents won a contract by quoting prices at less than list, the firm informed the competition (Westinghouse) that all of CGE's gross profits from the sale would be donated to charity.

89. For example, in *Regina v. Canadian Gen. Elec. Co.*, the court noted the instances in which one defendant informed another of pricing errors and concluded that "[t]his was not the conduct of a competitor but of [one] who believed that the accused were united in an agreement, express or implied, to act together and pursue a common purpose." 29 Can. Pat. Rptr. 2d at 32, 34 Can. Crim. Cas. 2d at 518.