Brett L. Gibbs, Esq. (SBN 215000)
38 Miller Avenue, #263
Mill Valley, CA  94941
415-325-5900

*Attorney for Objector,*
*Gordon Hansmeier*

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SHAMES; GARY GRAMKOW, on behalf of themselves and on behalf of all persons similarly situated, <br><br> *Plaintiffs*, <br><br> vs. <br><br> THE HERTZ CORPORATION, *et al.*, <br><br> *Defendants*. | No. 3:07-cv-02174-MMA-WMC <br><br> **CLASS ACTION** <br><br> **OBJECTION OF GORDON HANSMEIER TO PROPOSED SETTLEMENT AND ATTORNEY'S FEE AWARD AND NOTICE OF INTENT TO APPEAR AT HEARING** <br><br> Judge:     Hon. Michael M. Anello <br> Date:      October 29, 2012 <br> Time:      2:30 PM <br> Courtroom: 5 |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

   I.   THE OBJECTOR IS A MEMBER OF THE CLASS ............................................ 2

   II.  THIS PROPOSED SETTLEMENT WARRANTS HEIGHTENED SCRUTINY ON
       BEHALF OF ABSENT CLASS MEMBERS ....................................................... 3

       a.   This Proposed Settlement Displays All of the Warning Signs Identified by the
           Ninth Circuit in *Bluetooth*, and Therefore Requires Heightened Scrutiny ...................... 4

       b.   Federal Law Requires Heightened Scrutiny for this Mixed Coupon Settlement .............. 6

       c.   The Court Should Discount Attempts by the Settling Parties to Infer Class
           Approval From a Low Number of Objections ................................................................... 8

   III.  THE LIMITED INFORMATION BEFORE THE COURT MAKES EVALUATION
        AND FINAL APPROVAL OF THIS PROPOSED SETTLEMENT IMPOSSIBLE ........... 10

       a.   The Settling Parties Have Not Supplied Any Evidence as to the Value of the
           Claims Surrendered By the Class ................................................................................... 10

       b.   The Settling Parties Have Not Supplied Any Evidence as to the True Value of the
           Relief the Class Would Receive ..................................................................................... 11

       c.   This Court Must Follow *Sobel v. Hertz* and Deny Final Settlement Approval
           Where It Cannot Adequately Evaluate the Class Relief by Comparison to the
           Value of Claims Surrendered ......................................................................................... 12

   IV.  THE LIMITED INFORMATION BEFORE THE COURT SHOWS A FEE-
        DRIVEN SETTLEMENT, CERTAIN TO RESULT IN MINIMAL CLASS
        RECOVERY ....................................................................................................... 13

       a.   The Proposed Settlement Is Structured so as to Discourage Class Participation
           and Ensure That Actual Class Recovery Will Be Minimal, Despite the Existence
           of an Obvious Solution ................................................................................................... 13

       b.   Based on the Limited Information the Settling Parties Have Supplied, the Best
           Inference Is that Class Counsel Has Vastly Overpaid Itself and Vastly
           Overestimated this Proposed Settlement's Real Value ................................................... 17

   V.   THE ATTORNEY FEES REQUESTED ARE EXCESSIVE ............................................ 20

       a.   This Court Is Not Required to Use Class Counsel's Fictitious Common Fund
           Estimate to Gauge the Reasonableness of the Fee Request ............................................ 20

- i -

b.   Linking Attorney Fee Awards to Actual Class Recovery Is Supported by Both Law and Public Policy ........................................................................................................ 23

c.   The Class Action Fairness Act of 2005 Prohibits the Court from using Class Counsel's Fictitious Common Fund Estimate to Gauge the Reasonableness of the Fee Request .................................................................................................................... 24

CONCLUSION ................................................................................................................................. 25

# TABLE OF AUTHORITIES

**CASES**

*Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.*, 52 F.R.D. 373 (D. Kan. 1971) ........................................................................................... 10

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................. 4

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 100 S.Ct. 745 (1980) .......................... 23

*Browning v. Yahoo!, Inc.*, No. C04-01463, 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007) ........................................................................................................................ 21

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) .......................... 4

*Create-A-Card, Inc. v. Intuit, Inc.*, No. C 07-06452 WHA, 2009 WL 3073920 (N.D. Cal. Sept. 22, 2009) ................................................................................... 14, 22, 23, 24

*Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401 (9th Cir. 1989) .......................... 3

*Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439 (W.D. Pa. 2007) .............................. 9

*Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292 (S.D. Fla. 2007) ................................. 7, 11

*Fleury v. Richemont N. Am., Inc.*, No. C-05-4525 EMC, 2008 WL 3287154 (N.D. Cal. Aug. 6, 2008) ................................................................................................ 6, 22

*Ford Explorer Cases*, J.C.C.P. Nos. 4366 & 4270 (Cal. Sup. Ct., Mar. 11, 2010) ........................... 14

*Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434 (S.D. Iowa 2001) ........................................ 9

*Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933 (1983) ................................................ 24

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ................................. passim

*In re Classmates.com Consol. Litig.*, No. C09-45RAJ, 2012 WL 3854501 (W.D. Wash. June 15, 2012) ..................................................................................... 19

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 370 F. Supp. 2d 320 (D. Me. 2005) ............................................................................................. 14

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ......................................... 9

*In re Gen. Motors. Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ................................................................................. 5, 9, 10

*In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106 (7th Cir. 1979) ...................... 9

*In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395 (D. Mass. 2008) ......... 14, 16, 23

*Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223, 120 S.Ct. 2237 (2000) (O'Connor, J., writing on denial of writ of certiorari) ................................................ 23

- iii -

*Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766 (N.D. Ohio 2010) ......................... 14

*Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir. 1987) ............................................................................................................ 9

*Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781 (7th Cir. 2004) ......................................... 3

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ..................................................................... 4

*Parker v. Time Warner Entm't Co.*, 631 F. Supp. 2d 242 (E.D.N.Y. 2009) ....................... 23

*Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292 (M.D. Pa. 1995) .................... 9

*Silber v. Mabon*, 957 F.2d 697 (9th Cir. 1992) ..................................................................... 3

*Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) ............ 19

*Sobel v. Hertz Corp.*, No. 3:06-CV-00545-LRH-RAM, 2011 WL 2559565 (D. Nev. June 27, 2006) .................................................................................................... passim

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ....................................................... 4, 19

*Stern v. Gamballo*, Nos. 10-56929, 10-57062, 2012 WL 1744453 (9th Cir. May 17, 2012) ..................................................................................................................... 21, 22

*Stern v. New Cingular Wireless Servs., Inc.*, No. SACV 09-1112-CAS (AGRx) (C.D. Cal. Nov. 22, 2010) .............................................................................................. 22

*Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844 (5th Cir. 1998) ................................. 22

*Strong v. BellSouth Telecomms., Inc.*, 173 F.R.D. 167 (W.D. La. 1997), *aff'd*, 137 F.3d 844 (5th Cir. 1998) .......................................................................................... 14

*Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34 (D. Me. 2005) ....................................... 13, 14, 16, 17

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006) ............. 6, 7

*Tarlecki v. Bebe Stores, Inc.*, No. C 05-1777 MHP, 2009 WL 3720872 (N.D. Cal. Nov. 3, 2009) .......................................................................................................... 22

*True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010) ...................... passim

*Walter v. Hughes Commc'ns, Inc.*, No. 09-2136 SC, 2011 WL 2650711 (N.D. Cal. July 6, 2011) .................................................................................................... 11, 13

*Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026 (9th Cir. 1997) ..................... 21, 22

*Yeagley v. Wells Fargo & Co.*, No. 05-03403, 2008 WL 171083 (N.D. Cal. Jan. 18, 2008), *rev'd*, 365 F. App'x 886 (9th Cir. 2010) ......................................... 14, 22, 23

*Young v. Polo Retail*, No. C-02-4546, 2007 WL 951821 (N.D. Cal. Mar. 28, 2007) ....... 21

- iv -

**STATUTES**

28 U.S.C. § 1711 .................................................................................................. 14

28 U.S.C. § 1712 ........................................................................................... 1, 7, 24

**OTHER AUTHORITIES**

Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges* (3d ed. 2010) ............................................... 16, 24

Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71 (2007) ............................... 8, 14

Fed. R. Civ. P. 23 (h), 2003 Advisory Committee Notes .................................... 7

James Tharn & Brian Blockovich, *Coupons and the Class Action Fairness Act*, 18 Geo. J. Legal Ethics 1443 (2005) ............................................................... 14

S. Rep. No. 109-14 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3 ................... 7, 8

**RULES**

Fed. R. Civ. P. 23(e) ......................................................................................... 20

# **INTRODUCTION**

Gordon Hansmeier, the Objector, represents millions of class members who believe that this Proposed Settlement is unfair. The Settling Parties have constructed a settlement which appears, on its face, to give the promise of valuable relief. Merely scratching the surface, however, reveals a settlement which is completely unconscionable, in at least four separate ways.

*First*, this settlement displays each and every one of the red flags and "subtle signs" of collusion identified by the Ninth Circuit in *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011).

*Second*, this agreement qualifies as a mixed coupon settlement under the Class Action Fairness Act of 2005, 28 U.S.C. § 1712. Yet, the Settling Parties have wholly failed to give the Court the information it requires to determine the actual value—not face value—of the car rental coupons that this settlement would award.

*Third*, and most fundamentally, the Settling Parties have failed to give the Court any of the information that the Ninth Circuit's controlling precedent has determined this Court needs to even begin its inquiry into whether this settlement is fair, reasonable, and adequate. The Court must compare the value of the claims to be surrendered by the class to the actual value of the relief the class will receive, and it requires solid, well-supported data and well-reasoned analysis for this task. Because the Settling Parties have failed to provide this, the Court should deny final approval of the settlement—just as final approval was denied in the analogous *Sobel v. Hertz Corp.*, No. 3:06-CV-00545-LRH-RAM, 2011 WL 2559565 (D. Nev. June 27, 2006), a case involving the same parties, identical facts, and the same neutral mediator.

*Fourth*, a rough estimate of the true actual value of this settlement to the class members—ignoring Class Counsel's wildly misleading figures based on an impossible 100% claims rate—shows that Class Counsel have breached their fiduciary duties to the class. They have negotiated a settlement which would secure themselves outsized compensation, amounting to nearly *half* the total actual value of this settlement to the class. At the same time, Class Counsel has inexplicably ignored

the fact that Defendants have the ability to automatically pay claims to non-responding class members, and thus ensured that the vast majority of class members will receive no relief whatsoever.

Therefore, the Court is required by binding law, in exercise of its duties to protect absent class members from exploitation, to deny final approval of this settlement. The Objector is not opposed to class actions or to settlement in general—in fact, the Objector believes that a minimal change in the claims process, allowing for automatic payment to silent class members, along with sufficient documentation of the actual values and figures involved, should be sufficient to allow the Objector to support the final approval of a renegotiated settlement. The Objector attempted to raise his arguments in discussions with Class Counsel prior to filing this objection; Class Counsel wholly dismissed the Objector's suggestions for improving the settlement, and most recently attempted to intimidate the Objector from making his concerns heard by threatening sanctions. *See* Exhibits A, B, C & D.

The Objector plans to file a motion for limited discovery, for this purpose of ensuring that the Court and the Objector have sufficient information with which to review a settlement that bears all of the *Bluetooth* indicia of collusion. Unfortunately, under the current unfair settlement terms and with the inadequate supporting information available at present, the settlement must be rejected.

## ARGUMENT

### I.   THE OBJECTOR IS A MEMBER OF THE CLASS

The Objector, Gordon Hansmeier, is a resident of the state of Minnesota who made multiple car rentals directly from Rental Car Defendant(s) Avis and/or Budget for pick up at a San Diego, California airport location during the period from January 1, 2007 through November 14, 2007, and was charged and paid to Avis and/or Budget an Airport Concession Fee, Tourism Commission Assessment Fee, or both as a separate line item on his invoices. These rentals were not made pursuant to a pre-existing agreement pursuant to which the rental charge was determined, nor were they rentals in which the customer paid a package price to a third-party tour operator or on-line booking agency. The Objector does not fall within any of the excluded categories of persons and entities.

This information about the Objector was pre-populated on the settlement website, ostensibly by reference to the Rental Car Defendants' transactional databases produced to Plaintiffs from data kept in the ordinary course of business. *See* Stipulation of Settlement (Dkt. No. 310-2, Ex. A), at 16. According to the Stipulation of Settlement and the settlement website, this information makes the Objector eligible to elect either a cash payment of $10 or one voucher good for a single day of free time and mileage from Avis and/or Budget.

Therefore, according to the class definition previously given preliminary approval by the Court, the Objector is a member of the putative settlement class with standing to object. *See* Amended Order Preliminarily Approving Settlement (Dkt. No. 313), at 2. The Objector intends to appear at the fairness hearing through his counsel. The Objector will provide his address, telephone number, and signature upon request by the Court or counsel; he withholds the information here for his privacy.

## II.   THIS PROPOSED SETTLEMENT WARRANTS HEIGHTENED SCRUTINY ON BEHALF OF ABSENT CLASS MEMBERS

In reviewing a proposed settlement of a class action, the Court must act as a fiduciary for the absent class members. "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697, 701 (9th Cir. 1992); *see also Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989) ("The district court must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent class members."). Because the Proposed Settlement before the Court displays numerous warning signs and includes a coupon distribution, it warrants a heightened level of scrutiny.

OBJECTION TO PROPOSED SETTLEMENT           CASE NO. 3:07-cv-02174-MMA-WMC

### a. This Proposed Settlement Displays All of the Warning Signs Identified by the Ninth Circuit in *Bluetooth*, and Therefore Requires Heightened Scrutiny

In its landmark decision in *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011), the Ninth Circuit identified certain factors which should cause district courts to closely review proposed settlements for fairness. The factors are determined as a matter of law to constitute indicia of collusion. First, the Ninth Circuit held that where "a settlement agreement is negotiated *prior* to formal class certification, consideration of [the] eight *Churchill* factors[1] alone is not enough to survive appellate review." *In re Bluetooth*, 654 F.3d at 946. In such situations, the district court must closely examine a proposed settlement to determine that it is not the product of collusion among the negotiating parties. *Id.* at 946–47. This followed and expanded upon the well-established principle that a court reviewing a settlement-only class certification must look to factors "designed to protect absentees." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see also Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003).

Second, the Ninth Circuit listed three "subtle signs" of collusion which courts must "be particularly vigilant for," and which serve as "warning signs" that class counsel have "allowed pursuit of their own self-interests . . . to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947; *see also Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003). The three signs specifically identified by the Ninth Circuit were:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
> (2) when the parties negotiate a clear sailing arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

---

[1] These factors in a court's fairness assessment include: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement. *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

4

*In re Bluetooth*, 654 F.3d at 947 (collecting cases) (internal citations and quotation marks omitted).

As in *Bluetooth*, all three of these warning signs are present in the Proposed Settlement. First, Class Counsel have negotiated a "claims-made" settlement which does not guarantee any distribution of cash or coupons to the class whatsoever. *See* Stipulation of Settlement (Dkt. No. 310-2, Ex. A), at 17 (providing that no money will be set aside by Defendants to pay claims unless and until cash claims have been made against it and until the "Election Period" is over). At the same time, Class Counsel have negotiated for themselves to receive a fee award of $5,870,000 in cash within ten days of the Court's order and judgment. *See id.* at 20. Thus, Class Counsel would guarantee an ample reward for themselves even while the class distribution remains entirely speculative. Second, the Settling Parties have included a "clear sailing" arrangement, wherein they have agreed on a fee ceiling under which Defendants will not oppose approval, and have negotiated the payment of fees separate and apart from any class funds. *See id.* at 19–20 (agreement of Defendants not to oppose fee request and for payment separate and apart from class benefits). Third, the Settling Parties have fully separated the attorney fee award from the class benefits, such that neither will have any effect on the other, and consequently any reduction in attorney fees will not benefit the class but result in a savings for the Defendants. *See id.* at 20–21. Thus, every one of the specific factors which resulted in appellate reversal in *Bluetooth* exists here, and the Court must take extra care in its evaluation.

The Court must address these "multiple indicia of possible implicit collusion" specifically and with a "clear explanation" of why such features are justified as "in the class' best interest as part of the settlement package." *In re Bluetooth*, 654 F.3d at 947–49. Although this analysis is relevant specifically to the fairness inquiry required for approval of the Proposed Settlement itself, the analysis concentrates on an examination of the attorney fee provisions in light of the rest of the settlement agreement. *See id.* The Ninth Circuit warns that a "district court should [press] the parties to substantiate their bald assertions with corroborating evidence." *Id.* at 948. Even where the Settling Parties claim, as they do here, that attorney fees were negotiated separately, the Court should refuse "to place such dispositive weight on the parties' self-serving remarks." *Id.* (quoting *In re Gen. Motors. Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 804 (3d Cir. 1995)).

1 Similarly, "the mere presence of a neutral mediator, though a factor weighing in favor of a finding of

2 non-collusiveness, is not on its own dispositive of whether the end product is a fair, adequate, and

3 reasonable settlement agreement." *Id.* at 948.

### b.  Federal Law Requires Heightened Scrutiny for this Mixed Coupon Settlement

5 The proposed settlement contains a large "coupon settlement" component. *See True v. Am.*

6 *Honda Motor Co.*, 749 F. Supp. 2d 1052, 1069 & n.20 (C.D. Cal. 2010) (finding a coupon settlement

7 where coupons were the primary form of relief, even where other forms of relief were involved);

8 *Fleury v. Richemont N. Am., Inc.*, No. C-05-4525 EMC, 2008 WL 3287154, at *2 (N.D. Cal. Aug. 6,

9 2008) (defining a coupon settlement as one where the relief constitutes "a discount on another

10 product or service offered by the defendant in the lawsuit"). The car rental vouchers are a form of in-

11 kind compensation, which "is worth less than cash of the same nominal value." *Synfuel Techs., Inc.*

12 *v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006). Furthermore, it is foreseeable and,

13 indeed, fully expected that "some percentage . . . will never be used and, as a result, will not

14 constitute a cost . . . ." *Id.* at 654.

15 The vouchers this settlement contemplates are not fungible in the way cash is; rather they can

16 only be used to reduce the cost of exactly one good that class members, in order to benefit from the

17 voucher, must buy. Another name for such relief is "coupons." To make matters worse, the car rental

18 vouchers have extreme limitations on transferability and must be presented in their original form,

19 creating a significant likelihood that even a class member who wants to redeem their voucher will be

20 thwarted by the happenstance of inconvenience or loss. *See* Stipulation of Settlement (Dkt. No. 310-

21 2, Ex. A), at 12 (limiting transferability to members of the class member's own household, requiring

22 original vouchers to be physically presented for redemption, and denying replacement for lost or

23 stolen vouchers).

24 The Settling Parties might attempt to argue that their car rental vouchers are not "coupons" in

25 that they represent an entire product, akin to pre-paid mailing envelopes. *See Synfuel Techs.*, 463

26 F.3d at 654 (recognizing that pre-paid envelopes were "not identical to coupons, since they represent

27 an entire product, not just a discount on a proposed purchase"). This argument must be rejected. A

28

OBJECTION TO PROPOSED SETTLEMENT          CASE NO. 3:07-cv-02174-MMA-WMC

voucher good for free time and mileage for one rental day does not constitute an entire product. First, class members would still need to pay for gasoline and other assorted costs in order to derive any value from a voucher. Second, the proposition that these car rental vouchers are entire products would rely on the unsupported supposition that all class members can make use of a single rental day (or, in some unknown and unestimated percentage of cases, two days). Common sense dictates that it would be very likely that a given leisure trip taken by a class member would require a multiple-day car rental. In such cases, a single-day voucher functions as a discount coupon on the entire purchase price and has all the problematic features of a discount coupon, such as, for example, requiring a consumer who might otherwise avoid doing future business with the Defendant to return and consequently *increase* the Defendant's marginal sales. It is clear that the Settling Parties realize that their vouchers are discounts and not entire products—otherwise, there would be no reason for the settlement to provide that a "voucher may be used with any rate discounts for which the renter is otherwise eligible." Stipulation of Settlement (Dkt. No. 310-2, Ex. A), at 13. Such language would only have relevance if class members were anticipated to use their vouchers as effective discounts on multiple-day rentals, and clearly shows that the car rental vouchers were contemplated as discount coupons by the Settling Parties.

The fact that class members have a cash option does not change the fact that this is a coupon settlement—Congress specifically recognized that coupon settlements may have a "mixed basis," where, as here, coupons are mixed with other forms of recovery. *See* 28 U.S.C. § 1712(c). Under the Class Action Fairness Act of 2005, courts must give a heightened level of scrutiny to coupon settlements. *E.g.*, *Synfuel Techs.*, 463 F.3d at 654; *Sobel v. Hertz Corp.*, No. 3:06-CV-00545-LRH-RAM, 2011 WL 2559565, at *6 (D. Nev. June 27, 2006); *True v. Am. Honda*, 749 F. Supp. 2d at 1069; *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1321 (S.D. Fla. 2007); *see also* S. Rep. No. 109-14, at 27 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 27 (Section 5 of CAFA "requires greater scrutiny of coupon settlements"); Fed. R. Civ. P. 23 (h), 2003 Advisory Committee Notes ("Settlements involving nonmonetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class.").

1  This heightened scrutiny requires the Court to "discern if the value of a specific coupon

2  settlement is reasonable in relation to the value of the claims surrendered" as part of its inquiry into

3  whether the settlement is fair, reasonable, and adequate. *Sobel v. Hertz*, 2011 WL 2559565, at *10

4  (quoting *True*, 749 F. Supp. 2d at 1069). In ascertaining fairness, the Court is to "consider, among

5  other things, the real monetary value and likely utilization rate of the coupons provided by the

6  settlement." S. Rep. No. 109-14, at 31, *as reprinted in* 2005 U.S.C.C.A.N. 3, 31; *see also Sobel v.*

7  *Hertz*, 2011 WL 255565, at *10; *True*, 749 F. Supp. 2d at 1073.

8  This mandate is especially relevant to these proceedings, where there has been absolutely

9  zero effort by the Settling Parties in the briefing thus far to identify either the real monetary value of

10 the car rental vouchers, or their likely utilization rate—let alone what percentage of the total relief

11 will be distributed through the coupon option as opposed to cash. Class Counsel's extremely limited

12 and superficial attempts to estimate the face value of the coupons simply cannot suffice to allow the

13 Court to complete this inquiry. *See* Memo. In Supp. Of Mot. For Award Of Att'y Fees (Dkt. No.

14 328-1), at 1 fn.3, 22 (using a completely unsupported $40 estimate for face value and assuring the

15 Court that the figure is "quite conservative"); Memo. In Supp. Of Pl.'s Mot. For Prelim. Approval Of

16 Class Action Settlement (Dkt. No. 310-1), at 7 fn.8 (estimating face value from "a recent internet

17 search" of only two airport locations).

18
    **c.  The Court Should Discount Attempts by the Settling Parties to Infer Class
Approval From a Low Number of Objections**

19

20 Any given class action settlement, no matter how much it betrays the interests of the class,

21 will produce only a small percentage of objectors. The predominating response will always be

22 apathy, because objectors must expend significant resources on an enterprise that will create little

23 direct benefit for themselves over something that is worth a minimal amount to any one person.

24 "[S]ilence is a rational response to any proposed settlement even if that settlement is inadequate. For

25 individual class members, objecting does not appear to be cost-beneficial." Christopher R. Leslie,

26 *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L.

27 Rev. 71, 73 (2007). Another common response for laypersons is to affirmatively avoid anything

28 involving a courtroom. Class counsel may argue that this understandable tendency to ignore notices

OBJECTION TO PROPOSED SETTLEMENT      CASE NO. 3:07-cv-02174-MMA-WMC

or free-ride on the work of other objectors is best understood as evidence of support for the settlement. This is wrong—silence is simply *not* consent:

> There may be many reasons why class members in this case didn't register their concerns about the settlement: lack of interest, time, information, etc. Like the Third Circuit in the *General Motors* case, the Court is unwilling to automatically equate class silence with a showing of "overwhelming" support for the settlement. Therefore, the fact that statistically few people bothered to opt-out or file an objection ultimately counts little in the Court's overall fairness analysis.

*Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001) (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 791 (3d Cir. 1995).

Courts around the country have echoed the common-sense observation that class silence does not equal consent to a settlement. "[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *In re General Motors Corp. Pick-Up*, 55 F.3d at 812, *citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217–18 (5th Cir. 1981); *cf. Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292, 297 (M.D. Pa. 1995) ("'[T]he silence of the overwhelming majority does not necessarily indicate that the class as a whole supports the proposed settlement . . . .'"). "[A] low number of objectors is almost guaranteed by an opt-out regime, especially one in which the putative class members receive notice of the action and notice of the settlement offer simultaneously." *Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439, 446 (W.D. Pa. 2007). "[W]here notice of the class action is, again as in this case, sent simultaneously with the notice of the settlement itself, the class members are presented with what looks like a *fait accompli*." *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677, 680–81 (7th Cir. 1987). "Acquiescence to a bad deal is something quite different than affirmative support." *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1137 (7th Cir. 1979) (reversing approval of settlement).

The judge must act as a guardian for *all* class members—whether or not they have formally entered the case by registering an objection. "[T]he silence or absence of class parties does not relieve the judge of his duty and, in fact, adds to his responsibility." *Amalgamated Meat Cutters &*

9

*Butcher Workmen v. Safeway Stores, Inc.*, 52 F.R.D. 373, 375 (D. Kan. 1971). Thus, in measuring the class's own reaction to the settlement, courts look not only to the number but also the "vociferousness of the objectors." *In re General Motors Corp. Pick-Up*, 55 F.3d at 812; *see also Sobel v. Hertz Corp.*, 2011 WL 2559565, at *15; *True*, 749 F. Supp. 2d at 1079. The settlement's proponents have the burden to show that the Proposed Settlement and the proposed fee award are fundamentally fair, adequate and reasonable—and class counsel simply have not carried this burden.

## III.   THE LIMITED INFORMATION BEFORE THE COURT MAKES EVALUATION AND FINAL APPROVAL OF THIS PROPOSED SETTLEMENT IMPOSSIBLE

Evaluating whether the Proposed Settlement is fair, adequate, and reasonable requires the Court to compare the value of the claims surrendered by the class to the value of the relief the class will receive under the settlement terms. Unfortunately, such an evaluation is impossible with only the extremely limited information that is currently before the Court. However, a direct analogue to this case exists in *Sobel v. Hertz Corporation*, No. 3:06-CV-00545-LRH-RAM, 2011 WL 2559565 (D. Nev. June 27, 2011), a proposed class action settlement before the U.S. District Court for the District of Nevada which involved most of the same Defendants as well as the same mediator. This Court should follow the reasoning presented there, and deny final approval of this Proposed Settlement for lack of sufficient information.

### a.   The Settling Parties Have Not Supplied Any Evidence as to the Value of the Claims Surrendered By the Class

Determining "the value of the claims surrendered" by the class members is a crucial step the Court must take in evaluating whether the Proposed Settlement is fair, reasonable, and adequate. *True*, 749 F. Supp. 2d at 1052. Class Counsel claims to have obtained, through discovery and investigation, detailed information about the value of the class members' claims. *See* Memo. In Supp. Of Pl.'s Mot. For Prelim. Approval (Dkt. No. 310-1), at 11 (describing extensive document review, depositions, and expert economic analysis). Class Counsel assures the Court that it obtained "knowledge and insight as to both the strengths and weaknesses of the case (both liability and damages), including as against each Defendant." *Id.*

1    Yet, the Settling Parties give only vague statements—and no supporting evidence—about the

2  value of class members' claims: "Analysis indicated that per day damages suffered by any given

3  Class member . . . were relatively modest." *Id.* at 6. Class Counsel says that class members suffered

4  "average estimated damages of a few dollars per rental day," while also, contradictorily, arguing that

5  their negotiated $5 minimum (or $2 per rental day) payment only "approaches that value." Memo.

6  In. Supp. of Pl.'s Mot. For Award Of Att'y Fees (Dkt. No. 328-1), at 20.

7    Because the value of the claims surrendered by the class is the starting point for evaluating

8  whether the settlement is fair, the Court simply does not have enough information before it to begin

9  its inquiry. Regarding damages, "the Court has not been presented with any substantial, balanced

10  analysis on the issue of damages; the one-sided presentation in the papers supporting settlement

11  approval hardly qualifies." *Sobel v. Hertz Corp.*, 2011 WL 2559565, at *8. Regarding liability, the

12  fact "[t]hat the claims are contested . . . is not to say the claims are weak." *Figueroa*, 517 F. Supp. 2d

13  at 1324. Certainly, the estimated value of Plaintiffs' claims "need not be determined with precision,"

14  but in cases such as this "the court cannot even begin this inquiry." *Sobel v. Hertz Corp.*, 2011 WL

15  2559565, at *10.

16    **b.  The Settling Parties Have Not Supplied Any Evidence as to the True Value of the
      Relief the Class Would Receive**

17

18    Determining the amount which will actually be paid to the class is "an important factor in

19  determining the fairness of a settlement." *Walter v. Hughes Commc'ns, Inc.*, No. 09-2136 SC, 2011

20  WL 2650711, at *12 (N.D. Cal. July 6, 2011). Yet, the Settling Parties give only their unsupported

21  assurance that the benefits are "significant." Memo In Supp. Of Pl.'s Mot. For Prelim. Approval

22  (Dkt. No. 310-1), at 7.

23    Class Counsel suggest that the Court should value the settlement by reference to their rough

24  estimates of the total compensation available if an impossible 100% of class members submitted

25  claims. *See* Memo In Supp. Of Pl.'s Mot. For Award Of Att'y Fees (Dkt. No. 328-1), at 22; *see also*

26  Decl. of Jonathan Carameros Re: Notice Procedures (Dkt. No. 328-7), at 4–5. Note, however, that

27  they do not provide any information which might bring their estimate down to earth, such as the

28  number and value of claims that have actually been received so far, an estimate of how many claims

1   will actually be made in total by the end of the claims period, or an analysis of what percentage of

2   class members have chosen (or will choose) the cash option over the car rental coupon option (and

3   vice versa). And instead of valuing the car rental coupons realistically—as a form of in-kind

4   compensation worth less than face value—Class Counsel only gives an estimate of the face value of

5   the coupons, and that figure is itself a flawed product of unsupported assumptions and mere *de*

6   *minimis* investigation. *See* Memo. In Supp. Of Mot. For Award Of Att'y Fees (Dkt. No. 328-1), at 1

7   fn.3, 22 (using a completely unsupported $40 estimate for face value and assuring the Court that the

8   figure is "quite conservative"); Memo. In Supp. Of Pl.'s Mot. For Prelim. Approval Of Class Action

9   Settlement (Dkt. No. 310-1), at 7 fn.8 (estimating face value from "a recent internet search" of only

10  two airport locations).

11         These kind of calculations are "disingenuous," and it is surely within the ability of qualified

12  counsel to more accurately estimate the total gross value to be recovered by the class, or to

13  commission a competent expert to do so. *Walter v. Hughes Commc'ns, Inc.*, No. 09-2136 SC, 2011

14  WL 2650711, at *12–13 (N.D. Cal. July 6, 2011). As math teachers sometimes say, you must show

15  your work. Class Counsel have failed to do so, and without the underlying evidence the Court cannot

16  review this settlement in a way that would satisfy its fiduciary role to the class.

17         **c.   This Court Must Follow *Sobel v. Hertz* and Deny Final Settlement Approval
18              Where It Cannot Adequately Evaluate the Class Relief by Comparison to the
                 Value of Claims Surrendered**

19         The case before the Court is not without precedent. The same Defendants that appear here

20  previously negotiated a similar proposed settlement in the U.S. District Court for the District of

21  Nevada. That settlement was ultimately rejected in *Sobel v. Hertz Corporation*, No. 3:06-CV-00545-

22  LRH-RAM, 2011 WL 2559565 (D. Nev. June 27, 2011). The rejected settlement in *Sobel v. Hertz*

23  involved similar claims regarding the imposition of airport "concession recovery fees" by car rental

24  companies, and was even negotiated before the exact same neutral mediator, the Hon. Ronald

25  Sabraw (ret.) of JAMS. 2011 WL 25559565, at *1–2.

26         In *Sobel v. Hertz*, as here, the Court simply did not have enough information to evaluate and

27  approve the proposed settlement—and the only option in such situations is to deny final approval.

28

The *Sobel* court concluded "that the absence of evidence as to the actual value to the class of the coupons offered in settlement and the value of the claims surrendered precludes any finding that the settlement is fair, reasonable, and adequate under either Rule 23(e) or 28 U.S.C. § 1712(e)." *Id.* at *15. The Settling Parties must "provide such evidence in support of the settlement," and their failure to do so makes final approval impossible. *Id.*

## IV.   THE LIMITED INFORMATION BEFORE THE COURT SHOWS A FEE-DRIVEN SETTLEMENT, CERTAIN TO RESULT IN MINIMAL CLASS RECOVERY

Despite the lack of sufficient information to accurately gauge the fairness of the Proposed Settlement, there are some observations and assumptions which can be nevertheless be logically applied in order to gain a better understanding of the proposal before the Court. Observation of the settlement terms show that the Settling Parties have created a claims process that will ensure low actual class recovery, despite the fact that Class Counsel had all of the information necessary to negotiate for automatic payments to non-responding class members. And, applying certain logical assumptions and basic math to the settlement terms and to the limited information currently available shows that the Settling Parties have vastly overestimated the actual value of this settlement, and that the settlement would vastly overcompensate Class Counsel in comparison to the actual results they achieved. Considering the *Bluetooth* warning signs that are also contained in this Proposed Settlement, the result is an unfair settlement which cannot merit final approval.

### a.   The Proposed Settlement Is Structured so as to Discourage Class Participation and Ensure That Actual Class Recovery Will Be Minimal, Despite the Existence of an Obvious Solution

As the Settling Parties are doubtless aware, only a small fraction of the estimated four million class members are likely to claim any of the benefits this Proposed Settlement makes available. Average claims submission rates in class actions are "typically ten percent or less." *Walter v. Hughes Commc'ns, Inc.*, No. 09-2136 SC, 2011 WL 2650711, at *13 (N.D. Cal. July 6, 2011); *see also Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34, 52 (D. Me. 2005) (finding "'claims-made' settlements regularly yield response rates of 10 percent or less"). One academic review found that "[i]t is not unusual for only 10 or 15% of the class to bother filing claims." Christopher R. Leslie, *The*

*Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71, 119–20 (2007).

Examples of similarly low claims rates are legion. *See, e.g.*, *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 775–77 (N.D. Ohio 2010) (53,782 claims from 487,277 potential class members, an 11% claims rate); *Create-A-Card, Inc. v. Intuit, Inc.*, No. C 07-06452 WHA, 2009 WL 3073920, at *3 (N.D. Cal. Sept. 22, 2009) (1% claims rate); *In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 406 (D. Mass. 2008) (slightly more than 3% claims rate); *Yeagley v. Wells Fargo & Co.*, No. 05-03403, 2008 WL 171083, at *2 (N.D. Cal. Jan. 18, 2008) (less than 1% claims rate), *rev'd on other grounds*, 365 F. App'x 886 (9th Cir. 2010); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 370 F. Supp. 2d 320, 321 (D. Me. 2005) (2% claims rate); *Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34, 52 (D. Me. 2005) (19% claims rate); *Strong v. BellSouth Telecomms., Inc.*, 173 F.R.D. 167, 169 (W.D. La. 1997) (4.3% claims rate), *aff'd*, 137 F.3d 844 (5th Cir. 1998). Low claims rates are not a fluke within the class action system—they are endemic, and must be expected. If Class Counsel has any evidence that the claims rate here will be higher than the norm of approximately 10%, they should present it; until then, the Court should expect similarly low participation.

The probabilities at work are even slimmer for coupons like the proffered car rental vouchers here. In order to derive value from such vouchers, class members have to not only submit claims, but must further find a convenient time to use the *original* voucher (Stipulation of Settlement (Dkt. No. 310-2, Ex. A), at 12) within eighteen months (Stipulation of Settlement (Dkt. No. 310-2, Ex. A), at 12–13). For these and other reasons, coupon redemption rates are famously low. *See* 28 U.S.C. § 1711, note § 2(a)(3)(A). The rule of thumb is that a redemption rate for a coupon without a secondary market is between 1% and 3%. *See generally* James Tharn & Brian Blockovich, *Coupons and the Class Action Fairness Act*, 18 Geo. J. Legal Ethics 1443 (2005). Even that low redemption rate may be an overestimate. *See, e.g.*, Final Report on Settlement Claims and Voucher Redemption, *Ford Explorer Cases*, J.C.C.P. Nos. 4366 & 4270 (Cal. Sup. Ct., Mar. 11, 2010) (only 148 coupon claimants out of a million-member class, creating a redemption rate of less than one-fifth of 1%).

These participation and redemption rates are simply inexcusable when Class Counsel had an obvious method of ensuring widespread class recovery, which they inexplicably chose to ignore. Class Counsel has obtained, through discovery, information about class members "based on the Rental Car Defendants' rental transaction databases produced in this Litigation from data kept in the ordinary course of business." Stipulation of Settlement (Dkt. No. 310-2, Ex. A), at 16. This information is being treated by the Settling Parties as wholly reliable—it is used to pre-populate claim forms on the settlement website. *See id.* This information is so reliable that the Settling Parties have assured the Court that "[c]lass members who do not disagree with the data contained in the Rental Car Defendants' databases *have no obligation to submit any documentation* in support of their claims." Memo. Of Points And Authorities In Supp. Of Pl.'s Mot. For Prelim. Approval Of Class Action Settlement (Dkt. No. 310-1), at 6 (emphasis added). Yet, inexplicably, class members who do not "click a box indicating their election" will receive absolutely no value. *Id.* While affording class members the ability to choose the form of their relief during the claims process may be a benefit in the abstract, the true distinguishing feature of the "election period" that the Settling Parties have devised is that it will unnecessarily prevent millions of class members from receiving any relief.

The fact that class members must "click a box" in order to receive any benefits whatsoever is inexcusable in the face of the obvious alternative: Class Counsel could have negotiated for class members to receive one option automatically if no specific option had been elected by the end of the claims period. All of the information necessary to send checks for the appropriate amount of money to the vast majority of non-responding class members is available to the Settling Parties and the claims administrator, and the Settling Parties have admitted as much. Automatic payments need not affect the ability of class members to choose the form of their relief; class members could still be given a time period in which to elect an alternative option. And even if some percentage of automatically-sent checks did not reach the actual non-responding class members or were not cashed, the result would still be a vast improvement in actual class recovery over the current Proposed Settlement.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The fact that Class Counsel either did not think of this option or did not negotiate strongly for its inclusion in the Proposed Settlement does not speak well of the value of their representation. It shows a failure "to give adequate thought to matters such as how the class members may best be reached or what benefits may most be appreciated." *In re TJX*, 584 F. Supp. 2d at 406. It creates the appearance that Class Counsel "lost sight of their fiduciary duties to the Class while still managing to protect their own pecuniary interests." *Sylvester*, 369 F. Supp. 2d at 48. Class Counsel has ignored the probability of low class recovery, as in "the age-old adage, '[y]ou can lead a horse to water, but you can't make him drink.'" *Id.* at 49. However, it is the responsibility of Class Counsel "to ensure that the settlement provides real value (or, to extend the metaphor of the just quoted aphorism, 'actual drinks') to their . . . clients." *Id.* at 49. The Court can and should insist that Class Counsel "does everything in their power" to accomplish this "by, for example, verifying the horse can see the water, choosing clear, fresh and cold water so that the horse is given the utmost incentive to drink, and making sure there are no obstacles in the horse's path." *In re TJX*, 584 F. Supp. 2d at 410. In this case, Class Counsel literally had the ability to "make the horse drink"—but inexplicably chose not to do so. The Settling Parties instead would place an unnecessary stumbling block "in the horse's path," ensuring that only about 10% of class members will receive any relief.

The "Pocket Guide for Judges" on adjudicating class actions published by the Federal Judicial Center cautions judges to carefully consider whether Class Counsel has sufficiently represented the interests of the silent class members in negotiating a settlement with Defendants— particularly where, as here, the claims process serves literally no purpose but to ensure that many silent class members will receive no compensation whatsoever. "First, consider whether a claims process is necessary at all. The defendant may already have the data it needs to automatically pay the claims of at least a portion of class members who do not opt out." Barbara J. Rothstein & Thomas E. Willging, Managing Class Action Litigation: A Pocket Guide for Judges 30 (3d ed. 2010). In this case, the Settling Parties admit that they have all the data they need to automatically pay claims to class members, but Class Counsel did not insist that it be used to ensure compensation. There is no reasonable explanation for this failure of representation, and the Court should not allow it to be

16

explained away as a mere artifact of negotiation—especially not in the context of the *Bluetooth* warning signs of collusion.

### b. Based on the Limited Information the Settling Parties Have Supplied, the Best Inference Is that Class Counsel Has Vastly Overpaid Itself and Vastly Overestimated this Proposed Settlement's Real Value

> [T]he inherent nature of a claims-made reversionary fund settlement is that the settlement can have the potential to provide fair and adequate compensation to the class and yet in practice yield an actual settlement that is inadequate.

*Sylvester*, 369 F. Supp. 2d at 53 (D. Me. 2005). Of course, this is not a "reversionary fund" settlement—this "claims-made" settlement is worse, since there is *no common fund* that will be established in the first place, and Defendants will keep their money unless and until class members claim it. Thus, the Court should carefully consider the likely outcome of approval, and the likely actual value that the class will receive in evaluating the fairness of this Proposed Settlement. In this Section, the Objector will attempt to perform some basic calculations to determine the true settlement value, and compare it to the attorney fee request.

Unlike the documents filed with this Court by the Settling Parties, the assumptions this brief makes are transparent, and the calculations it provides are simple. *First*, there are approximately 3,448,968 unique class members. *See* Decl. of Jonathan Carameros Re: Notice Procedures (Dkt. No. 328-7), at 2–4, ¶¶ 4, 16, 28. *Second*, generously ignoring the fact that class members making claims must *choose* between vouchers and cash, a reasonable estimate is that 10% of the class will claim cash and 1% of the class will actually redeem vouchers. *See supra* Part V.a. Thus, under these assumptions, approximately 344,897 class members might claim cash, and approximately 34,489 class members might redeem car rental vouchers.

The Settling Parties have only provided figures premised on the impossible assumption that 100% of class members will participate in the settlement and claim benefits. Thus, they say, the total amount "*made available*" in cash payments is $42,880,872 (taking into account those class members eligible for the $5 minimum), and the total number of free days of rental car time and mileage available are 4,125,159 (taking into account those class members eligible for two vouchers). *See*

17

Decl. of Jonathan Carameros Re: Notice Procedures (Dkt. No. 328-7), at 4–5, ¶ 28. Dividing each of these figures by the 3,448,968 unique class members shows that the average (mean) class member is eligible for a cash payment of $12.43, or a car rental voucher good for 1.19 days.

The true value of the car rental coupon is indeterminate—Class Counsel assumes, without evidence, that the average *face value* of the voucher is approximately $40, but, of course, in-kind compensation is worth less than the face value amount in cash. The Court should require more extensive supporting documentation for a true estimate of car rental coupon value, as there is no such evidence on the record to date, but the Objector is necessarily limited to working with the same numbers available to the Court at present. An alternative calculation for the true value of the car rental coupons derives from *Sobel v. Hertz*: "If Defendants are not willing to agree to any cash settlement but they are willing to issue $10 and $20 coupons, perhaps the actual value of the coupons is nothing at all." 2011 WL 2559565, at *12. Similarly, and by analogy, if the Defendants are willing to agree to cash payments of, on average, $12.43, and are also willing to issue indeterminate-value car rental coupons with extreme use restrictions, then perhaps the actual value of the car rental coupons is, on average, $12.43. Unless and until Class Counsel provide a better-supported estimate of the actual value of the car rental vouchers, $12.43 must suffice as a reasonable estimate.

Therefore, approximately 344,897 class members (10% of the class) might claim $12.43 each in cash, and approximately 34,489 class members (1% of the class) might redeem car rental coupons with an average actual value of about $12.43. This would give a *total actual recovered value* to the class members of $4,715,767.98.

Class Counsel notes that the cost of administration is estimated at $1.6 million, and their own fee request totals $5.87 million. *See* Memo. In Supp. Of Mot. For Att'y Fees (Dkt. No. 328-1), at 22. Thus, the *total actual benefit* to the class members, including attorney fees and administration costs, would be $12,185,767.98—approximately $12.19 million.

Class Counsel's attorney fee request of $5.87 million therefore is actually *greater* than the total actual value the class is likely to recover directly (about $4.7 million). Further, Class Counsel's attorney fee request represents slightly *more than 48%* of the total actual class benefit—far above

18

and beyond the normal Ninth Circuit benchmark of 25%. *See Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).[2]

While it may be true that Class Counsel's fee request is based on their total hours worked, "[g]iving undue weight to class counsel's lodestar calculation would only encourage work that did not benefit the class." *In re Classmates.com Consol. Litig.*, No. C09-45RAJ, 2012 WL 3854501, at *6 (W.D. Wash. June 15, 2012). It is not enough for settlement approval that the Proposed Settlement achieves "at least minimal benefit;" rather, the Court must inquire specifically into whether there is any "clear explanation of why the disproportionate fee is justified and does not betray the class's interests." *In re Bluetooth*, 654 F.3d at 944–45 (vacating settlement approval order where lodestar-calculated attorney fee award constituted 37.2% of total class benefit). Combined with the three *Bluetooth* warning signs present in this Proposed Settlement, the disproportionate distribution of benefits points toward collusion and makes final approval impossible. *See* 654 F.3d at 947. "[T]he likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have been obtained." *Id.* (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003)).

These calculations are not just matters of law. They are matters of simple math, and they imply three things. First, they make certain assumptions about class claims rates, coupon redemption rates, and coupon values—assumptions which are only necessary due to the absence of transparency from the Settling Parties on these matters. Second, if the above assumptions are anywhere in the ballpark, class counsel is asking this Court to approve a payment that amounts to *nearly half* of the total value of the settlement, nearly double the benchmark of *Six Mexican Workers*. Third, assuming that the 3,448,968 class members will in fact receive a total actual benefit of about $12.19 million from the Proposed Settlement, this means that each class member is receiving, on average, a grand

---

[2] The 25% benchmark is with reference to a common fund. As the Objector points out elsewhere, however, there is no true "common fund" to be found in this settlement—it is strictly a claims-made settlement which does not require Defendants to set *any* funds aside until claims are actually made. Therefore, for the purposes of evaluation, this brief's calculation of *total actual benefit* to the class is much closer to the definition of a "common fund" than Class Counsel's 100% claims-rate estimates.

19

total of approximately $3.53 per capita. While these calculations are rough assumptions, they nonetheless reveal much more about the "real value to the class members" of this Proposed Settlement than anything the Settling Parties have yet filed. The Court should certainly investigate whether the average class member is being undercompensated (which would make the settlement inadequate), or, alternatively, whether the chance of success in the courtroom is equivalently low (which would make the settlement unreasonable)—but regardless, the overpayment to Class Counsel in relation to the total actual class benefit certainly makes the settlement unfair. This Court, under Rule 23(e), should not approve it.

## V.   THE ATTORNEY FEES REQUESTED ARE EXCESSIVE

Considering the basic, rough calculations by the Objector, it appears that Class Counsel has negotiated a fee award for themselves which constitutes an unconscionable percentage of the total actual benefit to the class, and which is—stunningly—greater than the total actual value class members would recover directly from Defendants in cash or coupons. However, Class Counsel insists that its $5.87 million fee request is justified by their lodestar calculation, and argues that the reasonableness of that figure should be judged by its relation to the total *potential* class recovery—a fictitious common fund, in a case with no true common fund at all. Class Counsel would thus have this Court completely disregard the actual value that Class Counsel's representation will gain for the class. While the Objector strongly believes that the best result for the class would be for the entire unfair Proposed Settlement to be rejected (and renegotiated), in the event that the Court does give final approval, the Objector urges the Court in the alternative to disregard Class Counsel's self-serving calculations and reduce the fee award in proportion to the actual benefit to the class.

### a.   This Court Is Not Required to Use Class Counsel's Fictitious Common Fund Estimate to Gauge the Reasonableness of the Fee Request

Class Counsel argues that their lodestar fees should be cross-checked only against the potential class recovery—the amount which the class would recover if an unrealistic 100% of class members completed the claims process—and not against the actual class recovery, supported by credible estimates or evidence of actual claims made. Class Counsel goes so far as to claim that it would be "an abuse of discretion" for the Court to consider the likely or actual class recovery,

20

relying solely on *Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997), and *Stern v. Gamballo*, Nos. 10-56929, 10-57062, 2012 WL 1744453, at *1 (9th Cir. May 17, 2012). Class Counsel has wholly misstated the governing law, and their argument should be rejected in favor of a cross-check against actual, or at least likely, class recovery.

*Williams v. MGM-Pathe* was strictly a common-fund case, in which the defendants were required by the terms of the settlement to pay the full amount of the common fund into escrow upon approval. *See* 129 F.3d at 1027. Thus, a true common fund existed in *Williams*, and so even though it represented only the total value of possible claims and some portion of it may have later reverted to defendants, the fact that it had been *actually paid* out by the defendants made the Ninth Circuit's ruling unsurprising. Furthermore, the *Williams* defendants "knew, because it was in the settlement agreement, that the class attorneys would seek to recover fees based on the entire $4.5 million fund." *Id.*

The Proposed Settlement before this Court simply could not be more different than the one at issue in *Williams*. This Proposed Settlement is strictly a claims-made settlement, and thus no money will be paid into any common fund unless and until actual claims are made by class members. Furthermore, there is absolutely no attempt to quantify or even estimate the value of any "fund" in the settlement agreement here. Therefore, unlike in *Williams*, the only reasonable way to quantify the value of this settlement is by reference to evidence, or at least estimates, of actual claims against the Defendants.

It is true that a very small number of courts within this Circuit have chosen to cross-check based on potential, rather than actual recovery. *See Browning v. Yahoo!, Inc.*, No. C04-01463, 2007 WL 4105971, at *14 n.19 (N.D. Cal. Nov. 16, 2007) (distinguishing *Williams* as a common fund case, but nevertheless finding total potential recovery figure sufficient for cross-check); *Young v. Polo Retail*, No. C-02-4546, 2007 WL 951821, at *8 (N.D. Cal. Mar. 28, 2007) (applying *Williams* in a true common fund case, despite noting that the disparity between actual class recovery and the attorney fee award "gives the court pause"). And, while the unpublished *Stern v. Gambello* does indicate that the Ninth Circuit does not consider it an abuse of discretion to cross-check fees against

total potential recovery rather than actual claims made, *Stern* presented a fact pattern equally as remote from the present action as *Williams*. The settlement at issue in the *Stern II* appeal was strictly cash—not an unknown mix of cash and vouchers. *See* 2012 WL 1744453, at *1; Order Granting Final Approval To The UCC Settlement And Entering Final Judgment at 6, *Stern v. New Cingular Wireless Servs., Inc.*, No. SACV 09-1112-CAS (AGRx) (C.D. Cal. Nov. 22, 2010) (Dkt. No. 81) (detailing settlement benefits as a check in the amount of $7 for each claim).

This Court should instead follow the vast majority of courts within this Circuit that have distinguished *Williams* and its successors as strictly limited to common fund cases, and should judge the reasonableness of any attorney fee award in this case by reference to actual class recovery. *See, e.g.*, *Tarlecki v. Bebe Stores, Inc.*, No. C 05-1777 MHP, 2009 WL 3720872, at *3 (N.D. Cal. Nov. 3, 2009) (reducing fees that would have amounted to 86.2% of actual class recovery and distinguishing *Williams* as "a common fund case"); *Fleury v. Richemont N. Am., Inc.*, No. C-05-4525 EMC, 2008 WL 3287154 (N.D. Cal. Apr. 11, 2008) (acknowledging the settling parties' citation of *Williams* but distinguishing the case before the court as "at the very least, not a traditional common fund case"); *Yeagley v. Wells Fargo & Co.*, No. 05-03403, 2008 WL 171083, at *6 (N.D. Cal. Jan. 18, 2008) (rejecting counsel's argument that *Williams* required the court to "adopt the fiction" of an inflated common fund), *rev'd on other grounds*, 365 F. App'x 886 (9th Cir. 2010) (holding no true common fund existed); *see also True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1077 (C.D. Cal. 2010) ("The lodestar amount is particularly inappropriate where, as here, the benefit achieved for the class is small and the lodestar amount large."); *Create-A-Card, Inc. v. Intuit, Inc.*, No. C07-06452 WHA, 2009 WL 3073920, at *3 (N.D. Cal. Sept. 22, 2009) (adjusting lodestar downward based on limited actual class recovery); *cf. Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 852 (5th Cir. 1998) (concluding that the case was not a traditional common fund case because no money was paid into escrow or any other account, and the settlement agreement did not establish or estimate the defendant's total liability).

22

### b.  Linking Attorney Fee Awards to Actual Class Recovery Is Supported by Both Law and Public Policy

For the Court to tie attorney fees in a claims-made settlement to actual class recovery, using evidence or reasonable estimates, is indisputably good public policy. The Supreme Court ruling which *Williams* relied upon, *Boeing Co. v. Van Gemert*, expressly refrained from ruling on the question of whether its decision was applicable to circumstances in which a class action judgment required a defendant "to give security against all potential claims" rather than establish a common fund. 444 U.S. 472, 480 n.5, 100 S.Ct. 745 (1980) ("Nothing in the court's order made Boeing's liability . . . contingent upon the presentation of individual claims."). That unaddressed circumstance, of course, is directly analogous to the claims-made settlement before the Court now. Justice O'Connor later cautioned of "several troubling consequences" from failing to require "some rational connection between the fee award and the amount of the actual distribution to the class." *Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223, 1223, 120 S.Ct. 2237 (2000) (O'Connor, J., writing on denial of writ of certiorari).

Many other courts have embraced this linkage between fees and actual results as beneficial to the public. *See, e.g.*, *Parker v. Time Warner Entm't Co.*, 631 F. Supp. 2d 242, 274 (E.D.N.Y. 2009) ("As a matter of public policy, it would be unseemly for the rewards to Class Counsel to exceed those to Class Members, the ones for whom the litigation is ostensibly contested."); *Create-A-Card*, 2009 WL 3073920, at *4 ("Tethering fees (in part) to benefit will help guard against collusion in the general run of cases."); *In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395 (D. Mass 2008) ("[T]ying the award of attorneys' fees to claims made by class members . . . . will drive class counsel to devise ways to improve how class action suits and settlements operate."); *Yeagley*, 2008 WL 171083 at *9 (N.D. Cal. Jan. 18, 2008) ("To award class counsel the same fee regardless of the claim participation rate . . . would reduce the incentive in future cases for class counsel to create a settlement which actually addresses the needs of the class."), *rev'd on other grounds*, 365 F. App'x 886 (9th Cir. 2010).

23

1

2

   c.   **The Class Action Fairness Act of 2005 Prohibits the Court from using Class Counsel's Fictitious Common Fund Estimate to Gauge the Reasonableness of the Fee Request**

3

4   Even beyond the case law and public policy reasons in favor of tying reasonable attorney fees

5   to actual class recovery, the fact that this Proposed Settlement involves coupons makes such a

6   linkage necessary under federal law. CAFA requires that any award of attorneys' fees attributable to

7   the value of coupons "*shall be* based on the value to class members of the coupons that *are*

8   *redeemed*." 28 U.S.C. § 1712(a) (emphasis added). This narrow focus on the actual value of

9   redeemed coupons is mandated even where other forms of relief are proffered in addition to coupons.

10  *See* 28 U.S.C. § 1712(c) (requiring that where mixed relief is awarded, including both coupons and

11  equitable relief, the portion of any attorneys' fees attributable to the value from coupons must still be

12  calculated according to § 1712(a)). It is not enough merely to know the total value of coupons that

13  could be issued, nor is it even sufficient to know the total number of class members who have

14  submitted claims. "Determining the precise value to the class of the rare beneficial coupon settlement

15  . . . calls for hard data on class members' redemption of the coupons." Barbara J. Rothstein &

16  Thomas E. Willging, Managing Class Action Litigation: A Pocket Guide for Judges 18 (3d ed.

17  2010); *see also True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1073–75 (C.D. Cal. 2010)

18  (requiring, criticizing, and ultimately rejecting expert testimony on the actual value and likely

    utilization rate of settlement coupons).

19  While it is true that Class Counsel's fee request is based primarily on their hours worked, the

20  foremost consideration in determining the reasonableness of a lodestar figure should be "the benefit

21  obtained for the class." *In re Bluetooth*, 654 F.3d at 942 (citing *Hensley v. Eckerhart*, 461 U.S. 424,

22  434–36, 103 S.Ct. 1933 (1983)). Even in non-CAFA cases strictly involving cash compensation, this

23  means that a cross-check should consider "the benefit *actually conferred*" on the class through

24  claims. *Create-A-Card, Inc. v. Intuit, Inc.*, No. C 07-06452 WHA, 2009 WL 3073920, at *3 (N.D.

25  Cal. Sept. 22, 2009) (applying negative multiplier to lodestar fee award based on low claims rate).

26  Therefore, in CAFA cases like this one, where Congress has mandated that attorney fees be based on

27  actual coupon redemption, it would be beyond illogical to ignore actual coupon value and actual

28

redemption rates when cross-checking Class Counsel's lodestar figure. Class Counsel's suggestion that the Court use its inflated 100% redemption-rate figures—and those figures themselves—should therefore be entirely rejected.

## CONCLUSION

The Settling Parties have failed to carry their burden to prove that the settlement before the court is fair, adequate, and reasonable. The settlement shows all of the *Bluetooth* warning signs specified by the Ninth Circuit, yet the Settling Parties have failed to give any of the information the Court needs to even begin an inquiry into the settlement's fairness. The Objector's previous attempts to contact Class Counsel in good faith in order to resolve these problems have been met with intimidation and outright threats. *See* Exhibits A, B, C & D. The Objector plans to move the Court for limited discovery, in order to ensure that this settlement may be reviewed in the light of day. Such discovery would be eminently reasonable under Ninth Circuit standards where, as here, the multiple *Bluetooth* indicia of collusion require close review.

However, the Objector must presently judge the settlement by the filings and figures available. Based on a rough calculation, derived from the information Class Counsel has provided and several reasonable assumptions, it appears that nearly half of the settlement value would go to Class Counsel. Both this inherently unfair distribution and the present lack of information supporting the settlement require that it be rejected. Should the Court nevertheless approve the settlement, it must follow the wealth of case law, public policy, and 28 U.S.C. § 1712, all of which support the consideration of the *actual*—rather than *potential*—value of this settlement to the class in cross-checking an attorney fee award.

Respectfully Submitted,

**DATED: October 1, 2012**

By: _____/s/  Brett L. Gibbs, Esq._____

Brett L. Gibbs, Esq. (SBN 251000)
38 Miller Avenue, #263
Mill Valley, CA 94941
415-325-5900
*Attorney for Objector, Gordon Hansmeier*

25

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on **March 13, 2012**, all individuals of record who are deemed to have consented to electronic service are being served a true and correct copy of the foregoing document using the Court's ECF system.


/s Brett Gibbs