1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   MICHAEL SHAMES, individually and on          CASE NO. 07-CV-2174-MMA(WMC)
     behalf of others similarly situated, and,

12                                                 **ORDER ON FINAL APPROVAL**
     GARY GRAMKOW, individually and on             **OF CLASS ACTION SETTLEMENT,**
13   behalf of others similarly situated,          **ATTORNEYS' FEES, COSTS, AND**
                                                   **INCENTIVE AWARD;**
14                            Plaintiffs,
                                                   **JUDGMENT AND DISMISSAL**
15
                  vs.                              [Doc. Nos. 327 & 328]
16
     HERTZ CORPORATION, *et al.*,
17
                            Defendants.
18        On October 29, 2012, this matter came before the Court on Plaintiffs' Motion for Final

19   Approval of Class Settlement, [Doc. No. 327], and Motion for Attorney Fees, Reimbursement of

20   Expenses, and Incentive Award [Doc. No. 328].[1]  For the reasons explained below, the Court

21   **GRANTS** Plaintiffs' motions in their entirety.

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   ─────────────────

28        [1] All page citations to documents filed on the Court's docket refer to the documents' renumbered
     CM/ECF pages, not to their native pagination.

                                          - 1 -                                    07CV2174

# I. BACKGROUND

## A.    Class Action Allegations[2]

A "nonprofit mutual benefit corporation" created by state legislation in order to expand and develop California's tourism industry, the California Travel and Tourism Commission (the "Commission") is governed by thirty-seven commissioners, who simultaneously serve as directors.[3] The Secretary of the Business, Transportation and Housing Agency chairs the Commission.  Twelve commissioners are appointed by the governor, while the remaining twenty-four are elected by the tourism industry itself.

In 2006, the passenger rental car industry (hereafter, the "Rental Car Defendants") proposed changes to California law which were subsequently enacted.  Under these changes, the passenger rental car industry became the fifth tourism industry category under the Commission scheme and agreed to pay a high assessment fee, greatly increasing the Commission's budget.  In exchange for this increased funding, the Rental Car Defendants were allowed to "unbundle" fees charged to customers and itemize such fees separately from the base rental rate.  Significantly, the adopted changes allowed the companies to "pass on some or all of the assessment to customers."

Plaintiffs allege this led to the imposition of two specific fees on leisure rental car customers. First, pursuant to an agreement between the Rental Car Defendants and the Commission, a 2.5% tourism assessment fee was added to the cost of a car rental which, in turn, helped fund the Commission.  Plaintiffs allege that the Commission then colluded with the Rental Car Defendants, fixing rental car prices by passing on the 2.5% tourism assessment fee to customers.  Second, the Rental Car Defendants "unbundled" the already-existing airport concession fee charged to customers to pay airports for the right to conduct business on airport premises; this fee has traditionally

---

[2]  With minor alterations and omissions of citations, the following section is a near-verbatim reproduction of the Ninth Circuit's well-written summary of this case. *Shames v. Cal. Travel & Tourism Comm'n*, 626 F.3d 1079, 1081-82 (9th Cir. 2010).

[3]  The tourism industry is represented by five industry categories, one of which is the passenger rental car industry, which was added in 2006.  Each category is allotted a number of commission seats based on the weighted percentage of assessments paid to the Commission by that category.  Unlike the other categories, the passenger rental car industry is specifically limited to six commission seats regardless of the percentage of assessments paid to the Commission.

amounted to 9% of the rental price.  The bill permitted the Rental Car Defendants to charge this concession fee separately from the base rental rate.  According to Plaintiffs, the Commission also colluded with the passenger rental car industry in passing the 9% concession fee on to customers as an uniform add-on charge.  Plaintiffs allege that these agreements between the rental car companies and the Commission constituted pricefixing of rental car rates in violation of the Sherman Act section 1.  Plaintiffs also claim the Commission committed a host of Bagley-Keene Open Meeting Act violations, specifically, failing to adhere to detailed notice requirements and impermissibly holding closed session meetings.

Plaintiffs allege that, as a result of the Rental Car Defendants' collusion, they and similarly situated renters in the proposed settlement class paid a higher total price for the rental of a car at California airports than they would have otherwise.  Plaintiffs sought damages on behalf of themselves and the class.

**B.      Procedural History**

Plaintiffs originally filed suit on November 14, 2007.  After several extensions of time to file responsive pleadings, the Rental Car Defendants filed a motion to dismiss in January 2008.  The Commission and a now-dismissed individual defendant filed motions to dismiss shortly thereafter.  On April 8, 2008, the Court granted all three motions to dismiss, denied a pending motion for preliminary injunction, and granted Plaintiffs leave to amend their Complaint.

On May 1, 2008, Plaintiffs filed a First Amended Complaint.  Thereafter, all Defendants filed a second round of motions to dismiss.  On July 28, 2008, the Court granted the Commission's motion to dismiss and entered judgment in its favor on September 24, 2008.  The Rental Car Defendants answered the First Amended Complaint on August 25, 2008.  On October 23, 2008, Plaintiffs appealed the Commission's dismissal.

On November 2, 2008, the case was transferred to the undersigned's caseload.

On January 18, 2011, after extensive briefing, oral argument, and a petition for rehearing, the Ninth Circuit reversed the dismissal and reinstated the Commission in this case.  In the meantime, the remaining parties participated in settlement discussions with the assigned Magistrate Judge, met and conferred to coordinate discovery among related cases, drafted multiple discovery plans, and

1    participated in scheduling and status conferences with the Court.

2           Moreover, the parties conducted *extensive* discovery, including multiple rounds of written

3    discovery; the production, organization, and review of 737,000 pages of documents; 27 witness

4    depositions across the country; 17 third-party subpoenas resulting in the production of 1,200

5    documents; and devotion of 1,932 hours of expert witness time by Plaintiffs alone.

6           Once the Commission re-entered the case, the parties continued litigation, participating in

7    additional status conferences, discovery conferences, and six private mediation sessions with Judge

8    Ronald M. Sabraw (ret.).

9           On October 10, 2011, the Court granted a stay of all proceedings to facilitate the parties'

10   settlement efforts.  The Court extended the stay several times until the parties moved for preliminary

11   approval of class settlement on May 17, 2012.

12          This matter is now before the Court on final approval of the settlement, award of attorneys'

13   fees and costs, and approval of a class representative incentive award.  On October 29, 2012, the

14   Court held a hearing on Plaintiffs' pending motions.  Professor Robert Fellmeth and attorneys

15   Dennis Stewart and Donald Rez appeared and argued on behalf of Plaintiffs.  Attorney Michael

16   Tubach, accompanied by several other attorneys, appeared and argued on behalf of all Rental Car

17   Defendants.  Objector Stephen Hagen appeared and argued on his own behalf, and attorney Steven

18   Miller appeared and argued on behalf of Objector Steven Signer.

19   **C.      The Settlement**

20          **1.      Settlement Class**

21          The settlement class is comprised of all Persons (other than those Persons who timely and

22   validly request exclusion from the Class) who rented a car directly from a Rental Car Defendant for

23   pick-up at a California Airport Location during the period from January 1, 2007 through November

24   14, 2007, and were charged and paid to the Rental Car Defendant an Airport Concession Fee,

25   Tourism Commission Assessment Fee, or both, for that rental car as a separate line item or items on

26   their invoices.

27          Excluded from the Class are:  (i) rentals made pursuant to a pre-existing agreement between

28   a business or governmental entity and a Rental Car Defendant pursuant to which the rental charge

was determined; and (ii) rentals in which the customer paid a package price to a third party tour operator or on-line booking agency rather than a Rental Car Defendant.  Also excluded from the Class are the Defendants, the directors, officers, subsidiaries, and affiliates of Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest, and the legal representatives, affiliates, heirs, successors-in-interest or assigns of any such excluded person, and Related Parties as well as any judges or mediators involved in the Litigation (including U.S. District Judge Michael M. Anello, U.S. Magistrate Judge McCurine, and Judge Ronald Sabraw (ret.)).

### 2.    Settlement Terms

The settlement allows class members to choose from one of two payment options:

(1) <u>Cash Option</u>.  Class members may choose to receive cash in the amount of *$2.00 per rental day* with a *minimum payment of $5*, no matter the length of the rental.  For example, a class member who had a total of 10 rental days can choose to receive $20 cash.  A class member who rented for only 1 day may choose to receive $5.

(2) <u>Voucher Option</u>.  Class members who rented for a total of *less than 8 days* during the class period may choose a voucher for *one free rental day* (time and mileage) on any class of car up to full size, no matter what class of car the class member originally rented.

Class members who rented for a total of *more than 8 days* during the class period may choose a voucher for *two free rental days* on any class of car.

The free rental day vouchers may be stacked and may be used with most other rate discounts and promotions otherwise available to renters.  The vouchers may be used at any company-owned location of the brand for which it is issued anywhere in the United States.[4]  They also may be used by anyone in the class member's household at the same address.  Defendants' obligation to issue and redeem vouchers and to pay all cash claims is uncapped.

Finally, the Commission has agreed, with no time limitation, to undertakings assuring future compliance with the Bagley-Keene Act and other measures designed to assure that:  (1) consumers

---

[4]  Avis and Budget renters may use the vouchers on either brand.

1   are correctly informed about the Tourism Commission Assessment; and (2) the Commission does

2   not facilitate concerted decision making by the Rental Car Defendants or by any other class of

3   assessed businesses on whether and how much to charge consumers for their respective Tourism

4   Commission Assessment obligations.

5          The sole class representative, Gary Gramkow, will receive an incentive award of $2,000.[5]

6          The parties have agreed that Defendants will not oppose Plaintiffs' motion for attorneys' fees

7   and costs, seeking a total of $5,870,000, which includes costs of $746,664.  The parties agreed that

8   any attorneys' fees and costs shall be paid separately from the settlement and shall not reduce the

9   benefits that accrue to the class.  The parties negotiated this fee and cost award separately and after

10  agreeing on the class settlement.  Judge Ronald Sabraw (ret.), who acted as the mediator for the

11  class settlement negotiations, also helped negotiate the fee and cost arrangement in a separate

12  mediation session.

13                        **II.   DISCUSSION**

14  **A.      Motion for Final Approval of Class Settlement**

15          **1.          Class Certification**

16          A plaintiff seeking a Rule 23(b)(3) class certification must first satisfy the prerequisites of

17  Rule 23(a).  Once subsection (a) is satisfied, the purported class must then fulfill the requirements of

18  Rule 23(b)(3).  In the present case, the Court previously preliminarily certified the following class:

19              [A]ll Persons (other than those Persons who timely and validly request exclusion
                from the Class) who rented a car directly from a Rental Car Defendant for pick up
20              at a California Airport Location during the period from January 1, 2007 through
                November 14, 2007, and were charged and paid to the Rental Car Defendant an
21              Airport Concession Fee, Tourism Commission Assessment Fee, or both, for that
                rental car as a separate line item or items on their invoices.
22

23          At that time, the Court concluded that the proposed class satisfied the numerosity,

24  commonality, typicality, and adequacy of representation requirements of Rule 23(a).  [*See* Doc. No.

25  313.]  The Court also found that the proposed class satisfied the predominance and superiority

26  requirements of Rule 23(b)(3).  The Court reaffirms its prior certification of the class for the purpose

27  _____

28          [5]  Plaintiff Michael Shames is the second named plaintiff, but not a class representative for
    incentive award purposes.

1    of settlement.  No party or class member has objected to certification of the settlement class.

2        **2.    The Settlement**

3            **a.    Legal Standard**

4        Courts require a higher standard of fairness when settlement takes place prior to formal class

5    certification to ensure class counsel and defendant have not colluded in settling the case.  *Hanlon v.*

6    *Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).  Ultimately, "[t]he court's intrusion upon what

7    is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be

8    limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of

9    fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken

10   as a whole, is fair, reasonable and adequate to all concerned."  *Officers for Justice v. Civil Serv.*

11   *Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).  "The question [the Court] address[es] is not whether

12   the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from

13   collusion."  *Hanlon*, 150 F.3d at 1027.

14       Courts considers several factors when determining whether a proposed settlement is "fair,

15   adequate and reasonable" under Rule 23(e).  Such factors may include:  "[1] the strength of the

16   plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the

17   risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5]

18   the extent of discovery completed and the stage of the proceedings; [6] the experience and views of

19   counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to

20   the proposed settlement."  *Hanlon*, 150 F.3d at 1026; *see also Lane v. Facebook, Inc.*, ___ F.3d ___,

21   2012 U.S. App. LEXIS 19767, at *10 (9th Cir. Sept. 20, 2012) (quoting *Hanlon*, 150 F.3d at 1026).

22       Judicial policy favors settlement in class actions and other complex litigation where

23   substantial resources can be conserved by avoiding the time, cost, and rigors of formal litigation.  *In*

24   *re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1387 (D. Ariz. 1989).

25

26

27

28

07CV2174

**b.** **Analysis**

**i.** **The strength of the case and the risk, expense, complexity and likely duration of further litigation**

To determine whether the proposed settlement is fair, reasonable, and adequate, the Court must balance against the risks of continued litigation (including the strengths and weaknesses of Plaintiffs' case), the benefits afforded to members of the Class, and the immediacy and certainty of a substantial recovery. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000). In other words,

> [t]he Court shall consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, "It has been held proper to take the bird in hand instead of a prospective flock in the bush."

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (citations omitted).

Here, Plaintiffs aver that the main challenge in proving their antitrust claim against the Rental Car Defendants at trial would be able to establish the existence of a conspiracy among the Rental Car Defendants, who "adamantly maintained that each company's decision to surcharge those fees on the effective date of the legislation permitting it was reached unilaterally, flowed naturally from their unilateral self-interest, and was not the product of any agreement among them." Although Plaintiffs were confident they had developed persuasive evidence which would support such a finding, "as in most antitrust conspiracy cases, the meaning and inferences to be drawn from such evidence here were hotly disputed. Defendants were prepared to put forth a broad interpretation of the summary judgment standard in antitrust cases and argue that the evidence upon which Plaintiffs relied was not sufficient to exclude the possibility that they acted independently."

Moreover, Plaintiffs explain that their case was complicated by Defendants' intention to argue that the "*Noerr-Pennington*" doctrine, which involves immunity for petitioning the government, shielded much of the evidence of meetings and communications among the Defendants. While Plaintiffs were confident they could ultimately distinguish the case at bar from the line of cases applying the *Noerr-Pennington* doctrine, their evaluation of the risks and strength of this case

1   nonetheless required taking into account the risk posed by this defense at summary judgment, trial,

2   and on appeal.

3   　　　　Finally, Plaintiffs faced obstacles in proving damages in this antitrust case, as Defendants

4   were prepared to argue that Plaintiffs could not prove damages even if they prevailed on the liability

5   issue.  Thus, even if Plaintiffs prevailed at trial on the liability issue, they would have faced a fight

6   to establish damages.

7   　　　　Plaintiffs' case was hardly a foregone victory that would have garnered a significantly more

8   favorable victory for the class at trial.  In his declaration, Judge Ronald M. Sabraw, a highly

9   experienced and well-respected retired trial judge and mediator, observed that, "[t]he mediation

10   sessions and materials submitted demonstrated that both parties faced significant risks and were

11   advancing sharply contrasting theories and views both on liability and damages.  It was readily

12   apparent that the matter, if litigated, would be highly contested by able counsel to an uncertain

13   result."  [Doc. No. 328-6 at ¶ 5.]  In sum, this case presented Plaintiffs myriad challenges, uncertain

14   prospects at trial, and the possibility that recovery for the class would not come immediately, if ever.

15   Indeed Judge Sabraw, a disinterested third party, describes the results achieved in this case as

16   "excellent . . . given the liability and damages risks [the parties] faced and with which [he] became

17   closely familiar with during the mediation."  Plaintiffs faced significant uncertainty and risk of non-

18   recovery at trial, making a pre-trial settlement a reasonable tactical choice.

19   　　　　　　　　　　**ii.**　　　　**The stage of the proceedings**

20   　　　　In the context of class action settlements, as long as the parties have sufficient information to

21   make an informed decision about settlement, "formal discovery is not a necessary ticket to the

22   bargaining table."  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (quoting

23   *In re Chicken Antitrust Litig.*, 669 F.2d 228, 241 (5th Cir. 1982)) (internal quotations omitted).

24   Here, the parties engaged in *extensive* formal and informal discovery, including 27 depositions by

25   Plaintiffs alone, *all* forms of written discovery, production and review of 737,000 pages of

26   documents, and third-party discovery.  The parties participated in a number of meet and confer

27   efforts and discovery conferences with the assigned Magistrate Judge.  Experts were hired and

28   consulted for a total of 1,932 hours by Plaintiffs' experts alone.  The parties left no stone unturned,

1    and utilized a multitude of discovery tools, in the discovery phase of this case.  Class counsel were

2    highly knowledgeable about the case and well-prepared for settlement discussions.

3                           **iii.        The settlement amount**

4             To assess whether the amount offered is fair, the Court may compare the settlement amount

5    to the parties' estimates of the maximum amount of damages recoverable in a successful litigation.

6    *In re Mego Fin. Corp. Sec. Litig*., 213 F.3d at 459.  While settlement amounts that are close to the

7    plaintiffs' estimate of damages provide strong support for approval of the settlement, settlement

8    offers that constitute only a fraction of the potential recovery do not preclude a court from finding

9    that the settlement offer is fair.  *Id.* (finding settlement amount constituting one-sixth of the potential

10   recovery was fair and adequate).  Thus, district courts have found that settlements for substantially

11   less than the plaintiffs' claimed damages may be fair and reasonable, especially when taking into

12   account the uncertainties involved with litigation.  *See, e.g.*, *Williams v. Costco Wholesale Corp*.,

13   2010 U.S. Dist. LEXIS 67731, at *9-*10 (S.D. Cal. July 7, 2010) (finding settlement amount

14   constituting approximately 75.6% of the plaintiffs' claimed losses from unpaid overtime pay to be

15   adequate); *Glass v. UBS Fin. Serv., Inc*., 2007 U.S. Dist. LEXIS 8476, at *13 (N.D. Cal. Jan. 26,

16   2007) (finding settlement of wage and hour class action for 25% to 35% of the claimed damages to

17   be reasonable).

18            Plaintiffs aver that each class member sustained approximately $3 in actual damages for each

19   day they rented Defendants' cars.[6]  When compared to the estimated actual damages, the $2 cash

20   option represents a recovery of at least 67% of actual damages.[7]  Moreover, a single-day voucher,

21   _____

22       [6] At the final approval hearing, class counsel explained that this estimated damage amount was
     determined by Plaintiffs' economics expert, Michael Harris, who conducted highly complex
23   econometrics studies and prepared an expert report that Plaintiffs did not disclose to Defendants.  While
     Plaintiffs did not disclose the details of the report, they used some of the general information–such as
24   the damages amount–to reach settlement during mediation sessions.  At the hearing, class counsel
     provided acceptable explanations for not providing the expert report to the Court.  Given that counsel
25   declares–subject to Rule 11–that their expert-determined damages are $3 per rental day, the Court finds
     the damages amount credible.  For their part, Defendants' expert valued damages at $0.18 per rental day.
26   Using $3 as the benchmark for purposes of this order actually raises the bar for reasonableness purposes,
     as a $2 recovery is several times higher than $0.18 and a fraction of $3.

27       [7] In some cases, the cash option provides class members more value than their actual damages.
28   Class members who claim only one rental day receive a minimum of $5.  For these class members, the
                                                                                    (continued...)

07CV2174

the value of which can range from $40 to more than $100, represents a minimum of 1,333% value *above* actual damages.[8] Thus, while the cash option compensates each class member for nearly all of–or slightly more than–his or her actual damages, the voucher option compensates each class member for much more than actual damages.  Objectors' beliefs to the contrary notwithstanding, the Court finds that the rental vouchers provide real value to class members who choose that payment option.  The settlement amount is fair and reasonable in light of actual damages.

> **iv.** **Whether the class has been fairly and adequately represented during settlement negotiations**

Counsel who represented the class included attorneys from three separate law firms and the University of San Diego School of Law's Center for Public Interest Law.  Counsel were all individually and as a group experienced in antitrust and class actions.  The lead attorneys at each of the three law firms and the Center for Public Interest Law all have over 30 years of antitrust, class action, and public interest law experience.  Their experience includes the litigation of antitrust and class action cases through trial and appeal.  The class was more than adequately represented by experienced and competent counsel.  As such, their support of the settlement should be accorded significant consideration.  *See, e.g.*, *Nat'l Rural Telcoms Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation. This is because parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation.") (internal quotation marks and citations omitted).

---

[7](...continued)
cash option represents approximately 167% of their actual damages.  Class members who claim 2 rental days will receive 133% of their damages.

[8] At the hearing, counsel for both sides credibly noted that future rental rates are not amenable to precise determination.  Rates vary based on market conditions, season, and the locations of the specific rental facilities throughout the United States.  However, there is no need for exact future rental values so long as the Court can reasonably value the settlement using reasonable voucher values.  The values the parties have proposed are reasonable.  The rental vouchers continue to provide class members a substantial value even based on Objector Hansmeier's lower rental prices.  [*See* Doc. No. 352-1 at 3 (citing full size car rental prices ranging from $18.40 to $53.49.]  On the low end of Objector Hansmeier's range, a voucher for a $18.40 rental day still provides a class member many times the value of his or her estimated actual damages.  The same is true for the rates Objector Hansmeier cites of weekend car rentals.  [*See id.* at 5-6 (citing weekend prices ranging from $16.26 to 27.49).]

1     Moreover, counsel represented the class fairly during settlement negotiations.  Class counsel

2   did not capitulate early in the litigation process and accept a mediocre settlement for the class to

3   save themselves time, effort, and money.  Rather, they vigilantly advocated for the class throughout

4   this case and during settlement talks, as evidenced in part by *six* separate day-long mediation

5   sessions in addition to a settlement conference with the assigned Magistrate Judge.  The sheer

6   number of mediation sessions alone demonstrates class counsel's dedication to the class.  Moreover,

7   Judge Sabraw attests that the settlement negotiations he witnessed first-hand "were vigorous,

8   contentious and arms-length."  [Doc. No. 328-6 at ¶ 6.]

9     The Court finds that the class has been fairly and adequately represented during settlement

10   discussions.

11                    **v.      The reaction of the class to the proposed settlement**

12     The Ninth Circuit has held that the number of class members who object to a proposed

13   settlement is a factor the Court may consider in its settlement approval analysis.  *Mandujano v.*

14   *Basic Vegetable Prods. Inc.*, 541 F.2d 832, 837 (9th Cir. 1976).  The absence of a large number of

15   objectors supports the fairness, reasonableness, and adequacy of the settlement.  *See In re Austrian*

16   *& German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 175 (S.D.N.Y. 2000) ("If only a small

17   number of objections are received, that fact can be viewed as indicative of the adequacy of the

18   settlement.") (citations omitted); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979)

19   (finding "persuasive" the fact that 84% of the class has filed no opposition).  Here, class notice was

20   mailed to approximately 3.5 million potential class members.  Of the nearly 3.5 million class

21   members, only 143 class members opted out of the class as of September 6, 2012.  Moreover, the

22   Court received only 9 formal objections (by 12 total objectors) to the settlement agreement,

23   attorneys' fees request, or both.  The small number of objections and class members who opted out

24   of the settlement, when compared to the large number of class members, favors approval.  *Nat'l*

25   *Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004); *see also Ko v.*

26   *Natura Pet Prods.*, 2012 U.S. Dist. LEXIS 128615, at *15-*16 (N.D. Cal. Sept. 10, 2012); *Collado*

27   *v. Toyota Motor Sales, U.S.A., Inc.*, 2011 U.S. Dist. LEXIS 133572, at *6-*7 (C.D. Cal. Oct. 17,

28

2011); *Wren v. RGIS Inventory Specialists*, 2011 U.S. Dist. LEXIS 38667, at *33 (N.D. Cal. Apr. 1, 2011).

The Court next addresses the concerns of each objector.

### a.   Objections by Lawrence W. Stover, Jr.

Objector Lawrence W. Stover Jr. objects to the amount of attorneys' fees.  [Doc. No. 322 ("This amount is outrageous.  My understanding is that the plaintiffs lost the case and the defendants are only settling to be rid of a nuisance.").]  To the extent that Mr. Stover's objection is based on his "understanding," his objection is unfounded since Plaintiffs have neither "won" nor "lost" the case.  Mr. Stover's, and other objectors', objections to the reasonableness of the amount of attorneys' fees is discussed more fully in the Court's ruling on Plaintiffs' attorneys' fees motion.

### b.   Objections by Valerie Large

Objector Valerie Large, a Canadian resident, notes that she only rents cars during week-long trips to the United States, which means she would not be able to take advantage of week-long rental rates if she chooses the voucher.  [Doc. No. 321.]  She states that the vouchers are useless to her because she would be exposed to higher costs associated with shorter-term trips.  Regardless of whether Ms. Large's assertion is true, she can nonetheless choose the cash settlement option, which refunds her substantially all of the actual damages class members suffered if she chooses.  Just because the voucher option may provide class members more than their actual damages does not render the cash settlement "derisory" or unfair.  Ms. Large also objects that she will be forced to conduct business with "a company with which [she] may not now choose to do business."  However, class members may choose not to conduct business with Defendants by choosing the cash settlement option, which, again, substantially reimburses class members their actual damages and does not force them to conduct business with the Rental Car Defendants.

### c.   Objections by Aaron H. Pratt

Objector Aaron H. Pratt opines that the true aim of Plaintiffs' suit is to "enrich legal professionals," and is "frivolous" because it "provides no meaningful or significant benefit to" class members.  [Doc. No. 319.]  Mr. Pratt further opines that there "is nothing morally wrong with passing a tax or a fee on to consumers."  With respect to Mr. Pratt's belief that this case provides no

07CV2174

meaningful or significant benefit to class members, the Court has found that, when compared to the low damages each individual class member sustained, the proposed settlement either makes class members substantially whole (the cash option) or provides class members significantly more benefit than the actual damages suffered (the voucher option).[9]  If Mr. Pratt believes the cash option is *de minimus*, that objection is unfounded, as $2 is substantial when compared to each class member's damages.  As for Mr. Pratt's opinion on the morality of passing taxes to consumers, his view is not a challenge to the fairness of the settlement, but a general observation about the merits of this case and his opinion about the propriety of Defendants' conduct.  Mr. Pratt is always free to opt out of the class if his beliefs compel him to do so, but he has not raised a valid basis to challenge the *fairness* of the settlement.

### d.      Objections by Ronald L. Harman

Objector Ronald L. Hartman, a member of the California State Bar, writes a scathing condemnation of class action litigation in general.  [Doc. No. 323.]  He essentially accuses the parties of colluding to settle the case for minimal benefit to class members in favor of Plaintiffs' attorneys, who he believes will receive an unreasonably large fee award, and Defendants, who he sees as benefitting from increased income from class members' use of the vouchers.  However, like Mr. Pratt, Mr. Hartman does not recognize that the damages each class member suffered were themselves very small.  In stating that, as part of the parties' class action fee-churning conspiracy, "[i]f a class member does not want a voucher, he receives a de minimus payment such as $2.00," Mr. Hartman misses the point that the cash option substantially compensates class members, and the voucher option, which is an added bonus, provides class members more than their actual damages.  A class member who chooses the voucher option certainly does not receive *de minimus* value.  In

---

[9]  Of course, the value of an object or monetary amount is relative and depends on context.  Objectors who deride the $2-per-day payment as illusory, worthless, or *de minimus* do so without evaluating the $2 within the context of their estimated actual damages.  $2 is a substantial recovery when compared to their estimated $3 in actual damages.  The objectors further ignore that those who have a claim for only one rental day receive *more* than their actual damages because the class settlement requires that every class member who chooses the cash option receive a minimum of $5.  Indeed, 10 out of the 12 objectors will receive $5 even though they have only one compensable rental day within the class period.  [Doc. No. 347 at 5.]  Thus, while they otherwise would be entitled to only $2–or 67% of their estimated actual damages–they will receive $5–or 167% of their estimated actual damages.  In the proper context, Objectors' condemnation of the $2 payment as *de minimus* is unfounded.

1    light of all the evidence before the Court, Mr. Hartman's objections to the fairness of the class

2    settlement are unfounded.  Moreover, as explained below, the Court finds no evidence of collusion

3    here.

4                      **e.**        **Objections by Michael J. Schulz**

5          Objector Michael J. Schulz lodges several objections.  First, he believes the "claims process

6    is too cumbersome" because the Rental Car Defendants know who is in the class and could "send

7    the cash option to everyone in the class who does not make a claim requesting the non-cash option."

8    [Doc. No. 339.]  However, there is nothing inherently objectionable with a claims-submission

9    process, as class action settlements often include this process, and courts routinely approve claims-

10   made settlements.  *See, e.g.*, *Guschausky v. Am. Family Life Assur. Co.*, 851 F. Supp. 2d 1252, 1259

11   (D. Mont. 2012); *Pelletz v. Weyerhaeuser Co.*, 255 F.R.D. 537, 544 (W.D. Wash. 2009) (approving

12   claims-made process where class members were required to "answer two reasonable claim forms

13   and submit a total of 10 photographs of the mold spotting."); *Lemus v. H&R Block Enters. LLC*,

14   2012 U.S. Dist. LEXIS 119026 (N.D. Cal. Aug. 22, 2012) (approving claims-made settlement where

15   unclaimed funds reverted to the defendants); *Morales v. Stevco, Inc.*, 2012 U.S. Dist. LEXIS 68640

16   (E.D. Cal. May 16, 2012) (recommending final approval of claims-made settlement); *Harris v.*

17   *Vector Mktg. Corp.*, 2012 U.S. Dist. LEXIS 13797 (granting final approval of claims-made

18   settlement) (N.D. Cal. Feb. 6, 2012).

19         Mr. Schulz next objects that "the 8-day cut-off for non-cash claims is arbitrary and

20   unreasonable."  This "8-day cut-off" refers to the settlement terms which grant class members a 1-

21   day rental voucher if they had between 1 and 7 days of qualifying rental days and a 2-day voucher if

22   they had 8 or more qualifying rental days.  Whether this "cut-off" is arbitrary is irrelevant, as it is a

23   term negotiated by the parties.  Mr. Schulz does not propose an alternative non-arbitrary cut-off or a

24   better method the parties should have used to calculate the cut-off, and the Court finds nothing

25   unreasonable or unfair about this term.

26         Next, without any explanation, Mr. Schulz asserts that the rental vouchers "have illusory or

27   no value."  The Court has addressed this objection in other portions of this Order.

28

1    Finally, Mr. Schulz objects that attorneys' fees are unreasonable, and the Court "should wait

2  until the claims are in, and it is determined how much was actually paid to the class before

3  determining a reasonable percentage for class counsel."  Mr. Schulz's objection necessarily assumes

4  that the Court will–or should–employ the "common fund" percentage method of calculating

5  attorneys' fees.  However, here, the Court uses the more time-consuming "lodestar" method.  In any

6  event, even if the Court employed the common fund approach, the Court could nonetheless gauge

7  the reasonableness of the fee award by using the "percentage-of-the-recovery method" by

8  "reasonably estimat[ing] the settlement value based on the terms agreed by the parties."  *Guschausky*

9  *v. Am. Family Life Assur. Co.*, 851 F. Supp. 2d 1252, 1258-59 (D. Mont. 2012) (discussing *Shaffer v.*

10  *Cont'l Cas. Co.*, 362 Fed. Appx. 627, 631 (9th Cir. Jan. 12, 2010), and related cases).  There is no

11  need to wait until all class members have filed claims to award attorneys' fees.

12    **f.    Objections by Steven C. Signer**

13    Objector Steven C. Signer, through counsel, objects both to the fairness of the settlement and

14  the requested attorneys' fees.  First, he objects that the cash option is nominal when compared to the

15  voucher option, which he avers is an attempt to steer class members to the voucher option and

16  continued business with Rental Car Defendants.  [Doc. No. 329.]  The cash-option value objection

17  has already been addressed.  As for Mr. Signer's belief that the parties intended to steer class

18  members to the voucher option, that "goal" clearly has not been accomplished because nearly twice

19  as many class members have chosen the cash option over the voucher option so far.  [Decl. of

20  Patrick M. Passarella, Doc. No. 343-3 at ¶ 39 (declaring that, of the claims submitted as of October

21  12, 2012, 108,619 were for the cash option while 61,732 were for the voucher option).]

22    Mr. Signer next objects that the settlement agreement's "clear sailing" provision, whereby

23  Defendants agree not to oppose Plaintiffs' motion for attorneys' fees and incentive award, suggests

24  the presence of collusion.  The Court addresses Objector Signer's objection to the "clear sailing"

25  provision below in its discussion of the same objection by Objector Hansmeier.

26    **g.    Objections by Stephen E. Hagen**

27    Objector Stephen E. Hagen objects to portions of the claims process and raises issues with

28  class notice.  [Doc. No. 334.]  With respect to the claims process, Mr. Hagen objects to the

1   requirement of an "ID Number" to file a claim.  He claims class members who lose their class notice

2   or receive notice through publication are effectively barred from filing a claim because they do not

3   have an ID number.  However, although an identification number is required to file a claim *online*,

4   the website dedicated to this matter also allows class members to download a blank Election of

5   Benefits Form, which does not require an ID Number.  *See* Election of Benefits Form, *available at*

6   http://www.acftcasettlement.com/Documents/HZS0001/HZS_EOB_web.pdf (last visited November

7   1, 2012).  Class members who do not have an ID Number can submit their claim form via mail.

8         With respect to class notice, Mr. Hagen points out that the hyperlink in the initial class notice

9   email he received did not work.  He admits that he received a second email, which included a

10  working link, but asserts that it  did not mention the broken link in the first email.  However, the

11  significance of these observations is unclear, as the fact remains that the mistake was fixed and class

12  members were given an operative hyperlink.  Moreover, according to the parties, the first email had

13  several hyperlinks, only one of which was broken.  Although Mr. Hagen avers that "[a] discouraged

14  claimant, unable to file a claim after reading the first notice, would likely ignore any subsequent

15  notice," this observation appears purely anecdotal.  Even had the broken hyperlink been the most

16  convenient way to access the claims website, it was not the *only* way to do so.  For instance, class

17  members could have typed the address of the claims website into their web browser and navigated

18  directly to the site.

19        Mr. Hagen also raises issues regarding the use of "stale" or outdated address information

20  when mailing the class notice.  While the Court shares Mr. Hagen's genuine desire to ensure proper

21  class notice and certainly appreciates his efforts in bringing his concerns to the Court's attention, the

22  Court is satisfied that the parties and the class administrator made reasonable efforts to reach class

23  members.  Class members who did not receive individualized notice still had opportunity for notice

24  by publication, email, or both.  Patrick Passarella, Vice President of Class Action Services at

25  Kurtzman Carson Consultants LLC, submitted a detailed declaration that convinces the Court that

26  the class notice mailing procedure, as implemented, was reliable and adequate.  [*See* Doc. No. 343-3

27  at ¶¶ 35-38.]  The Court is satisfied that the redundancies in the parties' class notice procedure–

28  mailing, e-mailing, and publication– reasonably ensured the widest possible dissemination of the

1    notice.  Indeed, the efficacy of these overlapping notice efforts is evidenced in the objection filed by

2    Objector Valerie Large–a Canadian resident and someone who Mr. Hagen argues was likely

3    "ignored by the notice process" because she does not have a U.S. address.  Having considered Mr.

4    Hagen's objection, the parties' responses, and Mr. Passarella's declaration, the Court respectfully

5    disagrees with Mr. Hagen's concerns and consequently declines his request to delay the final

6    approval hearing.

7                    **h.    Objections by Andrew Cesare, Cery Perle, Gary Bishop,
                              and Frank DeJulius**

8

9           Objectors Andrew Cesare, Cery Perle, Gary Bishop, and Frank DeJulius, collectively and

10   through counsel, object to the claims process and method of calculating attorneys' fees.  [Doc. No.

11   335.]  First, they contend that the claims-made "process is intended to minimize relief" because

12   "[r]equiring claim form submittals generally results in a claims rate of less than 10%."  They cite no

13   case within the Ninth Circuit and only one case from the District of Maine in support of this

14   proposition.  The Court has a much different view of the intent of the claims-made feature of this

15   settlement.  Rather than including this feature with the intent to *minimize* claims, the actual intent of

16   the claims process is to allow class members the opportunity to *choose* between several payment

17   options.  The parties would otherwise have no way of knowing whether a particular class member

18   wants to receive the cash option or the rental voucher.  In *Sylvester*, the sole case Objectors cite,

19   there was no indication that class members had an option between different payments.  Accordingly,

20   the Court does not assign to the parties the sinister intent Objectors advocate.  *See Sylvester v. Cigna*

21   *Corp.*, 369 F. Supp. 2d 34, 42 (D. Me. 2005) (class members who filed a valid claim form received

22   $51.97).

23          Objectors next challenge the amount of attorneys' fees and aver that "attorneys fees must be

24   linked to [the] actual value of settlement."[10]  However, Objectors' position ignores that two methods

25   _____

26          [10]  In doing so, it appears that Objectors misunderstand the cash option: "Cash claimants must
     demonstrate they rented a car for a minimum of three days during the relevant time frame[.]  [T]his
27   minimum claim will net them the whopping sum of $6.00."  This is incorrect.  Class claimants are
     entitled to $2 per rental day and a $5 minimum payment.  Thus, for example, a class member whose
28   claim is for only one rental day would receive $5.  Based on their misunderstanding, Objectors then
                                                                                        (continued...)

exist for calculating attorneys' fees, and, as discussed below, that the lodestar–rather than the "percentage of the common fund"–method is the most appropriate in cases like the one at bar.  The Objectors further do not acknowledge that, even under the common fund approach–which, again, the Court does not apply here–the Court is not *required* to compare requested attorneys' fees against the actual settlement payouts.  *See, e.g.*, *Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289, at *32-*33 (E.D. Cal. Sept. 1, 2011) (citing cases); *see generally Petersen v. Lowe's Hiw, Inc.*, 2012 U.S. Dist. LEXIS 123018, at *9 (N.D. Cal. Aug. 24, 2012) (citing *Williams v. MGM-Pathe Commc'n Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997)) (in common fund settlements, the fee percentage awarded is based on the total common fund rather than the funds actually paid to class members); *see also Iorio v. Allianz Life Ins. Co. of N. Am., Inc.*, 2011 U.S. Dist. LEXIS 21824, at *36 (S.D. Cal. Mar. 3, 2011) (cross-checking $18,000,000.00 lodestar-calculated fees award against the settlement's "'full utilization value' (*i.e.*, the value of the benefits made available to the Class) and 29.95% of the Settlement's 'projected utilization value' midpoint, (*i.e.*, the midpoint of the range of the projected value of the benefits which will be received by the Class).").

### i.    Objections by Gordon Hansmeier

Objector Gordon Hansmeier, through counsel, has filed by far the most lengthy objection to the class settlement and attorneys' fees request.[11]  To the extent the Court has not addressed his objections above, the Court addresses each new objection in turn.  First, Objector Hansmeier asserts "this settlement displays each and every one of the red flags and 'subtle signs' of collusion identified by the Ninth Circuit in *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011)."  Although *Bluetooth* is distinguishable on several grounds, the Court limits its analysis to

---

[10](...continued)
assert:  "Claimants who were subjected to the illegal practice for one or two days may only claim coupons."  This is also incorrect.

[11]  On October 22, 2012, Objector Hansmeier filed a "reply" to the parties' responses to the objectors' objections.  Neither the Local Rules nor the Court's preliminary approval Order allow *Objector Hansmeier* to file such a document in the current proceedings.  Objector Hansmeier also did not seek leave of Court to file this document.  Accordingly, the Court declines to specifically address the arguments made therein.  Nonetheless, the Court has reviewed the filing and finds it unpersuasive.

07CV2174

the three "subtle" or "warning" signs of collusion identified in that case,[12] and which Objector Hansmeier asserts exist in the parties' settlement.

First, Objector Hansmeier asserts that class counsel has "negotiated a 'claims made' settlement which does not guarantee a distribution of cash or coupons to the class whatsoever," and has simultaneously "negotiated for themselves to receive [fees] in cash withing ten days of the Court's order and judgment. Thus, Class Counsel would guarantee an ample reward for themselves even while the class distribution remains entirely speculative." However, as explained below, the Court's application of the lodestar method convinces the Court that Plaintiffs' sub-lodestar fee request is eminently reasonable despite Objector's belief that the "guaranteed" award is "ample"–a characterization that muddies the waters, but provides no substantive analysis. In any event, *Bluetooth* does not support Objector's position, as the trial court in that case had not addressed a number of factors and, as a result, did not satisfy the appellate court that it had fully evaluated the fairness of the settlement. *Id.* at 947-48. Here, the Court has taken pains to analyze the settlement and has made express findings that do not implicate the Court's concerns in *Bluetooth*. Indeed, in *Bluetooth*, the parties had negotiated a fee award 8 times higher than the fixed *cy pres* relief negotiated for the class. *See id.* at 947-48. In stark contrast, the parties in this case have negotiated a settlement that provides direct payment to class members and the value of which dwarfs the negotiated fee amount. In this case, as the Court has explained elsewhere in this Order, there simply is no evidence of an effort to short-change the class so that class counsel may be unjustly enriched.

Second, Objector Hansmeier asserts, without any substantive analysis of the resulting implications, that the settlement agreement contains a "free sailing" agreement. The Court thus

---

[12] The Court in *Bluetooth* identified the following signs on possible collusion:

(1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;

(2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds . . . ; and

(3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Bluetooth*, 654 F.3d at 947 (internal quotations and citations omitted).

07CV2174

turns its analysis to the Ninth Circuit's concern that such provisions *may indicate* collusion.[13]  First and foremost, the Court has placed little to no value on the fact that Plaintiffs' fee request is uncontested.  Further, as discussed below, the Court finds no evidence of collusion in the settlement process.  As far as the possible existence of collusion in negotiating the uncontested attorneys' fees request, the Court finds no evidence of collusion in that process either.  The fee amount was negotiated separately and only after the class settlement was finalized.  The parties also agreed that the class settlement would not hinge on whether they could successfully negotiate a fee amount.  Therefore, the parties took the risk that they would not be able to successfully negotiate a resolution of the attorneys' fees issue and the matter would be decided by the Court without their guidance.  Individually, each side also took the risk that the final fee amount would be more or less than they envisioned.  Further still, there is no evidence that Plaintiffs "negotiated away" anything to garner a higher fee amount.  The cash option represents *at least* a two-thirds recovery of actual estimated damages, and the voucher option represents a recovery many times more than actual damages.  Despite certain objectors' assertion that the settlement has no value, the Court has expressly found that the settlement provides substantial value to the class in light of their actual damages.  Had class counsel colluded to reduce the class recovery amount in exchange for higher fees, the settlement would not provide such a substantial value to the class.  Moreover, as discussed below, the parties' negotiated fee amount is *less* than the Court could have awarded on its own.  Had the parties colluded to garner higher fees, it is likely their fee request would have been much higher given the Court's conclusion below that the lodestar method is appropriate and reasonable given the sheer amount of work it took to litigate this case.  Finally, unlike in *Bluetooth*, the fee request here is not disproportionately *higher* than the benefits negotiated for the class–indeed it is much *lower*.

     The third and final "warning sign" identified in *Bluetooth* simply is not a factor in this case.  The settlement in *Bluetooth* "contained a 'kicker':  all fees not awarded would revert to defendants

---

[13] "The very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class.  Therefore, when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested."  *Id.* at 948 (internal quotations, alteration, and citations omitted).

1    rather than be added to the *cy pres* fund or otherwise benefit the class." *Id.* at 947.  Objector

2    Hansmeier asserts that this warning sign exists in this case because the Court's reduction of the fee

3    request will result in a "savings" for Defendants.  However, because the attorneys' fees in this case

4    are wholly separate from the class settlement–and will have no impact one way or the other on the

5    amount the class recovers–a "savings" for Defendants does not implicate the concerns the Ninth

6    Circuit expressed about the "kicker" provision in the *Bluetooth* settlement.  *Cf. id.* at 949.  In any

7    event, even *if* the Court believed the three *Bluetooth* warning signs existed in this case, the Court has

8    fully "assure[d] itself that the fees awarded in the agreement were not unreasonably high."  *Id.*

9    (citations and internal quotations omitted).

10          Objector Hansmeier's next objection relies on his assertion that the Class Action Fairness

11   Act ("CAFA") governs approval of this settlement, which he classifies as a "coupon settlement"

12   because it "contains a large 'coupon settlement' component."  The Court addresses this objection

13   under separate header below.

14          Objector Hansmeier's third objection relies on the applicability of CAFA and asserts that,

15   "[e]valuating whether the Proposed Settlement is fair, adequate, and reasonable requires the Court to

16   compare the value of the claims surrendered by the class to the value of the relief the class will

17   receive under the settlement terms."  The Court undertakes this analysis, including Objector

18   Hansmeier's reliance on *Sobel v. Hertz Corp.*, 2011 U.S. Dist. LEXIS 68984 (D. Nev. June 27,

19   2011), in its discussion of CAFA below and elsewhere in this Order.

20          Finally, Objector Hansmeier argues that the "limited information before the Court shows a

21   fee-driven settlement, certain to result in minimal class recovery."  [Doc No. 331 at 19-26.]  The

22   Court disagrees.  The claim submission rate to date is on par with similar class action settlements,

23   and the Court declines the invitation to infer that the parties intended to keep the redemption rate

24   low.  Given the fact that class members must *choose between* different payment options, the claim

25   process makes eminent sense.  As of October 12, 2012, 170,579 class members submitted claim

26   forms, representing a response rate of approximately 4.9%.  However, this arguably low response

27   rate does not heavily weigh against approval of the settlement for several reasons.  First, the

28   settlement is otherwise fair and represents a recovery of a substantial percentage of actual estimated

damages. *Accord Touhey v. United States*, 2011 U.S. Dist. LEXIS 81308, at *21-*22 (C.D. Cal. July 25, 2011) (finding that 2% response rate did not militate against final approval because, *inter alia*, settlement was fair to class members). Second, class members may continue to file claim forms until January 25, 2013–an additional 3.5 months beyond the date used for the 4.9% response rate calculation. As claims continue to come in, the response rate will increase. Third, the response rate to date may be the result of a variety of factors including procrastination or lack of interest. In short, a 4.9% response rate–which will be higher once the claim period ends–does not diminish the fairness of the settlement. *Accord White v. Experian Info. Solutions, Inc.*, 803 F. Supp. 2d 1086, 1100 (C.D. Cal. 2011) ("[T]his underwhelming [5%] response rate does not mean that the Settlement, on the whole, is not fair, reasonable and adequate."); *Touhey*, 2011 U.S. Dist. LEXIS 81308, at *21-*22; *see also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 526 (E.D. Mich. 2003) (finding favorable class reactions in a 6.9% response rate–1800 proofs of claim out of 26,000 notices sent–and a 9% response rate–37,000 proofs of claim out of over 400,000 notices sent); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 2011 U.S. Dist. LEXIS 40843, at *25 (D. Me. April 13, 2011) (finding favorable class reaction in a 3.9% response rate–438,169 claims out of 11.3 million eligible claimants). Indeed, many of the cases upon which Objector Hansmeier relies *approved* settlements with *lower* redemption rates than in the case at bar. *In re TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 397, 406 (D. Mass. 2008) (approving entire amount of attorneys' fees request after previously approving settlement with response rate of slightly more than 3%); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 370 F. Supp. 2d 320, 321 (D. Me. 2005) (noting prior approval of settlement that yielded 2% claim rate); *Strong v. BellSouth Telcoms., Inc.*, 173 F.R.D. 167, 169, 172 (W.D. La. 1997) (noting prior approval of settlement that yielded 4.3% claim rate); *Yeagley v. Wells Fargo & Co.*, 2008 U.S. Dist. LEXIS 5040, at *1, *5-*7 (N.D. Cal. Jan. 18, 2008) (reducing attorneys' fees request after previously approving settlement with less than 1% claim rate).

Based on the foregoing, and in addition to discussions in the remainder of this Order, all objections are **OVERRULED**.

07CV2174

### vi.   Absence of collusion in the settlement process

In addition to the above considerations, the Court has an obligation to "satisfy itself that the settlement was not the product of collusion." *Browning v. Yahoo! Inc.*, 2007 U.S. Dist. LEXIS 86266, at *38 (N.D. Cal. Nov. 16, 2007).  This negotiation process spanned more than a year and involved 7 separate sessions with two different judges.  The parties first met with Magistrate Judge William McCurine Jr. on February 14, 2011.  Thereafter, the parties met with The Honorable Ronald M. Sabraw (ret.) of JAMS for *six* separate private mediation sessions and participated in "multiple" teleconferences with Judge Sabraw.  [Judge Sabraw Decl., Doc. No. 328-6 at ¶ 4.]  In his declaration, Judge Sabraw provides his first-hand account of the of settlement negotiations:

> The matter was complex and contentious and the parties submitted extensive Mediation Statements with numerous exhibits detailing the factual legal and procedural issues entailed in this antitrust class action.  Mediation sessions were substantive and focused on the numerous factual disputes and legal issues and claims that were being litigated.  The mediation sessions and materials submitted demonstrated that both parties faced significant risks and were advancing sharply contrasting theories and views both on liability and damages.  It was readily apparent that the matter, if litigated, would be highly contested by able counsel to an uncertain result.
>
> The negotiations were vigorous, contentious and arms-length.  For example, when the initial three days of mediation found the parties at a very significant distance from each other, further extensive discovery ensued both on core liability issues as well as expert analysis of class certification and damages issues.  . . . .  It was apparent that all counsel were well informed of the strengths and weaknesses of their respective cases when they reached agreement.

[*Id.* at ¶¶ 5-6.]

The Court is very satisfied that the settlement process did not involve collusion.  The Court partly bases its conclusion on Judge Sabraw's participation, the sheer number of mediation sessions, and Judge Sabraw's first-hand description of the process.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (participation of mediator is not dispositive, but is "a factor weighing in favor of a finding of non-collusiveness."); *accord Amunrud v. Sprint Commc'ns Co.*, 2012 U.S. Dist. LEXIS 17258, at *10 (D. Mont. Feb. 10, 2012) (finding absence of signs of collusion based, in part, on mediator's participation); *In re HP Laser Printer Litig.*, 2011 U.S. Dist. LEXIS 98759, at *12-*13 (C.D. Cal. Aug. 31, 2011) (same).  The protracted and hard-fought nature of this case further militates against the existence of collusion.  It is highly unlikely that parties who

1  seek to collude would spend nearly a million dollars in costs (by Plaintiffs alone) and devote

2  thousands upon thousands of valuable attorney hours to the matter.  Rather, had the parties sought to

3  collude, they would have been much more likely to reach a collusive settlement as quickly and

4  cheaply as possible to minimize their costs and attorney time while maximizing their personal

5  recovery.  Finally, the substantial nature of the class recovery in this case further supports the

6  absence of collusion.  There are *no* objective signs of collusion in this case.

7                               **vii.    Class Action Fairness Act Considerations**

8              As mentioned above, Objector Hansmeier asserts the settlement in this case is a "coupon

9  settlement" and avers that the Class Action Fairness Act mandates heightened scrutiny of such

10  settlements.

11             When applicable, special considerations arise in cases involving coupon settlements.  CAFA

12  allows a court to approve coupon settlements "only after a hearing to determine whether, and

13  making a written finding that, the settlement is fair, reasonable, and adequate for class members."

14  28 U.S.C. § 1712(e).  Although this "fair, reasonable, and adequate" standard is identical to that

15  contained in Rule 23(e)(2), "several courts have interpreted section 1712(e) as imposing a

16  heightened level of scrutiny in reviewing such [coupon] settlements."  *True v. Am. Honda Motor*

17  *Co.*, 749 F. Supp. 2d 1052, 1069 (C.D. Cal. 2010) (citing *Synfuel Techs., Inc. v. DHL Express*

18  *(USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006); *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d

19  1292, 1321 (S.D. Fla. 2007)).  Likewise, Rule 23 itself may require closer scrutiny of coupon

20  settlements.  *See* Fed. R. Civ. P. 23(h), 2003 Advisory Committee Notes ("Settlements involving

21  non-monetary provisions for class members also deserve careful scrutiny to ensure that these

22  provisions have actual value to the class.").  Accordingly, before granting final approval, the court

23  "must discern if the value of a specific coupon settlement is reasonable in relation to the value of the

24  claims surrendered."  *True*, 749 F. Supp. 2d at 1069.

25             It is unclear whether CAFA applies to the settlement in this case.  Objector claims the

26  vouchers for free car rental days are "coupons" within the meaning of CAFA.  Although CAFA

27  defines various other terms, it does not define what constitutes a "coupon."  *See* 28 U.S.C. § 1711.

28  Persuasive authority supports Defendants' position that CAFA does not apply to settlements, such as

this one, that offer the option between cash and vouchers for free products (as opposed to *discounts*

on products where class members are required to purchase the products and pay the difference

between the full and coupon-discounted price).  For example, in an unpublished memorandum, the

Ninth Circuit recently observed:

> The settlement gives every class member the option to receive its share of the settlement proceeds in cash or cash-equivalent forgiveness of indebtedness already incurred.  This is not a "coupon settlement" and therefore does not trigger the Class Action Fairness Act of 2005's limitations on contingent fees awarded in connection with such settlements.

*CLRB Hanson Indus., LLC v. Weiss & Assocs., PC*, 465 Fed. Appx. 617, 619 (9th Cir. 2012).

Moreover, while Objector Hansmeier urges the Court to follow *Sobel*, it appears that case

implicated CAFA because it was "strictly [a] coupon settlement" that did not involve a "settlement

fund or any provision of cash payments to the Settlement Class."  *Sobel v. Hertz Corp.*, 2011 U.S.

Dist. LEXIS 68984, at *13 (D. Nev. June 27, 2011).  The Court is not convinced that CAFA controls

the parties' settlement.[14]

However, even *if* CAFA applied here, the Court has undertaken the "heightened analysis"

Objector Hansmeier advocates.  Specifically, the Court has satisfied CAFA's requirement that a

hearing be held and the Court's findings be in writing.  *See* 28 U.S.C. § 1712(e).  Moreover, the

Court has considered the value of the rental vouchers in comparison to the estimated actual damages

and has concluded that the settlement provides class members substantial value in comparison to the

individual claims surrendered.  Indeed, many of the concerns about the true value of the coupons in

*Sobel* are not implicated here.  *See Sobel*, 2011 U.S. Dist. LEXIS 68984, at *34-*38.  The Court

reiterates its finding that the rental vouchers in this settlement offer real and substantial value in

relation to class members' injuries, and that the settlement as a whole is fair, reasonable, and

adequate in light of the totality of the Court's discussions.  The Court is satisfied that the settlement

---

[14]  Objector Hansmeier also cites 28 U.S.C. section 1712(c) for the proposition that, "[t]he fact that class members have a *cash option* does not change the fact that this is a coupon settlement—Congress specifically recognized that coupon settlements may have a 'mixed basis,' where, as here, coupons are mixed with *other forms of recovery*."  [Doc. No. 331 at 13 (emphasis added).]  The Court is not persuaded.  Section 1712(c) addresses calculation of attorneys' fees in a settlement that involves "an award of coupons to class members and also provides for *equitable relief, including injunctive relief*," (emphasis added), not monetary relief in the form of cash payments as Objector Hansmeier argues.

1    in this case does not violate Congress's concern that in many cases "counsel are awarded large fees,

2    while leaving class members with coupons or other awards of little or no value."  Pub. L. No. 109-2,

3    119 Stat. 4, § 2(a)(3).

4         **3.      Conclusion**

5         The Court **GRANTS** the motion for final approval, finding that the settlement is

6    fundamentally "fair, adequate and reasonable" under Rule 23(e).  The Court expressly finds that no

7    evidence of collusion exists in the settlement of class members' claims.

8    **B.      Motion for Award of Attorneys' Fees, Costs, and Class Representative Award**

9         Plaintiffs seek an award of attorneys' fees and costs in the amount of $5,870,000, which

10   represents $5,123,336 in attorneys fees and $746,664 in costs.  After negotiating and finalizing the

11   class settlement, the parties separately negotiated the fees and costs award with Judge Ronald

12   Sabraw's assistance.  Defendants agreed to pay these fees and costs in addition to the class

13   settlement, which the parties agreed would not be reduced by any attorneys fees and costs.  Nor

14   would the parties' willingness to go forth with the settlement hinge on the Court's approval or

15   alteration of the negotiated award.

16        **1.      Relevant Law**

17        Rule 23(h) of the Federal Rules of Civil Procedure provides that, "[i]n a certified class

18   action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by

19   law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  "Where a settlement produces a common

20   fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or

21   the percentage-of-recovery method."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942

22   (9th Cir. 2011).  "Because the benefit to the class is easily quantified in common-fund settlements,

23   we have allowed courts to award attorneys a percentage of the common fund in lieu of the often

24   more time-consuming task of calculating the lodestar."  *Id.*  However, "[t]he 'lodestar method' is

25   appropriate in class actions brought under fee-shifting statutes (such as federal civil rights,

26   securities, antitrust, copyright, and patent acts) . . . ."  *Id.* at 941.

27        "The lodestar figure is calculated by multiplying the number of hours the prevailing party

28   reasonably expended on the litigation (as supported by adequate documentation) by a reasonable

hourly rate for the region and for the experience of the lawyer." *Id.* "Though the lodestar figure is presumptively reasonable, the court may adjust it upward or downward by an appropriate positive or negative multiplier reflecting a host of 'reasonableness' factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment. Foremost among these considerations, however, is the benefit obtained for the class." *Id.* at 941-42 (internal quotation marks and citations omitted).

**2.     Analysis**

Because Plaintiffs pursued claims under statutes with fee-shifting provisions, 15 U.S.C. § 15(a); Cal. Govt. Code § 11130.5; Cal. Code Civ. Proc. § 1021.5, the Court chooses to apply the lodestar method–not the common fund method–to calculate and evaluate attorneys' fees. Here, Plaintiffs provide the Court the following chart, which calculates the lodestar based on the four plaintiffs firms' total hours and blended average hourly rate:

| Firm | Hours | Rate Range | Avg. Rate | Total Lodestar |
|------|-------|-----------|-----------|----------------|
| Hulett, Harper, Stewart | 7,375.17 | $150-$675 | $473.07 | $3,488,939.75 |
| Sullivan, Hill, Lewin, Rez & Engel | 3,725.8 | $150-$540 | $463.38 | $1,726,467.00 |
| Center for Public Interest Law | 1,237.66 | $450-$600 | $549.07 | $672,686.00 |
| Freedman, Boyd, Hollander, Goldberg, Ives, & Duncan | 2,168.25 | $100-$400 | $227.39 | $493,035.00 |
| **Totals** | **14,506.9** | | **$439.87** | **$6,381,127.75** |

The Court first considers whether counsel's $439.87[15] average hourly rate is reasonable and finds that it is. A reasonable hourly rate is typically based upon the prevailing market rate in the community for "similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers v. City of L.A.*, 796 F.2d 1205, 1210 (9th Cir. 1986); *see also Davis v. City of S.F.*, 976 F.2d 1536, 1545-46 (9th Cir. 1992), *vacated in part on other grounds*, 984 F.2d 345 (9th Cir. 1993). In support of this rate, Plaintiffs first submit extensive documentation from the *National*

---

[15] The Court first finds that it is appropriate to use this blended hourly average as the rate for lodestar purposes. In reviewing the declarations submitted in support of the fees motion, it appears the attorneys with the highest billing rates performed the bulk of the work in this case. Therefore, this blended average rate represents a discount off the top billers' rates, meaning that the lodestar itself is discounted.

1   *Law Journal*, *The Wall Street Journal*, and other sources.  The *National Law Journal* data reveals

2   that rates at six national defense firms with San Diego offices averaged between $550 and $747 per

3   hour for partners and $346 and $508 per hour for associates.  *The Wall Street Journal* data reveals

4   that so-called "top billers" at five national firms charged between $1,025 and $1,250 per hour.

5          As for plaintiffs attorneys in the San Diego market, Plaintiffs cite *Hartless v. Clorox Co.*, 273

6   F.R.D. 630, 644 (S.D. Cal. Jan. 20, 2011) (Bencivengo, J.), in which this Court approved hourly

7   rates that ranged from $575 to $795 per hour for six local plaintiffs attorneys.  The low end was

8   awarded to a 1989 graduate of Duke Law School and the high end was awarded to a 1986 graduate

9   of the University of Tulsa College of Law.  The Court also approved a $655 rate for a 1990 graduate

10  of George Washington University and $585 rate for a 1995 graduate of U.C. Hastings.  Based on the

11  thorough declarations and exhibits that accompany Plaintiffs' fee motion, the Court finds class

12  counsel's skills and experiences comparable to local counsel, including the comparable local

13  plaintiffs' attorneys in the *Hartless* case.  Based on the detailed, ample data provided, the Court

14  further finds the four firms' average hourly rate of $439.87 is a reasonable hourly rate for counsel of

15  similar skill and experience in the San Diego legal market.

16         The Court next considers whether the four firms' collective devotion of 14,506.9 hours of

17  work to this matter is reasonable and finds that this number of hours is justified given the nature and

18  the course this case took.  Although counsel has not provided the Court with detailed time sheets,

19  such detailed time sheets are not necessary given the Court's intimate familiarity with this case and

20  the sheer amount of work and effort it took for the case to proceed to this point.  *See Fox v. Vice*,

21  131 S. Ct. 2205, 2216 (2011) ("[T]rial courts need not, and indeed should not, become

22  green-eyeshade accountants.  The essential goal in shifting fees (to either party) is to do rough

23  justice, not to achieve auditing perfection.  So trial courts may take into account their overall sense

24  of a suit, and may use estimates in calculating and allocating an attorney's time.  And appellate

25  courts must give substantial deference to these determinations, in light of the district court's superior

26  understanding of the litigation.") (internal quotations and citations omitted).  Over the course of the

27  past five years, this case has entailed a large number of mediation sessions, extensive briefing in

28  both trial and appellate courts, discovery disputes, lengthy meet and confer efforts, numerous court

appearances and contacts, 27 depositions across the country, and other extensive discovery-related work.  The issues were complex and required a substantial amount of research and analysis.  The documentary discovery produced to Plaintiffs was voluminous and required extensive organization, review, and analysis.  The parties also appeared before the Ninth Circuit Court of Appeals, which required extensive analysis, research, briefing and preparation for oral argument.  Additionally, throughout this case, counsel's briefing was extensive, thorough, and of exceptional quality–as evidenced by the two motions currently pending before the Court.  At every juncture, the case was hard-fought by both sides.  In short, superior quality takes time to produce, and given the contentious, novel, and complex nature of this case, the 14,506.9 hours spent on this case were reasonable and justified.[16]

Based on the foregoing, when multiplying the reasonable hourly rate by the number of hours, Plaintiffs' calculation of a $6,381,127.75 lodestar amount is both appropriate and "presumptively reasonable." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011) (citing *Cunningham v. Cnty. of L.A.*, 879 F.2d 481, 488 (9th Cir. 1988)).  In light of this presumptively reasonable lodestar, Plaintiffs' $5,123,336.00 fee request is reasonable, as it represents a *20% reduction* of the lodestar.

Next, although the Court chooses not to increase the parties' negotiated fee and costs amount, the Court nonetheless discusses the "reasonableness" factors, as they further support the parties' negotiated fees and costs.  First, the quality of representation in this matter was exceptional.  Class counsel fought hard for the class, employing nearly every possible litigation tool and succeeding on appeal before the Ninth Circuit.  As just a few examples of the quality of counsel's work, the motion for preliminary approval, motion for final approval, and the instant motion for fees and costs were impeccable, thorough, detailed, and stand as models for others to follow.  Second, the benefit obtained for the class was, particularly in the case of the voucher option, highly beneficial to the class.  While individual damages were only a few dollars per day, a class member who chooses

---

[16] This conclusion is supported by the unsurprisingly detailed and thorough joint declaration of Mssrs. Rez and Stewart.  This conclusion is also informed by some of the factors previously discussed in the section on approval of the class settlement.

to receive a voucher receives many, many times the value of his or her damages.  Third, the novelty

and complexity of the issues in this case are evident in the appellate work completed here.  While

the Ninth Circuit initially affirmed the Court's entry of judgment in the Commission's favor on

"state action immunity" grounds, the panel reversed itself after granting Plaintiffs' petition for

rehearing.  Thus, Class Counsel's work in this case resulted in published case law even before the

case concluded.  *See generally Shames v. Cal. Travel & Tourism Comm'n*, 626 F.3d 1079 (9th Cir.

2010).  Finally, counsel always faced the specter of nonpayment, which included $764,664 in out-of-

pocket advanced costs, in the event they did not recover for the class.  Thus, although the Court

could have justifiably adjusted the lodestar upward based on these factors, the Court chooses not to

disturb the parties' negotiated attorneys' fees amount.

        In finding that $5,123,336.00 is a reasonable fee award, it bears emphasizing that the

antitrust nature of this case played a significant role in the Court's decision to use the lodestar

method.  The Court acknowledges that some observers may view this award as being unjustifiably

large when compared to the ultimate value of cash and voucher redemptions.  In today's

environment of hostility towards class actions based on the perceived motivations behind such

lawsuits, it would be far too easy to unfairly paint all class actions with the same broad brush.  But,

where, as here, an antitrust action truly seeks to vindicate the public's interest when it otherwise may

have been ignored, many benefits may also inure in favor society at large.  For instance, while

antitrust actions may often compensate class members aggrieved in the past, they may also halt

practices that will benefit the public at large in unquantifiable ways in the future.  The Third Circuit

Court of Appeals has cogently explained the unique nature of "socially beneficial" actions like this

one and why a court may find the lodestar method beneficial in such a case:

> Courts generally regard the lodestar method, which uses the number of hours
> reasonably expended as its starting point, as the appropriate method in statutory fee
> shifting cases.  *Because the lodestar award is de-coupled from the class recovery, the
> lodestar assures counsel undertaking socially beneficial litigation (as legislatively
> identified by the statutory fee shifting provision) an adequate fee irrespective of the
> monetary value of the final relief achieved for the class.*
>
> *This de-coupling has the added benefit of avoiding subjective evaluations of
> the monetary worth of the intangible rights often litigated* in civil rights actions.
> Outside the pure statutory fee case, the lodestar rationale has appeal where as here, the
> nature of the settlement evades the precise evaluation needed for the percentage of

recovery method.  The lodestar method has the added benefit of resembling modes of fee determination in conventional bipolar litigation.  On the other hand, the lodestar method has been criticized as giving class counsel the incentive to delay settlement in order to run up fees while still failing to align the interests of the class and its counsel, and for not rewarding counsel incrementally for undertaking the risk of going to trial.

Courts use the percentage of recovery method in common fund cases on the theory that the class would be unjustly enriched if it did not compensate the counsel responsible for generating the valuable fund bestowed on the class.  *Because these [type of common fund] cases are not presumed to serve the public interest (as evidenced by the lack of a fee statute), there is no social policy reason that demands an adequate fee.*  Instead, the court apportions the fund between the class and its counsel in a manner that rewards counsel for success and penalizes it for failure.

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995) (citations and footnote omitted; emphasis added).  Although the Third Circuit's explanation referred to civil rights cases, the Courts finds no meaningful distinction between the unquantifiable, intangible rights litigated in civil rights cases and the unquantifiable future benefits bestowed upon the public at large in antitrust cases such as the one before the Court.  Here, in addition to the existence of express fee shifting statutes, the settlement potentially had the effect of halting a practice that allegedly would have injured the public for years to come.  Not only does the settlement substantially compensate aggrieved class members for alleged past harms, it potentially prevents future harm.  This outcome potentially results in millions upon millions of dollars in savings for an untold number of future California leisure renters.  The unrelenting cynic may perhaps scoff at the "trivial" few dollars each future renter may save for each rental day and question the public benefit achieved here, but the aggregate benefit of this settlement to the traveling public in California will be great.  How great?  This difficult question is precisely why the lodestar method is appropriate in this case.  It is also why comparison of the Court's fee award with the final value of redemptions is a patently unfair way to compensate class counsel in this case.  Such a comparison discounts the value of the benefit achieved for the class and undervalues class counsel's *substantial* efforts and the resulting long-term public benefits they secured.[17]

---

[17]  The Court's discussion here should not be interpreted as the Court's belief that Defendants actually engaged in the conduct alleged in the First Amended Complaint or that they are legally liable for any of the alleged conduct therein.  The Court merely wishes to emphasize the nature of this antitrust case and the intangible public benefit such cases often may pursue.  In this case, Plaintiffs indeed sought public benefits, as evidenced by their First Amended Complaint, and the settlement contains non-

(continued...)

07CV2174

1    Finally, class counsel seek reimbursement of their out-of-pocket expenses in the amount of

2    $746,664.  As with fees, reimbursement of costs here will be paid directly by Defendants and will

3    not reduce the funds available to the Class.  Class counsel are entitled to reimbursement of the

4    out-of-pocket costs they reasonably incurred investigating and prosecuting this case.  *See In re*

5    *Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1996) (citing *Mills v. Electric*

6    *Auto-Lite Co.*, 396 U.S. 375, 391-92 (1970)); *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir.

7    2003).  Given the length and scope of this litigation, the Court finds that class counsels'

8    out-of-pocket costs were reasonably incurred in connection with the prosecution of this litigation,

9    were advanced by class counsel for the benefit of the Class, and shall be reimbursed in full in the

10   amount requested.

11       **3.    Conclusion**

12       The Court **APPROVES** the award of attorneys' fees, as well as Class Counsel's request for

13   litigation costs and expenses, in the total amount of $5,870,000.00.[18]

14   _____

15       [17](...continued)
     monetary provisions that have potential to benefit the public at large.  The Court's discussion is in no

16   way an indication of Defendants' culpability.

17       [18]  The Court disagrees that *In re Petroleum Prods. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir.
     1997), compels a different result here.  That case involved a $5,120,000 common-fund settlement, where

18   the total settlement funds available to the class *were reduced by* the amount of attorneys' fees awarded
     to class counsel.  It was under those circumstances that the Ninth Circuit wrote:

19
         When Dunne's earlier fee award was appealed, *we vacated and remanded because*

20       *the district court had not considered the burden to the common fund of the other pending*
         *fee applications. State of Florida v. Dunne*, 915 F.2d 542, 546 (9th Cir. 1990).  "*The fact*

21       *that seventy-two percent of the common fund could be distributed in attorney's fees and*
         *costs in this case is disturbing.*"  *Id.*

22       . . . .
             It is reasonable for the district court to compare the lodestar fee, or sum of lodestar

23       fees, to the 25% benchmark, *as one measure* of the reasonableness of the attorneys' hours
         and rates.  . . . .  The district court should evaluate whether the *combined effect* of granting

24       the fee applications *in toto would be to reduce substantially the size of the common fund*
         *available for distribution to the plaintiff class.*  The plaintiff class should ordinarily receive

25       75% of the wealth the attorneys brought them, according to the 25% proper benchmark,
         at least where the size of the common fund does not make that benchmark arbitrary.  If the

26       lodestar amount overcompensates the attorneys according to the 25% benchmark standard,
         then a second look to evaluate the reasonableness of the hours worked and rates claimed

27       is appropriate.

28   *Id.* (emphasis added;  some internal quotations and citations omitted).   *Petroleum Products* is
                                                                           (continued...)

- 33 -

1    **C.      Class Representative Incentive Payment**

2            **1.      Relevant Law**

3            In assessing the reasonableness of an incentive award, several district courts in the Ninth

4    Circuit have applied the five-factor test set forth in *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp.

5    294, 299 (N.D. Cal. 1995), which analyzes (1) the risk to the class representative in commencing a

6    class action, both financial and otherwise; (2) the notoriety and personal difficulties encountered by

7    the class representative; (3) the amount of time and effort spent by the class representative; (4) the

8    duration of the litigation; and (5) the personal benefit, or lack thereof, enjoyed by the class

9    representative as a result of the litigation.  *See, e.g.*, *Carter v. Anderson Merchs., LP*, 2010 U.S. Dist.

10   LEXIS 55629 (C.D. Cal. May 11, 2010).

11           **2.      Analysis**

12           The only Class Representative in this case is Plaintiff Gary Gramkow.  Plaintiff Michael

13   Shames, though a named plaintiff, has not been put forth as a class representative and does not seek

14   an incentive award.  No class member has objected to Plaintiffs' intent to seek an incentive award of

15   $2,000 to Mr. Gramkow.  Moreover, class counsel aver that Mr. Gramkow "cooperated in discovery

16   and conferred with counsel on matters such as progress of the case and settlement and otherwise

17   assisted counsel in the prosecution of the case as requested."  The Court finds the arguably nominal

18   $2,000 incentive award for five years of service is well within the acceptable range of approval and

19   does not appear to be the result of collusion.  *See, e.g.*, *Villegas v. J.P. Morgan Chase & Co.*, 2012

20   U.S. Dist. LEXIS 114597, at *18 (N.D. Cal. Aug. 8, 2012) ("[T]he Settlement provides for an

21   incentive award to the Plaintiff in the amount of $10,000.  In this District, a $5,000 incentive award

22   is presumptively reasonable."); *Williams*, 2010 U.S. Dist. LEXIS 67731, at *19-*20 (approving

23   

24                   [18](...continued)

25   distinguishable.  Here, the settlement did not create a common fund.  *Cf. id.* at 605 ("The settlements
     produced a common fund of $5,120,000 for the people of Florida.").  Moreover, the "wealth" available

26   to the class is wholly independent of any attorneys' fees award, which will not reduce the amount
     available to the class in any way.  Thus, there is no danger here that a large portion of the wealth

27   available to the class–embodied in a common fund–will be diverted to class counsel to the detriment
     of the class.  *Cf. id.* (quoting *State of Fl. v. Dunne*, 915 F.2d 542, 546 (9th Cir. 1990) ("The fact that

28   seventy-two percent of the common fund could be distributed in attorney's fees and costs in this case
     is disturbing.")).

1    $5,000 award in an antitrust case settling for $440,000).

2        **3.    Conclusion**

3        The Court **APPROVES** the $2,000 incentive award to Plaintiff Gary Gramkow.

4                        **III.    CONCLUSION**

5        The Court **OVERRULES** all objections to the class settlement and fee award and

6    **GRANTS** Plaintiffs' motions in their entirety, finding the proposed settlement of this class action

7    appropriate for final approval pursuant to Federal Rule of Civil Procedure 23(e).  In doing so, the

8    Court finds that the proposed settlement appears to be the product of serious, informed,

9    non-collusive negotiations, has no obvious deficiencies, and does not improperly grant preferential

10   treatment to any individuals.  The Court finds that the settlement was entered into in good faith; that

11   the settlement is fair, reasonable and adequate; and that Plaintiffs have satisfied the standards for

12   final approval of a class action settlement under federal law.  Furthermore, as set forth above, the

13   Court finds the negotiated attorneys' fees and costs amount eminently reasonable in light of the

14   reasonableness of the number of hours and hourly rate used to calculate the lodestar and the

15   significant discount off the lodestar the negotiated award represents.  Finally, the class

16   representative incentive payment is reasonable.

17                **JUDGMENT AND ORDER OF DISMISSAL**

18       This Court **APPROVES** the settlement and **ORDERS** the parties to effectuate the settlement

19   agreement according to its terms.

20       The Court **DISMISSES** this case on the merits and with prejudice, pursuant to the terms of

21   the parties' settlement agreement.

22       Upon the effective date, the Plaintiff, and each and every class member, and anyone claiming

23   through or on behalf of any of them, shall be deemed to have, and by operation of this Judgment

24   shall have, fully, finally, and forever waived, released, relinquished, discharged, and dismissed each

25   and every one of the released claims against each and every one of the Released Persons, regardless

26   whether such class member shares in the settlement benefits.  Names of the persons who have

27   submitted timely and valid requests for exclusion from the class are set forth in Appendix 1 to this

28   Order.  This judgment shall have no binding effect on the persons named in Appendix 1.

If this Judgment and the settlement do not become final and effective in accord with the terms of the settlement agreement, then this Judgment and all orders entered in connection therewith shall be deemed null and void and shall be vacated.

The Court shall not retain continuing jurisdiction over implementation of the settlement or future disputes over construing, enforcing, or administering the settlement.

**IT IS SO ORDERED**.

DATED:  November 5, 2012

Hon. Michael M. Anello
United States District Judge

07CV2174

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# APPENDIX 1

07CV2174

**Shames v. Hertz**
**Exclusion Report 10/22/2012**

| | KCC ClaimID | Last Name | First Name |
|---|---|---|---|
| 1 | | ACOSTA | LINDA |
| 2 | | ALEJANDRA | JANET MEDOZA |
| 3 | | ALEXANDER | VERA |
| 4 | | ANDREA | MENICHI |
| 5 | | BARTH | CARINA |
| 6 | | BEDDAGE | DON |
| 7 | | BEHRENS | KENNETH |
| 8 | | BENISCH | DIANE |
| 9 | | BENNETT | DARREN JOHN |
| 10 | | BERNABEI | ANDREA |
| 11 | | BIRRELL | SANDRA |
| 12 | | BIRRELL | STEVEN |
| 13 | | BOHM | HARRY |
| 14 | | BORSARELLI | MARCO |
| 15 | | BRADOW | JOAN |
| 16 | | BRADOW | JOAN |
| 17 | | BRAUNS | JEFF |
| 18 | | BROWNING | JAMES |
| 19 | | BROWNING | JAMES |
| 20 | | BRUNNER | MARY |
| 21 | | BURWELL | BARBRA |
| 22 | | CANALI | DAVIDE |
| 23 | | CANTU | SUZANNE |
| 24 | | CARROLL | RAYMOND K |
| 25 | | CAVE | DAVID |
| 26 | | CELUSNEK | MARK |
| 27 | | CHAMBERLAIN | CHARLES |
| 28 | | CHANG | EILEEN |
| 29 | | CHELAZZI | GIULIANO SIG |
| 30 | | CHOE | YOUNG-SUN |
| 31 | | COYLE | PATRICIA |
| 32 | | CRITELLI | FRANCESCO A |
| 33 | | CURRIE | NANCY |
| 34 | | DAVIS | KENNETH |
| 35 | | DAVIS | NANCY |
| 36 | | DELL ELCE | SARA |
| 37 | | DI GIOVANNI | EMILIA |
| 38 | | DOERR | ARLENE M |
| 39 | | DRAGOS | PETER |
| 40 | | DYKSHOORN | LORINDA MARIE |
| 41 | | EVINS | TOMMY |
| 42 | | FIFE | KIM |
| 43 | | FRANCESCHI | MIRCO |
| 44 | | FREEMAN | DENNIS |

07-CV-2174-MMA(WMC)

**Shames v. Hertz**
**Exclusion Report 10/22/2012**

|     | KCC ClaimID | Last Name | First Name |
|-----|-------------|-----------|------------|
| 45  |             | GARNER    | BRUCE      |
| 46  |             | GATMAITAN | YSABEL     |
| 47  |             | GAUTIER   | CLAUDE     |
| 48  |             | GIANNONE  | LUCA       |
| 49  |             | GIBSON    | VICTORIA   |
| 50  |             | GRANT     | RONNIE     |
| 51  |             | GRANT     | RONNIE     |
| 52  |             | GRANT     | RONNIE     |
| 53  |             | GRANT     | RONNIE     |
| 54  |             | GUZMAN    | LILY       |
| 55  |             | HAMM      | WILLIAM    |
| 56  |             | HAY       | DIANE      |
| 57  |             | HINDS     | BILLY      |
| 58  |             | HINES     | JULIE      |
| 59  |             | HOBBS     | RICHARD    |
| 60  |             | HOBBS     | RICHARD    |
| 61  |             | HOLMES    | JACK       |
| 62  |             | HONSOWITZ | ALETHA     |
| 63  |             | HUTCHINSON| CLAIRE     |
| 64  |             | JACOBSON  | PERRY      |
| 65  |             | JOHNSON   | ROCKLYN    |
| 66  |             | KENNY     | EILEEN     |
| 67  |             | KIRSCH    | SUSAN      |
| 68  |             | KLEIN     | LASSE      |
| 69  |             | KOPP      | NICOLAS M  |
| 70  |             | KOZA      | CLAIRE     |
| 71  |             | KUNIHIRO  | MARIA      |
| 72  |             | LA SALLE  | PIERRE DE  |
| 73  |             | LANGE     | ROBERT     |
| 74  |             | LAUFER    | BRUNO      |
| 75  |             | LEE       | BEVERLY    |
| 76  |             | LEE       | CHIHPING   |
| 77  |             | LEWENSTEIN| ALAN       |
| 78  |             | LEWENSTEIN| ALAN       |
| 79  |             | LONG      | VICKI      |
| 80  |             | MAC       | LEAN CARRIE|
| 81  |             | MADSEN    | CAROLYN    |
| 82  |             | MANDZIARA | BRIAN      |
| 83  |             | MANJARRES | GINA       |
| 84  |             | MARLBOROUGH| DAVID     |
| 85  |             | MASCARENHAS| ROSEMARY  |
| 86  |             | MAY       | COURTNEY   |
| 87  |             | MAY       | REBECCA    |
| 88  |             | MCCOO     | JOHN       |

**Shames v. Hertz**
**Exclusion Report 10/22/2012**

| | KCC ClaimID | Last Name | First Name |
|---|---|---|---|
| 89 | | MCCORD | CARL |
| 90 | | MCDONALD | LEILANI |
| 91 | | MCMULLEN | STEPHEN |
| 92 | | MEDCALF | MARGARET |
| 93 | | MEDCALF | MARGARET |
| 94 | | MELCHIORI | ANDREA |
| 95 | | MEROD | JUDITH |
| 96 | | MESSENGER | DEBORAH |
| 97 | | MORESHEAD | JON |
| 98 | | MORGAN | DAVID |
| 99 | | MORGAN | NANCY |
| 100 | | NAIM | CYRILLE |
| 101 | | NEVES | FABRICIO |
| 102 | | OKE | HIROTAKA |
| 103 | | PALMER | BRIAN |
| 104 | | PALOMES | ANA |
| 105 | | PASMAN | SOLEDAD |
| 106 | | PATTERSON | KATHIE |
| 107 | | PETERSON | R EUGENE |
| 108 | | PINTO | HECTOR |
| 109 | | PRESTON | MARGRET |
| 110 | | READ | TERESA |
| 111 | | REICKMANN | KLAUS |
| 112 | | RICHENBURG | CHRISTINE |
| 113 | | RYAN | JULIE |
| 114 | | SACCO | PATRICK |
| 115 | | SALAZAR | ARMANDO |
| 116 | | SCARTEZZINI | JEAN LOUIS |
| 117 | | SMITH | WENDY |
| 118 | | SONDERER | NIKLAUS HERR |
| 119 | | SPACCASASSI | ENRICO |
| 120 | | SPEDA | |
| 121 | | STARKOVICH | JOSEPH |
| 122 | | STENSON | GLEN |
| 123 | | STERN | ROXANNE |
| 124 | | STORYBAKER | ANN |
| 125 | | STORYBAKER | ANN |
| 126 | | STORZ | ROLF |
| 127 | | TAKIZAWA | KAREN |
| 128 | | TASSONE | MARIA |
| 129 | | TERRY | WILLIAM |
| 130 | | THAKKAR | TUSHAR |
| 131 | | TO | CHINH |
| 132 | | TSUCHIDA | YASUSHI |

07-CV-2174-MMA(WMC)

**Shames v. Hertz**
**Exclusion Report 10/22/2012**

| | KCC ClaimID | Last Name | First Name |
|---|---|---|---|
| 133 | | VANDENBERG | WILLEM |
| 134 | | VARELA | YVONNE |
| 135 | | WALLACE | GREG |
| 136 | | WALLACE | GREGORY |
| 137 | | WALLACE | KEITH |
| 138 | | WARD | JANET |
| 139 | | WARD | RICHARD |
| 140 | | WELSBY | GEORGE |
| 141 | | WELTE | ELISABETH |
| 142 | | WHITE | THOMAS |
| 143 | | WHITE | YONG SOOK |
| 144 | | WILSON | ANN WARKENTIN |
| 145 | | WINTER | MARY |
| 146 | | WITTER | MICHAEL |
| 147 | | WONG | CHRISTINE MISS |
| 148 | | YOUNG | CLAUDE |
| 149 | | YOUNG | PATRICIA |
| 150 | | YOUNG | PATRICIA |
| 151 | | YUNG | VIVIEN WAI WAN |
| 152 | | ZHU | YUN |
| 153 | | ZIMMERMAN | THOMAS |

07-CV-2174-MMA(WMC)